PUBLIC VERSION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

YANPING CHEN,                                )
                                             )
            Plaintiff,                       )
                                             )      **Case No. 1:18-cv-03074-CRC**
      v.                                     )
                                             )      **Hon. Christopher R. Cooper**
FEDERAL BUREAU OF INVESTIGATION,             )      **United States District Judge**
U.S. DEPARTMENT OF JUSTICE,                  )
U.S. DEPARTMENT OF DEFENSE, U.S.             )
DEPARTMENT OF HOMELAND SECURITY,             )      **Oral Argument Requested**
                                             )
            Defendants.                      )
                                             )

## MEMORANDUM IN SUPPORT OF NON-PARTY CATHERINE V. HERRIDGE'S MOTION TO QUASH

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
Patrick F Philbin (453620)
pphilbin@egcfirm.com

1155 F Street, NW, Suite 750
Washington, DC 20004
Telephone: (202) 249-6900
Facsimile: (202) 249-6899

*Counsel for Catherine V. Herridge*

July 29, 2022

PUBLIC VERSION

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ...................................................................................................1

BACKGROUND .....................................................................................................4

      1.      Information from an FBI Informant, a Chinese Military Expert, and Other Sources ...................................................................6

      2.      Information allegedly subject to the Privacy Act .........................8

ARGUMENT .........................................................................................................13

I.     The Subpoenas Should Be Quashed Because They Invade the First Amendment Journalist's Privilege..............................................................13

     A.     The Subpoenas Seek Information Protected by the Journalist's Privilege. ..........16

     B.     Plaintiff Cannot Show That the Information Sought in Her Subpoenas Is "Central" to Her Case Because the Subpoenas Are Vastly Overbroad. ................16

     C.     Plaintiff Cannot Carry Her Burden of Showing That She Has Exhausted Alternative Avenues of Discovery.........................17

     D.     The Public Interest in First Amendment Protections That Support a Robust Free Press Outweighs Plaintiff's Personal Interest in Seeking Damages in Her Privacy Act Lawsuit...........................22

           1.     *Zerilli* Calls for a Balancing of Interests.................................22

           2.     The Balance of Interests Overwhelmingly Favors the Public Interest in First Amendment Protections that Promote a Robust Free Press. ........................26

                a.     Plaintiff's Personal Interest in Damages Weighs Little in the Balance, Especially Given the Weaknesses in her Claims. .......................26

                      (i)     Plaintiff Cannot Obtain Privacy Act Damages for DoD's Decision to Terminate Tuition Assistance "Based on National Security Grounds." ...........................27

                      (ii)    All the Key Elements of the Story Appeared in the Fox Reporting Through Sources *Other Than* the Few Pieces of Information Allegedly Implicating the Privacy Act...................................29

(iii)   Virtually All the Information Underpinning
Plaintiff's Claims Was an FBI Affidavit That
Was Legally a Matter of Public Record Since 2013..........31

(iv)    This Case Is Not Like *Hatfill* or *Lee,* Where the
Government Had Made Egregious Errors.........................34

b.   The Public Interest in First Amendment Protections for a
Free Press Overwhelms Plaintiff's Interest in Damages................36

II.   The Subpoenas Should Be Quashed Because They Invade the Newsgathering
Privilege under Federal Common Law. ..........................................................39

CONCLUSION....................................................................................................45

ii

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Albright v. United States*,
    732 F.2d 181 (D.C. Cir. 1984) ................................................................................... 27

*Alemu v. Dep't of For-Hire Vehicles*,
    327 F. Supp. 3d 29 (D.D.C. 2018) ............................................................................ 27

*Alpha-Omega Ins. Servs., Inc. v. Prudential Ins. Co.*,
    272 F.3d 276 (5th Cir. 2001) .................................................................................... 25

*Ashwander v. Tenn. Valley Auth.*,
    297 U.S. 288 (1936) ................................................................................................. 44

*Baltimore Sun Co. v. Goetz*,
    886 F.2d 60 (4th Cir. 1989) ...................................................................................... 31

*Barry v. U.S. Dep't of Just.*,
    63 F. Supp. 2d 25 (D.D.C. 1999) ............................................................................ 32

*Bartel v. FAA*,
    725 F.2d 1403 (D.C. Cir. 1984) ............................................................................... 33

*Belanger v. City and Cnty. of Honolulu*,
    Civ. No. 93-4047-10 (Haw. 1st Cir. Ct. May 4, 1994) .............................................. 43

*Broaddrick v. Exec. Off. of Pres.*,
    139 F. Supp. 2d 55 (D.D.C. 2001) .......................................................................... 25

*Carey v. Hume*,
    492 F.2d 631 (D.C. Cir. 1974) ................................................................................. 14

*State ex rel. Classic III Inc. v. Ely*,
    954 S.W.2d 650 (Mo. Ct. App. 1997) ...................................................................... 43

*Clemente v. Clemente*,
    56 Va. Cir. 530 (2001) ............................................................................................. 43

*Connick v. Myers*,
    461 U.S. 138 (1983) ................................................................................................. 44

*Cox Broad. Corp. v. Cohn*,
    420 U.S. 469 (1975) ................................................................................................. 32

*Danks v. Zinke,*
   No. 1:17-cv-114, 2018 WL 8646658 (D.N.D. Nov. 27, 2018).........................................32, 33

*Dellums v. Powell,*
   566 F.2d 167 (D.C. Cir. 1977) ...........................................................................................27

*Douglas v. Agric. Stabilization & Conservation Serv.,*
   33 F.3d 784 (7th Cir. 1994) ...............................................................................................28

*Estate of Parsons v. Palestinian Auth.,*
   952 F. Supp. 2d 61 (D.D.C. 2013) .....................................................................................25

*FDIC v. Dye,*
   642 F.2d 833 (5th Cir. 1981) .............................................................................................32

*Goldberg v. Amgen,*
   123 F. Supp. 3d 9 (D.D.C. 2015).............................................................................21, 22, 25

*Grand Forks Herald v. Dist. Ct. in & for Grand Forks Cnty.,*
   322 N.W.2d 850 (N.D. 1982) .............................................................................................43

*Grunseth v. Marriott Corp.,*
   868 F. Supp. 333 (D.D.C. 1994).........................................................................................26

*Hand v. Gary*
   838 F.2d 1420 (5th Cir. 1988) ...........................................................................................28

*Hatfill v. Ashcroft,*
   404 F. Supp. 2d 104 (D.D.C. 2005).....................................................................................34

*Hatfill v. Gonzales,*
   505 F. Supp. 2d 33 (D.D.C. 2007) ............................................................................. *passim*

*Hawkins v. Williams,*
   Civ. No. 2900054 (Cir. Ct. 1st Jud. Dist. Hinds Cnty., Mar. 16, 1983) .................................43

*Hollis v. Dep't of the Army,*
   856 F.2d 1541 (D.C. Cir. 1988).........................................................................................32

*Hotel Oakland Assocs. v. Doyle Real Est. Advisors, LLC,*
   No. 21-CV-05389-SK, 2022 WL 1493267 (N.D. Cal. May 3, 2022) ....................................27

*Hutira v. Islamic Republic of Iran,*
   211 F. Supp. 2d 115 (2002) ...............................................................................................16

*In re Contempt of Wright,*
   700 P.2d 40 (Idaho 1985)...................................................................................................43

*In re Exec. Off. of Pres.,*
    215 F.3d 20 (D.C. Cir. 2000) ........................................................................................25

*In re Grand Jury Subpoena, Judith Miller,*
    438 F.3d 1141 (D.C. Cir. 2006) ...............................................................................40, 41

*In re John Doe Grand Jury Investigation,*
    574 N.E.2d 373 (Mass. 1991) ......................................................................................43

*In re Leopold to Unseal Certain Elec. Surveillance Apps. & Ords.,*
    964 F.3d 1121 (D.C. Cir. 2020) ....................................................................................31

*In re Search of: 2122 21st Road North, Arlington, Virginia,*
    No. 1:12-sw-01002-JFA (2017) ............................................................................9, 10, 31

*In re Slack,*
    768 F. Supp. 2d 189 (D.D.C. 2011) ..............................................................................16

*In re Subpoena to Goldberg,*
    693 F. Supp. 2d 81 (D.D.C. 2005) ................................................................................25

\* *Jaffee v. Redmond,*
    518 U.S. 1 (1996) ............................................................................................... *passim*

*Keene Publ'g Corp. v. Cheshire Cnty. Super. Ct.,*
    406 A.2d 137 (N.H. 1979) ............................................................................................43

*Kleiman v. Dep't of Energy,*
    956 F.2d 335 (D.C. Cir. 1992) ......................................................................................28

*Lamberto v. Bown,*
    326 N.W.2d 305 (Iowa 1982) .......................................................................................43

*Lee v. Dep't of Just.,*
    287 F. Supp. 2d 15 (D.D.C. 2003) ................................................................................35

*Lee v. Dep't of Just.,*
    401 F. Supp. 2d 123 (D.D.C. 2005) ......................................................................... *passim*

*Lee v. Dep't of Just.,*
    413 F.3d 53 (D.C. Cir. 2005) ...............................................................................15, 16, 24

*Lee v. Dep't of Just.,*
    428 F.3d 299 (D.C. Cir. 2005) ................................................................................ *passim*

*Leib v. Veterans' Admin.,*
    546 F. Supp. 758 (D.D.C. 1982) ...................................................................................28

*Lexington Herald-Leader Co. v. Beard*,
      690 S.W.2d 374 (Ky. 1984) ................................................................................43

*Luckey v. Miller*,
      929 F.2d 618 (11th Cir. 1991) ...........................................................................25

*Martin v. Dep't of Just.*,
      488 F.3d 446 (D.C. Cir. 2007) ...........................................................................31

*Maughan v. NL Indus.*,
      524 F. Supp. 93 (D.D.C. 1981) ..........................................................................16

*McCarty v. Bankers Ins. Co., Inc.*,
      195 F.R.D. 39 (N.D. Fla. 1998) .........................................................................43

*Mideast Sys. & China Civ. Constr. Saipan Joint Venture v. Hodel*,
      792 F.2d 1172 (D.C. Cir. 1986) .........................................................................27

*Mitchell v. USDA*,
      No. 13-cv-500-bbc, 2014 WL 7240671 (W.D. Wis. Dec. 17, 2014) ...................32

*Moore v. Anderson*,
      222 F.3d 280 (7th Cir. 2000) .............................................................................25

*N.Y. Times Co. v. United States*,
      403 U.S. 713 (1971) ...........................................................................4, 36, 37, 41

*Reese v. Geneva Enters., Inc.*,
      No. CIV.A. 96-1575-LFO, 1997 WL 214864 (D.D.C. Apr. 18, 1997) .................27

*Riley v. City of Chester*,
      612 F.2d 708 (3d Cir. 1979) ..............................................................................44

*Russo v. United States*,
      576 F. Supp. 2d 662 (D.N.J. 2008) ....................................................................33

*Shoen v. Shoen*,
      5 F.3d 1289 (9th Cir. 1993) ...............................................................................14

*Snyder v. Phelps*,
      562 U.S. 443 (2011) ...........................................................................................44

*Tavoulareas v. Piro*,
      93 F.R.D. 35 (D.D.C. 1981) ...............................................................................16

*Tripp v. Dep't of Def.*,
      284 F. Supp. 2d 50 (D.D.C. 2003) ...............................................................22, 25

*U.S. Commodity Futures Trading Comm'n v. McGraw-Hill Cos.*,
    507 F. Supp. 2d 45 (D.D.C. 2007) .................................................................26

*U.S. Dep't of Just. v. Reporters' Comm. for Freedom of Press*,
    489 U.S. 749 (1989) .........................................................................................32

*United States v. Lee*,
    No. CR-99-1417, 2000 WL 36739632 (D.N.M. Aug. 31, 2000) .........................34

*United States v. Libby*,
    467 F. Supp. 2d 20 (D.D.C. 2006) ....................................................................8

\* *Zerilli v. Smith*,
    656 F.2d 705 (D.C. Cir. 1981) ................................................................ *passim*

## **STATUTES**

42 Pa. Cons. Stat. § 5942 ............................................................................42

5 U.S.C. § 552a(b) ......................................................................................32

18 U.S.C. app. III § 6(e)(1) ...........................................................................8

Ala. Code § 12-21-142 ................................................................................42

Alaska Stat. § 09.25.310(b) ..........................................................................43

Ark. Code Ann. § 16-85-510 .........................................................................43

Cal. Evid. Code § 1070 ................................................................................42

Colo. Rev. Stat. § 13-90-119(3) .....................................................................43

Conn. Gen. Stat. § 52-146t(d) .......................................................................43

D.C. Code § 16-4702 ...................................................................................42

D.C. Code § 16-4703 ...................................................................................43

Del. Code § 4320-26 ...................................................................................43

Ga. Code Ann. § 24-5-508 ............................................................................43

Ind. Code § 34-46-4-2 .................................................................................42

Kan. Stat. § 60-482 .....................................................................................43

Ky. Rev. Stat. § 421.100 ...............................................................................42

La. Rev. Stat. § 45:1453 ...................................................................................43

Maine Rev. Stat. § 61(2) ...................................................................................43

Md. Cts. & Jud. Proc. Code Ann. § 9-112 .................................................42, 43

Mich. Comp. Laws Ann. §§ 767.5a, 767A.6 .....................................................43

Minn. Stat. §§ 595.023, 595.025 .......................................................................42

Mont. Code § 26-1-902 .....................................................................................42

N.C. Gen. Stat. Ann. § 8-53.11 .........................................................................43

N.J. Stat. § 2A:84A-21 ......................................................................................42

N.Y. Civ. Rights Law § 79-h .............................................................................42

Neb. Rev. Stat. § 20-146 ...................................................................................42

Nev. Rev. Stat. § 49.275 ...................................................................................42

Ohio Rev. Code § 2739.12 ................................................................................42

Okla. Stat. Ann. tit. 12, § 2506 .........................................................................43

Or. Rev. Stat. § 44.520 ......................................................................................42

S.C. Code Ann. § 19-11-100 .............................................................................43

S.D. Codified Laws § 19-2-15 ...........................................................................42

Tenn. Code § 24-1-208 ......................................................................................43

Tex. Civ. Prac. & Rem. Code § 22.024 .............................................................43

Vt. Stat. § 1615(b) .......................................................................................42, 43

W. Va. Code § 57-3-10 ......................................................................................42

Wash. Rev. Code § 5.68.010(2)(b) ................................................................42, 43

Wis. Stat. § 885.14 ......................................................................................42, 43

## **RULES**

Fed. R. Civ. P. 26 ..............................................................................................17

Fed. R. Evid. 501 ...................................................................................39, 40, 45

N.M. R. Evid. Rule 11-514 ....................................................................................43

Utah R. Evid. 509....................................................................................................42

**OTHER AUTHORITIES**

Catherine Herridge, Pamela K. Browne & Cyd Upson, *Congress investigating taxpayer-backed school over alleged ties to Chinese military after Fox News report*, FOXNews.com, (Feb. 24, 2017) ...........................................................5

Catherine Herridge, Pamela K. Browne & Cyd Upson, *FBI 'reopening' probe of DoD-funded school with suspected Chinese military ties, rep says* FOXNews.com, (June 28, 2017)...........................................................................................................5

Catherine Herridge, Pamela K. Browne & Cyd Upson, *Fox investigation: DoD-funded school at center of federal probes over suspected Chinese military ties*, FOXNews.com, (Feb. 24, 2017) ...........................................................................5

Exec. Order No. 13982, 86 Fed. Reg. 6833 (Jan. 19, 2021) ..........................................38

*FBI raids in Rosslyn area*, WTOP News (Dec. 5, 2012, 11:20 AM) .............................5

*FBI Raids Two Locations in Arlington,* NBC4 Wash. (Dec. 5, 2012, 10:26 PM).........5

Gail Huff, *FBI raids Rosslyn University of Management and Technology offices*, WJLA (Dec. 5, 2012, 11:31 AM) ........................................................................5

Joseph Marks, *Lawyers are nearing a settlement deal for the infamous 2015 OPM hack*, Wash. Post (May 9, 2022) ...........................................................................12

Josh Fruhlinger, *The OPM hack explained: Bad Security practices meet China's Captain America*, CSO (Feb. 12, 2020)...........................................................11–12

Karen H. Greve, *Graymail: The Disclose or Dismiss Dilemma in Criminal Prosecutions*, 31 Case W. Reserve L. Rev. 84 (1980)..............................................8

Michael Kaplan, *Army to award Purple Hearts to 50 soldiers injured in Iran missile attack following CBS News investigation*, CBS News (Dec. 20, 2021) ................38

Natalie Gross, *DoD bans popular TA school from accepting the benefit*, Military Times (Apr. 6, 2018)........................................................................................12

Stephen Battaglio, *How this CBS journalist and organ-donating mom finds purpose in military vet reporting*, L.A. Times (May 4, 2022)...................................................38

Vernon Loeb & Walter Pincus, *Whistleblower or Demagogue?*, Wash. Post (Aug. 29, 1999) ....................................................................................................34

Winners: SEJ 20th Annual Awards for Reporting on the Environment, Soc'y of
    Environmental Journalists, https://www.sej.org/winners-sej-20th-annual-awards-
    reporting-environment ...........................................................................................................38

## INTRODUCTION

Plaintiff's subpoenas to Catherine V. Herridge, former Chief Intelligence Correspondent for Fox News Network ("FNN"), strike at the heart of the First Amendment journalist's privilege. They seek to uncover confidential source(s) used for reporting on a counterintelligence probe into Plaintiff and the University of Management Technology ("UMT").  Under governing law, the journalist's privilege protecting such sources must prevail "in all but the most exceptional cases." *Zerilli v. Smith*, 656 F.2d 705, 712 (D.C. Cir. 1981).  Plaintiff cannot remotely carry her burden to show that this is an exceptional case that warrants overriding the privilege.

In 2017, FNN published a series of articles (the "Fox Reporting") about an investigation into Plaintiff and UMT and included information indicating that Plaintiff had been a colonel in the Chinese military—the People's Liberation Army—that she sought to hide that fact (by lying on immigration forms and telling others to lie), and that UMT, which Plaintiff founded and ran, was gathering data on thousands of U.S. servicemembers and making it remotely accessible from China.  In 2018, the Department of Defense ("DoD") entered findings of fact ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████  Based on these findings, DoD terminated UMT "on national security grounds" from a tuition assistance program that had provided a large portion of UMT's revenues.

_____

███████████████████████████████████████████████

Plaintiff did not challenge that decision or any of DoD's findings in court. Instead, she sued several agencies under the Privacy Act. In her view, because the Fox Reporting included some information allegedly from government files (photos of her in her PLA uniform, immigration forms showing false statements, and information from FBI interview memoranda) she was owed damages—mostly arising from the loss of DoD tuition assistance. Most of her privacy claim thus boils down to this: she should be compensated for the fallout from DoD's unchallenged finding in 2018 that UMT raised national security concerns because someone earlier released information showing that DoD was *correct* that UMT raised real national security concerns.

The central question on this motion is whether, to support her Privacy Act claim, Plaintiff should be allowed to breach the First Amendment journalist's privilege and expose the source(s) who provided some information for the Fox Reporting exposing a situation that (in DoD's view) was a genuine national security threat. The answer is no.

Under *Zerilli*, to determine whether the First Amendment journalist's privilege can be overcome, the Court must "look to the facts of [the] case, weighing the public interest in protecting a reporter's sources and the private interest in compelling disclosure." 656 F.2d at 712. Two "guidelines" inform that balancing: (i) whether the information is "central" to the case, and (ii) whether Plaintiff has "exhausted every reasonable alternative source of information." *Id.* at 713. Plaintiff fails on all prongs of the analysis.

First, the information Plaintiff seeks is not "central" to her claim because her subpoenas are sweepingly overbroad. They seek information without any link to her Privacy Act claims.

Second, Plaintiff has not "exhausted every reasonable alternative source of information." 656 F.2d at 713. Plaintiff's discovery has identified multiple situations in which people had access to a particular document (a PowerPoint) that Plaintiff believes was leaked. But Plaintiff failed to

2

find the identity of all those individuals and ascertain whether they could be the source.  Plaintiff must follow all those leads before demanding confidential sources from journalists.

Third, *Zerilli* calls for a balancing of the interests at stake.  Recent decisions reducing *Zerilli* to a bare consideration of the centrality and exhaustion guidelines distort the decision.  In Privacy Act cases, that approach turns *Zerilli* into a mere exhaustion test under which the plaintiff will eventually get access to confidential sources in *every* case, no matter how trivial or tenuous the claim.  That illogical result cannot be squared with *Zerilli*'s admonition that the privilege must prevail "in all but the most exceptional cases."  *Zerilli*, 656 F.2d at 712.

Here, the balance of interests overwhelmingly favors protecting sources.  Plaintiff's private interest in Privacy Act damages carries no broader public interest.  Moreover, given the infirmities in the merits of her case, it is unlikely that Plaintiff can ever establish significant damages at all.

The bulk of Plaintiff's alleged damages turn on DoD's decision to terminate UMT from tuition assistance "on national security grounds."  But Plaintiff cannot get damages under the Privacy Act for that decision.  The agency's independent action was a superseding cause, and in any event, it cannot be collaterally attacked here.

Plaintiff also faces another causation problem.  If the few photos and documents allegedly subject to the Privacy Act are excised from the Fox Reporting, the stories still present (from other sources) all the basic information that Plaintiff claims has harmed her.  Interviews with other sources (some on camera) showed that Plaintiff admitted being a colonel in the PLA—and told others to lie about it; that UMT was recruiting U.S. servicemembers, gathering massive amounts of data on them, and making it remotely accessible in a database that the Chinese military would love to get at.  To top it off, DoD was funding UMT with hundreds of thousands of taxpayer dollars a year.  The FBI was not happy about a decision not to prosecute and the Naval Criminal

Investigative Service confirmed that there was an ongoing investigation into UMT.  Given all that information (and more)—none of which Plaintiff has even alleged is covered by the Privacy Act— Plaintiff faces insurmountable hurdles in proving that it was the few documents and photos allegedly subject to the Act (not the rest of the reporting) that caused her damages.

Plaintiff's claims are further undermined by the fact that an FBI affidavit detailing virtually all the information underpinning her claim (other than the actual photos of Plaintiff) was legally a matter of public record ever since a sealing order expired in 2013—which forecloses Plaintiff's claim that there has been a "disclosure" under the Privacy Act.

By contrast, the First Amendment interest in protecting journalists' sources is at its highest in cases, like this, involving reporting on national security.  Matters affecting national security are some of the most important in which the press plays its vital role to "bare the secrets of government and inform the people."  *N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring).  And confidentiality is critical for government sources who may face punishment for speaking to the press.  Ms. Herridge has spent a career securing the confidence of contacts in the national security field.  Forcing her to disclose her source(s) would destroy her credibility and cripple her ability to play a role in bringing important information to light for the public.

The balance of interests is not even close and overwhelmingly favors First Amendment protections for Ms. Herridge.  The motion to quash should be granted.

## BACKGROUND

### A.    The Government's Investigation into Plaintiff and UMT and Fox's Reporting

Plaintiff, Yanping Chen, is the founder and sole owner of the University of Management Technology ("UMT").  Compl. ¶¶ 13–14, ECF No. 1.  On December 5, 2012, the FBI executed

search warrants at UMT's offices and at Plaintiff's home.  Compl. ¶ 18.  The raids were carried out publicly and were widely reported in local media at the time.[2]

In March 2016, the U.S. Attorney's Office for the Eastern District of Virginia informed Plaintiff that she would not be prosecuted.  Compl. ¶ 22.  As investigative reporting by FNN later revealed, the years-long investigation involved counterintelligence concerns, and not everyone was satisfied that the outcome had protected national security.

On February 24, 2017, FNN ran the first in a series of articles detailing the investigation into UMT and Plaintiff.  (Ex. B).[3]  Ms. Herridge, who at the time was FNN's Chief Intelligence Correspondent, was the lead reporter on the series.  *See* Decl. of Catherine V. Herridge ¶ 5 (Ex. C) ("Herridge Decl.").[4]  The investigative series, which appeared in three web articles published on February 24, 2017; April 28, 2017 (Ex. D);[5] and June 28, 2017 (Ex. E),[6] and two related news

---

[2] *See FBI Raids Two Locations in Arlington,* NBC4 Wash. (Dec. 5, 2012, 10:26 PM), https://www.nbcwashington.com/news/local/fbi-raids-two-locations-in-arlington/1937628/;  Gail Huff, *FBI raids Rosslyn University of Management and Technology offices,* WJLA (Dec. 5, 2012, 11:31 AM), https://web.archive.org/web/20121209051420/http://www.wjla.com:80/articles/ 2012/12/fbi-raids-rosslyn-university-of-management-and-technology-offices-arlnow-reports-82782.html; *FBI raids in Rosslyn area,* WTOP News (Dec. 5, 2012, 11:20 AM), https://wtop.com/news/2012/12/developing-fbi-raids-in-rosslyn-area/.

[3] Catherine Herridge, Pamela K. Browne & Cyd Upson, *Fox News investigation: DoD-funded school at center of federal probes over suspected Chinese military ties*, FOXNews.com, (Feb. 24, 2017),   https://www.foxnews.com/politics/fox-news-investigation-dod-funded-school-at-center-of-federal-probes-over-suspected-chinese-military-ties.

[4] Ms. Herridge is now a senior investigative correspondent at CBS News.

[5] Catherine Herridge, Pamela K. Browne & Cyd Upson, *Congress investigating taxpayer-backed school over alleged ties to Chinese military after Fox News report*, FOXNews.com, (updated May 1,   2017),   https://www.foxnews.com/politics/congress-investigating-taxpayer-backed-school-over-alleged-ties-to-chinese-military-after-fox-news-report.

[6] Catherine Herridge, Pamela K. Browne & Cyd Upson, *FBI 'reopening' probe of DoD-funded school with suspected Chinese military ties, rep says*, FOXNEWS.COM, (June 28, 2017), https://www.foxnews.com/politics/fbi-reopening-probe-of-dod-funded-school-with-suspected-chinese-military-ties-rep-says.

segments[7] (collectively, the "Fox Reporting"), detailed that federal officials were concerned that Plaintiff had ties to the Chinese military and that UMT was being used to help the Chinese government collect data on U.S. servicemembers enrolled at UMT.

### 1.   Information from an FBI Informant, a Chinese Military Expert, and Other Sources

The Fox Reporting featured on-camera interviews with Stephen Rhoads, a whistleblower who had worked at UMT and had served as an undercover FBI informant for the investigation. As an ideal inside source, Rhoads shared a wide array of information about Plaintiff, UMT, and the government investigation. Indeed, Rhoads set out all the basic elements of the story.

First, he revealed that Plaintiff had admitted that she had been a colonel in the People's Liberation Army or "PLA" and that Plaintiff made efforts to conceal that fact. As Rhoads told FNN, "One of the first sentences she [Plaintiff] ever threw out—after she found out I was an Army officer, was, 'Well . . . I was a colonel in the army.'" Ex. B at 2.[8]  When Rhoads asked where she trained, Plaintiff "laughed and said, 'Oh, no, I was in the Chinese army, you know.'" *Id.*  But when Rhoads told Plaintiff that the FBI wanted him to testify before a grand jury, Plaintiff told him to lie: "Oh, you don't tell them anything. We don't know each other. . . . You don't—you don't know I was a colonel in the P.L.A.  They'll never have proof to say that." *Id.* at 3.

Rhoads also explained how UMT could be used by the Chinese government to collect information on U.S. servicemembers who attended the school. According to Rhoads, UMT was collecting copious amounts of information about U.S. servicemembers' military history that could then be remotely accessed: "It got uploaded into an O-drive, they called it … their personal military

---

[7]   Fox News, *Taxpayer-funded school suspected of Chinese military ties*, https://www.youtube.com/watch?v=jh2Xk42PVA8; Fox News, *Congress investigating school's alleged ties to China*, https://video.foxnews.com/v/5417408120001.

[8] Citations are to the page number of each article attached as an exhibit to this memorandum.

bio, you know, where they were trained, how they were trained, how long, that could be remotely accessed." *Id.* Plaintiff asked Rhoads specifically to recruit students for UMT at one of the Air Force's most technology-and-research-heavy locations—Ohio's Wright-Patterson Air Force Base. *Id.* An expert on the Chinese military, Peter Mattis, explained why a school like UMT would be of interest to the Chinese military. The personnel records would provide a "curated database" that would be of interest for two reasons: "The first is, militaries everywhere want to know what a potential adversary might look like – what are their capabilities, how will they act? The second is this might also serve as a vehicle for recruiting individuals." April 28 Article at 2.

Rhoads also told FNN that UMT received approximately $250,000 to $300,000 per month in taxpayer dollars from the U.S. government. *Id.* at 1. UMT was a participant in DoD's tuition assistance program. This financial pipeline drew the ire of members of Congress, including Rep. Jason Chaffetz (R-Ut.). Rep. Chaffetz wrote a letter to the Secretary of Defense asking to know what was going on with the investigation. *Id.* As Rhoads summed up the situation: "It's a bad deal for the soldiers . . . it's a bad deal for the taxpayer." *Id.*

FNN also managed to unearth Plaintiff's family ties to a senior leader in the PLA. FNN found Plaintiff's dissertation for the PhD she had earned at George Washington University in 1999, which had been paid for by the Chinese government. She dedicated the dissertation to her father, General Chen Bin, a former general in the PLA who had overseen weapon and technology development. Ex. B at 3. As FNN's expert on the Chinese military explained on camera, Plaintiff's father "supposedly participated in the Long March and that . . . gives her credentials not unlike being an officer in the continental army." Ex. D at 2.

The Fox Reporting also explained that, according to sources, the FBI and the U.S. Attorney's Office were not able to agree whether to prosecute Plaintiff and that the conflict had

been based in part on concerns about disclosing intelligence gathering sources and methods.[9]  Ex. B at 3.  In addition, the Naval Criminal Investigative Service ("NCIS") confirmed on the record that there was "still an active multi-agency investigation" into UMT.  Ex. E at 1.

## 2. Information allegedly subject to the Privacy Act

The Fox Reporting also included some materials that later became the subject of Plaintiff's Privacy Act claims.  Plaintiff alleges that certain pictures and documents in the Fox Reporting came from government files.  Specifically, she points to pictures allegedly seized in the FBI raids (including pictures of her wearing the uniform of a colonel in the PLA), *see* Compl. ¶¶ 26, 31, portions of her immigration forms (including a form showing her denial that she had ever been affiliated with the Communist Party) *id.* ¶¶ 25, 27; and images or information from FBI memoranda memorializing interviews with her and with her daughter, including, in particular, an interview in which she denied having held rank in the PLA, *id.* ¶¶ 26, 29.

## B. Public Access to the FBI Affidavit Filed in Support of the 2012 Searches

Shortly after the first Fox article had run, on March 10, 2017, Plaintiff filed a motion in the Eastern District of Virginia seeking an order to show cause why the government should not be

---

[9] Prosecuting a case related to espionage consistent with the defendant's constitutional rights may force the government to disclose classified information, including sensitive intelligence gathering sources and methods.  The government may decide that the prosecution is not worth further compromising national security.  *See generally* Karen H. Greve, *Graymail: The Disclose or Dismiss Dilemma in Criminal Prosecutions*, 31 Case W. Reserve L. Rev. 84 (1980).  The Classified Information Procedures Act ("CIPA"), 18 U.S.C. app. III §§ 1–16, does not eliminate this dilemma.  It primarily provides procedures allowing courts to rule on evidentiary issues, including redacting material provided to the defendant or using substitute information, "to permit the government to ascertain the potential damage to national security of proceeding with a given prosecution before trial."  *United States v. Libby*, 467 F. Supp. 2d 20, 24 (D.D.C. 2006) (quoting S. Rep. No. 96-823, at 1 (1980)).  Ultimately, the defendant's rights may require disclosing sensitive information, which can lead to avoiding prosecution.  *See* 18 U.S.C. app. III § 6(e)(1) (requiring court to dismiss the prosecution if the Attorney General objects to disclosing information necessary for fair trial).

sanctioned for allegedly violating the order sealing the original search warrant application from 2012.  Mot. to Show Cause, *In re Search of: 2122 21st Road North, Arlington, Virginia*, No. 1:12-sw-01002-JFA (E.D. Va. Mar. 10, 2017) ("*Search Warrant Litig.*"), ECF No. 9 ("Mot. To Show Cause") (Ex. F).  Plaintiff argued that information in the Fox Reporting came from the affidavit filed in support of the search warrant application ("FBI Affidavit") and from the search.  *Id.* at 2.

In denying Plaintiff's motion, the magistrate judge who had entered the sealing order held that, on its face, the order expired on March 4, 2013 (90 days after the application) and that the information in the FBI Affidavit was available to the public after that date.  May 8, 2017 H'rg Tr. at 29:21–30:3, *Search Warrant Litig.,* ECF No. 20 (Ex. G) ("May 8, 2017 Tr."); *see also* Order, *Search Warrant Litig.*, ECF No. 3 ("Sealing Order") (Ex. H).  As he explained, "my order was specific in that the information that was contained in the application and affidavit . . . was not considered to be under the Court's sealing order after March 4, 2013," and "I don't find that there is any violation of the sealing order and having the information that was contained in the affidavit in support of the search warrant made public to anyone."  May 8, 2017 H'rg Tr. at 29:21–30:3; *see also* Sealing Order.

The clerk's office apparently had "overlooked" the limited duration of the sealing order and failed to place the materials on the publicly accessible docket, May 8, 2017 H'rg Tr. at 29:13, but the magistrate judge held that the error made no difference.  For a judicial record to be under seal, "there has to be a reason for it," and after March 4, 2013, "there was no court order that allowed those proceedings to remain under seal," and it "should have been removed from the sealed portion of the court's file."  *Id.* at 4:7–8, 14–15, 19–20.  He went on: "[T]he information is the information.  And if it is no longer to be under seal, whether somebody looks at it or not, it still

9

should be public information." May 8, 2017 Tr. at 26:10–13.[10]  Plaintiff challenged other aspects of the judge's ruling, but waived any challenge to the ruling that, under the court's sealing order, the FBI Affidavit had become subject to public inspection and release in 2013.[11]

Short of providing the actual pictures of Plaintiff allegedly seized in the FBI raid, the FBI Affidavit detailed every bit of information that Plaintiff has pointed to as the basis for her Privacy Act claim—and more.  *See* Aff. in Support of Two Appls. for Search Warrants, *Search Warrant Litig.*, ECF No. 1. ("FBI Aff.") (Ex. J).  The FBI Affidavit detailed allegations that Plaintiff had been a colonel in the PLA, including transcribed cuts from tape recordings in which Plaintiff admitted that fact.  FBI Aff. at ¶¶ 15–16.  It described Plaintiff's allegedly false statement on an immigration form that she had never been affiliated with the Communist Party—the same form that appeared in the Fox Reporting.  *Id.* ¶¶ 20–21.  It also listed multiple additional false statements on immigration forms that were not mentioned in the Fox Reporting.  *Id.* ¶¶ 18–19, 24–29.  It spelled out that a "UMT employee" had confirmed that personnel at UMT's Beijing offices had access to the database of information UMT had compiled on U.S. servicemembers (corresponding to the information in the FBI memorandum summarizing the interview with Plaintiff's daughter shown in the Fox Reporting).  *Id.* ¶ 14.  And it detailed Plaintiff's denial that she had held rank in the PLA during her 2012 interview by the FBI—the same information presented in the Fox Reporting allegedly from the FBI memorandum summarizing that interview.  *Id.* ¶¶ 48–49.

---

[10] Prior to the hearing on May 8, 2017, the court *sua sponte* entered an order on April 25, 2017, making it express that only filings in the matter *after* February 23, 2017 should be under seal.  That order apparently resulted in the clerk's office placing earlier filings on the public docket.  *See* May 8, 2017 Tr. at 2:16–21.  The FBI Affidavit was thus publicly available on PACER before FNN ran the second in its series of articles on April 28, 2017.

[11] *See* Objections to U.S. Magistrate Judge's Denial of Mot. to Show Cause at 2 n.1, *Search Warrant Litig.*, ECF No. 27 ("Judge Anderson's denial of relief based on a violation of the Court's seal is not included in this appeal.") (Ex. I).

C.     **DoD Terminates UMT's Participation in the Tuition Assistance Program "On National Security Grounds"**

Almost a year after the Fox Reporting began, in January 2018, DoD ███████████ that

UMT's participation in the tuition assistance program was being "terminated on national security

grounds." ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

Based on the record before it, DOD ███████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

---

████████████████████████████████████████████████
███████████████████████████████████████.

[13] It is no secret that China has intelligence efforts focused on databases with information on government personnel.  *See, e.g.*, Josh Fruhlinger, *The OPM hack explained: Bad Security*

11



Plaintiff did not challenge the DoD decision—or any of the findings on which it was based—in court.

### D.    Plaintiff's Privacy Act Suit

In late 2018, Plaintiff sued multiple agencies alleging a Privacy Act violation and seeking damages.  Plaintiff alleges that the photographs, excerpted immigration forms, and information from two FBI interviews that appeared in the Fox Reporting were released in violation of the Privacy Act.  *See*  Compl. ¶¶ 23, 25–29, 31.  Plaintiff expressly claims damages based, in large part, on DoD's decision to terminate UMT from its tuition assistance program.  *Id.* ¶ 42.

### E.    Plaintiff's Subpoenas to Ms. Herridge

In June 2022, Plaintiff served Ms. Herridge with subpoenas for documents and a deposition.  In part, the subpoenas seek the identity of any source(s) who provided the photos and documents forming the basis for Plaintiff's Privacy Act suit.  Thus, the document subpoena seeks documents "sufficient to identify the individual(s) that transmitted or provided" documents

---

practices      meet      China's      *Captain      America*,      CSO      (Feb.      12,      2020), https://www.csoonline.com/article/3318238/the-opm-hack-explained-bad-security-practices-meet-chinas-captain-america.html; Joseph Marks, *Lawyers are nearing a settlement deal for the infamous      2015      OPM      hack*,      Wash.      Post      (May      9,      2022), https://www.washingtonpost.com/politics/2022/05/09/lawyers-are-nearing-settlement-deal-infamous-2015-opm-hack/.

[14] The decision was also publicly reported.  *See, e.g.*, Natalie Gross, *DoD bans popular TA school from accepting the benefit*, Military Times (Apr. 6, 2018), https://www.militarytimes.com/news/education/2018/04/06/dod-bans-popular-ta-school-from-accepting-the-benefit/.

concerning Plaintiff.  Subpoena to Prod. Docs. Issued to Catherine Herridge Schedule A at 7 ("Herridge Subpoena") (Ex. L).

But the subpoenas also seek vastly more than just information bearing on source(s) who may have released information from government files.  The document subpoena defines "Private Documents and Information" as "*any and all* documents and information concerning Dr. Chen and/or the University that were provided to or obtained by you *from a third party* and that were presented in, referred to, or *considered* in relation to" the Fox Reporting."  *Id.* Schedule A at 3 (emphases added).  By demanding that Ms. Herridge produce "all Private Documents and Information," Plaintiff is actually seeking *every* document and piece of information *from anyone* relating to Plaintiff and/or UMT, whether the document has any relation to a possible release of Privacy Act information from government files or not.  The subpoena literally seeks production of the *entire* investigative reporting file Ms. Herridge compiled while working on the Fox Reporting, to the extent such documents are still in her possession.

## ARGUMENT

## I.  THE SUBPOENAS SHOULD BE QUASHED BECAUSE THEY INVADE THE FIRST AMENDMENT JOURNALIST'S PRIVILEGE.

The subpoenas should be quashed because they plainly seek information protected by the journalist's privilege under the First Amendment and Plaintiff cannot bear her burden of overcoming that privilege.  It is settled law that the First Amendment provides journalists a qualified privilege from compelled disclosure of their newsgathering activities, including especially the identity of confidential sources.  *See, e.g., Zerilli v. Smith*, 656 F.2d 705, 710–11 (D.C. Cir. 1981).  As the D.C. Circuit has explained, "[t]he First Amendment guarantees a free press primarily because of the important role it can play as a 'vital source of public information.'" *Id.* at 710.  But "journalists frequently depend on informants to gather news, and confidentiality is

13

often essential to establishing a relationship with an informant." *Id.* at 711.  As a result, "[c]ompelling a reporter to disclose the identity of a source may significantly interfere with [the press's] news gathering ability." *Id.* at 711.  Thus, such compelled disclosure "raises obvious First Amendment problems." *Id.* at 710.  Without confidential sources, the press could not uncover information vital for informing the public—especially about the inner workings of government— and the citizens would be deprived of information essential for them to make "informed political, social, and economic choices." *Id.* at 711.

To protect the ability of a robust free press to play its role in informing the electorate, the journalist's privilege generally protects against compelled disclosure of sources.  "Rooted in the First Amendment, the privilege is a recognition that society's interest in protecting the integrity of the news gathering process, and in ensuring the free flow of information to the public, is an interest of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice." *Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993).

To determine whether a plaintiff can overcome the privilege, the D.C. Circuit has instructed that courts must "look to the facts of each case, weighing the public interest in protecting a reporter's sources and the private interest in compelling disclosure." *Zerilli*, 656 F.2d at 712.[15]  In particular, *Zerilli* identified two "guidelines" that are of "central importance" in the balance.  First, to justify disclosure, a plaintiff must show that the information sought goes to "the heart of the matter," *id.* at 713, in other words, that it is "central" to her case, *Lee v. Dep't of Just.*, 401 F. Supp. 2d 123, 132 (D.D.C. 2005).  Second, the litigant must have "exhausted every reasonable alternative source of information." *Zerilli*, 656 F.2d at 713.  Plaintiff bears the burden of showing

---

[15] *See also Carey v. Hume*, 492 F.2d 631, 636 (D.C. Cir. 1974) ("[T]he court will look to the facts on a case-by-case basis in the course of weighing the need for the testimony in question against the claims of the newsman that the public's right to know is impaired.").

that these guidelines have been satisfied and that the balance tips in her favor.  And that is a heavy burden.  The D.C. Circuit warned that "when striking the balance," courts must "be mindful of the preferred position of the First Amendment" and expressly cautioned that "[i]f the privilege does not prevail in all but the most exceptional cases, its value will be substantially diminished."  *Zerilli*, 656 F.2d at 712.  Plaintiff cannot carry her burden here.

First, she cannot show that the information she seeks is "central" to her claims because her subpoenas are stunningly overbroad.  The only information even arguably "central" to Plaintiff's Privacy Act claim is the identity of any source(s) who released information covered by the Privacy Act.  *See, e.g.*, *Lee v. Dep't of Just.*, 413 F.3d 53, 60 (D.C. Cir. 2005).  But Plaintiff's subpoena seeks essentially Ms. Herridge's *entire* investigative reporting file without any limitation connecting the documents Plaintiff seeks to alleged releases from government files.

Second, Plaintiff cannot show that she has "exhausted every reasonable alternative source of information."  *Zerilli*, 656 F.2d at 713.  Plaintiff believes that a particular PowerPoint document was the source of the disputed information in the Fox Reporting.  But Plaintiff has failed to pursue many discovery leads related to personnel who had access to the PowerPoint.

Third, the balance of interests weighs overwhelmingly against Plaintiff.  Her private interest in Privacy Act damages carries no broader public interest.  That is especially the case where her primary claim for damages rests on the legally insupportable theory that she can seek damages in a Privacy Act suit for DoD's independent decision to terminate UMT from tuition assistance on national security grounds.  The Privacy Act is not an all-purpose avenue for collaterally attacking agency decisions.  On the other side of the balance, the First Amendment interest in protecting journalists' confidential sources is at its strongest in a case, like this, involving reporting in the national security field and the potential misuse of taxpayer dollars.

15

Plaintiff's Privacy Act suit simply does not qualify as a "most exceptional case," *Zerilli*, 656 F.2d at 712, that merits overriding First Amendment protections.

**A.      The Subpoenas Seek Information Protected by the Journalist's Privilege.**

There can be no question that the subpoenas seek information protected by the journalist's privilege.   Part of Plaintiff's goal is to uncover confidential source(s) who allegedly provided documents that form the basis for Plaintiff's Privacy Act claims, and confidential sources are at the very heart of the journalist's privilege.   *See, e.g.*, *Zerilli*, 656 F.2d at 711–12; *see also, e.g.*, *In re Slack,* 768 F. Supp. 2d 189, 193–94 (D.D.C. 2011) (noting that courts "rigorously" protect confidential information).   Indeed, the privilege applies both to discovery directly seeking a source's identity and to discovery that would likely lead to identifying a source.   *Tavoulareas v. Piro*,   93 F.R.D. 35, 40 (D.D.C. 1981).   In addition, "the privilege for journalists shields both confidential and nonconfidential information from compelled disclosure."   *Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 120 (2002).   Thus, the privilege also applies to "resource materials prepared by a reporter in anticipation of writing a news article," such as drafts or notes. *Maughan v. NL Indus.*, 524 F. Supp. 93, 95 (D.D.C. 1981) (quoting *United States v. Cuthbertson*, 630 F.2d, 139, 147 (3d Cir. 1980)).   As a result, *all* of the documents that Plaintiff seeks from Ms. Herridge (including communications she had with third parties) are covered by the privilege.

**B.      Plaintiff Cannot Show That the Information Sought in Her Subpoenas Is "Central" to Her Case Because the Subpoenas Are Vastly Overbroad.**

Plaintiff fails on the first step of the *Zerilli* analysis because her subpoenas are overbroad and seek information that is not remotely "central" to her claim.   The only information that is even arguably "central" to Plaintiff's case and potentially in Ms. Herridge's possession is information bearing on the identity of any government source(s) who may have released information allegedly in violation of the Privacy Act.   *See, e.g., Lee*, 413 F.3d at 60.   But Plaintiff's subpoenas seek much

more than that.  The document subpoena seeks all "Private Documents and Information."  The definition of that term, however, has nothing to do with information protected by the Privacy Act.  Instead, the subpoena defines "Private Documents and Information" as "*any and all* documents and information concerning Dr. Chen and/or the University that were provided to or obtained by you *from a third party* and that were presented in, referred to, or *considered* in relation to" the Fox Reporting.  Herridge Subpoena Schedule A at 3 (emphases added).  Plaintiff is thus asking for *every* document and bit of information *from anyone* relating to Plaintiff and/or UMT whether the document has any relation to a possible release of Privacy Act information or not.  The subpoena thus effectively seeks the *entire* investigative reporting file that Ms. Herridge assembled, to the extent she still has it.  It is difficult to imagine a more comprehensive—and more unjustified— invasion of the journalists' privilege.

Plaintiff cannot remotely justify her sweeping requests under *Zerilli*.[16]  They have nothing to do with the only information potentially "central" to Plaintiff's case.  For that reason alone, Plaintiff's subpoenas should be quashed or radically restricted under a protective order.

### C.  Plaintiff Cannot Carry Her Burden of Showing That She Has Exhausted Alternative Avenues of Discovery.

Plaintiff also cannot carry her burden to show that she "has exhausted every reasonable alternative source of information."  *Zerilli*, 656 F.2d at 713.  She has failed to pursue multiple reasonable avenues of discovery for determining the source(s) of the alleged Privacy Act information in the Fox Reporting.  Plaintiff believes that the source for the alleged Privacy Act

---

[16] Indeed, they could not even be justified under the ordinary standard of Rule 26.  Sources for information other than the few pieces of information that Plaintiff claims were covered by the Privacy Act are utterly irrelevant to Plaintiff's claims, and seeking discovery concerning those sources necessarily falls outside the scope of allowable discovery under Rule 26(b), which prohibits discovery where the burden of the discovery is disproportionate to its likely benefit.  Fed. R. Civ. P. 26(b)(1).

information was a PowerPoint created by FBI agent Timothy Pappa.  But even accepting that narrow focus, Plaintiff's discovery efforts have left huge gaps that must be pursued before the Court could possibly contemplate overriding the journalist's privilege.

To start with, it does not appear that Plaintiff ever secured a comprehensive list of personnel who had access to the PowerPoint at the FBI.  At the FBI, the PowerPoint was ██████████████ ███████████ ████████████████████████████ where ██████████████████████████████ ████████████████" had access.  ████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████ Nonetheless, as far as the discovery materials Plaintiff has provided reveal, Plaintiff never demanded a comprehensive list of all these individuals and never pursued depositions or declarations from this entire group.

Next, deposition testimony revealed a number of individuals who likely obtained copies of the PowerPoint, but whom the Plaintiff never pursued.  For example, in November 2013, the lead DHS agent on the investigation sent an email ████████ stating that he planned to give a copy of the PowerPoint to a ████ colleague named ██████████ ██████████████████████ Plaintiff has not deposed or obtained a declaration from anyone named ████████ ██████████████████████████ ██████████████ testified that he may have provided copies of the PowerPoint to his direct supervisors, ██████████████████████████████████████████ ██████████████████████████ He further testified that he may have used the PowerPoint to brief two higher level supervisors.  ████████████ Plaintiff has not deposed or secured declarations from any of these individuals.  Plaintiff has also failed to depose or obtain a declaration from ██████████████████, even though ██████████████ asked Pappa to send ████

18

████████████████████████ based on the PowerPoint. ████████████████

████████████████████████████████████ An email from ████████████ also shows

that DoD determined that █████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████ ███████████████████████████

████████████████ But Plaintiff failed to identify what ████████ documents the email was

referencing and failed to depose or obtain a declaration from three of the email recipients.

Lastly, there was evidence that ████████████████████████████

████████████████████████████████████████████. ████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████ Pappa recalls █████████████████████████████████

██████████, ████████████████████████████████████ and

███████████████████████████████████████████, *see*

████████████████. Pappa acknowledges that █████████████████████

██████████████ ████████████. ████████████████ Pappa does not recall ████████

████████████████████████████, ████████, and ████████

███████████████████████████ (he was never even asked if he deleted it).

The Government has also admitted that █████████████████████████████

████████████. ████████████████████████ Although Plaintiff had information

showing that ███████████████████████████████████████████

19

██████████   ████████████████████████████████████████████████ it
appears that Plaintiff did not determine whether ██████████████████████
████████.

      Finally, Pappa ████████████████████████████████████████
████████████   ████████████, and it is not clear what happened to █████████. ████
███████████████████████████████ Pappa does not recall ███████████
████, another witness recalls ████████ but cannot remember if they were collected at
the end of the briefing, and a third believes they were collected, but does not know who took them.
████████████████████████████████████████████████████████████
████████████████.

      Given that testimony, anyone present at those briefings could potentially have released the
PowerPoint.  As a result, it was incumbent on Plaintiff to determine who was present at each
meeting and depose (or get a declaration) from each attendee.  But Plaintiff never did that.  For the
████████ Briefing, Plaintiff failed to ask the government's 30(b)(6) witnesses for a complete list
of attendees and failed to follow up or move to compel after the government objected when
Plaintiff asked Pappa about attendees, ███████████████████████   Although ████████
identified two attendees (in addition to ████████████), Plaintiff failed to follow up on that
information and has not deposed or obtained a declaration from either of them.  ████████
████████████████████████████████████████████████████████ For
the ████████ Briefing, Plaintiff failed to ask Pappa about attendees, and other deponents were
unable to recall attendees, aside from ████████████████ and an unnamed person from ██
████████████████████████████████ As far as the materials
provided by Plaintiff show, Plaintiff has not deposed or obtained declarations from any ██

personnel.  For the ███████ Briefing, Plaintiff never asked Pappa for a list of attendees, but an email in Plaintiff's possession includes a partial list of invitees, █████████████████



To the extent that the deponents could not provide the names of any specific attendees for the ████████ or ████████ Briefings, that does not exhaust Plaintiff's obligation.  Through RFPs, interrogatories, or 30(b)(6) testimony, Plaintiff should have determined definitively whether building or office visitor logs were available (building logs of outside visitors certainly are created at ██████████████ secure facilities) and whether the scheduling assistants for any of the known attendees had any records showing invitees.  Given security requirements, it is virtually impossible for a meeting including outside visitors from other agencies to take place in a secure building like the ████████ or ████████ without records showing the point of contact within the building, which would provide a direct lead to the schedulers in the building and to attendees.

To exhaust "every reasonable alternative source of information," *Zerilli*, 656 F.2d at 713, Plaintiff should be required to pursue all of these leads.  To the extent Plaintiff complains that she "cannot reasonably be expected to depose a large quantity of" people, the answer is clear: "that is precisely what the law in this circuit requires."  *Goldberg v. Amgen*, 123 F. Supp. 3d 9, 18 (D.D.C. 2015).  Where there is "a reasonably well-defined number of possible alternative sources for the same information sought from the journalist, the party seeking to compel testimony must demonstrate reasonable efforts to exhaust those possible sources."  *Id.*  And that specifically

includes pursuing all those who are known to have had access to particular documents at issue. *See, e.g.*, *Tripp v. Dep't of Def.*, 284 F. Supp. 2d 50, 61 (D.D.C. 2003) (requiring plaintiff to depose employees at three agencies "who have access to personnel files").

As the D.C. Circuit has explained, the obligation to exhaust reasonable alternatives "is clearly very substantial," and "an alternative requiring the taking of as many as 60 depositions might be a reasonable prerequisite to compelled disclosure." *Zerilli,* 656 F.2d at 714. Plaintiff's tally of 17 fact depositions is nowhere near that mark. The gaps in discovery outlined above delineate a "reasonably well-defined number of possible alternative sources," *Goldberg*, 123 F. Supp. 3d at 18, and Plaintiff must pursue them all before seeking discovery from Ms. Herridge.

> **D.**    **The Public Interest in First Amendment Protections That Support a Robust Free Press Outweighs Plaintiff's Personal Interest in Seeking Damages in Her Privacy Act Lawsuit.**

Analysis under *Zerilli* does not abruptly end with a mechanical assessment of (i) whether subpoenaed information is central to a plaintiff's case (centrality) and (ii) whether plaintiff has exhausted other avenues of discovery (exhaustion). Instead, *Zerilli* calls for balancing the plaintiff's interest in securing the information against vital First Amendment protections that are essential for promoting the public interest in a robust free press. *See Zerilli*, 656 F.2d at 712. Although some decisions in this district have reduced *Zerilli* to a mere two-part test foreclosing a broader balancing of interests, that is contrary to what *Zerilli* described, and no decision of the D.C. Circuit requires that result. A case-by-case balancing of interests is necessary, and that balancing overwhelmingly favors upholding the journalist's privilege in this case.

> **1.**    ***Zerilli* Calls for a Balancing of Interests.**

*Zerilli* itself straightforwardly announced a broad balancing analysis, explaining that "to determine whether the privilege applies courts should look to the facts of each case, weighing the public interest in protecting the reporter's sources against the private interest in compelling

disclosure." 656 F.2d at 712. Indeed, the *Zerilli* court repeatedly emphasized that "a balancing approach should be applied." *Id.*; *see also id.* (explaining that courts should "strik[e] a balance between the civil litigant's interest in compelled disclosure and the public interest in protecting a newspaper's confidential sources"). The court even rejected calls for tests providing more "specificity" and instead defended "the case-by-case balancing approach we have adopted." *Id.* at 712 n.46. And in describing particular factors that should inform that balancing, *Zerilli* did not announce a two-part test producing a mechanical result. Instead, it announced "guidelines" to be used in deciding "how the balance should be struck in a particular case." *Id.* at 713.

Treating *Zerilli* as if it demanded an end to analysis whenever the centrality and exhaustion guidelines have been met would also flatly contradict *Zerilli*'s core instruction that courts should protect the "preferred position of the First Amendment" and ensure that the privilege would "prevail in all but the most exceptional cases." 656 F.2d at 712. The contradiction is clear in cases, like this, involving the Privacy Act. Because courts in this circuit have treated the identity of a source as a central issue in Privacy Act cases, if *Zerilli* could be reduced to a two-part test turning on centrality and exhaustion, as a practical matter it would become nothing more than an exhaustion requirement. Under that approach, the journalist's privilege could be overcome in *every* Privacy Act case once a plaintiff had run to ground other discovery options, no matter how minimal the alleged violation or claimed damages, no matter how dubious the merits of the claim, and no matter how important the First Amendment interests involved. As Judge Tatel has observed, reducing *Zerilli* to such an "arid two-factor test" would "allo[w] the exigencies of even the most trivial litigation to trump core First Amendment values." *Lee v. Dep't of Just.*, 428 F.3d 299, 301 (D.C. Cir. 2005) (Tatel, J., dissenting from denial of rehearing en banc). That result cannot be squared with *Zerilli*. The core teaching from *Zerilli* is that First Amendment protections

must not be eroded.  Instead, a balancing of interests should ensure that the privilege would be overcome only in "the most exceptional cases" and "only in rare circumstances."  656 F.2d at 712 & n.46.

If the words retain any meaning, *every* Privacy Act case cannot qualify as a "most exceptional" case or "rare circumstance" worthy of overriding First Amendment protections.  To the contrary, if the privilege must "prevail in all but the most exceptional cases," *id.* at 712, that necessarily means that there will be *unexceptional* civil cases (including Privacy Act cases) in which it will *not* be worth overriding First Amendment protections, even if the civil litigant has no other way to get at the information he seeks.  Put simply, *Zerilli* did not hold that a showing of genuine *need* for information (because it is central to a case and cannot be found elsewhere) trumps First Amendment interests embodied in the journalist's privilege *every time*.

No subsequent decision of the D.C. Circuit has rewritten *Zerilli* to mandate that analysis must end whenever a plaintiff meets the two "guidelines" of centrality and exhaustion.  In particular, *Lee* did not mandate that result.  *Lee* merely addressed the centrality and exhaustion factors without addressing any further balancing of interests one way or another.  *See Lee*, 413 F.3d at 60–61.  Silence on that point cannot rewrite the clear instructions in *Zerilli* to ensure that a balancing of interests favors the First Amendment "in all but the most exceptional cases."

Nor did the denial of rehearing en banc in *Lee* provide any holding on the use of balancing simply because Judge Tatel raised the issue in dissent.  The court of appeals denied rehearing without opinion on an equally divided 4-4 vote.  *See Lee*, 428 F.3d at 300 & nn. 1&5 (Judges Edwards, Rogers, Tatel, and Garland voted to grant rehearing, and Judges Brown and Griffith did not participate).  Judge Tatel and then-Judge Garland dissented on the ground that *Zerilli* provided for a balancing of interests, which the panel had failed to conduct.  *See id.* at 301–03 (Tatel, J.,

joined by Garland, J., dissenting from denial of reh'g en banc).  But nothing in that outcome provides a holding *banning* a balancing of interests.  Denial of rehearing en banc leaves the panel opinion undisturbed.  It cannot convert a silent *failure to apply* a particular mode of analysis into a holding *forbidding* that analysis.  To the contrary, "a summary denial of rehearing en banc is insufficient to confer any implication or inference regarding the court's opinion relative to the merits of a case" even as to an argument "raised in dissent."  *Luckey v. Miller*, 929 F.2d 618, 622 (11th Cir. 1991); *see also Estate of Parsons v. Palestinian Auth.*, 952 F. Supp. 2d 61, 69 n.6 (D.D.C. 2013) ("[S]ummary denial of a petition for rehearing has no binding effect on the arguments raised therein.").[17]   Other decisions in this district that have read *Lee* to preclude balancing mistakenly rely on the disposition of the petition for rehearing.  *See Lee v. Dep't of Just.*, 401 F. Supp. 2d 123, 132 n.14 (D.D.C. 2005); *see also Hatfill v. Gonzales*, 505 F. Supp. 2d 33, 47 (D.D.C. 2007) (citing the district court in *Lee*).  Such decisions are not persuasive, and this Court is not bound to follow them.  *See, e.g.*, *Broaddrick v. Exec. Off. of Pres.*, 139 F. Supp. 2d 55, 59 (D.D.C. 2001); *see also In re Exec. Off. of Pres.*, 215 F.3d 20, 24 (D.C. Cir. 2000) (district court decisions do not establish "law of the district").

Other decisions in this district have described *Zerilli* as requiring the court to "consider two main factors," *Goldberg*, 123 F. Supp. 3d at 16 (emphasis added), to consider *three* factors, *In re Subpoena to Goldberg*, 693 F. Supp. 2d 81, 85 (D.D.C. 2005), and to consider *four* factors, *see Tripp*, 284 F. Supp. 2d at 55.  These varying descriptions reflect that *Zerilli* calls for *balancing*,

[17] *Accord Moore v. Anderson*, 222 F.3d 280, 284 (7th Cir. 2000) ("[B]ecause a summary denial of petition for rehearing does not explain the bases for the denial, it is 'insufficient to confer any implication or inference regarding a court's opinion relative to the merits of a case.'") (citation omitted); *Alpha-Omega Ins. Servs., Inc. v. Prudential Ins. Co.*, 272 F.3d 276, 281 (5th Cir. 2001) ("[T]he denial of a petition for rehearing can have no greater precedential effect than the denial of a petition for certiorari, which is to say none." (quotation marks and citation omitted)).

and different factors may be relevant to the balance in each case.  Indeed, confirming the view that *Zerilli* ultimately turns on balancing, other decisions of this court have explained that, "in civil cases, the privilege typically prevails because any interest in overcoming the privilege is by definition a private rather than public interest."  *U.S. Commodity Futures Trading Comm'n v. McGraw-Hill Cos.*, 507 F. Supp. 2d 45, 51 (D.D.C. 2007) (citing *Zerilli*, 656 F.2d at 712).  And courts have made it express that a plaintiff falls short under *Zerilli* where he "has demonstrated no overwhelming or compelling societal interest in overcoming the presumption favoring First Amendment protections for a reporter's sources."  *Grunseth v. Marriott Corp.*, 868 F. Supp. 333, 335–36 (D.D.C. 1994).

> **2.**     **The Balance of Interests Overwhelmingly Favors the Public Interest in First Amendment Protections that Promote a Robust Free Press.**

> **a.**     **Plaintiff's Personal Interest in Damages Weighs Little in the Balance, Especially Given the Weaknesses in her Claims.**

Here, the balance of interests under *Zerilli* overwhelmingly favors the journalist's privilege.  Plaintiff's interest in ferreting out confidential sources so that she can recover damages is a purely parochial, private interest of her own.  There is no "overwhelming or compelling societal interest" at stake in her claim for damages.  *Grunseth*, 868 F. Supp. at 335.  In this case, moreover, even a generalized interest in enforcing the Privacy Act weighs little in the balance, because it will be extraordinarily difficult for Plaintiff to prove that any damages she allegedly suffered arose from Privacy Act violations.  There can be no justification for damaging First Amendment protections for journalists in aid of a claim so hobbled by weaknesses that it is unlikely to result in any significant Privacy Act award for Plaintiff in any event.

(i)     **Plaintiff Cannot Obtain Privacy Act Damages for DoD's Decision to Terminate Tuition Assistance "Based on National Security Grounds."**

The bulk of damages that Plaintiff seeks arose from DoD's decision to terminate UMT from its tuition assistance program.  *See* Compl. ¶¶ 42, 55, 56.   Based on those findings, DoD terminated UMT "based on national security grounds."

For a host of reasons, Plaintiff cannot recover damages in this Privacy Act suit for that independent action by DoD.  To start with, Plaintiff cannot prove causation.  *See generally Albright v. United States*, 732 F.2d 181, 186 (D.C. Cir. 1984) (Privacy Act plaintiff must prove damages were caused by the violation of the Act).  An independent decision by a government authority is a supervening cause that breaks any chain of causation tracing back to acts (including tortious acts) prior to the government action.  *See, e.g.*, *Mideast Sys. & China Civ. Constr. Saipan Joint Venture v. Hodel*, 792 F.2d 1172, 1177–78 (D.C. Cir. 1986); *Alemu v. Dep't of For-Hire Vehicles*, 327 F. Supp. 3d 29, 52 (D.D.C. 2018); *Reese v. Geneva Enters., Inc.*, No. CIV.A. 96-1575-LFO, 1997 WL 214864, at *8 (D.D.C. Apr. 18, 1997); *Hotel Oakland Assocs. v. Doyle Real Est. Advisors, LLC*, No. 21-CV-05389-SK, 2022 WL 1493267, at *10 (N.D. Cal. May 3, 2022); *see generally Dellums v. Powell*, 566 F.2d 167, 192–93 (D.C. Cir. 1977).  To trace a chain of causation extending from the alleged leak through DoD's independent decision, Plaintiff would have to establish that

27

the DoD decision itself was somehow tainted and improperly based on the alleged leak of information (the tortious act) and *not* based on review of the record before the agency. *See, e.g.*, *Hand v. Gary* 838 F.2d 1420, 1428 (5th Cir. 1988) ("An independent intermediary breaks the chain of causation unless it can be shown that the deliberations of that intermediary were in some way tainted . . . .").

But even entertaining an argument along those lines would raise a further fatal problem: the agency decision is entitled to a presumption of regularity and cannot be collaterally attacked in this Privacy Act suit. *See, e.g.*, *Kleiman v. Dep't of Energy*, 956 F.2d 335, 337–38 (D.C. Cir. 1992) (the Privacy Act "is not, however, a vehicle for amending the *judgments* of federal officials") (emphasis in original; quotation marks and citations omitted); *Douglas v. Agric. Stabilization & Conservation Serv.*, 33 F.3d 784, 785 (7th Cir. 1994) (explaining that the "Privacy Act does not authorize relitigation of the substance of agency decisions"); *Leib v. Veterans' Admin.*, 546 F. Supp. 758, 762 (D.D.C. 1982) ("The Privacy Act was not intended to be and should not be allowed to become a 'backdoor mechanism' to subvert the finality of agency determinations."). If Plaintiff wanted to attack the DoD decision, she should have pursued further direct review.

In addition, Plaintiff's claim would perversely make the Privacy Act a means to get damages for *correct* agency decisions. Plaintiff was cut off from a stream of taxpayer funding because DoD found that UMT presented a national security threat. Now Plaintiff wants to get *more* taxpayer dollars as Privacy Act damages for that decision simply because someone allegedly released information showing that DoD was *right* that Plaintiff and UMT presented a genuine national security threat. Nothing in the Privacy Act permits that absurd result. And it is more than a bit ironic that Plaintiff now claims the mantel of the Privacy Act after DoD terminated funding

28

to UMT precisely because it put ███████████████████████████

██████████████████ at risk of collection by a foreign power. ████████████████████

**(ii)**    **All the Key Elements of the Story Appeared in the Fox Reporting Through Sources *Other Than* the Few Pieces of Information Allegedly Implicating the Privacy Act.**

To the extent Plaintiff claims damages apart from DoD's decision to cut off tuition assistance, she still faces insurmountable hurdles in proving that any alleged damages were caused by the specific information allegedly released in violation of the Privacy Act, rather than from the vast bulk of reporting (not based on any alleged violation) that detailed the years-long investigation into her and UMT.  After all, in 2012 it was widely reported that the FBI carried out a very public raid at both her home and at UMT.  *See supra* n.2.  And in the subsequent Fox Reporting, all the essential elements of the story were set out through sources quite apart from the few specific pieces of information that Plaintiff has identified as underpinning her Privacy Act claims.

Stephen Rhoads, a whistleblower who worked at UMT and served as an undercover FBI informant, told FNN on camera that Plaintiff had admitted to him that she had been a colonel in the PLA—and told him to lie about it to a grand jury.  Ex. B at 3.  Rhoads also explained that UMT targeted recruiting at U.S. military service members and uploaded their entire service records onto UMT's computer system where they could be accessed remotely.  *Id.*  An expert on the Chinese military, Peter Mattis, explained why a school like UMT would interest the Chinese military.  The personnel records would provide a "curated database" that would be valuable for two reasons: "The first is, militaries everywhere want to know what a potential adversary might look like—what are their capabilities, how will they act?  The second is this might also serve as a vehicle for recruiting individuals."  Ex. D at 2.  Rhoads also explained that the DoD itself was using taxpayer dollars to fund this potential front for Chinese espionage through its tuition assistance program.  Ex. B at 3.

29

Sources told FNN that the FBI and the U.S. Attorney's Office disagreed about prosecuting and that the case had been dropped partly for fear that proceeding might compromise methods of collecting intelligence.  *Id.*  In 2017, Congressman Jason Chaffetz sent a public letter to the Secretary of Defense demanding to know why more was not being done in the investigation.  Ex. D at 1.  And the NCIS publicly confirmed that there was "still an active multi-agency investigation" into UMT.  Ex. E at 1.

The core concerns underpinning the counterintelligence investigation were thus fully set out quite apart from any Privacy Act information: a person who had been a colonel in the PLA (and who was telling others to lie to hide it) was compiling a database on U.S. servicemembers, their postings, and their previous duties, that could potentially be made available to the Chinese government.  And the Pentagon was funding this operation through tuition assistance.  Indeed, as Exhibits X and Y make clear, even with all the alleged Privacy Act material removed, the February 24, 2017 and April 28, 2017 articles read like complete stories that convey all the essential elements of the report.[18]

Given that all this other information was available in the Fox Reporting, it will be virtually impossible for Plaintiff to prove that the few additional pieces of information allegedly subject to her Privacy Act claims—which this Court has summarized as "snippets of her immigration forms, a summary of an FBI interview with her daughter, and personal photographs of her and her husband," Dkt 13, at 1—caused whatever damages she attempts to claim.

---

[18] Exhibits X and Y have been created by removing all alleged Privacy Act material from the stories and eliminating the resulting gaps in order to demonstrate how the articles would read without any of the Privacy Act material.

        **(iii)**     **Virtually All the Information Underpinning Plaintiff's Claims Was in an FBI Affidavit That Was Legally a Matter of Public Record Since 2013.**

Plaintiff's claims are further fatally undermined by the fact that virtually all the information underpinning her Privacy Act claim was contained in the FBI Affidavit that the Eastern District of Virginia has held was a public document since 2013.  As explained above, *see supra* pp. 8–10, the magistrate judge in that case held that his order sealing the affidavit expired on March 4, 2013, that from that point in time "the information that was contained in the application and affidavit . . . was not considered to be under the Court's sealing order," and that it "should have been  removed from the sealed portion of the court's files."  May 8, 2017 Tr. at 2:19–20, 29:22–24; *see also supra* pp. 8–10.  That is, it was part of the public records of the court subject to public inspection and there could be no violation of the sealing order even if someone had released the information.[19]

Plaintiff did not challenge that holding, and she is precluded from relitigating the issue here.[20]

---

[19] Indeed, it would have violated the common law right of access to judicial records for the court *not* to make that document publicly available absent a court order.  *Baltimore Sun Co. v. Goetz*, 886 F.2d 60, 65 (4th Cir. 1989); *see also In re Leopold to Unseal Certain Elec. Surveillance Apps. & Ords.*, 964 F.3d 1121, 1123 (D.C. Cir. 2020) ("The public's right of access to judicial records is a fundamental element of the rule of law.").

[20] All the elements of issue preclusion are satisfied.  *See generally Martin v. Dep't of Just.*, 488 F.3d 446, 454 (D.C. Cir. 2007).  *First*, the question whether the FBI Affidavit had become a public document was "contested by the parties and submitted for judicial determination."  *Id.*  Plaintiff based her Motion to Show Cause partly on the argument that the "matter remained under indefinite seal" and that the disclosure of information was a "violation of this Court's seal."  Mot. To Show Cause at 2–3.  And the government opposed on the ground that "the sealing order was no longer in effect after March 4, 2013."  Gov't Response to Mot. To Show Cause at 2, *Search Warrant Litig.*, ECF No. 11.  *Second*, the issue was actually and necessarily determined" by the court.  *Martin*, 488 F.3d at 454.  The quotations cited above from the motion hearing make plain that the court ruled on the issue, *see supra* pp. 8–10, and it was necessary for the court to decide the issue to rule on Plaintiff's claim that the sealing order had been violated.  *Third*, it would not work any "basic unfairness" to preclude Plaintiff from relitigating the issue here.  *Martin*, 488 F.3d at 454.  The effect of the court's own sealing order was best decided by the Eastern District of Virginia and there could be no reason for revisiting that court's ruling about public access to its own docket.

Given that ruling, Plaintiff cannot establish that any release of the information contained in the FBI Affidavit constituted a "disclosure" under the Privacy Act.  *See* 5 U.S.C. § 552a(b).There is no disclosure for Privacy Act purposes where there is no "protectable privacy interest" in the information.  *Barry v. U.S. Dep't of Just.*, 63 F. Supp. 2d 25, 28 (D.D.C. 1999). And there can be no such interest either where the information has, as a matter of fact, been disseminated publicly, *see, e.g.*, *id.* at 27–28; *FDIC v. Dye*, 642 F.2d 833, 836 (5th Cir. 1981), or where it is legally available as a public record, "subject to public inspection," *e.g.*, *Danks v. Zinke*, No. 1:17-cv-114, 2018 WL 8646658, at *3 (D.N.D. Nov. 27, 2018); *Mitchell v. USDA*, No. 13-cv-500-bbc, 2014 WL 7240671, at *5 (W.D. Wis. Dec. 17, 2014);[21] *see also Hollis v. Dep't of the Army*, 856 F.2d 1541, 1545 (D.C. Cir. 1988) (approving view that, "when a release consists merely of information to which the general public already has access . . . the Privacy Act is not violated"). Indeed, it would make no sense to say that there could be an impermissible "disclosure" of information that was already a public record on a court docket.  *Cf. Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 494–95 (1975) ("[E]ven the prevailing law of invasion of privacy generally recognizes that the interests in privacy fade when the information involved already appears on the public record.").  Nor can a clerk's error failing to make the FBI Affidavit publicly accessible—contrary to  the court's sealing order—alter its legal status as a public record or create a protectable interest in information that was supposed to be available to the public for years.  *Cf. id.* at 495 ("[T]he First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection.").

---

[21] There is no question here of information that was available only in scattered and isolated public records that would have been difficult to compile.  *Cf. U.S. Dep't of Just. v. Reporters' Comm. for Freedom of Press*, 489 U.S. 749, 764 (1989).

In addition, the D.C. Circuit has acknowledged in *dicta* that there is no disclosure under the Privacy Act where information is "in the public domain" and of a type "traditionally released by an agency to the public without a FOIA request." *Bartel v. FAA*, 725 F.2d 1403, 1413 (D.C. Cir. 1984); *see also Russo v. United States*, 576 F. Supp. 2d 662, 672 (D.N.J. 2008) (release of public domain information cannot be a disclosure under the Privacy Act). That principle also applies to the FBI Affidavit. Once the U.S. Attorney's Office filed the FBI Affidavit in support of its application for a search warrant and secured an order sealing it only for 90 days, under settled law concerning access to court records, all that information was required to become public unless DOJ secured a continuation of the seal—which it never attempted to do.

As one court recently summarized, it is "well-established by case law" that "there can be no disclosure as required for a Privacy Act violation, when the information was already public information, subject to disclosure, or releasable." *Danks v. Zinke*, No. 1:17-cv-114, 2018 WL 8646658, at *3 (D.N.D. Nov. 27, 2018). The information in the FBI Affidavit was legally public information and certainly "subject to disclosure" and "releasable," because the order sealing it expired years ago. As a result, release of information included in the affidavit cannot qualify as a "disclosure" under the Privacy Act.

That alone forecloses virtually all of Plaintiff's Privacy Act claim. The FBI Affidavit spelled out, in vivid detail, every bit of information Plaintiff has identified as the basis for her claims—with the one exception that it did not include the actual photographs of Plaintiff in her PLA uniform. The FBI Affidavit included transcribed cuts from tape recordings in which Plaintiff admitted that she had been a colonel in the PLA; FBI Aff. at ¶¶ 15–16. It detailed Plaintiff's false statement on an immigration form that she had never been affiliated with the Communist Party. *Id.* ¶¶ 20–21. It also listed multiple additional false statements on immigration forms that were

not mentioned in the Fox Reporting. *Id.* ¶¶ 18–19, 24–29.  It explained that personnel at UMT's Beijing offices could access the database of information UMT had compiled on U.S. servicemembers (corresponding to the information from the FBI's interview with Plaintiff's daughter shown in the Fox Reporting). *Id.* ¶ 14.  And it detailed Plaintiff's denial that she had held rank in the PLA during her 2012 interview by the FBI. *Id.* ¶¶ 48–49.  Once all of that information is knocked out, the only remaining basis for Plaintiff's Privacy Act claim is the photographs.  And there is no likelihood that, with all the other information in the Fox Reporting, Plaintiff will be able to establish that the photographs alone caused her alleged damages.

### (iv)   This Case Is Not Like *Hatfill* or *Lee,* Where the Government Had Made Egregious Errors.

Finally, the weight on Plaintiff's side of the scale is further reduced given that this case is wholly unlike *Hatfill* or *Lee.*  In those cases, government leaks either smeared an innocent person who was the completely wrong target for a particular investigation (Hatfill) or grossly exaggerated the target's conduct (Lee).  In *Hatfill*, DOJ had even called a university to bar Hatfill from working on DOJ-funded contracts, which allegedly cost Hatfill his job.  *Hatfill v. Ashcroft*, 404 F. Supp. 2d 104, 108 (D.D.C. 2005).  In *Lee*, government leaks painted Lee as a spy who had handed China the most sensitive nuclear secrets since the Rosenberg case.[22]  In the end, after the FBI recanted some testimony[23]—and after Lee had served nine months in solitary pretrial confinement—Lee pleaded guilty solely to one misdemeanor count of mishandling documents.  *Lee v. Dep't of Just.*, 401 F. Supp. 2d 123, 126 (D.D.C. 2005).  The outrageous circumstances of those cases undoubtedly influenced the rulings on the journalists' privilege.  Indeed, in *Lee,* the court went out

---

[22] Vernon Loeb & Walter Pincus, *Whistleblower or Demagogue?*, Wash. Post (Aug. 29, 1999), https://www.washingtonpost.com/archive/politics/1999/08/29/whistleblower-or-demagogue/4e015bc9-17b2-4fa6-b6d4-0ed9254177b9/.

[23] *See United States v. Lee*, No. CR-99-1417, 2000 WL 36739632, at *4 (D.N.M. Aug. 31, 2000).

of its way to say that "[i]t cannot go unnoted that the manner in which Dr. Lee was treated by the Government appears to have been particularly egregious" and that another federal judge believed that government's handling of the case had "embarrassed our entire nation." *Id.* at 126 n.1.[24]

By contrast, there are no egregious government errors here. Plaintiff makes much of the fact that she was never prosecuted. But decisions not to prosecute in national security cases can be made for many reasons. *See supra* n.9. More important, the government has other means to protect national security. Here, DoD took action. As a result of the investigation, DoD made findings ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ DOD then terminated UMT from tuition assistance "on national security grounds." ████████████████ Plaintiff, moreover, never challenged those findings on judicial review and they remain unchallenged to this day. This case is thus a far cry from *Hatfill* or *Lee*.

---

[24] Indeed, the original discovery order in *Lee* balanced the interests at stake given the particular circumstances of that case. The court explained: "It does not detract from the importance of the First Amendment principle at stake to conclude that, *in the instant case at least*, the reasons for concealing from the plaintiff possible governmental complicity (if such there were) in the revelation to the news media of private, personal, and acutely hurtful information about Dr. Lee *do not outweigh* Dr. Lee's interest in having the evidence available for his use at trial." *Lee v. Dep't of Just.*, 287 F. Supp. 2d 15, 24 (D.D.C. 2003) (emphases added).

b.      **The Public Interest in First Amendment Protections for a Free Press Overwhelms Plaintiff's Interest in Damages.**

On the other side of the balance, the First Amendment interest in protecting confidential sources to promote a robust free press is at its zenith in a case such as this involving matters of national security.  The First Amendment protects the press "primarily because of the important role it can play as 'a vital source of public information.'"  *Zerilli*, 656 F.2d at 711 (citation omitted). "The press was protected so that it could bare the secrets of government and inform the people." *N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring).  But to fulfill that "essential role in our democracy," *id.*, journalists necessarily rely on confidential sources to secure the information the public needs to know.  As the court in *Zerilli* explained, "journalists frequently depend on informants to gather news, and confidentiality is often essential to establishing a relationship with an informant."  *Zerilli*, 656 F.2d at 711.  As a result, "[c]ompelling a reporter to disclose the identity of a source may significantly interfere with this news gathering ability."  *Id.*; *see also id.* at 712 ("Unless potential sources are confident that compelled disclosure is unlikely, they will be reluctant to disclose any confidential information to reporters."). Breaching the journalist's privilege thus necessarily impairs news gathering and undermines the ability of the press to serve as a source of information for the people.

All of the factors favoring protection for confidential sources under the First Amendment are magnified where reporting on national security matters is concerned.  To start with, the need for confidentiality is particularly acute.  Given the potential repercussions for leaking information in the national security field, no government employees would provide information to the press if they could not be assured of confidentiality.  *See* Herridge Decl. ¶ 9.  In addition, matters touching on national security are some of the most important on which the citizenry depends on the press for information.  Such matters range from justifications for war or peace (such as the intelligence

36

failures preceding the invasion of Iraq in 2003), to errors in the conduct of a war (exposed by the Pentagon Papers concerning Vietnam), to information exposing simple negligence or incompetence in a host of matters relevant to safeguarding the national interest against foreign adversaries.  The need for the press to play a role in informing the public is also especially heightened given the tendency toward secrecy in matters involving national security.  Secrecy that justifiably shrouds much government activity is also readily subject to misuse.  It can be used to conceal embarrassing information that reveals government overreaching impinging on civil liberties or simply mistakes, incompetence, and waste.  *Cf. N.Y. Times Co.*, 403 U.S. at 717 (Black, J., concurring in judgment) ("Only a free and unrestrained press can effectively expose deception in government.").  Here, FNN's reports brought to light a situation in which it seemed that, for years, DoD had paid millions of taxpayer dollars to an entity that was being investigated by the FBI and NCIS for serving as a front for Chinese espionage and that was placing at risk sensitive information on thousands of U.S. military members.  And DoD itself later ended that relationship "on national security grounds."

For the press to fulfill its role in informing the public, it is critical for confidential sources to remain protected.  If potential sources knew that, every time a Privacy Act case is filed, it will only be a matter of time until a court orders disclosure of the source's identity, no one would serve as a source.  The public would then be deprived of key information necessary to assess how elected officials (and those reporting to them) are handling some of the most critical affairs of the Nation.

Ms. Herridge's broader work further demonstrates both the critical role the press plays in informing the public and the damage to the public interest that would arise from breaching the journalist's privilege in this case.  Among other investigative reporting Ms. Herridge has pursued, she uncovered the true extent of the injuries U.S. servicemembers suffered from an Iranian ballistic

missile attack in Iraq in January 2020.[25]  The administration had downplayed the injuries for political reasons, both to minimize the effectiveness of the attack and to decrease tensions with Iran—even though that meant denying soldiers Purple Hearts they rightly deserved.  Due to Ms. Herridge's reporting, DoD changed course and fifty soldiers received Purple Hearts.[26]

Ms. Herridge also recently received the Kevin Carmody Award for Outstanding Investigative Reporting for an investigation that exposed serious health hazards from toxic waste at a U.S. military base in Uzbekistan where thousands of servicemembers have been stationed.  *See* Winners: SEJ 20th Annual Awards for Reporting on the Environment, Soc'y of Environmental Journalists, https://www.sej.org/winners-sej-20th-annual-awards-reporting-environment.  As the citation for that award explains, her "tenacious reporting" led to a promise from the Secretary of Defense to remedy the situation.  *Id.*  Indeed, it drove legislation and led to an Executive Order in January 2021 mandating a comprehensive study to address the health consequences for those who served at the base.[27]  None of this reporting could have been accomplished without confidential sources.  Herridge Decl. ¶ 7.  Ms. Herridge's work is so highly regarded that she has been nominated for an Emmy Award for investigative reporting and The Congressional Medal of Honor Society has awarded her the Tex McCrary Award for Journalism, which "is reserved for those persons from the fourth estate who, *through their life's work*, have distinguished themselves by

---

[25] Stephen Battaglio, *How this CBS journalist and organ-donating mom finds purpose in military vet reporting*, L.A. Times (May 4, 2022), https://www.latimes.com/entertainment-arts/business/story/2022-05-04/cbs-news-correspondent-catherine-herridge-organ-donation-for-son.

[26] *See* Michael Kaplan, *Army to award Purple Hearts to 50 soldiers injured in Iran missile attack following CBS News investigation*, CBS News (Dec. 20, 2021), https://www.cbsnews.com/news/purple-heart-iran-missile-attack-50-soldiers/.

[27] Exec. Order No. 13982, 86 Fed. Reg. 6833 (Jan. 19, 2021).

service or unbiased coverage of the United States Military through journalism in peace and war."
https://www.cmohs.org/about-the-society/awards (emphasis added).

If Ms. Herridge were forced to reveal her source(s), her credibility with contacts across the intelligence community—contacts that have been painstakingly established over a career spanning decades—will be destroyed.  And her ability to continue playing a vital role in fulfilling the functions of a free press will be destroyed along with it.

The balance of interests in this case is not even close.  The First Amendment interest in upholding the journalist's privilege vastly outweighs Plaintiff's personal interest in damages.  As Judge Tatel has put it, "it's hard to imagine" how a plaintiff's personal interest in Privacy Act damages "could outweigh the public's interest in protecting journalists' ability to report without reservation on sensitive issues of national security."  *Lee*, 428 F.3d at 302 (Tatel, J., dissenting from denial of reh'g en banc).  That is especially true here, given the hurdles Plaintiff faces in proving any damage actually caused by a disclosure of information protected by the Privacy Act.

At a minimum, the Court should exercise its discretion to postpone ruling on discovery from Ms. Herridge until the weaknesses in Plaintiff's case can be tested on motions for partial summary judgment from the government defendants.  That would provide a clearer view of the competing interests at stake before the Court rules on overriding First Amendment protections.

## II.    THE SUBPOENAS SHOULD BE QUASHED BECAUSE THEY INVADE THE NEWSGATHERING PRIVILEGE UNDER FEDERAL COMMON LAW.

If the Court concludes that the journalist's privilege under the First Amendment does not prevail in this case—and especially if the Court holds that *Zerilli* and *Lee* preclude balancing the competing interests at stake—the Court should recognize a federal common law privilege that allows the Court to consider that balancing.  It is well settled that "Rule 501 of the Federal Rules of Evidence authorizes federal courts to define new privileges by interpreting 'common law

principles . . . in the light of reason and experience.'" *Jaffee v. Redmond*, 518 U.S. 1, 8 (1996)

(quoting Fed. R. Evid. 501); *see also Hatfill v. Gonzales*, 505 F. Supp. 2d 33, 44 (D.D.C. 2007)

(new privileges may be recognized "if doing so is prudent 'in light of reason and experience'").

Although the D.C. Circuit has yet to recognize a common law privilege protecting a journalist's

confidential sources, it also has not rejected it.  *See generally In re Grand Jury Subpoena, Judith

Miller*, 438 F.3d 1141 (D.C. Cir. 2006).[28]  As explained below, all the factors the Supreme Court

identified in *Jaffee* strongly favor recognizing such a privilege, and other decisions in this district

rejecting a common law privilege are not persuasive.

First, like other relationships that have justified evidentiary privileges (such as the

psychotherapist-patient privilege in *Jaffee*), the relationship between a journalist and a confidential

source is plainly "rooted in the imperative need for confidence and trust." *Jaffee*, 518 U.S. at 10.

The D.C. Circuit has readily acknowledged that assurances of confidentiality are often "essential"

for journalists to secure information from sources.  *Zerilli*, 656 F.2d at 711.  In fact, confidentiality

is even more central to this relationship than to some others protected by privilege.  Confidentiality

does not merely promote the better functioning of the relationship by encouraging a more open

exchange between two parties. *Cf. Jaffee*, 518 U.S. at 10.  Confidentiality is the bedrock condition

without which the relationship would never be formed.

Second, recognizing a common law privilege would "serve public ends." *Jaffee*, 518 U.S.

at 11.  The core purpose of the privilege is to protect journalists' ability to gather news and thereby

to ensure that the press can "fulfill its essential role in our democracy" to "bare the secrets of

---

[28] In *In re Miller*, Judge Sentelle rejected a common law privilege.  438 F.3d at 1154–59 (Sentelle, J., concurring).  Judge Tatel argued in favor of it.  438 F.3d at 1164–83 (Tatel, J., concurring in judgment).  And Judge Henderson concluded only that, if such a privilege existed, it would have been overcome in that case.  *Id.* at 1159 (Henderson, J., concurring).

government and inform the people." *N.Y. Times Co.*, 403 U.S. at 717 (Black, J., concurring).  As Judge Tatel has explained, the press cannot fulfill its role without confidential sources.  "Reporters could reprint government statements, but not ferret out underlying disagreements among officials; they could cover public governmental actions, but would have great difficulty getting potential whistleblowers to talk about government misdeeds."  *In re Miller*, 438 F.3d at 1168 (Tatel, J., concurring in judgment).  The public ends served by a journalist's privilege are arguably more direct than those served by other evidentiary privileges.  The psychotherapist-patient privilege, for example, directly benefits individuals by removing barriers to seeking counseling.  *Jaffee*, 518 U.S. at 11 ("[T]he proposed privilege thus serves important private interests.").  It indirectly promotes the public interest through the aggregate effect of improving the "mental health of our citizenry."  *Id.*  The journalist's privilege, by contrast, is targeted directly at allowing the press to fulfill its role of informing voters on matters of public importance.  Promoting the proper functioning of a robust free press that can disclose information otherwise shrouded in government secrecy certainly merits recognition as a "public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth."  *Jaffee*, 518 U.S. at 9.

In rejecting a common law privilege, the court in *Hatfill* decided that "confidential sources" are not a "public good of transcendent importance," and that a free press is not "dependent" on a right to protect confidential sources.  *Hatfill*, 505 F. Supp. 2d at 45; *see also Lee,* 401 F. Supp. 2d at 141 (confidential sources "are not a *sine qua non* of journalism but only an important and useful tool").  That reasoning distorts the proper analysis.  The question under *Jaffee* is not whether "confidential sources" are a public good, but whether protecting a journalist's confidential source relationship *promotes* a public good.  It indisputably does, by furthering the newsgathering functions of a free press.  Similarly, it is not a prerequisite to recognizing a privilege that some

public good will be utterly destroyed without it.  Marriage would still exist without the spousal privilege and doctors would still see patients without the doctor-patient privilege.  The law recognizes, however, that these relationships benefit from an evidentiary privilege.  The vigorous functioning of the press is similarly benefitted by a privilege protecting confidential sources.

Third, "policy decisions of the States" overwhelmingly confirm that a privilege protecting confidential sources should be recognized.  *Jaffe*, 518 U.S. at 12.  The States are in almost complete agreement on the existence of a strong reporter's privilege.  Forty-nine States and the District of Columbia have recognized such a privilege.[29]  In twenty-one States and the District of Columbia, the privilege is *absolute* in civil cases (with exceptions for narrow circumstances not present here).[30]  And in at least twenty-two States and the District of Columbia, where the privilege is qualified (or qualified under certain circumstances, such as in cases involving non-confidential information), overcoming the privilege requires not only (i) showing the that evidence is central to the case and (ii) exhausting other avenues of discovery, but also (iii) showing that the balance

---

[29] Many States have created the privilege through legislation.  As the Supreme Court explained in *Jaffee*, however, "[i]t is of no consequence that recognition of the privilege in the vast majority of States is the product of legislative action rather than judicial decision."  518 U.S. at 13.

[30] Alabama: Ala. Code § 12-21-142; Arizona: A.R.S. § 12-2237; California: Cal. Evid. Code § 1070; District of Columbia: D.C. Code § 16-4702; Indiana: Ind. Code § 34-46-4-2; Kentucky: Ky. Rev. Stat. § 421.100; Maryland: Md. Cts. & Jud. Proc. Code Ann. § 9-112(c)(1); Minnesota: Minn. Stat. §§ 595.023, 595.025 (exception for defamation actions); Montana: Mont. Code § 26-1-902; Nebraska: Neb. Rev. Stat. § 20-146; Nevada: Nev. Rev. Stat. § 49.275; New Jersey: N.J. Stat. § 2A:84A-21; New York: N.Y. Civ. Rights Law § 79-h (McKinney); Ohio: Ohio Rev. Code § 2739.12; Oregon: Or. Rev. Stat. § 44.520 (exception for defamation actions); Pennsylvania: 42 Pa. Cons. Stat. § 5942; South Dakota: S.D. Codified Laws § 19-2-15; Utah: Utah R. Evid. 509(b) (exception where confidential information necessary to prevent substantial injury or death); Vermont: 12 Vt. Stat. § 1615(b)(1); Washington: Wash. Rev. Code § 5.68.010; West Virginia W. Va. Code § 57-3-10 (exception where confidential information necessary to prevent serious bodily injury or imminent death); Wisconsin: Wis. Stat. § 885.14.

of interests favors overcoming the privilege in the particular case.[31]  In rejecting a common law

privilege, *Hatfill* provided no rationale for ignoring this overwhelming consensus in the States.

Fourth, the benefits arising from the privilege must be weighed against the "likely

evidentiary benefit that would result from denial of the privilege." *Jaffee*, 518 U.S. at 11.  Here,

it is critical that the common law privilege would be qualified, not absolute, and subject to a

balancing of interests in each case.  Accordingly, the privilege would not deny access to evidence

in every case.  Instead, where there are sufficiently weighty public interests at stake, the privilege

would be overcome and a source would be disclosed.  The suggestion in *Hatfill* that recognizing a

common law privilege would effectively end enforcement of the Privacy Act is thus misplaced.

*Hatfill*, 505 F. Supp. 2d at 45.  In Privacy Act cases, as in other cases, a court would simply

consider whether the case presented sufficiently weighty interests to overcome the important role

---

[31] Alaska: Alaska Stat. § 09.25.310(b); Colorado: Colo. Rev. Stat. § 13-90-119(3); Connecticut: Conn. Gen. Stat. § 52-146t(d); District of Columbia: D.C. Code § 16-4703: Florida: *McCarty v. Bankers Ins. Co., Inc.*, 195 F.R.D. 39, 45 (N.D. Fla. 1998); Idaho: *In re Contempt of Wright*, 700 P.2d 40, 44 (Idaho 1985); Illinois: 735 Ill. Compiled Stat. 5/8-907; Iowa: *Lamberto v. Bown*, 326 N.W.2d 305, 309 (Iowa 1982); Kansas: Kan. Stat. § 60-482; Kentucky: *Lexington Herald-Leader Co. v. Beard*, 690 S.W.2d 374, 376 (Ky. 1984); Louisiana: La. Rev. Stat. § 45:1453; Maine: 16 Maine Rev. Stat. § 61(2); Maryland: Md. Cts. & Jud. Proc. Code Ann. § 9-112(d); Massachusetts: *In re John Doe Grand Jury Investigation*, 574 N.E.2d 373, 375 (Mass. 1991); New Mexico: N.M. R. Evid. Rule 11-514; North Dakota: *Grand Forks Herald v. Dist. Ct. in & for Grand Forks Cnty.*, 322 N.W.2d 850, 857 (N.D. 1982); Tennessee: Tenn. Code § 24-1-208; Texas: Tex. Civ. Prac. & Rem. Code § 22.024; Utah: Utah R. Evid. 509(c)–(d); Vermont: 12 Vt. Stat. § 1615(b)(2); Virginia: *Clemente v. Clemente*, 56 Va. Cir. 530, at *1 (2001); Washington: Wash. Rev. Code § 5.68.010(2)(b); Wisconsin: Wis. Stat. § 885.14(2)(c).

The remaining States recognizing the privilege are: Arkansas: Ark. Code Ann. § 16-85-510; Delaware: 10 Del. Code § 4320-26; Georgia: Ga. Code Ann. § 24-5-508; Hawaii: *Belanger v. City and Cnty. of Honolulu*, Civ. No. 93-4047-10 (Haw. 1st Cir. Ct. May 4, 1994) (unpublished) (civil); Michigan: Mich. Comp. Laws Ann. §§ 767.5a, 767A.6; Mississippi: *Hawkins v. Williams*, Civ. No. 2900054 (Cir. Ct. 1st Jud. Dist. Hinds Cnty., Mar. 16, 1983); Missouri: *State ex rel. Classic III Inc. v. Ely*, 954 S.W.2d 650, 655 (Mo. Ct. App. 1997); New Hampshire: *Keene Publ'g Corp. v. Cheshire Cnty. Super. Ct.*, 406 A.2d 137, 138 (N.H. 1979); North Carolina: N.C. Gen. Stat. Ann. § 8-53.11; Oklahoma: Okla. Stat. Ann. tit. 12, § 2506; Rhode Island: R.I. Gen. Laws Ann. §§ 9-19.1-2; South Carolina: S.C. Code Ann. § 19-11-100.

that confidentiality plays in the functioning of a free press.  Without any balancing of interests, the alternative rule is that, eventually, the plaintiff will be able to uncover a confidential source in *every* Privacy Act case, whether the case presents any significant public interest or not.

*Hatfill* and *Lee* are also mistaken in suggesting that a balancing of interests is "inherently unworkable" because judges are ill-suited to determine the "newsworthiness" of particular stories. *Hatfill*, 505 F. Supp. 2d at 47.  That misunderstands the nature of the balancing.  Courts would not weigh the value of a particular story bur rather the broader interest in protecting confidential sources to promote a vigorous free press.  The question to be answered is whether undermining *that* interest is justified in a particular case.  *See, e.g.*, *Riley v. City of Chester*, 612 F.2d 708, 716 (3d Cir. 1979) (recognizing federal common law reporter's privilege and explaining that "we must balance on one hand the policies which give rise to the privilege").[32]

*Hatfill* and *Lee* err once more in suggesting that, if the constitutionally based privilege in *Zerilli* does not include a balancing of interests, any common law privilege must be similarly limited. *Hatfill*, 505 F. Supp. 2d at 46–47; *Lee*, 401 F. Supp. 2d at 139.  That reasoning inverts the ordinary presumptions underpinning the constitutional avoidance rule.  Ordinarily, courts prefer to ground a decision on a source of law *other than* the Constitution, to avoid addressing constitutional issues.  *See, e.g.*, *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring).  But pointing to *Zerilli* to constrain the common law effectively constitutionalizes decisions on the scope of any common law privilege.  It also improperly stifles

---

[32] Courts might need to assign different weight to different *types* of reporting, but it is settled law that the First Amendment recognizes some hierarchy in types of speech.  *See, e.g.*, *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) ("[N]ot all speech is of equal First Amendment importance . . . .") (internal quotation marks and citation omitted); *Connick v. Myers*, 461 U.S. 138, 145 (1983) ("[T]he Court has frequently reaffirmed that speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection.") (citation omitted).

the development of the law, contrary to the Supreme Court's admonition in *Jaffee* that, under Rule 501, federal courts are to "continue the evolutionary development of testimonial privileges." *Jaffee*, 518 U.S. at 9 (quoting *Trammel v. United States*, 445 U.S. 40, 47 (1980)).

For all these reasons, the Court should adopt a journalists' privilege under the federal common law. And for all the reasons above, Plaintiff cannot overcome that privilege. She has not exhausted other avenues of discovery, *see supra* Part I.C, and she cannot show that her interest in disclosure outweighs the public interest in protecting confidential sources, *see supra* Part I.D. As a result, the common law privilege provides an independent ground for quashing the subpoenas.

## **CONCLUSION**

For the foregoing reasons, the motion to quash the subpoenas should be granted.

DATED:  July 29, 2022                    Respectfully submitted,

                                         ELLIS GEORGE CIPOLLONE
                                         O'BRIEN ANNAGUEY LLP
                                              Patrick F. Philbin (DC Bar No. 435620)
                                              1155 F St. NW
                                              Suite 750
                                              Washington, DC 20004
                                              Tel.: (202) 249-6633
                                              Fax: (202) 249-6899
                                              pphilbin@egcfirm.com


                                         By:        /s/ Patrick F. Philbin
                                                    Patrick F. Philbin
                                         *Counsel for Catherine V. Herridge*