PUBLIC VERSION

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

YANPING CHEN,

                         **Plaintiff,**

v.

FEDERAL BUREAU OF INVESTIGATION,
U.S. DEPARTMENT OF JUSTICE, U.S.
DEPARTMENT OF DEFENSE, and U.S.
DEPARTMENT OF HOMELAND SECURITY,

                         **Defendants.**

Civil Action No. 1:18-cv-03074-CRC

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## NON-PARTY CATHERINE V. HERRIDGE'S MOTION TO QUASH

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ................................................................................................... 1

RELEVANT FACTUAL BACKGROUND ................................................................. 4

    A.    Plaintiff Dr. Yanping Chen ............................................................................ 4

    B.    The Government Investigates Dr. Chen for Years but Ultimately Does Not Charge Her With Any Crime. ................................................................... 5

    C.    The Fox News Reports Concerning Dr. Chen. ........................................... 6

    D.    Discovery Reveals the Origin of the Private Materials Referenced and Depicted in the Fox News Reports. ............................................................ 8

    E.    Dr. Chen's Exhaustive Efforts to Discover Who Leaked Her Private Information and Documents to Herridge and Fox News. ............................ 9

    F.    Dr. Chen's Subpoenas to Fox News and the Individual Authors of the Fox News Reports Concerning Dr. Chen. ..................................................... 13

ARGUMENT ....................................................................................................... 14

I.    Dr. Chen Has More Than Satisfied the Requirements for Overcoming the Qualified First Amendment Privilege. ............................................................. 14

    A.    The Discovery Requests at Issue Seek Only Information Central—Indeed, Crucial—to Dr. Chen's Privacy Act Claims. .......................................... 15

    B.    Dr. Chen Has Made Extensive Prior Discovery Efforts to Identify the Source of the Leak of Her Private Documents and Information—but Has Received Denials from Every Reasonably Identifiable Potential Source. ........................... 18

II.    There Is No Amorphous, Stand-Alone "Balancing" Element of the Test for Discovery in a Privacy Act Case. ........................................................................ 25

    A.    The Two-Part Test in *Zerilli* is the Law of This Circuit. ......................... 25

    B.    Numerous District Court Decisions Have Agreed that *Zerilli* Created a Two-Part Test and Rejected the Adoption of a Vague Balancing Element. ......... 28

    C.    Herridge's Argument Concerning Dr. Chen's Damages Case is an Irrelevant Red-Herring—and Wrong to Boot. ...................................................... 29

    D.    Herridge's Arguments Concerning a Sealed Search Warrant Are Similarly Misleading, Immaterial, and Meritless. ................................................. 34

E.      Herridge's Arguments Concerning Other Sources Cited in the Fox News
        Reports Are Also Immaterial and Incorrect. .......................................................40

III.    There is No Federal Common Law Reporter's Privilege. ..................................................41

CONCLUSION .........................................................................................................................45

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alemu v. Dep't of For-Hire Vehicles*,
    327 F. Supp. 3d 29 (D.D.C. 2018)......................................................................32

*Baker v. F & F Inv.*,
    470 F.2d 778 (2d Cir. 1972) ...........................................................................26

*Bartel v. FAA*,
    725 F.2d 1403 (D.C. Cir. 1984).....................................................................38, 41

*Branzburg v. Hayes*,
    408 U.S. 665 (1972) .................................................................................42, 44

*Carey v. Hume*,
    492 F.2d 631 (D.C. Cir. 1974)........................................................................26

*Cloonan v. Holder*,
    768 F. Supp. 2d 154 (D.D.C. 2011).................................................................40

*Dickson v. Office of Pers. Mgmt.*,
    828 F.2d 32 (D.C. Cir. 1987).........................................................................32

*Douglas v. Agric. Stabilization & Conservation Serv.*,
    33 F.3d 784 (7th Cir. 1994) ...........................................................................33

*Finley v. Nat'l Endowment for the Arts*,
    795 F. Supp. 1457 (C.D. Cal. 1992) ...............................................................39

*Hatfill v. Gonzales*,
    505 F. Supp. 2d 33 (D.D.C. 2007)...................................................4, 24, 29, 45

*Hollis v. U.S. Dep't of the Army*,
    856 F.2d 1541 (D.C. Cir. 1988)......................................................................38

*Hotel Oakland Assocs. v. Doyle Real Estate Advisors, LLC*,
    No. 21-cv-05389, 2022 WL 1493267 (N.D. Cal. May 3, 2022) ......................................33

*Hutira v. Islamic Republic of Iran*,
    211 F. Supp. 2d 115 (D.D.C. 2002)................................................................30

*In re Grand Jury Subpoenas*,
    438 F. Supp. 2d 1111 (N.D. Cal. 2006)............................................................42

*In re Miller,*
   438 F.3d 1141 (D.C. Cir. 2006)..................................................................42, 43, 44

*In re Special Proceedings,*
   373 F.3d 37 (1st Cir. 2004)....................................................................................42

*In re U.S. OPM Data Sec. Breach Litig.,*
   928 F.3d 42 (D.C. Cir. 2019)...........................................................................32, 34

*Kleiman v. Dep't of Energy,*
   956 F.2d 335 (D.C. Cir. 1992)................................................................................33

*Lee v. Dep't of Justice,*
   287 F. Supp. 2d 15 (D.D.C. 2003)....................................................................15, 19

*Lee v. Dep't of Justice,*
   401 F. Supp. 2d 123 (D.D.C. 2005)................................................4, 28, 29, 30, 41, 44

*Linde v. Resolution Trust Corp.,*
   5 F.3d 1508 (D.C. Cir. 1993).................................................................................41

*Mideast Sys. & China Civ. Constr. Saipan Joint Venture, Inc. v. Hodel,*
   792 F.2d 1172 (D.C. Cir. 1986)..............................................................................32

*Pilon v. Dep't of Justice,*
   73 F.3d 1111 (D.C. Cir. 1996)................................................................................38

*Pinson v. U.S. Bureau of Prisons,*
   No. 13-cv-1821, 2015 WL 756501 (E.D. Cal. Feb. 23, 2015) .........................................39

*Quinn v. Stone,*
   978 F.2d 126 (3d Cir. 1992) ...........................................................................37, 39

*Reese v. Geneva Enterprises, Inc.,*
   No. 96-cv-1575, 1997 WL 214864 (D.D.C. Apr. 18, 1997) ...........................................33

*United States v. Nixon,*
   418 U.S. 683 (1974) ............................................................................................41

*United States v. Sterling,*
   724 F.3d 482 (4th Cir. 2013) ...........................................................................41, 42

*Zerilli v. Smith,*
   656 F.2d 705 (D.C. Cir. 1981)......................14, 15, 18, 24, 25, 26, 27, 28, 29, 31, 44, 45

**Statutes**

5 U.S.C. § 552a........................................................................................1, 15, 32, 37, 39

iv

**Other Authorities**

S. Rep. No. 1183, 93d Cong., 2d Sess. 23, 1974 U.S.C.C.A.N. 6916, 6997 (1974) .....................31

**Rules**

Federal Rule of Evidence 501 .................................................................................................41, 42

## INTRODUCTION

For seven years, from 2009 to 2016, the Federal Bureau of Investigation ("FBI") investigated and scrutinized every aspect of Plaintiff Yanping Chen's personal and professional life.  Federal agents dug through her trash, interrogated her children, secretly taped her conversations, and held her at gunpoint while rifling through her private photos and papers.  Thankfully for Dr. Chen—an accomplished American scientist, educator, and entrepreneur—that arduous ordeal ended in 2016 when the United States Attorney's Office for the Eastern District of Virginia declined to charge her with any crime.

Unfortunately for Dr. Chen, the FBI's investigation was just the beginning of her troubles.  Some time prior to February 2017, an unknown federal agent or agents selectively leaked private records from the FBI's case file to Catherine Herridge, then a reporter for Fox News.  Most importantly, someone leaked to Herridge a closely-held PowerPoint presentation drafted by the lead FBI agent, which contained, among other things, personal photographs of Dr. Chen and her family, excerpts from confidential FBI interview memoranda, and Dr. Chen's immigration and naturalization records.  This abuse of power, an egregious violation of the Privacy Act, 5 U.S.C. § 552a, fueled a series of Fox News broadcasts that caused Dr. Chen substantial personal and professional harm.  Never having been charged in a court of law, Dr. Chen found herself unfairly and unlawfully convicted in the court of public opinion.  This Privacy Act suit followed.

For more than two years, Dr. Chen has diligently pursued discovery of the Defendant federal agencies to try and determine who leaked her protected records to Herridge and Fox News.  Her exhaustive efforts have included serving interrogatories on each Defendant requesting the identity of "each and every person" who had possession of that PowerPoint presentation and deposing every identified individual.  When document and deposition discovery revealed additional individuals who could have had access to the PowerPoint, Dr. Chen conducted

1

additional discovery of those individuals.  In all, Dr. Chen has served Defendants with 67 requests for Production, requested 67 interrogatory responses, issued 57 Requests for Admission, taken 18 depositions of current and former Government employees (including four FBI 30(b)(6) depositions on fourteen topics), issued 13 third-party subpoenas to Government personnel (as well as to the mobile phone service provider for Stephen Rhoads, an on-the-record source for Fox News and self-proclaimed FBI informant), and obtained 22 declarations from Government personnel involved in and/or aware of the investigation into Dr. Chen.  Every deponent and declarant has flatly denied being the source of the unauthorized disclosure to Herridge, and none identified the source.  In May and June of 2022, only after exhaustive efforts to identify the individual(s) who leaked her protected records to Herridge and Fox News, Dr. Chen finally served deposition and document subpoenas on Herridge and Fox News to learn that information.

Dr. Chen easily meets the two-part test in this Circuit for obtaining discovery from a reporter in a Privacy Act case:  the information she seeks is central to this case, and she has exhausted other reasonable avenues of obtaining it.  Herridge fails to present any compelling reason why the perpetrator of this outrageous act of government misconduct should be shielded in discovery.

First, Herridge contends that the document subpoena is overbroad, and seeks information not "central" to Dr. Chen's case, because it supposedly seeks Herridge's "entire" investigative reporting file concerning the Fox News reports about Dr. Chen.  But this unreasonable reading of the subpoena ignores that the subpoena itself states that it seeks documents and communications reflecting and relating to Dr. Chen's "Private Documents and Information" in the Fox News reports, **and** that it specifically enumerates five discrete categories of government-investigation materials featured in the reports.  Indeed, two other Fox News journalists who received identical

subpoenas and are represented by the same counsel as Herridge responded that they interpreted the subpoena requests to encompass protected records collected or generated by the FBI during its investigation, including specifically the very documents Dr. Chen enumerated in the subpoena. And there can be no dispute that determining who leaked what to Herridge is "central"—indeed, absolutely crucial—to Dr. Chen's Privacy Act claim, and thus Dr. Chen easily satisfies this element of the test.

Second, Dr. Chen has exhausted every reasonable alternative avenue to obtain the information she seeks from Defendants and other non-media third parties. As set forth above and in greater detail below, she has used every means of discovery available to her to identify the potential leaker(s) and to obtain sworn testimony from those individuals—and each has disclaimed being the source of the leak. Herridge's speculative theories regarding unknown and unknowable potential other individuals improperly perverts the applicable standard, which requires ***reasonable*** efforts, not scorching the earth.

Third, because she lacks meritorious arguments concerning centrality and exhaustion, Herridge resorts to character assassination, red herrings, and legal arguments that have been long rejected by courts in this Circuit. Specifically, Herridge contends—wrongly—that the Court should balance the newsworthiness of her reporting against Herridge's perception of the strength of various elements of Dr. Chen's Privacy Act claim and/or Herridge's perception of Dr. Chen as a person and a litigant. But that is simply not the law, and courts in this Circuit have repeatedly refused identical invitations to graft this type of subjective and amorphous balancing test onto the actual, two-part test of centrality and exhaustion.

Finally, in a tacit admission that there is no "balancing" element of the applicable two-part test, Herridge asks this Court to create a new federal "common law" reporter's privilege that would

include that element.  But again, this identical argument has been rejected in this Circuit, both because it would contravene the D.C. Circuit's established two-part test, and trying to balance the perceived value of a news story against a plaintiff's perceived worth as a litigant is "inherently unworkable," *Lee v. Dep't of Justice*, 401 F. Supp. 2d 123, 139 (D.D.C. 2005), and "extremely problematic," *Hatfill v. Gonzales*, 505 F. Supp. 2d 33, 46 (D.D.C. 2007).

At bottom, Dr. Chen can hardly be said to have jumped the gun here.  She spent two years seeking documents from the defendants and third parties, filing motions to compel, engaging in extensive formal and informal written discovery, and obtaining the sworn testimony of 39 individuals and representative deponents.  Despite these efforts, she has not obtained direct evidence of who selectively leaked her protected records to Herridge and Fox News.  The handful of individuals with access to the records—even the one who communicated with Herridge hundreds of times during the investigation—have denied under oath being the leaker.  Dr. Chen now appropriately seeks that information from the only ones known to have it—Herridge, and her then-employer and publisher, Fox News.

For all these reasons, and as further explained below, the Court should deny Herridge's Motion to Quash.

## RELEVANT FACTUAL BACKGROUND

### A.    Plaintiff Dr. Yanping Chen.

Dr. Yanping Chen is an accomplished scientist, entrepreneur, and educator who has lived in the U.S. for 35 years and has been a naturalized U.S. citizen for 21 years.  Before moving to the U.S. from China in 1987, she earned a medical degree as a cardiologist and worked as a Medical Researcher and the Director of Planning for the Chinese astronaut program.  (Compl. ¶ 11 (ECF No. 1).)  She came to the U.S. as a visiting scholar at George Washington University, where she built on her work in space policy to earn a master's degree and PhD in Public Policy.  (*Id*.).

Contrary to Herridge's claim (Mem. at 7), Dr. Chen's education in the United States was funded by scholarships awarded by GWU, stipends from the Smithsonian Institution and others, and her own savings.  *See* Ltr. A. Phillips to Fox News re "Fox News Reporting on Yanping Chen and the University of Management and Technology" (July 14, 2017) (Ex. 1).  She met her now-husband, an academic and U.S. citizen, while at GWU and decided to make the U.S. her home.  (Compl. ¶ 12.)  Dr. Chen became a lawful permanent resident in 1993, and she renounced her Chinese citizenship and gained U.S. citizenship in 2001.  (*Id*.)

In 1998, Dr. Chen founded the University of Management and Technology ("UMT"), an accredited university that provides post-secondary and graduate education to working adults.  (*Id*. ¶ 13.)  Given UMT's location in Arlington, Virginia and the diverse coursework offered, many of its students worked for the U.S. Government, and—like thousands of other well-respected educational institutions—UMT participated in the Department of Defense's ("DOD") Tuition Assistance program, which provides funding to military students to further their secondary education.  UMT excelled under Dr. Chen's leadership, with more than 12,000 students receiving degrees as of December 2018, (*Id*. ¶13.), and thousands more since that time.  Dr. Chen wholly owns UMT and derives a substantial portion of her income from its operations.  (*Id*. ¶ 14.)

### B.    The Government Investigates Dr. Chen for Years but Ultimately Does Not Charge Her With Any Crime.

In 2010, Dr. Chen became the target of an FBI investigation focused on statements she made on immigration forms concerning her work in the 1980s as a scientist for the Chinese astronaut program.  (Compl. ¶ 15.)  Over a seven-year period, the FBI probed deeply into Dr. Chen's personal and professional life.  (*Id*. ¶ 16.)  Agents of the U.S. Government interrogated her family members, obtained her immigration records, monitored her travel, employed an undercover informant to gather information about her, and secretly monitored and recorded her conversations.

(*Id.*)  As part of that investigation on December 5, 2012, the FBI executed search warrants for Dr. Chen's home and the main office of UMT, both located in Arlington.  (*Id.* ¶ 18.)  Dr. Chen awoke in her nightgown early that Wednesday morning to dozens of heavily armed law enforcement agents, who held her at gunpoint in her living room as they ransacked her residence.  (Chen Dep. 99:10–102:14 (Ex. 2).)  During the searches, the FBI collected dozens of boxes of material from Dr. Chen's home and office, including tax and business records, communications, personal memorabilia, and years of personal photographs of her, her husband, her then-minor daughter, and other family members and friends.  (Compl. ¶ 20.)  Despite the years of investigation, in March of 2016, the U.S. Attorney's Office for the Eastern District of Virginia informed Dr. Chen that no charges would be filed, and thus Dr. Chen was never charged with, let alone convicted of, any crime.  (*Id.* ¶ 22.)

### C.      The Fox News Reports Concerning Dr. Chen.

On February 24, 2017, Fox News aired on its cable channel the first broadcast report about Dr. Chen.  (*Id.* ¶ 25.)[1]  Fox News subsequently published a print version of that February 24, 2017 report on its website.[2]  These would be followed by broadcast and website stories published on April 28, 2017,[3] and on June 28, 2017.[4]  These stories, primarily authored and reported by

---

[1] Fox News, *Taxpayer-funded school suspected of Chinese military ties*, (Feb. 24, 2017), https://www.youtube.com/watch?v=jh2Xk42PVA8.

[2] C. Herridge, P. Browne, & C. Upson, *Fox News investigation: DoD-funded school at center of federal probes over suspected Chinese military ties*, FoxNews.com (Feb. 24, 2017), https://www.foxnews.com/politics/fox-news-investigation-dod-funded-school-at-center-of-federal-probes-over-suspected-chinese-military-ties.

[3] C. Herridge, P. Browne, & C. Upson, *Congress investigating taxpayer-backed school over alleged ties to Chinese military after Fox News report*, FoxNews.com (May 1, 2017), https://www.foxnews.com/politics/congress-investigating-taxpayer-backed-school-over-alleged-ties-to-chinese-military-after-fox-news-report (the broadcast report that aired on April 28, 2017 is embedded and playable at this URL on which the print story was posted).

[4] C. Herridge, P. Browne, & C. Upson, *FBI 'reopening' probe of DoD-funded school with suspected Chinese military ties, rep says*, FoxNews.com (June 28, 2017),

*(cont'd)*

Herridge, (Mem. at 5), strung together portions of leaked materials and information about Dr. Chen

and coupled them with misleading insinuations about Dr. Chen's background in order to accuse

her of spying for China.  The Fox News reports displayed, among other things:

- Information derived from and images of an FBI FD-302 Form memorializing an FBI interview of Dr. Chen's daughter;

- Information from and images of Dr. Chen's immigration and naturalization forms;

- Information taken from and images of Dr. Chen's certificate of U.S. citizenship;

- Numerous personal photographs of Dr. Chen, including a photograph depicting her and her husband, a photograph of Dr. Chen's family members, and a photograph of Dr. Chen visiting her father's gravesite;

- An excerpt of an interrogation of Dr. Chen's daughter indicating that the case was a "200d," which Fox News described as a "counter-intelligence case" and "one of the most highly sensitive categories for a federal probe."

(Compl. ¶¶ 26–31; Mem. at 8.)  These materials came from the FBI's investigation of Dr. Chen,

including materials obtained from Dr. Chen's home during the December 5, 2012 FBI search.

(Compl. ¶¶ 26–34.)  In addition to the records displayed onscreen, the Fox News reports also

disclosed a wide variety of other confidential information from the FBI case file, including:

- The identities of the law enforcement agencies working with the FBI;

- That the investigation began in "at least 2012 – and perhaps as early as 2009";

- The year that Dr. Chen first entered the United States;

- The type of visa under which Dr. Chen first visited the United States;

- The identity of a child who accompanied Dr. Chen when she first entered the country;

- The name of an Assistant U.S. Attorney assigned to investigate Dr. Chen; and

- Details of the disagreement between the FBI and prosecutors about whether to prosecute Dr. Chen.

The Fox News reporting was little more than a xenophobic smear campaign, which

---

https://www.foxnews.com/politics/fbi-reopening-probe-of-dod-funded-school-with-suspected-chinese-military-ties-rep-says (the broadcast report that aired on June 28, 2017 is embedded and playable at this URL on which the print story was posted).

repackaged unlawfully disclosed materials and information to falsely accuse Dr. Chen of being a

Chinese spy and of using UMT as a front to covertly funnel information about students who are

current or former servicemembers to the Chinese government.[5]

   **D.     Discovery Reveals the Origin of the Private Materials Referenced and
           Depicted in the Fox News Reports.**

   Discovery in this case to date has revealed the likely source of much of the private and

personal information of Dr. Chen that was referenced, quoted, and visually depicted in the Fox

News broadcasts:  a PowerPoint presentation authored by FBI Special Agent Timothy Pappa,

versions of which were produced in discovery by Defendants FBI and DHS, but not DOD or DOJ.

Pappa, who led the investigation of Dr. Chen, testified that ██████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

████████████.  (Pappa Dep. 18:13–18, 20:6–21:3, 28:2–8, 31:22–32:11, 58:8–59:11, 65:8–66:21,

83:19–88:25, 92:19–94:6 (Ex. 5).)  In numerous instances, the highlighting, notation, and cropping

of the records displayed in the Fox News reports matches exactly the versions and images of those

same documents in the PowerPoint created by Pappa, and the Fox News reports also quote from

an FBI memorandum of an interview with Dr. Chen that is also reflected in Pappa's PowerPoint.[6]

These commonalities make clear—and Herridge and Fox do not dispute—that Herridge obtained

---

[5] *See* Letter from A. Phillips to Fox News (July 14, 2017) (Ex. 1) (retraction demand letter
addressing false and misleading allegations in Fox Reporting); Letter from M. Jones to DOD OIG
(Dec. 14, 2018) (Ex. 3) (discussing reported unlawful disclosures of evidence gathered during FBI
investigation); Letter from M. Jones to DOJ OIG (June 25, 2018) (Ex. 4) (same).

[6] *See* Letter from A. Phillips to P. Philbin (June 23, 2022) (Ex. 6) (containing a chart visually
depicting the commonalities between the images and statements in the Fox News broadcasts and
the same materials in Pappa's PowerPoint presentation).

at least some of the investigative materials displayed in and relied upon by the Fox News reports in the form of Pappa's PowerPoint.

  **E.**    **Dr. Chen's Exhaustive Efforts to Discover Who Leaked Her Private Information and Documents to Herridge and Fox News.**

On January 27, 2020, Dr. Chen defeated the Defendant agencies' motion to dismiss and, thereafter, the Court bifurcated discovery into two phases. (Opinion & Order Denying Mot. Dismiss (ECF No. 13); Amended Scheduling Order (ECF No. 55).) Phase One addresses liability on Dr. Chen's Privacy Act claim, and Phase Two will address damages. For more than two years, Dr. Chen has been engaged in exhaustive discovery of Defendants and third parties, most of which has been focused on issues relating to liability, seeking to identify the source(s) of the leaked documents and information—and, in particular, who provided a copy of Pappa's PowerPoint presentation to Herridge and Fox News.

To date, Dr. Chen has served Defendants with 67 requests for Production, requested 67 interrogatory responses, issued 57 Requests for Admission, taken 18 depositions of current and former Government employees (including from four FBI 30(b)(6) deponents on fourteen topics), and obtained 22 declarations from Government personnel involved in and/or aware of the investigation into Dr. Chen. This includes discovery of the lead FBI and DHS case agents for the investigations: Pappa, SSA-8, ███████, and ███████████, and their primary supervisors SSA-14 and ██████████.

With respect to Pappa's PowerPoint, Dr. Chen served requests for production on each agency seeking "all documents or other items that were collected or generated in the course of" the investigation into Dr. Chen. In response, the FBI and DHS produced the PowerPoint. FBI0007480–7611 (Ex. 7); DHS_00000298–429 (Ex. 8). None of DOD, DOJ, or the 13 individual third-party subpoena recipients produced any such presentation.

In addition to requests for production, Dr. Chen served interrogatories on each Defendant agency requesting they identify "each and every person" who "received from the FBI or otherwise had possession, custody, or control" of the PowerPoint, "or any version or subpart thereof, including" the name of the individual, the dates and times when the PowerPoint came into their possession, custody or control, and the format of the document. Defendants identified only three people who had ever possessed the PowerPoint or any subpart of it: Pappa, DHS Special Agent ███████████, and ██████████ supervisor, ██████████. (DOD Response to Interrogatory No. 15 (Ex. 9); DOJ Response to Interrogatory No. 14 (Ex. 10); FBI Response to Interrogatory No. 16 (Ex. 11); DHS Response to Interrogatory No. 14 (Ex. 12); DHS_00000184–85 (Ex. 13).) Dr. Chen deposed all three individuals, who each denied leaking the documents or knowing who had done so. (Pappa Dep. 296:14–21 (Ex. 5); ██████████ Dep. 98:1–99:10 (Ex. 14); ██████████ Dep. 102:17–19, 106:11–20 (Ex. 15).)[7] Dr. Chen also served all three with Rule 45 subpoenas in their personal capacities. None produced the PowerPoint or any document suggesting they had transmitted it to Herridge.

Notably, Pappa vehemently denied having leaked any documents or information to Herridge. Pappa testified under oath that—while Herridge wrote at least four stories about FBI investigations he led—Herridge never attempted to contact him for information or comment. (*See, e.g.*, Pappa Dep. 152:24–153:2, 153:10–25 (Ex. 5).) According to Pappa, his only contact with Herridge was when they were briefly introduced at ██████████, but they never discussed the

---

[7] Herridge points to testimony from ██████████ deposition that ██████████ ██████████. (Mem. at 18.) But none of those individuals were identified by DHS as having ever received or had possession of the PowerPoint. (DHS Response to Interrogatory No. 14 (Ex. 12).)

story she had recently written about one of his investigations or the reporting she was then doing on the investigation into Dr. Chen.  (Pappa Dep. 120:3-25, 121:2-7, 123:2-7, 126:4-14 (Ex. 5).)

Through intensive discovery—including deposition testimony—Dr. Chen identified eight other individuals ███████████████████████████████████████████████████ ████, Stephen Rhoads, ████████████, ████████████, James Gillis, SI-1, SSA-7, SSA-14.[8]  Dr. Chen then: (1) deposed ████████████, Gillis, and Rhoads; (2) served Rule 45 subpoenas on ████████████, Rhoads, ██████, and Gillis in their personal capacities; and (3) obtained declarations from ████, SI-1, SSA-7, and SSA-14.  Although this discovery produced powerful circumstantial evidence of Rhoads' role in the leaks, none of this discovery provided direct evidence that any of these individuals leaked the PowerPoint to Herridge.[9]

Even without reason to believe they ever possessed Pappa's PowerPoint presentation, Dr. Chen sought deposition testimony or declarations from 25 other people who had some information about the investigation to obtain sworn statements about whether they had leaked to Herridge or knew who had.  Those individuals include FBI personnel ████████████████████████ ███████████████████████████; FBI personnel who ████████████████████████████████ █████████████████████████████; ████████████, ████████████, and others from

---

[8] Plaintiff agreed with the government to protect the identity of these FBI agents, and they were each assigned a pseudonym.  SI-1 was an Assistant Special Agent in Charge and each SSA was a Supervisory Special Agent.

[9] ██████, Gillis, Rhoads, ████, SI-1, SSA-7, SSA-14 each denied in a deposition or declaration leaking the documents or knowing who did so.  (████ Dep. 79:14–81 (Ex. 16); Gillis Dep. 163:11–164:12 (Ex. 17); Rhoads Dep. 110:5–15 (Ex. 18); Decl. of ████ (Ex. 19); Decl. of SSA-14 (Ex. 20); Decl. of SSA-7 (Ex. 21); Decl. of SIS1-1 (Ex. 22).)  ████████ had no documents responsive to the Rule 45 subpoena directed to him, and ██████████████████████████ ████████████████████████████████████████. *See* ████████████████████ Dep. 71:15-20  (Ex. 15) ████████████████████████  Dep. 104:24-106:5 (Ex. 14) (not recalling ████ role in the Chen investigation); DHS_0001127 (Ex. 23) (████████████████████████████████ ██████████).

DOD who Rhoads and ████████████████████████████████████████ ;
and ████████████ and others at the Department of Veterans Affairs who ████████████████████
████████████████ .  Each one denied that they had leaked to Herridge, and each one denied
knowing who had.

In a further effort to identify other FBI employees who may have leaked to Herridge, Dr.
Chen demanded that the FBI exhaustively search for any text messages and phone calls between
18 key personnel and the Fox News reporters who worked on the reports, including Herridge—at
three different work and home phone numbers.  (Emails Between M. Jones, G. Coyle, C. Federighi,
& J. Lutkenhaus (Oct. 29–Nov. 23, 2021) (Ex. 24).)  The FBI's efforts did not reveal the leaker.
Dr. Chen has also served third-party subpoenas on 13 current or former Government employees in
their personal capacity and served a subpoena on Rhoads' personal cell phone service provider, T-
Mobile.  Additionally, Dr. Chen has aggressively, yet unsuccessfully, litigated motions to compel
information that may narrow down or reveal the identity of the source(s) that the Government has
withheld pursuant to the law enforcement privilege.  (Pl.'s Mot. Compel (ECF No. 36); Pl.'s Opp'n
to P.O. Mot. (ECF No. 66).)  Despite these efforts, Dr. Chen has been unable to obtain direct
evidence of the identity of the individual that leaked her private information to Herridge and
Fox News.

Dr. Chen also sought extensive discovery related to Rhoads, who communicated with
Herridge hundreds of times during the investigation of Dr. Chen and served as an on-the-record
source for the reports.  In deposition testimony, Rhoads acknowledged that Pappa had provided
him with highly confidential investigative information about Dr. Chen.  Rhoads also admitted that
he had orally disclosed highly confidential information about the investigation of Dr. Chen to
Herridge (starting with a 2012 tip that the FBI would be raiding Dr. Chen's home).  (*See, e.g.*,

Rhoads Dep. 91:10–20, 186:6–13, 188:3–8 (Ex. 18).)   But Rhoads vehemently denied having leaked the displayed photographs and other investigative documents to Herridge, claiming that he was surprised when Herridge showed him the documents, and that when he had previously claimed in an email to Congress, "I have documents, etc. that no one else has," he actually did not have any documents.  (*See, e.g.*, Rhoads Dep. 38:9–20, 58:7–11, 88:6–9, 92:6–25, 93:1–95:25, 98:4–12, 168:6–9, 192:14–23 (Ex. 18); RHOADS 000272 (April 26, 2017 email from S. Rhoads to B. Christensen describing documents in Rhoads' possession) (Ex. 25).)

## F.    Dr. Chen's Subpoenas to Fox News and the Individual Authors of the Fox News Reports Concerning Dr. Chen.

In May and June of this year, Dr. Chen served deposition and document subpoenas on Fox News, as well as Catherine Herridge, Pamela Browne, and Cyd Upson—the three current and/or former Fox News journalists that share a byline on the published stories about Dr. Chen. The document subpoenas requested a limited universe of materials aimed at identifying the source and scope of the unlawful disclosure.  Thus, the subpoenas requested records relating to Dr. Chen's "Private Documents and Information"—defined to include any "photograph purporting to depict Dr. Chen," "FBI FD-302 Form relating to or referring to Dr. Chen," "immigration or naturalization document relating to Dr. Chen," "internal government email involving Personnel of Defendants and relating to Dr. Chen, the University, and/or the [FBI] Investigation," and any "PowerPoint presentation, compilation, and/or report concerning Dr. Chen, the University, and/or the [FBI] Investigation"—and documents reflecting the transmittal of that information to Fox News/Herridge/Upson/Browne, as well as the identity of the individual who transmitted it.[10]

All of the subpoena recipients retained as counsel Patrick Philbin of the law firm Ellis George Cipollone O'Brien Annaguey, LLP.  Subsequently, following discussions of counsel, Cyd

---

[10] Document Subpoena to C. Herridge (Ex. 26); Document Subpoena to Fox News (Ex. 27).

Upson and Pamela Browne provided sworn declarations stating that Herridge was the lead reporter for the reporting on Dr. Chen, and that Herridge never shared with Upson or Browne the identity of the source(s) that provided Herridge with Dr. Chen's private materials.[11]  Based on those sworn representations, Dr. Chen agreed to withdraw her subpoenas to Upson and Browne.

## ARGUMENT

### I.   Dr. Chen Has More Than Satisfied the Requirements for Overcoming the Qualified First Amendment Privilege.

In this Circuit, there is a well-established, two-part test for determining when a Privacy Act plaintiff seeking information about the disclosure of her protected information is entitled to obtain that information from a non-party reporter.  First, the plaintiff must establish that the information sought is "central" to her claims or, in other words, that it goes to "the heart of the matter." *Zerilli v. Smith*, 656 F.2d 705, 713 (D.C. Cir. 1981) ; *Lee v. DOJ*, 413 F.3d 53, 60 (D.C. Cir. 2005).  Next, a plaintiff must establish that she has exhausted other reasonable avenues of obtaining the information before seeking discovery from the reporter.  *Zerilli*, 656 F.2d at 713; *Lee*, 413 F.3d at 57, 59.  Here, Dr. Chen easily satisfies both prongs of this two-part test, as the identity of the leaker and scope of the leak of her protected information are crucial issues in this case, and Dr. Chen has made every reasonable effort to obtain this information from alternative sources.

Because Dr. Chen plainly satisfies these two elements of the *Zerilli*/*Lee* test, Herridge attempts to graft onto it an analytical free-for-all by encouraging the Court to also conduct a subjective and amorphous "balancing" of her interests against Dr. Chen's—and then proceeds to spend the bulk of her brief arguing that Dr. Chen does not deserve the protection of the Privacy Act.  (*See* Mem. at 22–36.)  For the reasons set forth below, Herridge's "balancing" argument is foreclosed by controlling precedent from the D.C. Circuit, and this Court should, and must,

---

[11] Decl. of Cyd Upson (June 30, 2022) (Ex. 28); Decl. of P. Browne (June 30, 2022) (Ex. 29).

disregard Herridge's arguments.  But even if the Court were to take up Herridge's invitation to engage in a subjective policymaking exercise, her arguments are factually incorrect and legally unsupported.  In addition to wrongly diminishing the egregiousness of the violation of Dr. Chen's rights, Herridge ignores entirely powerful public interests that favor discovery, including the need to hold accountable federal agents who grossly abuse their powers and deter those agents from leaking sensitive information about counterintelligence investigations.  There is no basis to deny Dr. Chen discovery that is crucial to vindicate not only her claims, but the public interest in preventing and punishing government misconduct.

### A.    The Discovery Requests at Issue Seek Only Information Central—Indeed, Crucial—to Dr. Chen's Privacy Act Claims.

The Privacy Act provides a private right of action against a government agency when records pertaining to an individual have been improperly disclosed by that agency.  5 U.S.C. § 552a.  When a court finds that an agency made such a disclosure "in a manner which was intentional or willful," the United States is liable for damages plus attorneys' fees and costs.  *Id.* § 552a(g)(4).  In order for Dr. Chen to prevail at trial, it is imperative that she show that one or more of the Defendant agencies was the source of the leaked documents and information because without the identity of the leaker(s), her ability to show the willfulness and intent elements of the Privacy Act claim "will be compromised."  *See Lee v. DOJ*, 287 F. Supp. 2d 15, 20 (D.D.C. 2003), *aff'd* 413 F.3d 53 (D.C. Cir. 2005).  Thus, there can be no dispute that the source(s) who leaked Dr. Chen's protected records to Herridge and Fox News are "of central importance … go[ing] 'to the heart of the matter' … and [are] crucial to" Dr. Chen's case.  *Id.* (quoting *Zerilli*, 656 F.2d at 713); *see also Lee*, 413 F.3d at 57 (finding the identity of the actual source of disclosed information "is clearly central" to proving a violation of the Privacy Act and therefore goes to the "heart of the matter").  Herridge does not argue otherwise.  Instead, she argues that Dr. Chen's

document requests are not limited to information "central" to her claims because, Herridge contends, they broadly seek to discover Herridge's entire reporting file.  (Mem. at 16–17.)  Not so.

The document subpoena to Herridge requests only four categories of materials from her: (1) All "Private Documents and Information" in her possession, in the form in which she received them, i.e., the leaked documents themselves; (2) all documents and communications "comprising, reflecting, or relating to transmission or provision of the Private Documents and Information" to Herridge, i.e., how the documents were leaked; (3) documents or communications "sufficient to identify the individual(s) that transmitted or provided the Private Documents and Information" to Herridge, i.e., who leaked the documents; and (4) communications between or among Herridge and non-confidential source Stephen Rhoads, as well as lead FBI Special Agent Timothy Pappa. (Herridge Subpoena (Ex. 26).)  Herridge takes issue with the definition of the term "Private Documents and Information," contending that it is overly broad and seeks from Herridge discovery of all communications relating to the reporting, regardless of whether they relate to Privacy Act-protected material.  (Mem. at 17.)  But read in context, a reasonable reading of the subpoena is that it requests documents and communications regarding materials transmitted to Herridge that came from the government's investigative files.  In fact, the full definition of "Private Documents and Information" specifically states that the definition covers documents that Herridge obtained from a third party that were presented in, referred to, or considered in relation to the Fox News reports, specifically to include the following:

- Any photograph purporting to depict Dr. Chen;
- Any FBI-302 Form relating to or referring to Dr. Chen;
- Any internal government email communication involving Personnel of Defendants and relating to Dr. Chen, the University, or the Investigation; and
- Any PowerPoint presentation, compilation, and/or report concerning Dr. Chen, the University, and/or the Investigation.

16

(Herridge Subpoena, Schedule A at 3 (Ex. 26).)  Along with the instruction that all definitions in the subpoena are to be interpreted in accordance with a "reasonable meaning," and the fact that Plaintiff attached her Complaint to the subpoena, each of the above requests was plainly intended to seek documents and communications regarding the transmission to Herridge of the investigative materials that are at issue in this lawsuit.  (*Id*., Schedule A at 5; *id*., Schedule B.)

Notably, as set forth in the Factual Background above, Dr. Chen served materially identical subpoenas on Fox News journalists Cyd Upson and Pamela Browne, who were listed as co-authors of the Fox News stories regarding Dr. Chen.  Both of those individuals retained Patrick Philbin— who also serves as Herridge and Fox News' counsel—to represent them in connection with the subpoenas.  Following cooperative discussions between Mr. Philbin and counsel for Dr. Chen, Dr. Chen agreed to withdraw the subpoenas to Browne and Upson in exchange for sworn declarations stating that neither possessed the materials sought or were aware of the identity of the source(s) who leaked them to Herridge.[12]  And in those declarations, both Upson and Browne stated that while the definition of "Private Documents and Information" in the subpoena could be interpreted broadly, they reasonably interpreted the requests to refer to "records and information pertaining to [Dr. Chen] and her private affairs that Dr. Chen alleges the FBI had collected or generated in the course of its investigation of her, that Dr. Chen alleges were maintained by the FBI or another government agency, and that Dr. Chen alleges were not publicly available"—i.e., the specific materials listed in the subpoenas' definition of "Private Documents and Information."[13]

Herridge and her counsel are capable of reasonably interpreting what materials are sought by the subpoena—and Dr. Chen's counsel would have been happy to have a discussion clarifying

---

[12] Decl. of Cyd Upson (June 30, 2022) (Ex. 28); Decl. of P. Browne (June 30, 2022) (Ex. 29).
[13] *Id*. ¶ 7.

the scope of the subpoena if necessary.  Dr. Chen's counsel is happy to have that discussion with the Court as well if a narrowing of the language of the subpoena is appropriate to remove any ambiguity.  At bottom, Dr. Chen only seeks, and has only ever sought, the communications and documents that indisputably are "central to" her Privacy Act claims, and nothing else.

### B.   Dr. Chen Has Made Extensive Prior Discovery Efforts to Identify the Source of the Leak of Her Private Documents and Information—but Has Received Denials from Every Reasonably Identifiable Potential Source.

Dr. Chen's extensive discovery efforts over the last two years satisfy the second (and final) factor of the two-part test, as she has exhausted "every reasonable alternative source of information." *Zerilli*, 656 F.2d at 713.  In an effort to recast Dr. Chen's discovery efforts as falling short of the reasonable exhaustion requirement, Herridge goes to great lengths to nit-pick minute details in deposition transcripts and related documents and speculate about scenarios in which alternative sources that may or may not exist, may have had access to and leaked the PowerPoint, and then lambasts Dr. Chen for failing to pursue every possible means of discovery into these phantom sources.[14]  By so doing, Herridge reads the word "reasonable" out of *Zerilli*'s exhaustion factor, and ignores the Circuit Court's clear instruction that ***literal*** exhaustion of every conceivable source is not required to defeat the privilege—only ***reasonable efforts***:

> A plaintiff is not obliged to carry out a "wide-ranging and onerous discovery burden[ ] where the path is ... ill-lighted." The Court reminds the journalists that the *Zerilli* exhaustion-of-alternative-sources factor requires only that all "reasonable" sources of evidence be tapped.  It does not require proof positive that the knowledge exists nowhere else on earth but in the minds of the journalists and their anonymous confidants.

---

[14] Notably, Herridge was able to do so only because Dr. Chen willingly agreed to provide her and her counsel with an enormous amount of discovery materials in this case, despite being under no obligation to do so.  Dr. Chen was willing to do so because she is confident the record reflects her exhaustive efforts to uncover the source of the leak.

*Lee*, 287 F. Supp. 2d at 23 (citations omitted).  Thus, Dr. Chen is not required to seek discovery from "every individual who conceivably could have leaked the information," only "***reasonable*** alternative sources."  *Id*. (emphasis added).  Dr. Chen's use of every discovery method at her disposal directed at all Defendants, and her obtaining of sworn testimony of every individual identified by as possible sources of the leak—and then some—demonstrates more than reasonable efforts.  (*See* Relevant Factual Background, Section D-E, *supra*, for an overview of Dr. Chen's discovery efforts to date).

Far from demonstrating that there are "huge gaps" in the discovery that Dr. Chen failed to pursue, (Mem. at 17), Herridge's arguments instead demonstrate why only reasonable efforts at exhaustion are required.  Because of course, in every case, any reporter could conjure a speculative list of unlikely leakers, particularly where there are multiple defendant agencies that together employ many thousands of people.  But the reality is that Dr. Chen tracked down and eliminated every plausible leaker, and Herridge does not demonstrate otherwise.

For example, Herridge notes that Pappa ███████████████████████████ ███████████████████████████, and she lambasts Dr. Chen for failing to secure a "comprehensive list of personnel" who could have accessed it—while also noting that the testimony in the record is that ████████████████████████████ ████████████████████████.  (Mem. at 18.)  To claim that Dr. Chen should have deposed every single ███████████████████████████████, many of whom would have had no awareness of or involvement in the investigation of Dr. Chen, because any one of them could have theoretically decided to go through ██████████ and then coincidentally leak it to Herridge, who Rhoads had been leaking to for years, is to stretch the word "reasonable" beyond any sensible definition.



And in fact, while Dr. Chen was not able to secure a comprehensive list of anyone who may have had access to that box, it was not for lack of trying:

- She sought records showing who accessed the PowerPoint when it was ██████ but the FBI's designated witness under Rule 30(b)(6) testified that ████████████ ███████ Dep. 29:8–11, Apr. 27, 2022 (Ex. 30).)

- She obtained discovery from nine key members of the FBI responsible for ████████ ████████████████████████. None of that evidence suggests that any individuals other than Pappa ████████████████████████████████████ ██████.

- The FBI's counsel further confirmed, via email, that "the FBI is not aware of any specific persons who accessed the documents from this location." (Email from G. Coyle (Oct. 29, 2021) (Ex. 24).)

In another stretch, Herridge claims that Dr. Chen should have sought discovery from someone at Immigration and Customs Enforcement named ████████ because in 2013, "the lead DHS agent on the investigation," ████████████, "sent an email to Pappa stating that he planned to give a copy of the PowerPoint to an ICE colleague" with that name. (Mem. at 18.) But this interpretation of the cited email exchange is incorrect for several reasons. First, the email chain describes ████████████████████████████████████████, not vice versa. Second, ████████████ is mentioned only as ████████████████████████ ████████████████████████████. Pappa wrote, ████████████ ████████████████████████████ (DHS_00000184–85 (Ex. 13); ████████ Dep. 86:7–87:4 (Ex. 15).) ████████ responded, ████████████████████ (*Id.*) Tarantino further testified that he could not ████████████████████████████ and he agreed only that he ████████████████████████████████████ ████████████████ (*Id.*) Third, even if ████████████ did ████████ ████████████████████████████, there is no plausible basis to believe that ████████████ created a copy of it. ████████ reviewed his electronic files and determined that he

20

██████████████████████████████████████████"—ten days after

███████ email request to Pappa.  (DHS_00000184–85 (Ex. 13).)  At most, ████████ made

████████ after a few days during the week of November 11, 2013, and given that DHS did not

produce any version of the PowerPoint from ████████ files, there is no evidence to suggest

that ████████ ever retained a physical or digital copy.   Indeed, *the only version of the*

*PowerPoint produced by DHS came directly from* ████████, to which ████████████

had access.  (Email from C. Federighi (Dec. 1, 2021) (Ex. 31).)  Moreover, ICE was within the

scope of DHS's interrogatory responses, as made clear by DHS's construction of the term "DHS,"

but DHS still did not identify ████████ as among the individuals who ever possessed the

PowerPoint.  (DHS Response to Interrogatory No. 14 (Ex. 12).)

    Herridge also references an email from ████████ describing a request for Pappa

to send ████████████ to a ████████████, and claims Dr. Chen should have

deposed or obtained a declaration from ████ (Mem. at 18–19.)  But it is unclear why Herridge

thinks this is some kind of smoking gun, given that the request itself asks only for ████████

████, and not the PowerPoint itself that was clearly transmitted to Herridge.  In his deposition,

████—who was also a recipient of that email—testified that he did not know what the

████████████ referred to, and ████████ (who sent the email) similarly testified that he

did not know what the ████████████ was in reference to, and he could not recall whether

any such ████████ was ever provided to ████.  (████ Dep. 114:3–8 (Ex. 16); (████ Dep.

65:10–12, 65:19–22 (Ex. 32).)  In fact, the email referenced by Herridge and Fox News is the *only*

document in nearly 10,000 documents produced during this litigation that references ████.  Of

course, a single reference to an ████████████ does not suggest that a copy of the key

2013 PowerPoint presentation was ever provided to ████.  This is particularly true given that

█████ himself denied ever seeing the PowerPoint, and thus there is no evidence █████ would direct that the PowerPoint go to ███ . (█████ Dep. 122:21–123:4 (Ex. 32).)

Herridge also cites to a September 17, 2014 email that was produced from Fox News-source Stephen Rhoads' mailbox[15] that contains a summary from █████ about a recommendation from █████████████ to ████████████ about the Chen investigation ████████████ and speculates that these █████ could have included the PowerPoint, and that Dr. Chen should have deposed or obtained a declaration from the three recipients of that email. (Mem. at 19.) But discovery has not uncovered any evidence that any of the email recipients (█████████████) had previously received █████ material about Dr. Chen, and DOD did not identify them as ever receiving or having possession of the PowerPoint. (DOD Response to Interrogatory No. 15 (Ex. 9).) Moreover, █████ testified that he never received ████████ related to the investigation of Chen—instead, he said that his email referencing ████████████ █████████████ was to an email summary sent to ███ . (█████ Dep. 110:9–111:24 (Ex. 32).) █████ also said he was unaware of the other individuals on the email chain receiving █████████ materials from the FBI. (*Id.*)

Herridge also speculates that Pappa may have left "hard copies" of the PowerPoint at a █████████████ and that "it was incumbent on [Dr. Chen] to determine who was present at that meeting and depose (or get a declaration) from each attendee." (Mem. at 20.) First and foremost, the testimony Herridge points to in support of this notion indicates that Pappa █████████████ the PowerPoint presentation—which would have been a █████ █████████████████—for any briefing:

---

[15] Herridge mistakenly claims the email was produced from █████ mailbox.

- Pappa could not recall whether ███████████████████████████
  ██████████ (Pappa Dep. 227:23–229:2 (Ex. 5) ██████████
  ██████ ).)

- ████████████ testified that ████████████████████████████
  ████ Dep. 30:7–31:12, 27:21–23 (Ex. 33) ████████████████
  ████████ ).) ████ could not recall whether ████████████████
  ██████████████████, (*id.* at 30:7–31:12), but she did recall that
  ████████████████████████ (*id.* at 27:21–23.)

- AUSA James Gills described a hard-copy "notebook" provided by Pappa to each
  attendee at the ████████████, but he also testified that he had never seen the
  PowerPoint prior to preparation for his deposition in this litigation. (Gillis Dep.
  119:16–120:13, 113:2–8 (Ex. 17).)

Importantly, given that the images and information appearing in the Fox News reports are spread
out throughout the ████████ PowerPoint, the evidence strongly contradicts any notion that
a narrower set of ████████ was the source of the illegal leak (particularly given the
testimony that Pappa ████████████ after the briefing). And it is highly unlikely that the
witnesses—including Pappa, who would have been responsible for a massive effort to print and
transport the materials—would not remember ████████████████████.

Herridge also speculates—without any support—that Dr. Chen failed to definitively
determine whether ████████████████████ where it is *possible* that
an electronic copy of the PowerPoint was left. Again, this is mere speculation, and the law does
not require Dr. Chen to depose every individual who attended those meetings based solely on a
theoretical possibility that ██ could have been left behind. But even putting that aside, several
witnesses testified about the briefings which they attended, providing the names of others who
were present to the extent they recalled. (*See, e.g.*, Rhoads Dep. 100:2–10 (Ex. 18); ████

23

Dep. 54:3–18 (Ex. 32).)[16] And Dr. Chen requested from all defendant agencies all documents concerning who had access to materials about Dr. Chen, and she deposed a 30(b)(6) FBI witness about who had access specifically to the PowerPoint—a deposition at which she questioned the FBI about the various briefings.  (*See, e.g.,* ████ Dep. 35:3–11, 35:16–36:3, Apr. 27, 2022 (Ex. 30).)  If any access logs related to the briefings exist, they would be directly responsive to these requests, but none were produced.  Moreover, Herridge questions whether "the scheduling assistants for any of the known attendees had any records showing invitees" for the briefings, but offers no reason to believe the Defendant agencies did not conduct such a search.  (Mem. at 21.) Indeed, Defendants produced several calendar invitations, indicating that this type of document was within the scope of their searches.

Finally, Herridge's implication that 60 depositions are required to exhaust is incorrect under this Circuit's caselaw.  There is no "specific number of depositions" that is necessary to show exhaustion and the court must assess the reasonableness in light of the facts and circumstances of each case.  *Lee*, 413 F.3d at 61.  A plaintiff is not required to depose "every individual who conceivably could have leaked the information."  *Id.* (finding 20 depositions sufficient); *Hatfill v. Gonzalez*, 505 F. Supp. 2d 33, 40 (D.D.C. 2007) (finding 35 sufficient).

At bottom, Herridge's speculative arguments are a case study as to why the *Zerilli* exhaustion-of-alternative-sources factor requires only that all "reasonable" sources of evidence be tapped.  *Lee*, 413 F.3d at 61 (citing *Zerilli*, 656 F.2d at 713).  One could speculate endlessly about farfetched and unrealistic sources of the leak—Could a janitor at FBI headquarters have decided to grab ████ and mail it to Herridge?  Could someone have broken into FBI

---

[16] Further, while Herridge argues that Dr. Chen should have sought discovery from two additional attendees from the ████ briefing, (Mem. at 20), ████ testified that the PowerPoint was not presented at the briefing.  (████ Dep. 122:21–123:4 (Ex. 32).)

headquarters and taken a copy of the ███████████ from the room in which it was kept?  Could Pappa have dropped a copy as he walked down the street, to be picked up by an unknown individual?—but doing so does not suggest that Dr. Chen has not satisfied her burden.  Dr. Chen submits that the lengths to which Herridge must go to try and conjure up any potential, unexplored sources of the leak itself underscores that Dr. Chen has met her burden of exhausting potential sources of obtaining the information in question.  Far more plausible than the theory of a mystery leaker with no role in the Chen investigation finding a spare copy ███████ and coincidentally giving it to Herridge, is the likelihood that one of the 39 people from whom Dr. Chen has obtained sworn testimony is not telling the truth.

## II.     There Is No Amorphous, Stand-Alone "Balancing" Element of the Test for Discovery in a Privacy Act Case.

Recognizing she cannot credibly dispute that Dr. Chen has satisfied the two-part test for overcoming the qualified privilege first explicated by the Circuit Court in *Zerilli* and reaffirmed in *Lee*, Herridge attempts to twist the Circuit Court's holding in *Zerilli* and discount its holding in *Lee* to argue that this Circuit should (for the first time) adopt a kitchen-sink analysis for applying the privilege, and "balance" Dr. Chen's character, legal theories, and damage claim against a generalized public interest in a "robust free press."  (Mem. at 22.)  In so doing, Herridge ignores not only the D.C. Circuit but also the numerous district court decisions in this Circuit that flatly reject the notion that *Zerilli* requires a "broad balancing analysis" in addition to the enumerated two-part test of centrality and reasonable exhaustion.

### A.     The Two-Part Test in *Zerilli* is the Law of This Circuit.

On a superficial level, Herridge is correct that *Zerilli* referred generally to the notion of balancing "the public['s] interest in protecting a newspaper's confidential sources" when analyzing whether a qualified privilege applies in civil cases.  *Zerilli v. Smith*, 656 F.2d 705, 712 (D.C. Cir.

1981) (citing *Carey v. Hume*, 492 F.2d 631, 639 (D.C. Cir. 1974)).   But where Herridge goes astray—and twists the holding of *Zerilli*—is in ignoring that the Circuit Court was also very specific about ***how*** district courts are to conduct that analysis, particularly in a Privacy Act case. In determining how best to balance a litigant's interest in obtaining information from a reporter with the public's interest in newsgathering, the *Zerilli* Court looked to other Circuit Court decisions that addressed the application of the qualified privilege and examined the factors they applied "to determine how the balance should be struck in a particular case."   *Id*. at 713.   And rather than directing district courts to employ an amorphous and subjective balancing of the litigant's interests, the Court pointed to two "precise guidelines" that must be applied to determine "how the balance should be struck in a particular case."   *Id*. at 713 (citing *Carey*, 492 F.2d at 636).

The first factor *Zerilli* identified is whether "[t]he civil litigant's need for the information he seeks is of central importance … that is, if it is crucial to his case."   *Id*. (citing *Carey*, 492 F.2d at 636).   On the flip side, "if the information sought is only marginally relevant, disclosure may be very difficult to justify."   *Id*. (citing *Baker v. F & F Inv.*, 470 F.2d 778, 783–84 (2d Cir. 1972)). The second factor identified in *Zerilli* is "[t]he efforts made by the litigants to obtain the information from alternative sources," or, in other words, whether the plaintiff "has exhausted every reasonable alternative source of information" beyond the reporter.   *Id*.   Tying this second element to the first, the Court directed that "[e]ven when the information is crucial to a litigant's case, reporters should be compelled to disclose their sources only after the litigant has shown that he has exhausted every reasonable alternative source of information."   *Id.*   The Court then "appl[ied] these guidelines" to the facts of that Privacy Act case, holding that while the appellant had demonstrated that the information sought was crucial to his case (because success depended on identifying the leaker), he had failed to satisfy the second element of demonstrating that he had

exhausted reasonable alternative avenues of obtaining the information.  *Id*. at 714–15.

Thus, while the Court in *Zerilli* acknowledged the ultimate goal of balancing a plaintiff's need for the information sought from a reporter against the First Amendment interest in protecting sources, the Court was also very specific as to how that is to be achieved.  And the Court's application of the test it announced belies Herridge's assertion that the Court endorsed a broad, generalized, and subjective balancing of a non-party reporter's interest against the merits of the plaintiff's case or the plaintiff's value as a litigant.  There is no discussion in *Zerilli* of the latter points; instead, the Court did exactly what it said should be done: it evaluated the two factors of (1) whether the information sought was central to the plaintiff's case, and (2) whether the plaintiff had exhausted reasonable alternative avenues to obtain the information sought.  *Id*. at 714-15.

Thirty-one years later, the D.C. Circuit explicitly affirmed *Zerilli*'s holding in *Lee v. Dep't of Justice*, 413 F.3d 53 (D.C. Cir. 2005).  In *Lee*, a Privacy Act plaintiff sought information from a group of journalists concerning their confidential sources, and the journalists were held in contempt by the district court when they refused to give testimony on that issue.  *Id*. at 55.  On appeal, they argued that a First Amendment privilege protected them from having to disclose their sources to the plaintiff.  *Id*. at 57.

The Court in *Lee* began its analysis by reiterating that a reporter's privilege against disclosure is qualified, not absolute.  *Id*. at 58.  The Court then affirmed that "the guidelines of *Zerilli*" control with respect to evaluating when that qualified privilege must yield, and explained:

> As we stated above, *Zerilli* provides for a non-party journalist's qualified privilege in a civil action such as this one, where testimony of journalists is sought because government officials have been accused of illegally providing the journalist with private information.  *Zerilli* cites Carey for two guidelines determining when a court can compel a non-party journalist to testify about a confidential source.  First, the information sought must go to "the heart of the matter."  Second, the litigant must exhaust "every reasonable alternative source of information."  When applying this analysis, however, the court must keep in mind that this privilege is not absolute….

27

> [T]he protections of the Privacy Act do not disappear when the illegally disclosed information is leaked to a journalist, no matter how newsworthy the government official may feel the information is.

*Lee*, 413 F.3d at 60 (citing references omitted).  The Court then proceeded to "apply[] the factors laid out in *Zerilli*," asking first whether the information the plaintiff sought from the reporters went to the heart of the matter; and second, whether the plaintiff had exhausted reasonable alternative means of discovering the identity of the leaker.  *Id*. at 60–61.  In a *per curiam* decision, the court subsequently denied the petitioner-reporters' petition for rehearing *en banc*.

Thus, *Lee* explicitly and unambiguously reaffirmed the core holding of *Zerilli*—that in a Privacy Act case, the question of whether a non-party reporter must divulge the identity of his or her sources is governed by a two-part test.  Herridge's strained efforts to read into these clear decisions a hidden, third element that requires a district court to conduct a vague "balancing of the interest at stake," (Mem. at 3), is plainly foreclosed by these controlling precedents.  This Court is of course bound by the decisions in *Zerilli* and *Lee*, and Herridge's arguments—which essentially contend that these cases were wrongly decided—are not a basis for disregarding precedent.

### B.    Numerous District Court Decisions Have Agreed that *Zerilli* Created a Two-Part Test and Rejected the Adoption of a Vague Balancing Element.

While *Zerilli* and *Lee* are clear enough on their face that the applicable test for the discovery sought in this Privacy Act suit consists only of the elements of centrality and exhaustion, in arguing that the *Zerilli* decision supports the adoption of a free-ranging balancing test in and of itself, Herridge also skirts around numerous decisions in this Circuit that have confirmed this plain-language understanding of that precedent.  For example, in *Lee v. Dep't of Justice*, 401 F. Supp. 2d 123, 138 (D.D.C. 2005), Judge Collyer rejected the same argument that Herridge makes here, and confirmed that "[t]he law of this Circuit is clear," that "*Zerilli* and *Lee* explicate a two-part test of centrality and exhaustion to overcome a reporter's privilege to conceal his sources under

the First Amendment."  Similarly, in *Hatfill v. Gonzales*, 505 F. Supp. 2d 33, 40, 42–44 (D.D.C. 2007), Judge Walton held that "*Lee* provides direct and unequivocal guidance and instruction for the Court's assessment of whether [the Privacy Act plaintiff's] motion to compel should be granted," and proceeded to analyze the "two-part test" of centrality and exhaustion.

As discussed further below, (*see infra* Section III), Judge Collyer and Judge Walton also discussed at length the myriad reasons why the type of amorphous balancing test proposed by Herridge here would be, in their words, "inherently unworkable" and "extremely problematic." *Lee*, 401 F. Supp. 2d at 139; *Hatfill*, 505 F. Supp. 2d at 46.  But the question of whether an undefined grab bag of additional considerations should be added to the First Amendment privilege test is ultimately not one for this Court.  The two-part test to be applied in this Privacy Act suit is set forth unambiguously in *Zerilli*, *Lee*, and their progeny, and there is no basis for departing from that controlling precedent.  Therefore, as discussed further below, Herridge's arguments directed at various aspects of Dr. Chen's liability and damages cases—which are tied to the erroneous notion that the Court can conduct a generalized balancing of Herridge's interests against Dr. Chen's—are entirely irrelevant and should be disregarded.  Also irrelevant are Herridge's legally unsupported (and offensive) arguments that Dr. Chen is somehow undeserving of the protections of the Privacy Act.

### C.    Herridge's Argument Concerning Dr. Chen's Damages Case is an Irrelevant Red-Herring—and Wrong to Boot.

Next, proceeding from the erroneous premise that various elements of Dr. Chen's claims are relevant to this discovery dispute, Herridge argues that Dr. Chen is not entitled to the discovery central to her liability case because, in her view, Dr. Chen is unlikely to be able to ultimately obtain a substantial damages award.  (Mem. At 26–30.)  There are several reasons why this argument is both improper and erroneous.

First, again, the extent of damages Dr. Chen may ultimately recover is not at issue here (before damages discovery has even occurred).  Courts have rejected similar attempts by non-party journalists seeking to evade discovery by attacking the merits of a plaintiff's case.  *See, e.g.*, *Lee*, 401 F. Supp. 2d  at 142 n.24 (rejecting a non-party journalist's argument that he should not be compelled to reveal his confidential sources based on supposed deficiencies in the plaintiff's case because he lacked "standing to raise arguments concerning the merits," of the plaintiff's claim, and ongoing discovery made "the resolution of such issues wholly premature"); *Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 119 (D.D.C. 2002) (same).  Moreover, as noted above, the Court bifurcated liability and damages discovery, and thus it is premature and inequitable for Herridge to pre-judge Dr. Chen's potential damages recovery.

Second, Herridge's argument that Dr. Chen's interest in obtaining a remedy for the violation of her rights is "a purely parochial, private interest of her own," as opposed to the potential "damaging of First Amendment protections" if discovery is permitted, only serves to underscore why Herridge's proposed balancing test has been so bluntly spurned by courts in this Circuit.  (*See* Mem. at 26.). Indeed, in *Lee*, Judge Collyer rejected an identical invitation to assess the perceived value of a plaintiff's claims against a journalist's interest in protecting sources:

> The potential for widely varying perspectives is demonstrated by this very case. Dr. Lee may be seen as advancing an entirely personal quest for monetary damages for leaks of information protected by the Privacy Act.  Or, he may be seen as attempting to bring to light a serious abuse of power by senior federal officials who intentionally leaked information about the Lee investigation to create a smokescreen to cover up their own ineptitude.  Whether a reporter must reveal his sources should not rest on the value assigned by a jurist to the reporter's story or the litigant's purpose.

401 F. Supp. 2d at 139–40.  So too here.  While Herridge posits that this action has no value beyond personal compensation for Dr. Chen, she ignores that Dr. Chen seeks to vindicate the public interest in deterring outrageous misconduct by federal agents who used their extraordinary,

judicially-conferred powers to seize private papers from the sanctity of the home and selectively leak them to smear a private citizen. (*See* Compl. ¶¶ 22–23, 43–44.) Congress recognized the importance of allowing individuals to redress violations under the Privacy Act. *See* S. Rep. No. 1183, 93d Cong., 2d Sess. 23, 1974 U.S.C.C.A.N. 6916, 6997 (1974) ("[T]he grant of a cause of action to any 'aggrieved person' is designed to encourage the widest possible citizen enforcement through the judicial process."). Just as in *Lee*, Dr. Chen seeks to bring to light a serious abuse of power by a vigilante federal official or officials who intentionally leaked her protected information in order to harm her and convict her in the court of public opinion. Unlike *Lee*, where the Privacy Act plaintiff was actually indicted, pled guilty to a felony, and spent nine months in jail, Dr. Chen was never even charged. The societal harm that would flow from allowing this government misconduct to go unaddressed is as substantial as it is obvious.

Third, while Herridge focuses her arguments on whether Dr. Chen can recover damages for the post-Fox News-publication decision by DOD to terminate UMT from its tuition assistance program, she fails to acknowledge that this makes up only a portion of Dr. Chen's damages claim. Dr. Chen also seeks economic damages for, among other things, her expenditures on consulting fees and reputation management services necessary to remediate the damage from the Fox News reports, (*see* Supplemental Initial Disclosures (Apr. 24, 2020) (Ex. 34)), and Herridge does not contend that such damages are unavailable to Dr. Chen. Thus, Herridge's arguments go only to how much Dr. Chen is entitled to recover, not whether she is entitled to recover at all—and therefore, they are entirely irrelevant to this discovery issue.

Finally, even if the Court were to entertain Herridge's invitation to bolt an unprecedented damages inquiry onto the *Zerilli/Lee* test (which it should not), and even if the DOD's tuition assistance termination formed the entirety of Dr. Chen's damages claim (which it does not),

Herridge's arguments would still fail.  Under the black letter law, Dr. Chen is entitled to damages for the termination of tuition assistance if she can prove the termination was proximately caused by the Privacy Act violation.  Section 552a(g)(4)(A) requires that a plaintiff's damages be the "result of" the Privacy Act violation.  *Id.*  "To meet the Privacy Act's causation requirement [the plaintiff] must plausibly allege that the [violation] was the proximate cause of their damages."  *In re U.S. OPM Data Sec. Breach Litig.*, 928 F.3d 42, 67 (D.C. Cir. 2019); *see also Dickson v. Office of Pers. Mgmt.*, 828 F.2d 32, 37 (D.C. Cir. 1987) ("The adverse effect must be proximately caused by the Privacy Act violation.").

To establish proximate cause, a Privacy Act plaintiff must demonstrate that the violation was a "substantial factor in the sequence of events leading to [the plaintiff's] injuries, and those injuries must have been 'reasonably foreseeable or anticipated as a natural consequence' of [the agency's] conduct."  *In re U.S. OPM Data Sec. Breach Litig.*, 928 F.3d at 67 (citation omitted).  "To be the proximate cause is not necessarily to be the sole cause," rather the agency is "the proximate cause of the harm … so long as its conduct created a foreseeable risk of harm."  *Id.*

Herridge urges the Court, rather than relying on the D.C. Circuit's Privacy Act standard for causation, to rely on in-and-out-of-circuit standing and antitrust cases when conducting its novel review of the size of possible damages as a factor in its amorphous balancing of interests.  ***None*** of the cases Herridge cites for her "chain of causation" argument are from the Privacy Act context and two do not consider proximate cause at all.  *Mideast Sys. & China Civ. Constr. Saipan Joint Venture, Inc. v. Hodel*, 792 F.2d 1172, 1176 (D.C. Cir. 1986) (Article III standing context); *Alemu v. Dep't of For-Hire Vehicles*, 327 F. Supp. 3d 29 (D.D.C. 2018) (antitrust context).

Moreover, in the cases cited by Herridge, the plaintiffs failed to allege causation sufficient to even survive a motion to dismiss.  *See e.g.*, *Hotel Oakland Assocs. v. Doyle Real Estate Advisors,*

32

*LLC*, No. 21-cv-05389, 2022 WL 1493267, at *10 (N.D. Cal. May 3, 2022); *Reese v. Geneva Enterprises, Inc.*, No. 96-cv-1575, 1997 WL 214864 (D.D.C. Apr. 18, 1997).[17]   Here (when appropriate) Dr. Chen will present evidence that the DOD's decision was proximately caused by the Privacy Act violation; it was not the product of a considered, independent decision.

When this issue is properly before the Court (following damages discovery), Dr. Chen will prove that the Privacy Act violation was a "substantial factor in the sequence of events leading to" the DOD termination, and was a "reasonably foreseeable"—indeed, an intended—outcome of the Privacy Act violation.  DOD, despite ███████████████████████████████████ ████████████████, did nothing to terminate UMT from the Tuition Assistance program.  To the contrary, in August 2014, with full knowledge of the FBI's allegations, DOD affirmatively renewed UMT's Memorandum of Understanding to participate in the program for the next five years.  DOD did nothing to terminate UMT until it learned of the Fox News reporting, at which point—besieged by press inquiries and the congressional pressure that followed—DOD announced it had suddenly decided to review UMT's participation in the program.  When DOD did terminate UMT, it relied on information the FBI had generated years earlier—despite Dr. Chen's request that DOD conduct its own audit of the school and its systems.[18]   Dr. Chen will

---

[17] Similarly, the Privacy Act cases that Herridge does cite deal with an entirely different provision of the statute under which the plaintiffs sought to compel an agency to amend its records. *See e.g.*, *Kleiman v. Dep't of Energy*, 956 F.2d 335 (D.C. Cir. 1992) (seeking to compel DOE to amend its records); *see also Douglas v. Agric. Stabilization & Conservation Serv.*, 33 F.3d 784 (7th Cir. 1994) (same requested relief).  Dr. Chen in no way seeks to collaterally attack the agency's decision; instead, she seeks actual damages which were the proximate cause of the Privacy Act violation.

[18] Herridge suggests that Dr. Chen did not challenge DOD's termination of the MOU and that DOD "was *correct* that UMT raised real national security concerns," (Mem. at 2), but Dr. Chen appealed DOD's decision because it was "a near-verbatim recital of inaccurate and outdated claims" from the FBI's investigation and "[a] full, fair, and independent evaluation of the facts will reveal that there is no national security threat warranting the termination of the University from the Tuition Assistance Program," Ltr. from J. Gorelick to P. Shanahan re: "University of
*(cont'd)*

prove that DOD's decision was not an independent application of reasoned judgment, but an unjustified reaction to the sensationalist smearing of Dr. Chen fueled by the Privacy Act violation.

Not only was the outcome a reasonably foreseeable consequence of the leak, it was *the goal* that Rhoads and others vocalized.  For example, in an email from Rhoads to ███████ and another Army Reserves officer, Rhoads explains his view of the investigation and his passion for it: ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████ (DOD_00000057 (Ex. 36); *see also* FBI0003995 (Pappa discussing

████████████████████████████████████████████████████████

██████████████████ ) (Ex. 37).

That evidence is consistent with other cases where courts have found that a Privacy Act plaintiff has sufficiently shown causation.  For example, in *In re U.S. OPM*, the court determined that the complaint alleged facts sufficient to support proximate cause in a cybersecurity case because the plaintiffs alleged they "suffered forms of identity theft accomplishable only with the type of information that OPM stored and the hackers accessed.  [This] directly links the hack to the theft of the victims' private information, the pecuniary harms suffered, and the ongoing increased susceptibility to identity theft or financial injury."  928 F.3d at 67.  Thus, according to the court, this direct link was sufficient to establish proximate cause.  *Id.* at 68.  When appropriate, Dr.  Chen will present her evidence supporting proximate cause.

> **D.**   **Herridge's Arguments Concerning a Sealed Search Warrant Are Similarly Misleading, Immaterial, and Meritless.**

Next, Herridge argues that Dr. Chen's Privacy Act claims are undermined by the fact that

_____

Management and Technology Appeal of Notice of Cancellation of Memorandum of Understanding" (Feb. 9, 2018) (Ex. 35).

some pieces of the information that appeared in the Fox News reporting—the release of which forms the basis of Dr. Chen's claims—were included in a search warrant affidavit that hypothetically could have been publicly available at the time of the Fox News reporting if the district court's clerk office had understood that it should have been unsealed.  (Mem. at 31–34.) In reality—rather than the alternative universe that Herridge conjures—the clerk's office believed the affidavit was sealed until after the first Fox News report in spite of a self-executing unsealing order.   In any event, as with the other theories that Herridge advances, this argument is not appliable at all and, even if it were, it fails on the merits.

First, as set forth above, the strength of Dr. Chen's claims is not at issue at this stage, and it is not Herridge's place to contest the subpoenas by challenging the merits of a case that already survived a motion to dismiss.  *See supra* Section II-C.

Second, Herridge also admits that not all of the private information at issue in this case is contained in that affidavit.   (Mem. at 33 (acknowledging the affidavit did not contain the photographs of Dr. Chen that form part of her Privacy Act claims).)  But even this admission— which is fatal to Herridge's argument—does not tell the whole truth.  In fact, in addition to the photographs and images of non-public documents that gave life to the Fox News reporting, a host of other information constituting protected records was contained in the reports but not in the search warrant affidavit, including:

- That Dr. Chen was investigated by ICE and the Pentagon;
- That the investigation into Dr. Chen was a "200d" counterintelligence case;
- The claim that "the Chinese government funded Chen's research at George Washington University, where she received a PhD in Public Policy in 1999;"
- That Dr. Chen came to the United States from Beijing on a non-immigrant visa with her then-minor daughter, Lele Wang; and
- That Dr. Chen drew the "attention" of various federal agencies "perhaps as early as

2009."[19]

- That Dr. Chen told the FBI during a 2012 interview that her role in the Chinese space program was at a "civilian agency."

- That Dr. Chen's daughter, Lele Wang, told the FBI that "contractors in the UMT Beijing Office have [administrator] privileges" to access the student database.

- That there was a dispute among the FBI and the U.S. Attorney's Office about whether to criminally prosecute Dr. Chen.

Thus, like Herridge's attack on Dr. Chen's damages case, even if this argument were properly before the Court at this stage, and even if it had merit, it would at most limit the scope of Dr. Chen's claims—not preclude them entirely.  Thus, it is also no reason to deny Dr. Chen discovery to which she is entitled.

Finally, the search warrant affidavit argument fails on the merits, for two reasons.  First, Herridge's argument rests on the notion that there can be no Privacy Act violation when the disclosure consists of information already in the public domain.  (Mem. at 33.)  But, Herridge acknowledges, the search warrant affidavit was being treated as under seal by the U.S. District Court for the Eastern District of Virginia, and not available on the public docket, until months *after* the publication of the first Fox News report about Plaintiff in February 2017.  (Mem. at 5, 10, n. 10.)  Herridge's entire argument rests on the premise that the search warrant affidavit *theoretically* could have been made available prior to the Fox News reporting *if* someone had challenged its sealing, and *if* the Eastern District of Virginia court had previously ordered the clerk's office to treat the affidavit and unsealed and post it on the public docket.  (*See* Mem. at 31.)  But there is no dispute that the search warrant affidavit was not made publicly accessible on the district court's docket until April 2017.  (Mem. at 10, n. 10.)  Indeed, in November 2016, Pappa wrote to other FBI agents, ███████████████████████████████████████████████

---

[19] *Compare* Compl., Ex. B (ECF No. 1-2) (Feb. 24, 2017 Fox News Report) *with* Mem. at Ex. J (FBI search warrant affidavit).

████████████████████████████████████████████████████████

(DOJ_00001163–68 (Ex. 38).)   Furthermore, in January 2017—one month before the first Fox

News report—SSA-1 wrote to AUSA James Gillis that ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████   *Id.*   Gillis replied, ███████████████████████   *Id.*

Second, and more fundamentally, Herridge is simply wrong that no Privacy Act violation

could have occurred as a result of the disclosure of the search warrant affidavit to Herridge and

Fox News—*even if, in a hypothetical, but-for world,* the affidavit had actually been publicly

accessible on a court docket prior to the February 2017 Fox News report.   The Privacy Act flatly

prohibits the unauthorized disclosure of protected records *unless* one of twelve enumerated

exceptions applies.   5 U.S.C. § 552a(b).   None of those exceptions permits an agency to disclose

documents simply because they contain information that has previously been made public or might

be publicly releasable.   *See generally id.*   Indeed, Herridge makes no effort to ground her

arguments in the text of any of the Privacy Act's 12 exemptions.

Multiple courts, including at least one court in this district, have relied on the Privacy Act's

detailed statutory scheme to reject the very argument Herridge makes here.   In *Scarborough v.*

*Harvey*, the court rejected the defendants' claim that the information at issue was not Privacy Act-

protected "because it was information that was available to the public."   493 F. Supp. 2d 1, 16 n.29

(D.D.C. 2007).   As the court explained, "'[t]o define disclosure so narrowly as to exclude

information that is readily accessible to the public would render superfluous the detailed statutory

scheme of twelve exceptions to the prohibition on disclosure' set forth in the Privacy Act."   *Id.*

(quoting *Quinn v. Stone*, 978 F.2d 126, 134 (3d Cir. 1992)).   The court accordingly denied

defendants' motion to dismiss on the grounds there was no disclosure.

In so holding, the *Scarborough* court relied upon *Pilon v. Dep't of Justice*, 73 F.3d 1111 (D.C. Cir. 1996). In that case, a DOJ employee "faxed a confidential memorandum to Peter Nowinski," a former DOJ employee, who in turn passed it on to a reporter. *Id.* at 1113. The district court granted summary judgment to DOJ on the ground that this was not a Privacy Act "disclosure" because Nowinski was already familiar with the document from his time at DOJ. *Id.* at 1112. The district court relied on *Hollis v. U.S. Dep't of the Army*, 856 F.2d 1541 (D.C. Cir. 1988), which had held that the Army's provision of a summary of child-support payments to Ms. Hollis was not a "disclosure" because, "as the direct recipient of the … payments," she "already knew what had been remitted to her." *Id.* at 1543. The D.C. Circuit reversed, holding that *Hollis* was limited to its facts and that, after review of the text, purposes, and history of the Privacy Act, "the term 'disclose' [applies] in virtually all instances to an agency's unauthorized transmission of a protected record, regardless of the recipient's prior familiarity with it." *Pilon*, 73 F.3d at 1124. The D.C. Circuit explicitly declined to adopt the broad *dicta* from *Hollis*—relied upon by Herridge here, (Mem. at 32)—"that when a release consists merely of information to which the general public already has access … the Privacy Act is not violated." *Id.* at 1118.[20]

---

[20] Herridge improperly cites *Bartel v. FAA*, 725 F.2d 1403, 1413 (D.C. Cir. 1984), for the proposition that "there is no disclosure under the Privacy Act where information is 'in the public domain' and of a type 'traditionally released by an agency to the public without a FOIA request.'" (Mem. at 33.) This was not *Bartel*'s holding—indeed, *Bartel* expressly did *not* decide this question. *Bartel*, 725 F.2d at 1413 ("The OMB Guidelines suggest a possible exception to this interpretation for information that is traditionally released by an agency to the public without a FOIA request. We need not decide whether such an exception is proper, or if so what its exact scope may be."). Instead, *Bartel* analyzed the interaction between the requirement of disclosure under the Freedom of Information Act and the Privacy Act's prohibition on revealing personal information in its files. *Id.* at 1411–13. The court concluded that an agency may *not* release Privacy Act protected materials that might be releasable under FOIA unless it acted pursuant to a FOIA request and was unable to claim any of FOIA's exemptions. *Id.* at 1412.

The court in *Scarborough* also cited to decisions from the Third and Tenth circuits that reached the same conclusion.  493 F. Supp. 2d at 16, n.29.  In *Quinn v. Stone*, 978 F.2d 126, 134 (3d Cir. 1992), the court observed that it could find "no case that stands for the proposition that there is no violation of the [Privacy] Act if the information is merely readily accessible to members of the public."  Similarly, in *Gowan v. U.S. Dep't of Air Force*, 148 F.3d 1182, 1193 (10th Cir. 1998), the court rejected the argument that "a matter of public record is not subject to the provisions of 5 U.S.C. § 552a(b)," and held that "an agency may not defend a release of Privacy Act information simply by stating that the information is a matter of public record."  These cases are in accord with district court decisions from the Ninth Circuit that have also rejected the argument that an unlawful disclosure under the Privacy Act cannot occur if the information in question was available or accessible from other sources.[21]  These authorities collectively confirm that a Privacy Act violation could have occurred here even if the search warrant affidavit actually contained all of the private information at issue in this case (it does not), and even if it had actually been publicly accessible at the time of the February 2017 Fox News report (it was not).

In sum, Herridge's argument concerning the search warrant affidavit is simply another red herring designed to distract the Court from the actual operative issues of centrality and reasonable exhaustion.  The overall merit of Dr. Chen's claims simply is not at issue in this procedural context.  And even if it was, Herridge's arguments are unavailing.  The theoretical potential accessibility of

---

[21] *See also Finley v. Nat'l Endowment for the Arts*, 795 F. Supp. 1457, 1468 (C.D. Cal. 1992), *rev'd on other grounds*, 524 U.S. 569 (1998) ("[D]efendants argue that the information released was already publicly available; therefore, that disclosure cannot violate the Privacy Act…. However, case law in this Circuit is *contra*.  Thus, even if … the information released was already a matter of public record, in this Circuit, the allegations state a claim for relief under the Privacy Act." (citations omitted)); *Pinson v. U.S. Bureau of Prisons*, No. 13-cv-1821, 2015 WL 756501, at *6 (E.D. Cal. Feb. 23, 2015), *R.& R. adopted*, 2015 WL 1405224 (E.D. Cal. Mar. 26, 2015) ("Defendant cites no authority … to support its argument that information that is publicly known cannot be the subject of a Privacy Act violation.").

the sealed search warrant affidavit has no effect on whether unauthorized disclosure of some of the information contained therein by Defendants to Fox News and Herridge was a Privacy Act violation—and in any event, Herridge explicitly acknowledges that Dr. Chen's claims encompass disclosures of records that were not contained within the search warrant affidavit.

### E.   Herridge's Arguments Concerning Other Sources Cited in the Fox News Reports Are Also Immaterial and Incorrect.

These same principles are fatal to Herridge's argument (at 29-30) that Dr. Chen will be unable to prove damages caused by the disclosure of Privacy Act-protected information since— according to Herridge—the Fox News reports relied on other sources for "key elements" of the reports. Such an argument about the merits of Dr. Chen's damages claim is premature at this stage. And again, Herridge does not deny that certain information displayed in the Fox News reports *was* disclosed in violation of the Privacy Act. Further, certain information that Herridge claims to be from "other sources" also appeared in the PowerPoint—for example, excerpts of Dr. Chen's GWU dissertation—and Herridge may well have located that information after learning of it due to the unlawful disclosure of protected records. Dr. Chen is entitled to pursue discovery as to the Privacy-Act protected information, and at the appropriate time to demonstrate that the unlawful disclosure led to her damages. Indeed, journalists should not be able to insulate government agencies from willful violations of the Privacy Act simply by using the knowledge gained from unlawful sources to *also* locate and cite non-Privacy Act sources. Finally, Herridge improperly assumes that certain information published in the Fox News reports, like statements by Rhoads about the investigation, are not covered by the Privacy Act. But the Privacy Act covers oral disclosures the same as documentary disclosures, so long as they are retrieved from a protected record. *See, e.g.*, *Cloonan v. Holder*, 768 F. Supp. 2d 154, 163 (D.D.C. 2011) ("[T]he Privacy Act goes beyond the mere

dissemination of the physical records to prohibit 'nonconsensual disclosure of any information …
from a protected record." (citing *Bartel*, 725 F.2d at 1407)).

## III.     There is No Federal Common Law Reporter's Privilege.

Finally, because the test for overcoming the First Amendment privilege in this Circuit
plainly does not include the amorphous balancing element that Herridge asks the Court to apply
here, Herridge argues in the alternative that this Court should recognize a federal common law
reporter's privilege that does include a balancing element.  (Mem. at 39–45.)  This argument fails
for the simple reason that it has already been roundly rejected by courts across the country,
including numerous decisions in this Circuit.

From reading Herridge's brief, one could be forgiven for thinking that federal district
courts have free reign to invent new common law evidentiary privileges anytime a court may find
one advisable based on "reason and experience."  (Mem. at 39–40.)  In reality, both the U.S.
Supreme Court and the D.C. Circuit have cautioned that "new privileges should be created
sparingly and with caution."  *Lee v. Dep't of Justice*, 401 F. Supp. 2d 123, 136 (D.D.C. 2005)
(citing *United States v. Nixon*, 418 U.S. 683, 710 (1974) ("Exceptions to the demand for every
man's evidence are not lightly created or expansively construed, for they are in derogation of the
search for the truth."); *Linde v. Resolution Trust Corp.*, 5 F.3d 1508, 1514 (D.C. Cir. 1993) (noting
that "federal courts should not create evidentiary privileges lightly").  Thus, "the federal courts'
latitude for adopting evidentiary privileges under Rule 501 remains quite narrow indeed," and
courts must always start from the principle that evidentiary privileges are disfavored because they
obstruct the goal of ascertaining truth.  *United States v. Sterling*, 724 F.3d 482, 499 (4th Cir. 2013).

Tellingly, Herridge does not cite any federal court decision that has recognized a federal
common law reporter's privilege.  In fact, a long line of jurisprudence has addressed the question
of whether a federal common law reporter's privilege exists.  *In Branzburg v. Hayes*, 408 U.S. 665

(1972), the Supreme Court was asked to create a privilege—either under the First Amendment or the common law—to protect reporters from having to reveal confidential sources in response to grand jury subpoenas.  The Court declined to do so, expressly noting that "the common law recognized no such privilege," and further explaining that, in the Court's view, the press had flourished in the absence of any such rule, and thus the arguments in favor of creating one were unpersuasive.  *Id*. at 698–99.   Since that decision, numerous federal decisions interpreted *Branzburg* as directly foreclosing courts from creating a federal common law reporter's privilege unless and until the Supreme Court elects to revisit the issue.  *See, e.g.*, *Sterling*, 724 F.3d at 499–500 (holding that *Branzburg* precludes lower federal courts from recognizing "a qualified, federal common-law reporter's privilege protecting confidential sources"); *In re Grand Jury Subpoenas*, 438 F. Supp. 2d 1111, 1119 (N.D. Cal. 2006) (holding that "the Ninth Circuit's position on the issue appears clear to this Court: unless and until the Supreme Court states that a common law reporter's privilege exists, or unless Congress enacts such a privilege, *Branzburg*'s mandate is binding."); *In re Special Proceedings*, 373 F.3d 37, 44 (1st Cir. 2004) ("In *Branzburg*, the Supreme Court flatly rejected any notion of a general-purpose reporter's privilege for confidential sources, whether by virtue of the First Amendment or of a newly hewn common law privilege.").

Given this weight of authority and its roots in Supreme Court precedent, it is no surprise that the law in this Circuit is in accord.  The question of a common law reporter's privilege was first addressed by the D.C. Circuit in *In re Miller*, in which only one Circuit Judge on the three-judge panel was willing to hold that such a privilege existed.  438 F.3d 1141, 1164 (D.C. Cir. 2006).  In his concurrence, Judge Sentelle—who also wrote the majority opinion—gave several reasons for why it would be inappropriate to create such a privilege based on Federal Rule of Evidence 501.  *Id*. at 1153–59.  First, Judge Sentelle noted that *Branzburg* had rejected the notion

of a federal common law reporter's privilege, and therefore it would be "at least presumptuous if not overreaching" for the Circuit Court to adopt such a privilege.  *Id*. at 1155.  Next, Judge Sentelle noted that it would be "difficult and vexing" to determine who would be protected—i.e., defining who qualifies as a reporter or journalist, particularly in the internet age.  *Id*. at 1156.

To underscore that point, Judge Sentelle noted that although numerous states had adopted statutory journalist shield laws, those laws differed widely in terms of defining who is deserving of protection and the scope of the protection.  *Id*. at 1157–58.  Therefore, Judge Sentelle ultimately concluded that whether a non-Constitutional reporter's privilege should exist, who should be entitled to its protections, and what showing should be required to overcome it, were questions best addressed to the Article I legislative branch than the Article III courts.  *Id*. at 1158.

In her concurrence, Judge Henderson held that the court did not need to definitively reach the question of whether a common law privilege existed in order to resolve the case.  *Id*. at 1160.  However, she devoted the majority of her concurring opinion to explaining that even if such a privilege were to be created, she would favor limiting it to an analysis of centrality and exhaustion. *Id*. at 1161–62.  Judge Henderson then explained that the type of "multi-factor balancing test" proposed by Judge Tatel in his concurrence—and urged for adoption by Herridge here—"lack[ed] analytical rigor," and would prove unworkable because it would require district courts to engage in the impossibly subjective task of weighing the "news value" of a story against the perceived harm to the victim of an unlawful act.  *Id*. at 1162–63.  Thus, two of the three judges on the *In re Miller* panel disapproved of any proposed common law privilege test that balances the newsworthiness of the story against the perceived harm to the victim.

Since the decision in *In re Miller*, two district courts in this Circuit have addressed the precise question presented here and rejected the existence of a federal common law reporter's

privilege in the Privacy Act context.  First, in *Lee*, Judge Collyer addressed the question in the context of a Privacy Act suit in which the non-party reporter from whom discovery was sought argued—as Herridge does here—for the creation of a common law privilege that includes a balancing element that is not present in the two-part *Zerilli* test.  401 F. Supp. 2d at 126, 138.  In a detailed and thorough analysis, Judge Collyer rejected the invitation to find such a privilege.

Judge Collyer concluded that *Branzburg* is not necessarily dispositive of the question in a Privacy Act case because *Branzburg* was focused on the grand jury context.  *Id*. at 136. Nevertheless, Judge Collyer advanced several compelling arguments for why a common law privilege with a balancing element would be "inherently unworkable."  *Id*. at 139.  First, Judge Collyer noted that the D.C. Circuit already "explicate[d] a two-part test of centrality and exhaustion to overcome a reporter's privilege to conceal his sources under the First Amendment" in *Zerilli*, and failed to impose a different, three-part common law test in *In re Miller*—and therefore, for a district court to now create an additional common law privilege with a different test than that set forth in *Zerilli* would "circumvent" the D.C. Circuit's prior decisions.  *Id*. at 139. Next, Judge Collyer pointed out the "troubling" nature of a proposed common law privilege with "a subjective and elastic standard" that would ask district courts, in a Privacy Act case, to place a value on the "newsworthiness" of a particular piece of reporting, as well as on the perceived harm to the plaintiff and righteousness of his or her cause—and then to determine which has more value in a particular case.  *Id*. at 139–40.   Next, as Judge Sentelle did in *In re Miller*, Judge Collyer expressed concern that given the "proliferation of communications media in the modern world," it would be "impossible to construct a reasonable or useful definition of who would be a 'reporter' eligible to claim protection from a newly minted common law privilege.  *Id*. at 140.  And finally, Judge Collyer also noted that the proposed common law privilege would "undermine the

fundamental purpose of the Privacy Act," which expressly discourages leaks of confidential records, by voiding the protections of the Act whenever the illegally disclosed information happens to be leaked to a journalist rather than any other third party.  *Id*. at 141–42.

Finally, in *Hatfill*—also a Privacy Act case—Judge Walton similarly rejected the existence of a common law reporter's privilege.  505 F. Supp. 2d at 33.  The *Hatfill* decision focused in particular on the "balancing component" of the proposed test, labelling it "extremely problematic." *Id*. at 46.  Judge Walton also found that application of such a privilege in a Privacy Act case would be particularly inappropriate because it would have the "perverse effect" of making violations of the Act immune any time that leaks are made to reporters, and thus frustrate the "remedial relief" intended by the Act.  *Id*. at 45.  Therefore, Judge Walton concluded that "extending the privilege to Privacy Act cases where a viable claim has been pled would be inappropriate," and that "[t]o rule otherwise would frustrate the fundamental purpose for the Privacy Act's adoption."  *Id*.

For all of the reasons given by Judges Sentelle, Henderson, Collyer, and Walton, Herridge's request that this Court do what no other in this Circuit has done should be rejected. Herridge invites this Court to create a federal common law privilege that has never been recognized, and has in fact been roundly rejected, by courts in this Circuit.  And her explicit purpose in doing so is to ask the Court to apply a balancing test that requires it to subjectively weigh the news value of her reporting against the perceived worthiness of Dr. Chen as a person and as a litigant.  This is the precise approach that was rejected by a majority of the panel in *Zerilli* and harshly criticized in the *Lee* and *Hatfill* decisions as "inherently unworkable" and "extremely problematic."  This Court should decline the invitation.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Herridge's Motion to Quash.

Dated:  August 24, 2022

Respectfully submitted,

  _/s/ Andrew C. Phillips_____
Andrew C. Phillips (DC Bar No. 998353)
Shannon R. Timmann (DC Bar No. 1614929)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Tel: (202) 628-7400
andy@clarelocke.com
shannon@clarelocke.com

*Counsel for Plaintiff Yanping Chen*