# Exhibit 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| YANPING CHEN, | |
| Plaintiff, | Case Number: |
| vs. | 18-cv-3074(CRC) |
| FEDERAL BUREAU OF INVESTIGATION, et al, | |
| Defendants. | |

Video Deposition of

CATHERINE HERRIDGE

Tuesday, September 26, 2023

10:11 a.m.

Job No. 6455898

Reported by: Laurie Donovan, RPR, CRR, CLR

September 26, 2023
10:11 a.m.

Video Deposition of CATHERINE HERRIDGE, held in person in Washington, D.C., with the witness and all parties participating in person, pursuant to the Rules of the United States District Court for the District of Columbia, subject to such stipulations as may be recited herein or attached hereto, before Laurie Donovan, a Registered Professional Reporter and notary public of the District of Columbia, who officiated in administering the oath to the witness.



A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:
Meier Watkins Phillips Pusch, LLP
1629 K Street, NW
Suite 300
Washington, D.C. 20009
(847)951-7093
By: Andrew Phillips, Esq.
andy.phillips@mwpp.com
Shannon Timmann, Esq.
shannon.timmann@mwpp.com

ON BEHALF OF THE DEFENDANTS:
U.S. Department of Justice
1100 L Street, NW
Washington, D.C. 20005
(202)616-8016
By: Garrett Coyle, Esq.
garrett.coyle@usdoj.gov
Leslie Cooper Vigen, Esq.
leslie.vigen@usdoj.gov
Sopha Y. Kil, Esq.
Carol Federighi, Esq.



(Appearances continued)

ON BEHALF OF NON-PARTY CATHERINE HERRIDGE:
Ellis George Cipollone O'Brien LLP
1155 F Street, NW
Suite 750
Washington, D.C. 20004
(212)413-2600
By: Patrick F. Philbin, Esq.
pphilbin@egcfirm.com
Chase Harrington, Esq.

ALSO PRESENT:
Matt Jones, Esq. (via telephone)
Kim Johnson, videographer



EXAMINATION INDEX


| | PAGE |
|---|---|
| EXAMINATION BY MR. PHILLIPS . . . . . . . . . | 9 |
| EXAMINATION BY MS. VIGEN . . . . . . . . . . | 208 |
| EXAMINATION BY MR. PHILBIN . . . . . . . . . | 212 |


E X H I B I T S

PLAINTIFF'S EXHIBITS:


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1* | Unredacted version of the Memorandum of Understanding -- clawed back by opposing counsel . | 17 |
| Exhibit 1 | Redacted version of the Memorandum of Understanding and Order . . . . . . . . . . . . | 205 |
| Exhibit 2 | Article on Fox News: "DoD-funded school at center of federal probes over suspected Chinese military ties" . . . . . . . . . | 24 |

(Exhibits continued)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 3 | Article on Fox News, "Congress investigating taxpayer-backed school over alleged ties to Chinese military after Fox report" . . . . . . . . . . . . . | 62 |
| Exhibit 4 | Audio/visual material on thumb drive . . . . . . . . . . . . . . | 73 |
| Exhibit 5* | Large binder full of confidential documents -- (Clawed back) . . . | 81 |
| Exhibit 6 | Audio/visual material on thumb drive . . . . . . . . . . . . . . | 110 |
| Exhibit 7 | Article "State Department contractor allegedly paid by Chinese agent to spy on Americans - yet no charges filed" . . . . . | 158 |
| Exhibit 10 | Email from Catherine Herridge to Stephen Rhoads, June 2, 2016 . . . | 171 |
| Exhibit 12 | Email exchange between Rhoads and Herridge, February 20, 2017 . | 178 |
| Exhibit 14 | Text messages between Herridge and Rhoads, Bates RHOADS 67 . . . | 192 |



(Exhibits continued)

---------------------------------------------------

| DEPONENT'S EXHIBITS: | | PAGE |
|---|---|---|
| Deponent 1 | Police report for Herridge's car break-in . . . . . . . . . . . . | 213 |
| Deponent 2 | Photos of Herridge car . . . . . | 216 |



-------------------------------------------------

P R O C E E D I N G S

10:11 a.m.

-------------------------------------------------

THE VIDEOGRAPHER: Here begins the video-recorded deposition of Katherine Herridge, taken in the matter of Yanping Chen versus Federal Bureau of Investigation, et al, in the U.S. District Court for the District of Columbia, case number 118-CV-3074.

Today's date is September 26, 2023. The time is 10:11. This deposition is being held at 1155 F Street, Northwest, Washington, D.C. The court reporter is Laurie Donovan. The video camera operator is Kim Johnson, both on behalf of U.S. legal.

Will counsel please introduce yourself and state whom you represent.

MR. PHILLIPS: This is Andy Phillips with Meier Watkins Phillips Pusch, LLP on behalf of the plaintiff, Yanping Chen.

MS. TIMMANN: Shannon Timmann with Meier Watkins Phillips Pusch LLP on behalf of the plaintiff, Yanping Chen.

MR. PHILBIN: Patrick Philbin with the firm



Ellis George Cipollone O'Brien, representing the deponent, Ms. Herridge.

MR. COYLE: Garrett Coyle, Leslie Vigen, Carol Federighi and Sophia Kil for the government.

MR. HARRINGTON: Chase Harrington with the firm Ellis George Cipollone on behalf of the deponent.

THE VIDEOGRAPHER: And on the phone?

MR. JONES: Matt Jones from WilmerHale LLP on behalf of Dr. Chen.

THE VIDEOGRAPHER: Thank you.

Would the court reporter please swear in the witness.

* * * * *

Whereupon,

Catherine Herridge,

having been first duly sworn, testified upon her oath as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. PHILLIPS:

Q Good morning, Ms. Herridge.

A Good morning.

Q We met briefly off the record, but again my name is Andy Phillips, and I represent Yanping Chen,

Page 10

who is the plaintiff in this case.
Do you understand that you're here today to give a deposition in a case filed by Ms. Chen against the FBI, the Department of Justice, the Department of Defense, and the Department of Homeland Security?
A I do.
Q Have you ever given a deposition before?
A I have not.
Q Okay. Well, I'll go over some of the ground rules real quick.
A Thank you.
Q So it's a question-and-answer session today. We have our court reporter here who is taking a transcript, and we want that transcript to be clean, so it's important that we try not to talk over each other.
So if I ask a question, even if you think you know what it is I'm about to ask you, if you could let me complete my question before you begin your answer, and by the same token, I will try not to interrupt you and allow you to complete an answer before I begin a new question.
Does that all make sense?
A It does.
Q For the same reason -- that is, a clean

Page 11

transcript -- we need verbal responses, because things like head nods and shakes don't show up on a transcript, so we need, you know, yeses or nos rather than head nods or uh-huhs, if that make sense.
A I understand.
Q Do you understand that your testimony today is under oath?
A I understand.
Q Is there any reason that you're unable to testify truthfully today?
A No.
Q Ms. Herridge, before the deposition began, I presented your counsel, Mr. Philbin, with a copy of the stipulated protective order entered by the court in this case on June 2, 2020, and that protective order allows me to show discovery material that has been marked as confidential to a witness during a deposition, if the witness signs an acknowledgment form that is Exhibit A to that order.
Are you familiar with what I'm talking about?
A I have heard about the document. I have not reviewed it myself.
Q You have not reviewed the protective order?
A No.

Page 12

Q Am I correct in my understanding that you are declining to sign the Exhibit A Acknowledgment to the protective order?
MR. PHILBIN: Let me interject here to make clear that I have given my client legal advice on this, and we are objecting to signing the protective order today. This was raised only five minutes before this deposition was set to begin.
And Ms. Herridge is declining to sign the protective order, because the restrictions in the protective order say that anything that is protected material cannot be used for any other purpose other than this litigation, including, but not limited to, any other lawsuit or proceeding.
And the concern is, Counsel, that you may present Ms. Herridge with a document that has been produced by the government to you in this action that they have designated as protected material, that she may potentially have already received in some way during the course of her reporting.
In that event, this order could potentially convert that -- something that she already

Page 13

possessed -- into protected material, that then, under the terms of the order, if she signed it, she would not be allowed to use for any purpose other than this lawsuit, which would mean something that she had gathered through her investigative reporting suddenly would become subject to the protective order, and she could no longer use it in the future for her reporting.
And there's nothing in the terms of this protective order that would protect her from that. The only protective provision in the protective order is for the party that actually produced something and designated it as protected in this case.
And this is -- I'm referring to paragraph 18 that says, "Nothing in this protective order precludes a producing party from using or disseminating its own discovery material for purposes other than this action."
So the only carve-out to the restrictions imposed by the use paragraph, that's paragraph 18, is for a producing party. Since Ms. Herridge is not a producing party, she would not receive the protection of that carve-out.
In addition, paragraph 25 of the protective

order says that "all protected material, all protected material, including all copies, shall be returned to the producing party or destroyed" at the end of this litigation, which again is something that was already in Ms. Herridge's possession as part of her investigative reporting.

If converted into protected material by you showing it to her at this deposition, she would then potentially become under an obligation under this order, at the end of the litigation, to return or destroy it, which we believe would be a further violation of her First Amendment rights under the privilege, because it's material she potentially had gathered already through her investigative reporting.

And I want to put this all on the record and explain that if there were a proper protection in the protective order, then potentially that is a different situation, but because this was only raised five minutes before this deposition was set to begin, and we haven't had any opportunity to go to the court to see about modifying the protective order, this is not something she's prepared to sign now.



MR. PHILLIPS: I appreciate you putting that on the record, and for the record I want to state the plaintiff's position, which is that your reading of the protective order is unreasonable and not in accord with the definitions therein.

I would point you to paragraph 10 of the protective order, which defines "Protected Material."

"Protected material is explicitly defined as discovery material that is designated as confidential. Discovery material is also a defined term under the protective order, and by its terms, under paragraph 4, only applies to materials that are disclosed or produced in this action; i.e., materials that have been disclosed in discovery."

So I think that your position that the protective order could somehow encompass materials that are already in Ms. Herridge's possession, outside of having been shown to her in this deposition, simply doesn't make sense and is not in accord with the terms of the protective order.

That's our position, and I would encourage you to perhaps on a break take another read



through the protective order and see if you want to alter your position on that.

MR. PHILBIN: We can take a look at a break. I would also just like to make clear on the record that to the extent the intent would be to show Ms. Herridge documents that were produced by the government in discovery in order to determine whether or not she had those documents in her possession to determine whether or not it was something that she had gained through her investigative reporting, she would not answer the question anyway under the First Amendment reporter's privilege.

I insert an objection under the First Amendment reporter's privilege, because it is clear, under the decision in Maughan versus NL Industries, 524 F. Supp. 93, that a reporter's privilege also applies to "resource materials prepared by a reporter in anticipation of writing a news article, including drafts and notes," and that would include also information gathered by the reporter.

Similarly, In Re Slack, 768 F. Supp. 2nd 198, holds that "the reporter's privilege broadly protects journalists from compelled disclosure of



information which they have obtained as part of their news gathering role."

Any documents confirming or denying whether or not she had particular documents in her possession as part of her investigative reporting could be something that would help lead the plaintiff in this case to the identity of Ms. Herridge's confidential source or sources, if any, and so she would not answer any questions about those documents in any event.

BY MR. PHILLIPS:
Q Ms. Herridge, what, if anything, did you do to prepare for your deposition today?
A I met with my attorneys.
Q Did you review any documents?
MR. PHILBIN: Objection; privilege.
MR. PHILLIPS: To the yes or no?
MR. PHILBIN: She said she met with her attorney, and what we, if anything, reviewed would be disclosing work product.
BY MR. PHILLIPS:
Q Without telling me which documents you reviewed in preparation for your deposition today, did you review any documents?
MR. PHILBIN: You can answer.

THE WITNESS: We reviewed a handful of documents, including the original reports.
BY MR. PHILLIPS:
Q Did you review any materials on your own, outside of your meeting with counsel, to prepare for your deposition?
A I did not.
Q Ms. Herridge, do you understand that you were originally served via your counsel with a deposition subpoena in this case in June of 2022?
A Yes.
Q Am I correct that with the assistance of your counsel, you asked the United States District Court to quash that deposition subpoena?
A Yes.
Q Do you understand that in August 2023, the court issued an order requiring you to sit for this deposition today?
A I'll take your word on the timing, but yes.
MR. PHILLIPS: Let me show you a document that might help.
(Exhibit 1 was marked for identification but later replaced with the redacted version.)



(Witness peruses document.)
BY MR. PHILLIPS:
Q Are you familiar --
MR. COYLE: Counsel, I'm sorry to interrupt, but I believe there are two versions of this. One is redacted and one is not and contains materials subject to the protective order.
Do you or can you get a copy of the redacted version, the corrected version on the docket?
MR. PHILLIPS: I can do that on a break.
MR. COYLE: Thank you. Can we retrieve the copy?
MR. PHILLIPS: Yes. Ms. Herridge, I'm going to need to take that back from you.
MR. COYLE: Thank you.
BY MR. PHILLIPS:
Q Ms. Herridge, do you understand that -- and I'll represent it was August 1, 2023 -- that on August 1, 2023, the district court entered an order requiring you to sit for a deposition and identify the source or sources of any Privacy Act material related to Dr. Chen that you received in the course of your reporting on Dr. Chen and the University of Management & Technology?
A Yes.



Q You are here today for the deposition that the court ordered you to attend, correct?
A Yes.
Q Do you intend to provide substantive answers to questions related to your source or sources for the Privacy Act materials in question?
A I have complete respect for the court and its authority and for the order. I have no desire to defy a court order, but my understanding is that the courts have ruled that in order to seek further judicial review, I must now disobey the order, and for that reason, among others, I am invoking my First Amendment rights and declining to answer the question.
Q So it is your intention during today's deposition to, as you put it, "disobey" the district court's August 1, 2023 order?
A I refer you to my original answer.
Q So the answer to my question is yes?
MR. PHILBIN: Asked and answered, Counsel.
BY MR. PHILLIPS:
Q Do you intend to comply with the district court's order or to defy the district court's order?
A I explained I have complete respect for the court and its authority and for the order, and I have no desire to defy a court order.



My understanding is that the courts have ruled that in order to seek further judicial review in this case, I must now decline the order, and respectfully I am invoking my First Amendment rights in declining to answer the question.
Q Ms. Herridge, what is your home address?
A [redacted]
Washington, D.C.
Q And are you currently employed?
A Yes.
Q By whom?
A I'm a senior investigative correspondent for CBS News.
Q And how long have you been at CBS News?
A I began working at CBS News in November of 2019.
Q Prior to joining CBS News in 2019, where were you employed?
A I began my career at ABC News in London in 1987. I worked there for about a decade, rising through the ranks from radio reporter to a television correspondent, and then in 1996, I joined Fox News Channel and worked there until 2019 when I was the chief intelligence correspondent.
Q So you were at Fox News, am I correct, from

1996 to 2019?
A Yes.
Q What was your title when you joined Fox News?
A To the best of my recollection, I was a foreign correspondent, a London-based correspondent.
Q And do you know when you became the chief intelligence correspondent for Fox News?
A To the best of my recollection, it would have been 2016, 2015/2016, under my last contract at Fox News.
Q If that was 2016, do you know what your immediate prior title was?
It's not a memory test, just to the best --
A Yeah, no, I, I'd have to go back and look. I was a senior national correspondent at one point. I held various titles.
Q Why did you leave Fox News in 2019 after so many years with the network?
A I had a terrific opportunity to join CBS News as a senior investigative correspondent and to focus my energies on longer form investigations.
Q Were you under contract with Fox at the time you accepted a position with CBS?
A No.



Q So did you leave Fox after the expiration of your then existing contract?
A To the best of my recollection, my contract had expired over the summer, and I then left and joined CBS News.
Q Were there any discussions with Fox about renewing your contract, or was that something you were not --
MR. PHILBIN: Objection; relevance, Counsel. This has nothing do with what the court allowed this deposition for.
MR. PHILLIPS: I'm just getting background from the witness on her employment.
BY MR. PHILLIPS:
Q I'm going to continue to pose the question.
A Sorry. Could you repeat the question?
Q Yes. It was: Were there any discussions with Fox about renewing your contract at Fox, or did you simply leave because you had no interest in staying at Fox?
A My agent engaged with Fox News, as is typical in any contract expiration.
Q Were you offered another contract at Fox News?
A I was offered the opportunity to stay, yes.



(Exhibit 2 was marked for identification.)
BY MR. PHILLIPS:
Q I'm handing you what we have marked as Plaintiff's Exhibit 2. Do you recognize Plaintiff's Exhibit 2 as a story that was published on Fox News' website on February 24, 2017?
A I recognize the report.
Q Do you see the date at the top listed as February 24, 2017?
A I do.
Q Does that sound right to you in terms of when the story was published?
THE REPORTER: What was your question? I'm sorry. I'm just a little behind.
BY MR. PHILLIPS:
Q I asked if the date of February 24, 2017 on this document sounds correct to her as far as when the story was published on Fox News' website.
Is that a yes?
A Yes.
Q Were you the author of this story?
A Yes, along with other members of the team.
Q And who are the other members of the team that were involved in writing this story?



A Pamela Browne and Cyd Upson.
Q And at that time, February 2017, what were Pamela Browne and Cyd Upson's roles at Fox News?
A Both were part of an investigative unit.
Q Was there a name for that unit?
A The investigative unit.
Q Were you the head of that investigative unit?
A No.
Q Who was?
A To the best of my recollection, Pamela Browne.
Q I guess I'm trying to understand just who put, you know, who put the words on paper. Did you all work together to draft this story? Was it a collaborative effort? Was somebody the primary author? I'm just trying to understand how it came together.
MR. PHILBIN: Objection; privilege. The First Amendment privilege protects the entire news gathering and editorial process. To the extent, Counsel, you want to pry into sort of details of the editorial process, we are going to object on First Amendment grounds.

Page 26

MR. PHILLIPS: So just to be clear for the record, you're objecting on First Amendment grounds to the question who wrote the story?

MR. PHILBIN: Counsel, I think you've established that she -- that Ms. Herridge was the lead reporter on the story. That's already been established on the record by declarations that were submitted by Cyd Upson and Pamela Browne, they're in the record in this case, so that's been established.

To the extent you want to get more information about the editorial process, yes, we're going to assert the First Amendment privilege.

BY MR. PHILLIPS:

Q Were you the lead reporter for this story?

A Yes.

Q Am I correct in my understanding that you are not going to tell me about what Cyd Upson and Pamela Browne's roles were with respect to the reporting of this story?

A I believe we've already answered your question. I'm not prepared to discuss our news gathering or editorial process.

Q This story, Plaintiff's Exhibit 2, is about

Page 27

Dr. Chen as well as her role at the University of Management & Technology in Arlington, Virginia.

Do you agree?

A Yes.

Q Can you tell me the genesis of this story? And by that I mean how did it come about that you began reporting a story about Dr. Chen and UMT?

MR. PHILBIN: Objection; privilege. Again, the First Amendment privilege protects the news gathering process.

I'll cite again In Re Slack, 768 F. Supp. 2nd 189, which says that the privilege broadly protects journalists from compelled disclosure of information which they have obtained as part of their news gathering role. It also protects both confidential and nonconfidential information, also In Re Slack.

So Ms. Herridge is not going to answer questions that indicate how she started reporting, why she started reporting, what her news gathering process was, also because that could lead to information that would lead to the name or names of her confidential source or sources.

Page 28

BY MR. PHILLIPS:

Q Ms. Herridge, how did you as a reporter at Fox News become interested in Dr. Chen and UMT?

MR. PHILBIN: Again, objection.

BY MR. PHILLIPS:

Q Are you going to decline to answer that question?

A I decline to answer.

Q Ms. Herridge, I direct your attention to the third paragraph of Plaintiff's Exhibit 2 that begins with "however." Just let me know when you're there.

A I'm there.

Q This paragraph says, "However, there is another side to the school's leadership that drew the attention of the FBI, the Justice Department, the Pentagon, Immigration and Customs Enforcement, and the Naval Criminal Investigative Service (NCIS) since at least 2012 -- and perhaps as early as 2009."

Did I read that right?

A You have.

Q The reference to those agencies' interest in the school's leadership since at least 2012, does that refer to the 2012 search warrant raids that are referenced in the next paragraph?

MR. PHILBIN: You can answer.

Page 29

THE WITNESS: I mean to the best of my recollection, yes.

BY MR. PHILLIPS:

Q After saying that these federal agencies were interested in the school's leadership since at least 2012, that paragraph says "and perhaps as early as 2009."

What does that refer to?

MR. PHILBIN: Objection; privilege. To the extent that that question is trying to get at information gathered as part of the news gathering process that is not set out explicitly in the story, it remains subject to First Amendment privilege.

BY MR. PHILLIPS:

Q Are you going to decline to answer my question?

A I decline to answer, respectfully.

Q Where did you get the information about which federal agencies were allegedly investigating the University of Management & Technology's leadership?

MR. PHILBIN: Objection; privilege. Again, to the extent it's going to pry into the news gathering process and what Ms. Herridge's sources

Page 30

were, because it's specifically asking where she got certain information reflected in the story, we'll object on First Amendment grounds.
BY MR. PHILLIPS:
Q And are you going to follow your counsel's advice to decline to answer my question?
A I will follow my counsel's advice. Thank you.
Q The next paragraph, Ms. Herridge, says, "In December 2012, the FBI made two very public raids of UMT and the Northern Virginia home of university president Yanping Chen Frame and its academic dean, her husband, J. Davidson Frame. Documents reviewed by Fox News show it was a counter-intelligence case known as a 200d, one of the most highly sensitive categories for a federal probe."
Did I read that right?
A You have.
Q Where did the information stated in this story that the search warrants executed in 2012 were part of a 200d case come from?
MR. PHILBIN: Objection; privilege. Again, to the extent it goes to information that was part of the news gathering, that is not made clear in the story, remains confidential and

Page 31

subject to privilege.
BY MR. PHILLIPS:
Q Are you going to follow your counsel's instruction to decline to answer my question?
A Yes.
Q That same paragraph refers to documents reviewed by Fox News.
What documents?
MR. PHILBIN: Objection; privilege. Again, to the extent that it would be giving information that is not in the story about the news gathering process and specifying particular documents could lead to information that would lead to the name or names of Ms. Herridge's source or sources.
I refer again to In Re Slack and also to Tavoulareas vs. Piro, 93 F.R.D. 35, which holds that "where a confidential source is involved, the privilege applies not only to discovery that directly seeks the source's identity, but also to discovery that would be likely to identify the source."
Specifying particular documents that Ms. Herridge had received could potentially be indicative of the source and therefore is subject to the First Amendment privilege.

Page 32

BY MR. PHILLIPS:
Q And are you going to decline to answer my question, Ms. Herridge?
A Yes, I respectfully decline to answer.
Q The next paragraph says, "Photos exclusively obtained by Fox News appear to show Chen as a young officer in the People's Liberation Army, the military wing of China's communist party. Another photo shows Frame saluting his wife, Chen, who is holding a uniform. Three independent experts said it was a Chinese military colonel's uniform."
Did I read that right?
A You have.
Q If you flip to the next page, do you see that there's a photograph in this story, immediately following the paragraph I just read?
A I do.
Q And the caption says that it's an "undated photo that appears to show Yanping Chen Frame before she came to a U.S. graduate school."
A Yes.
Q Is that the photo that the paragraph I just read is referring to as appearing to show Chen as a young officer in the People's Liberation Army?
A Yes.

Page 33

Q And that same paragraph, when it refers to a photo showing Frame saluting his wife, Chen, who is holding a uniform, is that referring to the photo that appears at the top of Plaintiff's Exhibit 2 on the first page?
A Yes.
Q When the story says that these photos were obtained exclusively by Fox News, what does that mean?
A I think that's self-explanatory.
Q Well, it sounds like sort of news room jargon to me, so . . .
A Yeah, I think that's fair.
Q If you could try to explain it to me. What does it mean for something to be obtained exclusively by a media organization?
A Speaking broadly, that a news organization would be the only organization to have obtained the materials.
Q The two photographs that we just discussed on page 1 and 2 of Plaintiff's Exhibit 2, were they obtained by you in the course of reporting this story?
MR. PHILBIN: You can answer.
THE WITNESS: Yes.
BY MR. PHILLIPS:
Q When did you first obtain those photographs?

Page 34

MR. PHILBIN: Objection; privilege. To the extent that information about timing would potentially lead to the identity of the source or sources that Ms. Herridge had, it's covered by the First Amendment privilege, and I would cite -- bear with me for one moment -- the decision Tavoulareas versus Piro, 93 F. 3rd 35 at 39, where the court held that "things such as travel records, telephone bills, expense vouchers and similar materials, things that showed movements or timing of the reporter on the story were protected by the privilege, because this sort of information may lead plaintiffs to confidential sources which they are not entitled to obtain from defendants at this stage of litigation, because it was still subject to the First Amendment privilege."

So we will assert the privilege over questions that identify the timing of when materials were received.

BY MR. PHILLIPS:

Q Ms. Herridge, are you going to follow your counsel's instruction to decline to answer my question about when you obtained the photographs that appear on the first and second pages of Plaintiff's Exhibit 2?

Page 35

A I do.

Q Do you know where these photographs came from originally? And by that I mean who was originally in possession of these photographs, who they belonged to.

MR. PHILBIN: You can answer.

THE WITNESS: I can't say for certain.

BY MR. PHILLIPS:

Q Okay. Do you have an assumption, at least, or a speculation on that?

A My assumption is that they belonged to your client and her husband.

Q And was that your belief at the time that this story was published in February 2017?

A It was my assumption.

Q Do you know if these photographs were a part of the materials seized during the 2012 search warrant raid that is referenced in the story?

MR. PHILBIN: Objection; privilege, and to the extent it would go to knowledge of whether or not these were in the possession of the government or how they came in the possession of the government, whether they were transmitted to Ms. Herridge from someone in the government, potentially leading to identifying source or

Page 36

sources, and the First Amendment privilege applies.

BY MR. PHILLIPS:

Q Are you going to follow your counsel's instruction and decline to answer my question?

A I do.

Q Do you know if the photographs on page 1 and 2 of Plaintiff's Exhibit 2 were at one time in the possession of the government?

MR. PHILBIN: You can answer that.

THE WITNESS: I can't say for certain. It would be my assumption.

BY MR. PHILLIPS:

Q You can't tell me for certain whether you know that the government ever had possession of the photographs on page 1 and 2 of Plaintiff's Exhibit 2?

A I believe they possessed these photos, it is my assumption, at the time I was working.

Q And what was the basis for that assumption?

MR. PHILBIN: Objection; privilege. It's going to get into exactly what information she had about the photos and potentially identify source or sources.

BY MR. PHILLIPS:

Q Are you going to follow your counsel's

Page 37

instruction and decline to answer that question?

A I am.

Q Ms. Herridge, tell me how you came into possession of the photographs that appear on page 1 and 2 of Plaintiff's Exhibit 2.

MR. PHILBIN: Objection; privilege. It would lead directly into identifying the source or sources.

BY MR. PHILLIPS:

Q Are you going to decline to answer that question?

A Respectfully, yes.

Q Did you obtain these photographs from a source?

MR. COYLE: Objection; vague and ambiguous as to "source."

BY MR. PHILLIPS:

Q Let me back up then.

Ms. Herridge, as a reporter, do you understand what the term "source" means?

A I do.

Q How do you define it?

A A source can be an individual or individuals, maybe an organization that provides information that supports your journalism.

Q Using that definition, did a source for your reporting on Dr. Chen and UMT provide you with the photographs that appear on page 1 and 2 of Plaintiff's Exhibit 2?
MR. PHILBIN: And to clarify, Counsel, this is any source without specification as to where the source was?
BY MR. PHILLIPS:
Q That's all I've asked so far.
MR. PHILBIN: You can answer.
THE WITNESS: Yes.
BY MR. PHILLIPS:
Q Was it an individual?
MR. PHILBIN: Objection. That would lead to particularly identifying the source or sources.
BY MR. PHILLIPS:
Q Are you going to decline to tell me if a human person provided you the photographs that appear on page 1 and 2 of Plaintiff's Exhibit 2?
A I'm going to decline to answer, invoking my First Amendment rights.
Q In what form did you receive from a source the photographs that appear on page 1 and 2 of Plaintiff's Exhibit 2?
MR. PHILBIN: Objection; privilege. It goes


to the news gathering process, the methods used for news gathering, and potentially also could lead to identifying the source or sources if a particular method were identified.
BY MR. PHILLIPS:
Q Are you going to decline to answer my question?
A I am.
Q Were these photographs provided to you in digital form or in hard copy?
MR. PHILBIN: Same objection.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A I am. Thank you.
Q Ms. Herridge, who was the source that provided these photographs to you?
MR. PHILBIN: Objection. That directly questions for the source, which is confidential and First Amendment privileged.
BY MR. PHILLIPS:
Q Ms. Herridge, are you going to follow your counsel's instruction and decline to answer my questions about who provided these photographs to you?
A Yes.


Q To your understanding, Ms. Herridge, why did that source -- well, let me back up.
Just focusing for now on the photographs that appear on page 1 and 2 of Plaintiff's Exhibit 2, were both provided to you by a single source?
MR. PHILBIN: Objection. Goes to the news gathering process and is subject to the privilege.
BY MR. PHILLIPS:
Q Ms. Herridge, are you going to decline to tell me if a single individual provided you these photographs?
A I am.
Q To your understanding, Ms. Herridge, why did that source or sources provide these photographs to you?
MR. PHILBIN: Objection; privilege. It would lead to information that could potentially identify the source or sources.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Respectfully, yes.
MR. COYLE: I'll also add an objection. Calls for speculation.


BY MR. PHILLIPS:
Q Did the person or persons or entity or entities that provided these photographs to you indicate any view about whether they believe they were or were not legally permitted to disclose them to you?
MR. PHILBIN: Objection; privilege. Again, could lead to information that could identify the source or sources.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A I am declining. Thank you.
Q At the time that you received these photographs, did you have any understanding as to whether your source or sources were legally authorized to disclose them to you?
MR. PHILBIN: Same objection; would lead to information that could identify the source or sources.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question, Ms. Herridge?
A Yes.
Q Prior to publishing this story, how did you verify the authenticity of those photographs?

MR. PHILBIN: Objection; privilege. It goes to the news gathering process and editorial process.

BY MR. PHILLIPS:

Q Are you going to decline to answer that question?

A Yes.

Q I'm going to ask a slightly broader one.

Before the story was published in February 2017, did you take any steps to verify the authenticity of the photographs that appear on page 1 and 2 of Plaintiff's Exhibit 2?

MR. PHILBIN: I'm going to object to that also; going to the news gathering process.

BY MR. PHILLIPS:

Q Are you going to decline to answer that question on your counsel's instruction?

A Yes.

Q Turning to the second page of Plaintiff's Exhibit 2, do you see a paragraph about three quarters of the way down that begins with "Chen, 64"?

A Yes.

Q I'll go ahead and read that for the record.

It says, "Chen, 64, came to the United States in 1987 from Beijing on a non-immigrant visa



with her daughter, Lele Wang. The Chinese government funded Chen's research at George Washington University where she received a Ph.D. in Public Policy in 1999, the year after UMT was created."

Did I read that right?

A You have.

Q Where did you learn the information that Dr. Chen came to the United States in 1987 on a non-immigrant visa with her daughter?

MR. PHILBIN: Objection; privilege. Goes to the news gathering process and again could lead to identifying source or sources.

BY MR. PHILLIPS:

Q Are you going to follow your counsel's instruction and decline to answer that question?

A I am.

Q Did you obtain that information from a source?

MR. PHILBIN: You can answer.

THE WITNESS: Yes.

BY MR. PHILLIPS:

Q Was that information provided to you verbally, or was it incorporated within a document?

MR. PHILBIN: Objection; privilege. Goes to the news gathering process and could lead to



information identifying the source.

BY MR. PHILLIPS:

Q Are you going to decline to answer my question?

A Respectfully, yes.

Q Where did you learn the information that the Chinese government allegedly funded Dr. Chen's research at George Washington University?

MR. PHILBIN: Objection; privilege. It asks for the source of the information.

BY MR. PHILLIPS:

Q Did you obtain that information from a source?

MR. PHILBIN: You can answer that.

THE WITNESS: Yes.

BY MR. PHILLIPS:

Q And are you going to decline to testify as to who that source was?

A I am.

Q Turning to the next paragraph that begins with "While Rhoads," and again I'll just go ahead and read that into the record and ask you some questions about it.

It says, "While Rhoads says Chen was upfront about her Chinese military experience, he claimed she



hid those ties on immigration applications. Fox News reviewed Chen's immigration records where she consistently denied ties to the Chinese or any foreign military. When asked 'have you ever been a member of, or in any way affiliated with, the communist party or any other totalitarian regime,' Chen checked 'no.' She would later become a naturalized U.S. citizen."

Did I read that right?

A You have.

Q In the course of reporting this story, did you, in fact, review Dr. Chen's immigration records?

MR. PHILBIN: Objection; privilege. It goes to what was gathered in the news gathering process and potentially could reveal source or sources.

MR. PHILLIPS: Well, I'm going to push back on that one a little bit, because the paragraph says "Fox News reviewed Chen's immigration records, where she consistently denied ties to the Chinese or any foreign military."

MR. PHILBIN: I take your point.

You can answer that question.

BY MR. PHILLIPS:

Q My question was: During the course of this reporting, did you, in fact, review Dr. Chen's

Page 46

immigration records?
A Yes.
Q What documents specifically did you review in that regard?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q What is this story referring to when it says "immigration records"?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Yes.
Q When did you obtain Dr. Chen's immigration records?
MR. PHILBIN: Objection; privilege. The timing could lead to the identity of the source or sources. Again, Tavoulareas versus Piro.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A I am.
Q Were immigration records of Dr. Chen's provided to you by a source?
A Yes.

Page 47

Q Were they provided to you in physical hard copy, or did you obtain them as digital files?
MR. PHILBIN: Objection; privilege. Again, the method goes to the news gathering process and could provide information that would identify the source or sources.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question on your counsel's instruction?
A Respectfully, yes.
Q The immigration records that are referred to in the paragraph we're talking about, were they provided to you as standalone files, or were they contained within some other document or file?
MR. PHILBIN: Objection; privilege. Again it goes to the news gathering process, and by specifying what type of document it was, could lead to information that would identify source or sources.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Yes.
Q Were the immigration records referred to in this story part of a PowerPoint file?

Page 48

MR. PHILBIN: Same objection.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A I am.
Q I think I already asked this, but I want to be very sure.
A Certainly.
Q Who was the source that provided the immigration records referred to in that paragraph, to you?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A I am, yes.
Q At the time you received the immigration records referred to in this paragraph, did you have any understanding as to whether your source was legally authorized to disclose them to you?
MR. PHILBIN: Objection; privilege. Again it could lead to information that would identify the source or sources.
BY MR. PHILLIPS:
Q Are you going to decline to answer that

Page 49

question?
A Yes.
Q Did you take any steps to verify the authenticity of the immigration records that you received from the source?
MR. PHILBIN: Objection; privilege. It goes to the news gathering and editorial process.
BY MR. PHILLIPS:
Q So are you going to decline to answer that question?
A Respectfully, yes.
Q I'll ask you to turn to the third page of Plaintiff's Exhibit 2, Ms. Herridge.
A Certainly.
Q The fifth paragraph down says, "In her George Washington University dissertation, Chen thanks her father, a PLA general who directed arms and technology development. 'My father, General Chen Bin, gave me the inspiration to pursue this area of study," Chen wrote. As former chairman of COSTIND (1982 to 1987), he was an important player in supporting and directing the (Chinese) space program."
Did I read that right?
A You have.
Q In the course of reporting this story, did

you, in fact, review Dr. Chen's George Washington University dissertation?
A Yes.
Q How did you obtain that document?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A I am.
Q Was it provided to you by a source, or did you obtain it yourself?
That was a terrible question. Did you -- let me start over.
A You're allowed one terrible question.
Q Let me ask the first part.
Was Dr. Chen's George Washington dissertation provided to you by a source?
A My memory is a little fuzzy on that, that record in particular.
Q Do you recall at all if perhaps you went to George Washington University and asked for a copy of her dissertation?
A That would have been the only other avenue, I think, for obtaining it, and I, and I do know that we contacted George Washington University about the


dissertation.
Q Do you remember the nature of that contact, what it was you were asking them?
A If, if -- to the best of my recollection, it would have been to obtain a copy of her dissertation.
Q So you believe, to the best of your recollection, that you probably did obtain a copy of that from the university itself?
MR. PHILBIN: Objection. That misstates her prior testimony.
BY MR. PHILLIPS:
Q That's why I'm asking. I'm trying to clarify.
A I, I honestly just don't recall with that particular record.
Q How did you become aware of Dr. Chen's dissertation in the first place?
MR. PHILBIN: Objection; privilege. That's going to get into the news gathering process, potentially reveal sources.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A I am.
Q Did a source for your reporting suggest to


you that you should try to obtain Dr. Chen's George Washington dissertation?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Yes.
Q When did you obtain a copy of Dr. Chen's George Washington University dissertation?
MR. PHILBIN: Objection; privilege. Again, the timing of things can potentially lead to information that would identify a source or sources.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question, Ms. Herridge?
A I am.
Q Ms. Herridge, I'm going to direct your attention to the next paragraph on the third page of Plaintiff's Exhibit 2 that begins "In her 2012." Let me know when you're there.
A Pardon me. I'm not on the right page. Sorry.
Go ahead.
Q This paragraph references a 2012 FBI


interview of Dr. Chen.
Am I correct?
A Are you referring to the paragraph that begins "in her 2012 FBI interview"?
Q That's the one.
A Okay. Just wanted to be sure.
Q And specifically that paragraph identifies the document as an "interview summary."
Do you see that?
A Yes.
Q In the course of reporting this story, did you, in fact, review a summary of an FBI interview with Dr. Chen?
A What do you mean by an FBI interview summary; the entire document? Is that what you're asking me? A summary of that interview, a 302?
Q So I'm -- I guess I'm asking about the words on the page.
A Okay, sure.
Q So this paragraph refers to a 2012 FBI interview of Dr. Chen, correct?
A Yes.
Q And the very next sentence says, "The interview summary suggests federal agents challenged Chen's characterization," so I guess the question I'm

asking is: What document is being referred to in this paragraph?
MR. PHILBIN: Objection; privilege. On that? That's a different question from before, because that question asks to identify or further describe a particular document. If you want to ask her if she saw an interview summary, I was not going to object to that.
MR. PHILLIPS: I was getting there.
BY MR. PHILLIPS:
Q Ms. Herridge, did you review a summary of an FBI interview with Dr. Chen from 2012 in the course of reporting this story?
A I'm only going to ask for further clarification, because they mean different things in different worlds. For example, was it a 302? Is that what you're asking me, if I saw, or --
Q Well, let's start with that. Did you review a -- first, tell me your understanding of what a 302 is.
A It's an FBI summary of an interview.
Q Okay. Did you review a 302 reflecting a summary of an FBI interview with Dr. Chen in the course of your reporting on this story?
MR. PHILBIN: That I'm going to object to,


because it identifies a particular type of document.
BY MR. PHILLIPS:
Q Are you going to decline to answer my question?
A I am. Thank you.
Q When this paragraph refers to a 2012 FBI interview of Dr. Chen and specifically the "interview summary," can you help me understand what document this story is referring to?
MR. PHILBIN: Objection. That again goes to trying to explain a particular document, which could lead -- it's both about the news gathering process and specifying the particular document; could lead to information about the source or sources or where the document came from.
BY MR. PHILLIPS:
Q Are you going to decline to answer my questions?
A I am.
MR. COYLE: So we've been going for about an hour. When you get to a natural breaking point, would you mind if we took a short break?
MR. PHILLIPS: Yes. Let me just finish this paragraph.


BY MR. PHILLIPS:
Q Is this paragraph referring to a 302?
MR. PHILBIN: Objection; privilege. That would go to specifying a particular document.
BY MR. PHILLIPS:
Q Are you going to decline to answer my question?
A I am.
Q This paragraph again refers to both a 2012 FBI interview, and then in the next sentence it refers to an interview summary.
Are those two sentences talking about the same document or different documents?
MR. PHILBIN: Objection, Counsel. You're, you're characterizing what this says is involving particular documents. If you want to ask her if that interview is the same interview referred to in the summary . . .
BY MR. PHILLIPS:
Q Okay. This paragraph says, "In her 2012 FBI interview, Chen denied she ever was a colonel in the PLA, emphasizing she had worked as a doctor in the Chinese space program. Chen said it was a 'civilian agency.' The interview summary suggests federal agents challenged Chen's characterization."


Do you see that?
A Yes.
Q Is that all referring to a single document or to multiple documents?
A I don't recall.
Q You don't? Do you recall if you reviewed multiple FBI interview -- multiple documents reflecting FBI interviews with Dr. Chen?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A I am.
Q This story quotes -- well, let me back up.
This story describes the content of a summary of a 2012 FBI interview with Dr. Chen.
Would you agree with that?
A Sorry. Just repeat the question.
Q This paragraph describes the content of a summary of an FBI interview with Dr. Chen, correct?
A Yes. I think that's a fair characterization.
Q Okay. The summary referred to in this paragraph, was that a document that you reviewed in the course of your reporting this story?

Page 58

A He's asking me about specific documents.
MR. PHILBIN: I'm not going to object to just whether you saw a document.
THE WITNESS: Yes.
BY MR. PHILLIPS:
Q Who provided that document to you?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Yes.
Q Did you obtain a summary of an FBI interview with Dr. Chen from a source?
A Just repeat the question.
Q Did you obtain a summary of an FBI interview of Dr. Chen from a source in the course of reporting this story?
A I just want to speak to my lawyer to clarify something if I can.
MR. PHILLIPS: Why don't we take a five-minute break.
THE WITNESS: Okay.
THE VIDEOGRAPHER: Off the record at 11:09.
(Whereupon, a short recess was taken.)
THE VIDEOGRAPHER: We are back on the record

Page 59

at 11:20.
BY MR. PHILLIPS:
Q All right, Ms. Herridge, we're back from a break and still looking at Plaintiff's Exhibit 2, the February 24, 2017 story, and I want to direct your attention to the paragraph toward the bottom of the third page that begins with "while going through."
A Yes.
Q It says, "While going through the immigration process, Chen was also launching what would become a multi-million-dollar online academy, but that academy's work would eventually attract the attention of federal investigators, who questioned whether students' records were remotely accessed from China."
Did I read that right?
A Yes.
Q What was the basis for the statement in this story that federal investigators questioned whether UMT students' records were remotely accessed from China?
MR. PHILBIN: Objection; privilege. That could go to what source or sources, identifying them.

Page 60

BY MR. PHILLIPS:
Q Are you going to follow your counsel's instruction and decline to answer that question?
A Respectfully, yes.
Q Where did you learn that information?
MR. PHILBIN: Same objection.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Yes.
Q Did a source provide you with that information?
A Yes.
Q Who was that source?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Respectfully, yes.
Q Was that information provided to you verbally, in a document, or in some other form?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?

Page 61

A Yes.
Q The next paragraph says, "Before the 2012 raid, Chen's daughter Lele Wang, who also works at UMT, told the FBI that 'contractors' in the UMT Beijing office have [administrator' privileges to access the student database."
Do you see that?
A Yes.
Q Is that information that you acquired in the process of reporting this story?
A Yes.
Q How did you learn what Dr. Chen told -- what Dr. Chen's daughter told the FBI prior to the 2012 search warrant raid?
MR. PHILBIN: Objection; privilege. It goes to the news gathering process and could identify a source or sources.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Yes.
Q In the course of reporting this story, did you receive and review a summary of an FBI interview with Dr. Chen's daughter?
MR. PHILBIN: Objection; privilege.

Page 62

BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Yes.
Q During your reporting of this story, did a source provide you with information about what Dr. Chen's daughter said to the FBI during an interview?
A Yes.
Q Can you tell me who that source was?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Respectfully, yes.
Q Was that information from your source conveyed to you verbally, via a document, or some other method?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A I am.
(Exhibit 3 was marked for identification.)

Page 63

BY MR. PHILLIPS:
Q I'm going to hand you what we've marked as Plaintiff's Exhibit 3.
A Thank you.
Q Ms. Herridge, do you see that Plaintiff's Exhibit 3 is a Fox News story titled "Congress investigating a taxpayer-backed school over alleged ties to Chinese military after Fox News report"?
A Yes.
Q And this was published on Fox News' website on April 28, 2017?
A Yes.
Q Were you the principal author of this story?
A Yes.
Q Were you the lead reporter as far as gathering the information that is reflected in this story?
A Yes.
Q Did anyone else at Fox assist you with reporting or drafting this story?
A Yes.
Q Let's start with the first part. Who helped you with reporting this story?
A Pamela Browne and Cyd Upson.
Q And what were their roles with respect to

Page 64

the reporting of this story?
A Both of them were editorial producers and television producers.
Q Who assisted you with the drafting of this story?
A It was a joint effort.
Q And who -- a joint effort with whom?
A Ms. Upson and Ms. Browne.
Q This story is also about Dr. Chen and UMT, the University of Management & Technology, correct?
A Yes.
Q Fair to say this is a follow-up story to the February 2017 report that we looked at earlier?
A I believe it states that in the copy.
Q I want to direct your attention to the second page of Plaintiff's Exhibit 3.
Do you see the paragraph at the very top that begins "After the Fox News investigation"?
A Yes.
Q Below that paragraph, there is a picture of a dozen or so individuals.
Do you see that?
A Yes.
Q And the caption states that this is an "undated photo of Yanping Chen and family, wearing PLA

Page 65

uniforms" that was exclusively obtained by Fox News.
A Yes.
Q Was this photo obtained by you in course of reporting this story?
A Yes.
Q When did you first obtain this photo?
MR. PHILBIN: Objection; privilege. The timing again could go to information that would potentially lead to a source or sources.
BY MR. PHILLIPS:
Q Are you going to decline to tell me when you obtained this photograph?
A Respectfully, yes.
Q Okay. Do you know where this photograph came from?
MR. COYLE: Objection; vague and ambiguous.
BY MR. PHILLIPS:
Q Yeah, let me ask a better question.
Is it your understanding that this is a photograph belonging to Dr. Chen that was seized by the FBI during a search warrant raid of her house in 2012?
MR. PHILBIN: Objection; privilege. Answering that question could lead to the identity of a source or sources.

BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Yes, respectfully.
Q Do you know if this is a family photo that belonged to Dr. Chen?
A As I answered previously, it would be my assumption.
Q And was that your assumption at the time that you wrote this story?
A Yes.
Q Tell me how you came into possession of this photograph.
MR. PHILBIN: Objection; privilege. It goes to the news gathering process and asks specifically for sources.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Respectfully, yes.
Q During the course of reporting this story, did a source provide this photograph to you?
A Yes.
Q Can you tell me who that source was?
MR. PHILBIN: Objection; privilege.


BY MR. PHILLIPS:
Q Are you going to decline to identify that source for me?
A Yes.
Q In what form did you receive this photograph from a source? By that I mean was it printed out in hard copy, or was it a digital file, or something else?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Respectfully, yes.
Q Did you receive this photograph as a standalone document, or was it incorporated within some larger document?
MR. PHILBIN: Objection; privilege. The format could lead to identifying the source.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A I am, yes.
Q Did you receive this photograph as part of a PowerPoint file?
MR. PHILBIN: Same objection.


BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Yes.
Q Do you see that the photograph we're talking about on the second page of Plaintiff's Exhibit 3 has sort of blue bubble captions that appear to be identifying some of the individuals in the photograph?
A Yes.
Q At the time you received this photograph from the source, were those captions already on this image, or are those something that were added by folks at Fox News?
MR. PHILBIN: Objection; privilege. That could lead to identifying the source.
BY MR. PHILLIPS:
Q Ms. Herridge, are you going to decline to tell me whether these captions were on the image at the time you received it?
A Yes.
Q Did you take any steps to verify the authenticity of this photograph after it was provided to you by a source?
MR. PHILBIN: Objection; privilege. Goes to the editorial process.


BY MR. PHILLIPS:
Q Are you going to decline to answer that question.
A Yes.
Q Did you receive this photograph from the same source that provided you the photographs that we talked about in Plaintiff's Exhibit 2?
MR. PHILBIN: Objection; privilege. It would go to identifying whether there were one or many sources, and that could help to lead to identifying sources.
BY MR. PHILLIPS:
Q So are you going to decline to answer that question?
A Respectfully, yes.
Q The paragraph immediately below the photograph says, "Photos obtained by Fox News apparently show Chen wearing the uniform of a young officer in the Chinese military of the People's Liberation Army, known as the PLA, along with her family. In another undated photo, Chen appears to salute the grave of her father, Chen Bin, who was a senior general in the PLA in charge of technology and arms acquisition."
Do you see that?

Page 70

A I do.
Q The reference in that paragraph to a photo of Chen wearing the uniform of a PLA officer along with her family, is that referring to the photograph that appears above that paragraph that we just discussed?
A Yes.
Q And then that paragraph also refers to a photograph of Dr. Chen appearing to salute the grave of her father, correct?
A Yes.
Q Is that also a photograph that you obtained in the course of reporting this story?
A Yes.
Q Was it a source that provided you with the photograph of Dr. Chen saluting the grave of her father?
A Yes.
Q Do you know if that was a personal photograph of Dr. Chen's?
A It was my assumption. It was a family photo.
Q Who is the source that provided that photograph to you?
MR. PHILBIN: Objection; privilege.

Page 71

BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Respectfully, yes.
Q The photograph of Dr. Chen saluting the grave of her father, did you receive it as a digital file, in hard copy, or in some other format from your source?
MR. PHILBIN: Objection; privilege. The format could lead to information to help identify the source.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A I am, yes.
Q Also on the second page of Plaintiff's Exhibit 3, there are two photographic images side by side that appear to depict the same individual, one in which she's wearing a hat and one in which she's not.
Do you see that?
A I do.
Q And the caption below those photographs identify them as "undated photos of Yanping Chen's father, General Chen Bin."
A Yes.

Page 72

Q Did you obtain those photographs of Dr. Chen's father in the course of reporting this story?
A I can't recall whether these photos were obtained by us or we found them through historical research.
Q Gotcha. So as opposed to a source providing them to you, you're suggesting that you think that researchers at Fox may have identified these photographs?
A I can't recall. I know that we searched.
Q Okay, and do you know who was involved with that effort?
A Ms. Upson and Ms. Browne.
Q Ms. Herridge, I want to ask you now about the broadcast reports about Dr. Chen and UMT, and what I'm going to do is just go ahead -- we'll take them in pieces, but I'm going to play them for you to refresh your recollection. Then I'll have some questions. If at any time you want me to go back to, you know, a certain point in the video to help you with what I'm asking about, I'm very happy to do that.
MR. PHILBIN: Andy, how exactly are you going to display the videos?
MR. PHILLIPS: On my laptop.

Page 73

MR. PHILBIN: So that only Ms. Herridge can see them?
MR. PHILLIPS: I'll try to angle it so that you can see it as well. I suspect you're very familiar with these. These are the publicly broadcast stories.
Ms. Herridge, I'm going to start with what we'll identify as Plaintiff's Exhibit 4, and I'll provide the court reporter with a thumb drive with these files.
(Exhibit 4 was marked for identification.)
(Video/audio file played, Exhibit 4.)
BY MR. PHILLIPS:
Q All right, Ms. Herridge, the video file we just watched, which we're identifying as Plaintiff's Exhibit 4, do you recognize that as a broadcast report about Dr. Chen that aired on Fox's cable channel on February 24, 2017?
A Yes.
Q And specifically that was on the Bret Baier program, Special Report?
A Yes.
Q And am I correct that that was you narrating that broadcast report?

A Yes.
Q At about 1:10 in the video, we first saw Stephen Rhoads on camera, and he was described as a "military veteran whistleblower."
Do you recall that?
A Yes.
Q Who is Stephen Rhoads?
A He worked at the school, and he also worked as part of the investigation.
Q What do you mean that he worked as part of the investigation?
A Worked with law enforcement.
Q As part of which investigation?
A The investigation into UMT.
Q And in what role do you understand he worked with law enforcement for that investigation?
A My understanding is that he gathered information about the school and its operation.
Q How do you know Mr. Rhoads?
MR. PHILBIN: Objection; privilege. That could lead to information that could identify a source.
BY MR. PHILLIPS:
Q Okay. When did you first meet Stephen Rhoads?


A Boy. Maybe 2013? 2013.
Q And in what context?
A 2014? I first began speaking with Mr. Rhoads about doing an interview with Fox News on the record.
Q And was that for the reporting on Dr. Chen?
A Yes.
Q So you agree that Mr. Rhoads was a source for your reporting on Dr. Chen, correct?
A He spoke with us on the record, yes.
Q Had Mr. Rhoads ever served as a source for you on any prior reporting?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A I am.
Q Before you engaged with him as a source for your reporting on Dr. Chen, did you know Mr. Rhoads?
MR. PHILBIN: Objection; privilege. How she obtained a source, how she came into possession of contact information for a source could provide information about other sources.
MR. PHILLIPS: My question was simply whether she knew him before he acted as a source


on this story.
Are you going to advise your client not to answer that question?
MR. PHILBIN: You can answer that question.
THE WITNESS: I don't believe so.
BY MR. PHILLIPS:
Q Is it your recollection that your first interactions with Mr. Rhoads were in the context of him acting as a source for this story?
A Yes.
Q How is it that you got in touch with Mr. Rhoads in terms of him being a source for this reporting? And by that I mean did he reach out to you, did you reach out to him --
MR. PHILBIN: Objection --
BY MR. PHILLIPS:
Q -- or was there some other way that the two of you were connected?
MR. PHILBIN: The question is compound, and objection, privilege. Could lead to information about the news gathering process.
BY MR. PHILLIPS:
Q Are you going to decline to tell me how you first got in contact with Mr. Rhoads?
A Yes.


Q When was the interview with Mr. Rhoads conducted? And I'm referring to the on-camera interview that we saw in the broadcast report.
A To the best of my recollection, maybe 2016, 2015. It was sometime before the broadcast.
Q In his deposition, Mr. Rhoads testified that there was an occasion where he came to your office at Fox News, and you showed him materials you had gathered about Dr. Chen.
Do you recall that meeting?
A Yes.
Q Was that the same day as his interview, or was that prior to his on-camera interview?
MR. PHILBIN: Objection; privilege. Since you've described the meeting as involving showing documents, providing timing as to that in relation to the other could provide information that could lead to the identification of a source.
BY MR. PHILLIPS:
Q Are you going to decline to answer the question about when that meeting with Mr. Rhoads took place at Fox News?
A Respectfully, yes.
Q When did Mr. Rhoads first inform you that he

Page 78

was acting as a confidential informant for the FBI with respect to its investigation of Dr. Chen?
MR. PHILBIN: You can answer.
THE WITNESS: I don't exactly recall. I think it would have been around that time frame, 2015, 2016, maybe a little bit earlier.
BY MR. PHILLIPS:
Q Do you recall when you first communicated with Mr. Rhoads about Dr. Chen?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A I am.
Q Did you do anything to verify the authenticity of Mr. Rhoads' claim that he was acting as a confidential informant for the FBI?
MR. PHILBIN: Objection; privilege. Goes to the editorial process.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Respectfully, yes.
Q Did you reach out to the FBI and ask them to confirm whether or not Mr. Rhoads was a confidential

Page 79

informant?
MR. PHILBIN: Objection; privilege. Goes to the news gathering process and would also lead to the identification of a source or sources.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Yes.
Q About 45 seconds into the video file that we've identified as Plaintiff's Exhibit 4, we saw video footage of Dr. Chen, and your narration stated that she was "standing outside of her home, watching federal agents conduct a search warrant raid in December of 2012."
Do you recall that?
A Yes.
Q If I told you that was December 5, 2012, does that sound right?
A I think it was late in the year 2012. I'll take your word for it.
Q Where did you obtain the footage of Dr. Chen standing outside of her home during that 2012 search warrant raid?
MR. PHILBIN: Objection; privilege, if that would lead to the identification of a source.

Page 80

BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A I'm prepared to answer that question.
Q That was sort of a conditional objection.
A I'm prepared to answer that question. I believe that the video came from our Fox affiliate.
Q Meaning a local affiliate?
A Yes, the local Fox station.
Q In Northern Virginia?
A At that time I think it was in DC.
Q Gotcha.
A Yes.
Q Do you know -- let me back up.
Were you involved in any way in the filming of that incident?
A No.
Q Were you aware of it at the time?
A I was aware of the raid at that time, because it was such an extraordinary raid by the FBI that it choked off traffic into the entire city from Northern Virginia.
Q Did you have any advanced knowledge of the raid, meaning did you know that it was going to happen before it did?

Page 81

MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Yes.
Q Did a source tip you off that the search warrant was going to be executed that day?
A No.
Q I guess I'm just going to follow up, and if you --
A Of course.
Q -- refuse to answer, that's fine --
A Please.
Q -- but is the answer to my question that you did not have advanced knowledge of the search warrant?
MR. PHILBIN: I'm going to lodge the same objection.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A On the advice of my attorney, yes.
(Exhibit 5 was marked for identification - later clawed back by counsel.)

BY MR. PHILLIPS:
Q I'm going to hand you a large binder that we have identified as Plaintiff's Exhibit 5.
MR. COYLE: So this is marked as "Subject to the Protective Order."
MR. PHILLIPS: I did not see a marking on that. Are you sure about that?
MR. COYLE: Yeah, on the first page, bottom left corner, there's a --
MR. PHILLIPS: It was in very light print.
MR. COYLE: I believe this was also ordered by the court to be subject to the protective order.
MR. PHILLIPS: That's why I tried to check beforehand, but -- oh, my God. It's in the lightest print possible, but you are correct.
MR. COYLE: I believe that's attributable to us.
(Discussion was held off the record.)
BY MR. PHILLIPS:
Q That document is subject to the protective order, Ms. Herridge, so I'm going to have to take it back from you.
Do you know if you spoke by telephone with Mr. Rhoads on the day that the FBI executed the search



warrant raids at UMT and Dr. Chen's home?
A I may have.
Q Did you speak to him about the search warrant raids?
MR. PHILBIN: Objection; privilege. Goes to the news gathering process.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A I am.
Q Prior to the execution of the search warrants at Dr. Chen's home and UMT's offices in December 2012, did you have any conversations with Stephen Rhoads about the government's intent to search those properties?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A I am.
Q At about a minute and fifty into Plaintiff's Exhibit 4, the February 2017 broadcast report, the video shows an image of Dr. Chen sitting next to her husband and holding a uniform.
Do you recall that? I'm very happy to pull



it up for you.
A Yeah, why don't you pull it up so there's no confusion.
Q Okay. Ms. Herridge --
A Yes.
Q -- we are at 1:51 on the Plaintiff's Exhibit 4 file.
A Yes.
Q Is that an image of Dr. Chen sitting next to her husband while she's holding a uniform?
A Yes.
Q Is that the same photograph that we saw that was actually at the very top of Plaintiff's Exhibit 2, the February 24, 2017 digital story?
A This is the story that -- this is Exhibit 2?
Q Correct.
A Yes.
Q Same photograph?
A Appears to be, yes.
Q Was this a photograph obtained by you in the course of your reporting on Dr. Chen?
A Yes.
Q Did you obtain it from a source?
A Yes.
Q Will you tell me who that source was?



MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Respectfully, yes.
Q And just to be clear, do you know -- as you sit here today, do you recall who the source was that provided you with that photograph?
A Yes.
Q But you're not going to tell me who that was?
A Correct.
Q I'll pull up another segment of the video for you.
Here we're at timestamp 2:20 on the video file.
A Yes.
Q If you recall, the narration says that that was a picture from the mid-1980s that appears to show Chen before she went to George Washington University.
Do you recall that?
A Yes.
Q Was this a photograph obtained by you in the course of your reporting on Dr. Chen?
A Yes.

Page 86

Q When did you first obtain that photograph?
MR. PHILBIN: Objection; privilege. Timing could lead to identifying sources.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question on the instruction of your counsel?
A Respectfully, yes.
Q Do you understand that to have been a personal photograph of Dr. Chen's?
A It was my assumption.
Q Do you know if this is a photograph that was seized during the 2012 search warrant raid at Dr. Chen's home?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A I am.
Q Did you obtain this photograph from a source during the course of your reporting on Dr. Chen?
A Yes.
Q Do you know, as you sit here, who that person was?
A Yes.
Q Will you tell me who it was?

Page 87

MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to identify that source?
A Yes.
Q How did you obtain this photograph? By that I mean was it a physical printed copy, a digital file, or something else?
MR. PHILBIN: Objection; privilege. The method would go to the news gathering process and also could help identify the source.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Yes.
Q Did you obtain this photograph as a standalone document or file, or was it contained within some other larger document or file?
MR. PHILBIN: Same objection.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Yes.
Q Was it provided to you as part of a PowerPoint file?

Page 88

MR. PHILBIN: Same objection.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Respectfully, yes.
Q How did you know that this photograph, stated in your narration in the video report, was taken in the mid-1980s?
MR. PHILBIN: Objection; privilege. Goes to the news gathering process and could identify information about the source.
BY MR. PHILLIPS:
Q Was that information told to you by the source that provided you the photograph?
MR. PHILBIN: Objection; privilege. Going further into the source of the information is still going to go to the news gathering process.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question under the instruction of your counsel?
A Yes.
Q Ms. Herridge, here, I'm at timestamp 2:48 in Plaintiff's Exhibit 4, and this is during your on-camera interview of an individual identified as Dennis Blasko.

Page 89

Do you recall that?
A Yes.
Q He's identified in the broadcast report as an expert on the Chinese military?
A Yes.
Q And during that interview, you asked Mr. Blasko to comment on the uniform that Dr. Chen is holding in this photograph, correct?
A Yes.
Q When Mr. Blasko is speaking about the epaulettes on the uniform, the broadcast report shows this zoomed-in angle of the uniform that Dr. Chen was holding, correct?
A Yes.
Q And do you see that there are blue arrow graphics pointing at the epaulettes on the shoulder?
A Yes.
Q Were those blue arrows on the photograph that you're talking Mr. Blasko at the time you obtained it, or were they added later by graphics folks at Fox News?
MR. PHILBIN: Objection; privilege. Identifying whether it was on it as it was received from the source could potentially identify the source.

BY MR. PHILLIPS:
Q Are you going to decline to tell me if the blue arrows were already on that photograph at the time you obtained it from your source?
A Respectfully, yes.
Q We're at timestamp three minutes in the video. Do you recall the broadcast report flashes this document on the screen when your narration is describing how Dr. Chen checked "no" on a form when asked if she is or had ever been a member of the communist party?
A Yes.
Q What is this document that was aired during the broadcast report?
A I think it's identified in the broadcast report.
Q Is it an immigration form pertaining to Dr. Chen?
A Yes.
Q Is that a document that you obtained in the course of reporting this story?
A Yes.
Q When did you first obtain it?
MR. PHILBIN: Objection; privilege. Timing could go to identifying a source.



BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Respectfully, yes.
Q Do you know the identity of the source that provided you with this immigration record pertaining to Dr. Chen?
A Yes.
Q Who was that individual?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Respectfully, yes.
Q The immigration record that's shown on the screen here at three minutes of the video, did you obtain that as a standalone document or file, or was it contained within some larger document or file?
MR. PHILBIN: Objection; privilege. The format could lead to information to identify a source.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Yes.



Q Was it your understanding at the time you received it that this immigration record was a government document?
A Yes.
Q Did you have any understanding as to whether the individual that provided that document to you was or was not legally authorized to disclose it?
MR. PHILBIN: Objection; privilege. That could go to identifying the source.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Yes.
Q Here, Ms. Herridge, we're at 3:04 on the timestamp in Plaintiff's Exhibit 4.
A Yes.
Q What are we seeing on the screen there?
A I believe it's identified in the narration as the immigration form.
Q Was that a document obtained during the course of your reporting of this story?
A Yes.
Q Who provided that document to you?
MR. PHILBIN: Objection; privilege.



BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Respectfully, yes.
Q When did you obtain that document?
MR. PHILBIN: Objection; privilege. The timing could go to identifying a source.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Yes.
Q The document that's shown on the screen, do you see that it has yellow highlighting on it, as well as blue arrows on the left side?
A Certainly, yes.
Q Were those graphics on the document at the time you received it from the source, or were they added by Fox News for the broadcast report?
MR. PHILBIN: Objection; privilege. Identifying whether those were on it as received could help identify a source.
BY MR. PHILLIPS:
Q Are you going to decline to answer my question?
A Yes.

Q Do you know the answer to my question?
A Yes.
Q Ms. Herridge, here we're at 3:09 in the broadcast report? And if it helps, this is immediately after your narration states that Dr. Chen became a naturalized U.S. citizen.
With that context, do you know what this document we're looking at is?
A It's a certificate of naturalization, based on the broadcast.
Q And is that Dr. Chen's certificate of naturalization that's shown in the Fox report?
A It, it appears to be. I don't see her name here, but it appears to be, yes.
Q During the course of your reporting this story, did you obtain a copy of Dr. Chen's --
A Excuse me. Pardon me.
Q No worries. During your reporting of the story, did you obtain a copy of Dr. Chen's naturalization certificate?
A Yes.
Q When did you obtain that document?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Did you obtain that document from a source?



A Yes.
Q As you sit here today, do you know who that individual was?
A Yes.
Q Who was that person?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Respectfully, yes.
Q Was it your understanding, at the time that you obtained Dr. Chen's naturalization certificate, that that was a government record?
A All naturalization certificates are government records.
Q Did you have any understanding as to whether your source was or was not authorized to disclose that document to you?
MR. PHILBIN: Objection; privilege. Can go to identifying the source.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Respectfully, yes.
Q Did you obtain Dr. Chen's naturalization



certificate as a standalone document or file, or was it contained within some larger document or file?
MR. PHILBIN: Objection; privilege. The format would go to identifying the source.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Yes.
Q Was it provided to you by your source as part of a PowerPoint platform?
MR. PHILBIN: Same objection.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Yes.
Q It's a little hard to see, but I want to ask you to take a look. Again, we're looking at the naturalization certificate.
Do you see the blue arrow at the bottom that's pointing --
A Yes.
Q -- to a date?
A Yes.
Q Was that blue arrow graphic on the certificate or the image of the certificate at the



time you received it, or was that added by graphics people at Fox?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Yes, I am.
MR. PHILBIN: Andy, how much more? Because it's been about another hour, and lunch is here.
MR. PHILLIPS: It probably makes sense to get through this file, but not much more. I'm going as fast as I can.
BY MR. PHILLIPS:
Q That one is kind of small, too, so I'll hand it to you.
So we're at 4:36 on the timestamp of the Plaintiff's Exhibit 4 video file, and this is when your -- I don't know why I'm struggling with that word.
A Narration. It's okay.
Q This is when your narration references emails between Mr. Rhoads and an FBI agent, in which they discussed alerting the defense department about the investigation into Dr. Chen.
Do you recall that, that portion of the

broadcast?
A Well, actually, the email concerns the renewal of her DOD contract for taxpayer funds.
Q Okay, so this is -- what's shown on the screen at 4:36 is an email between Mr. Rhoads and an FBI agent, discussing UMT's Memorandum of Understanding with the Department of Defense; is that correct?
A Yes.
Q The image of the email that's shown on the screen blurs out the name of the person at the FBI that Mr. Rhoads is emailing with; is that correct?
A Yes.
Q Who provided you with that email?
MR. PHILBIN: Objection; privilege. Goes to the source.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Respectfully, yes.
Q Did Mr. Rhoads provide you with that email?
MR. PHILBIN: Same objection.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?


A Yes, I am.
Q Was the FBI agent's or -- I shouldn't say "agent," I guess. Do you have an understanding, as you sit here, of who the person at the FBI is that Mr. Rhoads was emailing with, whose name is blurred out?
A Yes.
Q The blurring on the email that prevents viewers from seeing the name of that individual, was that on the email at the time you received it, or did Fox News blur that email?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Yes, I am.
Q What is the name that's blurred out from that email?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to --
MR. PHILBIN: Goes to information that's confidential in the news gathering process.
BY MR. PHILLIPS:
Q Are you going to decline to answer that


question?
A Yes.
Q Is that FBI Special Agent Timothy Pappa's name that is blurred out?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Respectfully, yes.
Q Why was the name of the FBI -- or the individual at the FBI that Mr. Rhoads was communicating with withheld from viewers?
MR. COYLE: Objection; calls for speculation.
MR. PHILBIN: And objection, privilege, because that would indicate -- answering that question would indicate whether it was Fox that did the blurring or someone else did the blurring. If someone else did the blurring, obviously Ms. Herridge wouldn't know why.
BY MR. PHILLIPS:
Q So following that instruction, are you going to decline to answer my question?
A Yes. Yes, I am.
Q Did you take any steps to verify the


authenticity of this email after you received it?
MR. PHILBIN: Objection; privilege. Goes to the editorial process.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Yes.
Q During the course of your reporting on this story, did you ever speak with the individual at the FBI whose name is blurred out in that email?
MR. PHILBIN: Objection; privilege. Goes to news gathering and would tend to identify a source.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Yes.
Q Continuing with the broadcast report --
A I'm going to ask you to just -- I'm going to have to read --
Q Yes, and you may or may not need it for this question. I'm going to try, but if you do, just tell me.
In the broadcast report, your narration states that "resources told Fox that Assistant U.S.

Page 102

Attorney General James P. Gillis of the Eastern District of Virginia got the case against Chen, but that it stalled after a disagreement with the FBI over how to proceed."
Do you recall that?
A Yes.
Q What do you understand the U.S. Attorney's Office and the FBI's respective positions on the matter to have been?
A As I report there, there was a disagreement on how to proceed.
Q Right. I guess I'm trying to drill down a little bit farther on that.
What was the disagreement?
A Well, the FBI and Justice Department could best explain that.
Q But I'm asking your understanding.
A Are you asking me to speculate or to the best of my knowledge?
Q I'm asking whether you know -- as the lead reporter and author of this story, what was your understanding as to the disagreement between the FBI and the U.S. Attorney's Office?
A Well, as you know, speaking broadly, counter-intelligence investigations are highly

Page 103

sensitive, and there's often an internal discussion over whether to proceed to charges, because taking that course of action almost always requires the disclosure of sources and methods.
Q Who was the source or sources that -- well, let me back up.
The narration describes three sources describing to Fox this disagreement between the FBI and the U.S. Attorney's Office with respect to the case against Dr. Chen.
Who were those sources?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Respectfully, yes.
Q Was it your understanding that the FBI investigators on the Chen case were unhappy with the U.S. Attorney's Office's decision not to prosecute Dr. Chen?
A I believe that that's in one of the dot-com stories.
Q So is that essentially the disagreement?
A That the FBI was unhappy?
Q Yes.

Page 104

A No. I think the disagreement was more substantive. As I've just explained, in every counter-intelligence investigation, there is a difficult call as to whether to proceed, because proceeding in court will expose sensitive sources and methods, and it's not uncommon in counter-intelligence investigations for there to be a decision not to proceed.
Q Okay. So your understanding is, with respect to the case against Dr. Chen, that the U.S. Attorney's Office made a decision not to proceed with bringing any charges against Dr. Chen.
Is that fair?
A Yes.
Q And is it your understanding that the FBI investigators working on the Chen case were not happy with that decision?
A There was a disagreement of opinion, yes, but there may well have been disagreement within the Justice Department as well. I don't want to foreclose that.
Q Sure.
A Okay.
Q Were you told by a source that FBI investigators working on the Chen case were unhappy

Page 105

with the decision not to prosecute Dr. Chen?
A Yes.
Q And who was that source?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Respectfully, yes.
Q Was it your understanding that FBI agent Timothy Pappa was unhappy with the decision not to prosecute Dr. Chen?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Yes.
Q Did any source or sources for your reporting on Dr. Chen ever convey to you that Agent Pappa was unhappy with the decision not to prosecute Dr. Chen?
MR. PHILBIN: I'm going to make the same objection, that that level of detail could go to identifying the source.
BY MR. PHILLIPS:
Q Are you going to decline to answer my question?

Page 106

A Yes.
Q Towards the end of the broadcast, you tell Bret Baier that Fox News contacted the Department of Defense, and that Fox News was told that the Department of Defense was reviewing UMT's Memorandum of Understanding with the Department of Defense, which was supposed to run through 2019.
Do you recall that?
A I just have to hear the exact language again, please.
Q That's fair.
I'm going to start at 5:44 on the timestamp.
(Video/audio file played again, Exhibit 4.)
BY MR. PHILLIPS:
Q I'll stop there.
So am I correct that you stated, while speaking with Bret Baier after the video report aired, that you had contacted the Department of Defense regarding its funding of UMT?
A Yes.
Q Who did you speak to about that at the Department of Defense?
A I can't recall the name, but it would have been, to the best of my recollection, someone in the press office.

Page 107

Q Do you know if that was a phone call or an email?
A It was likely both, but as you know, sometimes you request a response via email, but then the answer comes in a phone call.
Q Sure. What was the substance of your inquiry? And I guess what I'm getting at with that question is: What information did you provide to the Department of Defense regarding Dr. Chen?
MR. PHILBIN: Objection; privilege. That goes to the news gathering process.
MR. PHILLIPS: So you're going to tell me that you're claiming privilege over what information she provided to the Department of Defense in the context of asking for comment from the Department of Defense?
MR. PHILBIN: I'll withdraw the objection.
BY MR. PHILLIPS:
Q Can you answer that question for me?
A As you know, it's almost -- how many years ago is it now? I, I just don't recall what specifically I asked them, but as I've reported here, they said they were reviewing it, so I'm sure that was accurate.

Page 108

Q What was the purpose of that inquiry to the Department of Defense?
A Well, in a story of this complexity, you want to give every party the opportunity to respond, so we reached out to the Department of Defense as we reached out to your client.
Q Do you know if the Department of Defense had UMT's Memorandum of Understanding under review before you reached out to them or not?
A To the best of my recollection, I think it was already under review.
Q And what's the basis for that?
A It's just my memory.
Q Okay.
A Yeah, I really -- I wish I could help you further, but it's -- I do thousands of stories a year, so -- and it's six years ago.
MR. PHILLIPS: All right. I think we're at a good breaking point for lunch.
THE VIDEOGRAPHER: Off the record at 12:22.
(Whereupon, the lunch recess was taken.)
THE VIDEOGRAPHER: We are back on the record at 1:03.
MR. COYLE: I'll just state on the record that I need to leave before the deposition is concluded, due to a prescheduled commitment, and Counsel has agreed that Ms. Vigen can step in and continue to represent defendants for the rest of the deposition.

Page 109

MR. PHILLIPS: That is agreed as to plaintiff.
MR. PHILBIN: And agreed as to Ms. Herridge.
MR. COYLE: Thank you.
BY MR. PHILLIPS:
Q All right, Ms. Herridge, we are back from lunch. We ended the last session reviewing the February 2017 broadcast report that aired on Fox's cable news channel.
Do you recall that Fox broadcast a follow-up video report on Dr. Chen in April of 2017?
A Yes, I recall a follow-up report, and I'd have to refresh my memory on the date, but that sounds about right.
Q My understanding is that it was April 28, 2017, which is the same date as the follow-up digital story.
Does that sound right to you?
A Yes, that does sound right.
MR. PHILLIPS: I'm going to go ahead and

Page 110

play what we will mark as Plaintiff's Exhibit 6,
and then I'll have some questions for you.
(Exhibit 6 was marked for identification.)
BY MR. PHILLIPS:
Q Again, Ms. Herridge, I'll try to -- if it's helpful, I'll be happy to direct you to specific portions as I ask you questions.
A Thank you.
(Video/audio file played, Exhibit 6.)
BY MR. PHILLIPS:
Q So was that video that we just watched, Plaintiff's Exhibit 6, was that the follow-up broadcast report about Dr. Chen that aired on Fox News cable channel in April 2017?
A Yes.
Q And am I correct, that was you narrating that broadcast report?
A It was.
Q Were you primarily responsible for putting that report together?
A I was the lead reporter, but I had assistance from my two colleagues.
Q And that was Cyd Upson and Pamela Browne?
A Correct.

Page 111

Q At the beginning of the segment narrated by you, you said -- and I'll be happy to play it for you -- quote, "Four congressional committees are now investigating this online taxpayer-funded school that markets to the military, the University of Management & Technology based in Rosslyn, Virginia, after a Fox News investigation revealed documents and photos tying the university's president, Yanping Chen, and her husband, Academic Dean David Frame, to the Chinese military," end quote.
Do you recall that?
A Yes.
Q Is it your understanding that the February 2017 Fox News reporting on Dr. Chen spurred those congressional committee investigations?
A Yes.
Q Did you communicate with anyone related to those committees before the first reports in February 2017, or did those communications occur after?
A To the best of my recollection, it would have been afterwards.
Q You specifically referenced those investigations starting after Fox News revealed documents and photos tying Dr. Chen to the Chinese

Page 112

military.
What documents and photos were you referring to?
A The documents and photos that appear in our reports.
Q The ones that we've talked about today?
A Yes.
Q About 1:10 in the video, your narration said, "After the Fox investigation, the Defense Department put the school under review."
Do you recall that?
A Yes.
Q And by "Fox investigation," were you referring to the February 2017 broadcast and digital stories about Dr. Chen?
A Yes.
Q With respect to the Department of Defense putting the school under review, you were referring to the Department of Defense reviewing its Memorandum of Understanding that allowed the University of Management & Technology to receive tuition assistance from the Department of Defense, correct?
A That would be one element of a review, yes.
Q Was it your understanding that it was Fox's February 2017 reporting that led the Department of

Page 113

Defense to put UMT's Memorandum of Understanding under review?
MR. COYLE: Objection; calls for speculation.
BY MR. PHILLIPS:
Q Do you understand my question?
A I do.
MR. PHILBIN: You can answer the question if you know the answer.
THE WITNESS: I honestly don't know the answer. The best of my recollection is that the Defense Department was already looking at the school at the time of the 2017 report.
BY MR. PHILLIPS:
Q Let me play for you your narration again and see if that helps clear up the timing on that for you.
I'm going to play it beginning at 1:10.
A Okay.
(Audio/visual file, Exhibit 6, played again.)
BY MR. PHILLIPS:
Q So you said there, "After the Fox investigation" --
A Yes, I did.
Q -- "the Defense Department put the school

under review but continues to fund it."
Did you hear that?
A Yes.
Q Does that help with the time frame there, that, in fact, the defense department began reviewing its MOU with UMT after the Fox broadcast and digital stories in February 2017?
A Yes.
Q Is it your understanding that that review occurred as a result of Fox's reporting?
MR. COYLE: Objection; calls for speculation.
BY MR. PHILLIPS:
Q I can only ask what your understanding is, Ms. Herridge.
A My understanding is that may have been one factor under consideration.
Q Did you ever submit, you or Fox ever submit any of the reporting on Dr. Chen for any kind of journalism awards or accolades?
A I can't recall. As a general practice, Fox News didn't submit reports for prizes. This one may have, but they -- as a general rule, they have not submitted for prizes in the past. This one may have been submitted, but I just don't recall.



Q Okay. So I have time-stamped one minute, 30 seconds, and the Plaintiff's Exhibit 6 video file up in front of you.
Do you see that there is a photograph shown on the screen there?
A I do.
Q Do you know what that photograph is?
MR. PHILBIN: Objection; vague.
BY MR. PHILLIPS:
Q Do you know what is depicted in that photograph?
A It's your client and another individual.
Q It's Dr. Chen and another individual?
A Yes.
Q Was that photograph obtained by you in the course of reporting this story?
A Yes, it was.
Q When did you obtain this photograph?
MR. PHILBIN: Objection. The timing would go to revealing the source or sources.
BY MR. PHILLIPS:
Q The narration in the video, right before it shows that photograph, refers to "new photos" that "show just how deep the ties may go," referring to Dr. Chen?



A Can you just, just play it for me.
Q Sure.
A Thank you.
Q I'm going to play from 1:25.
(Audio/visual file, Exhibit 6, was played again.)
BY MR. PHILLIPS:
Q So my question for you is: Right before the flash on the screen, that photograph of Dr. Chen and another person, you made reference in your narration to "new photos."
Did you hear that?
A Yes.
Q What did you mean by "new photos"?
A Big picture new.
Q I guess more specifically, I'm wondering, that photograph, for example, of Dr. Chen and the other individual, was that something that you obtained in the interim between the February 2017 reporting and the April 2017 reporting? Is that why you referred to it as "new"?
MR. PHILBIN: Objection to the extent it would reveal the timing in which things were received and could potentially identify the source.



BY MR. PHILLIPS:
Q Are you going to follow your counsel's instruction not to testify --
A Respectfully, yes.
Q -- about the timing of when you obtained that photograph?
Did you obtain that photograph from a source?
A Yes.
Q Who was that individual?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to testify as to who provided that photograph of Dr. Chen?
A Respectfully, yes.
Q Is it your understanding that that was a personal photograph of Dr. Chen's?
A As I've stated earlier, it's my assumption.
Q I'll draw your attention to just after that photograph of Dr. Chen and another individual, shown on screen is this photograph of what I understand to be Dr. Chen and a number of her family members.
Is that correct?
A Yes.
Q And is that the same photograph that we saw

earlier when we were looking at the April 28, 2017 digital story? Feel free to --
A Yes, sure.
Q It's Plaintiff's Exhibit 3.
A This one?
Q Yes.
A It does appear to be, yes, though it's cropped.
Q In the video file?
A Yes.
Q Yes.
A That's what it appears to me.
Q Sure. I'm just asking you if you understand that to be the same image.
A Yes.
Q Okay.
In the context of discussing Plaintiff's Exhibit 3, of course, I had asked you if that image was provided to you by a source, and you said yes, correct?
A Correct.
Q I also asked you when you obtained that photograph, and you declined to answer; is that correct?
A That is correct.



Q Would you give me the same answer with respect to that, asking you about the version of that photograph that appears in the video file?
A I would, yes, because it's the same photo.
Q Will you tell me who the source was that provided that photograph to you?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to follow your counsel's instruction not to answer that question?
A Yes, I am.
Q I'll direct you to time stamp one minute, 38 seconds in Plaintiff's Exhibit 6.
A Yes.
Q When we were talking about -- I believe it was the April 28, 2017 digital, digital story, Plaintiff's Exhibit 3 -- there's reference in that story to a photograph of Dr. Chen saluting her father's grave.
A Yes.
Q Does the photograph that we see in timestamp 1:38 of Plaintiff's Exhibit 6 the same photograph that you were referring to in Plaintiff's Exhibit 3?
A Yes.
Q Did you obtain that photograph in the course



of reporting these stories about Dr. Chen and UMT?
A Yes.
MR. COYLE: Objection; asked and answered.
BY MR. PHILLIPS:
Q Was that photograph provided to you by a source?
MR. COYLE: Same objection.
BY MR. PHILLIPS:
Q Yes or no?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q My question was: Was that photograph provided to you by a source?
A So I'm just a little bit confused with the overlapping here. Can you just pick back up?
MR. PHILBIN: Can you read it again?
MR. PHILLIPS: Yes.
BY MR. PHILLIPS:
Q Okay. So we're looking at timestamp 1:38, Exhibit 6, and there's a photograph that I understand, from your description of it in the digital story and the narration, to be an image of Dr. Chen saluting her father's grave.
Is that how you understand it?
A Yes.



Q So I'm asking you about the provenance of that photograph. My question was: During the course of your reporting, did a source provide you with that photograph of Dr. Chen saluting her father's grave?
MR. COYLE: Objection; asked and answered.
MR. PHILBIN: You can answer.
THE WITNESS: Okay. Yes.
BY MR. PHILLIPS:
Q Who was that person?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to follow your counsel's instruction and decline to tell me who the source was that provided you this photograph?
A Respectfully, yes.
Q Let me ask you some general questions about your reporting materials.
Having reviewed these Fox News digital and broadcast reports about Dr. Chen from 2017 -- well, let me back up. Let me ask you about the broadcast reports.
Who decided whether and when to air those broadcast reports on Fox's cable channel?
MR. PHILBIN: Objection. Goes to the editorial process.

BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Yes.
Q I believe you testified earlier that the on-air interview with Stephen Rhoads occurred in 2016.
Is that your recollection?
A May have even been a little bit earlier, but it was well in advance of the broadcast of the story.
Q Why was there a delay between the taping of that interview and the airing of the first broadcast report in February 2017?
MR. PHILBIN: Objection. Goes to the news gathering and editorial process.
BY MR. PHILLIPS:
Q Are you going to follow your counsel's instruction and decline to answer that question?
A Respectfully, yes.
Q Same question for the digital stories from February and April of 2017: Who decided when to publish those stories on Fox News' website?
MR. PHILBIN: Objection; privilege. Goes to the editorial process.
BY MR. PHILLIPS:
Q Are you going to decline to answer that


question?
A Yes.
Q Do you recall when the stories were -- when the drafting of the stories was finalized vis-a-vis when they were actually published on Fox News' website?
MR. PHILBIN: Objection, the same, to the editorial and also relevance.
BY MR. PHILLIPS:
Q Do you recall there being a time lag between when the stories were completed and when they were actually published? I'm speaking of the digital stories.
A No.
Q You don't? Okay. What about the broadcast stories; were those completed in advance of when they actually aired on Fox's cable channel?
A Not to my recollection. Maybe a couple of days at most, but not to my recollection.
Q Was there any reason why they were published in 2017 when you interviewed Mr. Rhoads in 2016, and he testified that he had seen the documents that supported those reports in your office at Fox News in advance of that interview?
MR. PHILBIN: Objection. Again goes to the


editorial process.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A I am, but I would just like to clarify. I don't remember exactly when the interview took place. It may have even been 2015.
Q Did you select the photographs and other visuals that appeared in the broadcast reports? For example, the photographs, the immigration records, the naturalization certificate; was that your job to pick those out?
A It would be the responsibility of myself and Ms. Upson and Ms. Browne. We worked as a team.
Q How did you decide which -- well, let me back up.
I'm going to assume that in the course of your reporting on Dr. Chen, you obtained a wide variety of documentary materials and photographs; is that fair?
MR. PHILBIN: Objection. To the extent you're asking about the extent of other material gathered in the news gathering process, it's privileged.


BY MR. PHILLIPS:
Q Let me ask a more narrow question.
Did you obtain documents and photographs pertaining to Dr. Chen in addition to those that actually appeared in the digital and broadcast stories?
MR. PHILBIN: You can answer.
THE WITNESS: Yes.
BY MR. PHILLIPS:
Q How did you decide, you and your colleagues, which photographs and documents to put on the screen in the broadcast reports and put on the website for the digital reports?
MR. PHILBIN: Objection. That goes to the editorial process.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Respectfully, yes.
Q During the time that you were reporting these stories on Dr. Chen, how did you store your news gathering materials? Emails, texts, photographs, documents; how were they stored?
Does that make sense?
A I could use a little bit more, I think.

Page 126

Q Sure. So I guess I'm asking a very general question.
Again, we discussed that in the course of your news gathering, you obtain things like photographs, immigration records, apparently Dr. Chen's George Washington University dissertation.
All those kinds of materials, how are they maintained at Fox News, whether digitally or in hard copy?
MR. PHILBIN: You can answer that.
THE WITNESS: With great care.
BY MR. PHILLIPS:
Q But can you be more specific? I'm asking where. Was there some kind of box system or file storage system? Do you understand what I'm asking?
A Generally speaking, I was the person who had custody of the materials.
Q So for digital files, would they have been maintained on a hard drive?
MR. PHILBIN: Counsel, I'm going to object, because at this point all that the court has allowed is a deposition for information relating to the identity of sources, and it specifically quashed the subpoenaed deposition for documents from Fox and the subpoenaed deposition for

Page 127

documents from Ms. Herridge.
So at this point probing into document storage and the existence of, you know, where documents were, I don't think is within the scope.
MR. PHILLIPS: I'm going to disagree with you, because the court's August 1, 2023 order actually directs that we are entitled to ask Ms. Herridge about any non-privileged other matters relevant to her Privacy Act claim. How relevant documents were stored is certainly a relevant area of inquiry.
I would add that the order also notes that if she doesn't answer our questions about identity of sources and the like, we have the ability to renew our subpoenas to Fox. So I do intend to ask the witness about where I might find those documents. I'm happy to do it over your objection, but I think the order is clear that she needs to answer those questions.
MR. PHILBIN: Well, it says "non-privileged other matters," so as to the bare existence and where things may be stored, I'll withdraw the objection, but if it's getting into anything more about how things are handled that get into the

Page 128

editorial process of Fox, I'm going to object to that.
BY MR. PHILLIPS:
Q Let's start with I guess where I left off, which was things that you collected in the course of your reporting, you said that you had primary responsibility for having custody of those things.
So what I had asked before the objection was: With respect to digital files, computer files, would you have maintained those on a hard drive?
A Everything I obtained through the course of my reporting, I kept in a single box.
Q A physical box?
A A physical box.
Q Okay. I'm going to imagine -- you can tell me if I'm wrong, but I'm going to imagine that in the course of reporting you would have gathered some materials that were electronic in terms of things you gathered from the internet or things that were emailed to you.
Is that fair?
MR. PHILBIN: I'm going to object again, because this is getting into sort of the method by which things were received, and the method by which things are received could relate to

Page 129

identifying sources.
BY MR. PHILLIPS:
Q But I didn't ask about a specific document or even a Privacy Act protected document. I asked a very general question. In the course of this reporting, did you gather any information about Dr. Chen that would have been in the form of a digital file?
MR. PHILBIN: With the understanding the question is that broad, it's anything related to the reporting, you can answer the question.
THE WITNESS: Yes.
BY MR. PHILLIPS:
Q And where would you have saved something like that?
A In the box.
Q So you would have printed it out and put it in a physical box?
MR. PHILBIN: You can answer.
THE WITNESS: Everything related to my reporting I kept in a single place, in a box.
BY MR. PHILLIPS:
Q Okay. I guess I'm going to go back to my question about digital files, though. If I obtain a PDF, I suppose I can print that out and then delete

the electronic copy of it.
Is that what you did, or where would the electronic files have lived?
A I don't know how to answer the question. Generally materials were -- I just don't know how to answer the question.
Q Well, tell me how I can clarify it for you. I'll try to ask it another time a different way if I can.
A Okay. That would be good. Thank you.
Q All I'm asking is: In the course of your reporting on Dr. Chen, if you obtained information that you felt was relevant to your reporting in the form of an electronic file, whether a PDF, a PowerPoint, a Word document, you know, a JPEG, where would you have saved those electronic files?
A For example, the Memorandum of Understanding was an electronic file. I printed out that file and would keep it together with the rest of the materials.
Q And what about the electronic version of the file; what did you do with that?
A It would, it would depend how full my mailbox was, because some of these files can be very large. Sometimes I would purge them or leave them.
Q So did you delete electronic files that you


obtained in the course of your gathering information on Dr. Chen?
A Not to my recollection, no.
Q So if I wanted to go find those files today, where would I look for them?
A I guess in my Fox News email account, if it still exists.
Q Okay. Did you save electronic files anywhere else? Like did you save things to a folder on a hard drive, to a desktop, to some kind of file management system?
MR. PHILBIN: You can answer.
THE WITNESS: I think some files were saved to a digital system for the editing process, as part of the editing process.
BY MR. PHILLIPS:
Q Does that system have a name?
A Oh, I don't know. I really -- no, I don't know what it would be called.
Q How many years did you spend at Fox News?
A I spent 22, but that is really much more of a production question, and my role was an editorial role.
Q Was there any protocol when you were at Fox News for recording file type materials, electronic


files in terms of where and how to save those?
A The investigative unit had a system for maintaining materials, but I don't -- I was not involved in that process.
Q I see.
Other than things that would be in your email, you don't recall ever saving to any system, whether a desktop, a hard drive, or file management system, you don't remember saving any electronic files related to your reporting about Dr. Chen?
A We certainly saved some files that were used in the editing process.
Q And where?
A It would be in a production, you know, file folder.
Q I guess would that be on a computer, or would that be on some kind of like --
A You're really getting -- I mean I'm not -- I really -- I don't even know the mechanics of how that would work, because I'm not involved in the production, the editing of the story.
Q Do you still have access today, you personally, to any of the photographs, immigration records, FBI interview summaries, those kinds of materials that we talked about today that are


referenced in the report?
MR. PHILBIN: You can answer.
THE WITNESS: I have very limited files from that period.
BY MR. PHILLIPS:
Q Okay. So is the answer to my question yes or no?
A Yes, but limited.
Q And the ones that you do have, are they in hard copy or are they electronic files?
A Hard copy.
Q And where are those being kept?
A I maintain them at my home.
Q I guess let me ask a specific one.
The naturalization certificate of Dr. Chen; do you recall we talked about how that appears in the broadcast report?
A Yes.
Q Do you still have a physical copy of that today?
A I don't believe so, no.
Q What about the photograph of Dr. Chen saluting her father's grave; do you still have a copy of that today?
A Yes.

Q That's in hard copy in a box in your home?
A No. I, I think I have a photo of it on my phone. I don't know whether that is from one of the broadcasts or whether it has a different source of origination.
Q Okay. The immigration record we talked about where Dr. Chen checked "no" in reference to association with the communist party; do you still have a copy of that document today?
A I don't believe so, no.
Q What about the photograph of Dr. Chen and her husband when she's holding the military uniform; do you recall that photograph?
A Similar to my earlier answer, I may have a copy of that, but if I do, it would exist on my phone, not as a hard copy.
Q Okay. Do you have a hard-copy copy of any of the materials that we've talked about today that are referenced in the reporting?
MR. PHILBIN: Objection. That's vague.
BY MR. PHILLIPS:
Q Any of the photographs, immigration records, FBI interviews that we talked about today, do you have any of those materials in hard copy?
A I may have a handful of records.


Q Okay. Have you destroyed any copies of those?
A No.
Q At any time?
A Well, when I left Fox News, I cleared out a lot of my files at that time.
Q By "cleared out," do you mean you deleted them or you handed them over to Fox News?
A I threw them out.
Q Hard-copy materials?
A Yes.
Q Would that include materials relating to Dr. Chen?
A Yes.
Q Do you know what material specifically?
A I think the, the photographs, the immigration, perhaps the naturalization.
Q Okay, and that occurred at the time you left Fox News?
A I did a big clear-out of files when I left Fox News, and then I did a subsequent clear-out, because I took some material with me, earlier this year.
Q So you would have -- would that include materials pertaining to Dr. Chen?


A Yes.
Q So you believe you destroyed physical copies of materials relating to your reporting on Dr. Chen earlier this year in 2023?
MR. PHILBIN: Objection. I'm going to object to that, and I'd like to talk to my client.
MR. PHILLIPS: Let's take a five-minute break.
THE VIDEOGRAPHER: Off the record at 1:36.
(Whereupon, a short recess was taken.)
(Mr. Coyle exited the conference room.)
THE VIDEOGRAPHER: Back on the record at 1:46.
BY MR. PHILLIPS:
Q Ms. Herridge, before me took a break there, I was --
MR. PHILBIN: Could she clarify her last answer? She wants to --
BY MR. PHILLIPS:
Q Go ahead.
A So I was confused about the timing. I'm talking about early 2022 when I got rid of the records, because it was prior to the subpoena.
Q Okay. So I had asked you about hard-copy of


materials --
A Yes.
Q -- you had in your possession pertaining to your reporting on Dr. Chen, and before we took a break, you had testified that you believe you destroyed those earlier this year, was your prior testimony, correct?
A That's correct.
Q After a break and a chance to speak with your counsel, you testimony is now that, in fact, you destroyed those materials earlier in 2022, not 2023?
A That's correct.
Q What was the source of your confusion as to the timing?
A I, I had forgotten that it's been an entire year that this process has been going on since the subpoena, and it had been five years since I broadcast the story, and for me, five years is kind of a window when I, if I don't think I'm going to need things, I get rid of them, so it was -- I generally misspoke. I'm sorry about that.
Q When did you first become aware of Dr. Chen's Privacy Act lawsuit?
A I think the last I knew about the suit was probably maybe 2019, 2020.

Page 138

Q Do you recall how you became aware of the litigation?
A I may have read about it.
Q Did you ever speak with Stephen Rhoads about this lawsuit?
A He had told me at one point that he was going to be deposed in the lawsuit.
Q And in fact, he testified in his deposition that he called you when he received a subpoena.
Do you recall that conversation with Mr. Rhoads?
A I recall him getting in touch with me, yes.
Q I think he testified that, in fact, you helped refer him to someone who was able to get him counsel to represent him in his deposition.
Do you recall that?
A I referred him to Judicial Watch, for someone with Judicial Watch.
Q Do you have a sense of the time frame when those conversations took place?
A I think it was a couple years ago.
Q I might have a document that could help with that.
If I told you that Mr. Rhoads' deposition took place in March of 2021, does that help orient you

Page 139

in terms of time frame as to when you spoke to him about his upcoming deposition?
A It would probably be around that time.
Q Probably prior to that?
A Prior to that, yeah.
Q When you got rid of the physical materials you had relating to Dr. Chen -- and you say it was early 2022?
A Yeah.
Q Can you narrow down that time frame for me at all?
A I think it was early in 2022. It was kind of a, you know, New Year's cleaning out of stuff.
Q Okay. Did you -- well, first of all, you said -- I think the term you used was clean them out. What did you do with them exactly?
A You know, with most of my work-related papers, I try and shred them if I can.
Q Do you have a shredder in your home?
A Yes.
Q So you think you would have shred those hard-copy materials that you had pertaining to your reporting on Dr. Chen?
A Yes.
Q At the time you did that, did you shred any

Page 140

other materials not relating to Dr. Chen?
A No. Oh, sorry. I did. I cleaned out other materials from my reporting at that time as well. Pardon me.
Q Can you give me an example of other materials that you got rid of at the same time?
A I had several records related to the work that we had done on the Clinton emails from that time period. We had also done some reporting on the investigation into sort of weapons trafficking, and I'm trying to think if there was anything else from that period. There may have been a special, some Special Forces related records.
Q Okay. When you left Fox News in 2019, did you leave any files, any hard-copy files pertaining to your reporting on Dr. Chen with Fox News?
A No.
Q You took everything with you?
A Yes.
Q As far as electronic files, you mentioned earlier having images on your phone of some of the materials that we talked about today.
Do you still have those?
A Yes. I've been careful not to delete things since the subpoena.

Page 141

Q In terms of email communications with respect to your reporting on Dr. Chen, when you communicated with sources in the course of your reporting, did you use a Fox News email address or a personal email address?
MR. PHILBIN: Objection; privilege. The method of communication could go to identifying sources.
MR. PHILLIPS: Whether she used a personal or a Fox News email address? How could that identify a source?
MR. PHILBIN: It would lead to avenues for finding out how she was communicating with sources and therefore who they were.
BY MR. PHILLIPS:
Q What about Stephen Rhoads; did you ever communicate with him using your personal email address?
A I may have from time to time.
Q You had a Gmail address; is that correct?
A I don't think I had a Gmail address at that time, no.
Q Oh, I misspoke. Did you have a Hotmail address at that time?
A Yes.

Q Does the address [redacted].com ring a bell?
A Yes. That's my address.
Q Is that your personal email address?
A Yes.
Q Did you use that to communicate with Ms. Rhoads, for example, in June of 2016?
A I'd have to see the email.
Q Okay. Did you ever communicate with Mr. Rhoads using your Hotmail email account?
A Yes.
Q What about other sources for this report?
MR. PHILBIN: Objection; privilege. Goes into the, goes into the methods --
MR. PHILLIPS: How?
MR. PHILBIN: -- of communication with sources.
BY MR. PHILLIPS:
Q Are you going to decline to tell me whether you communicated with sources in the course of your reporting on Dr. Chen using a personal email address?
MR. PHILBIN: The objection stands.
BY MR. PHILLIPS:
Q Is the answer to my question yes?
A I'm respectfully declining.



Q Have you deleted any emails on your Hotmail email address pertaining to your reporting on Dr. Chen at any time?
A Not to my knowledge, no.
Q Did you ever communicate with sources, in the course of your reporting on Dr. Chen, using a Fox News email address?
A Probably, yes.
Q Do you still have in your possession any and all emails pertaining to Dr. Chen that would have been sent from or received to your Hotmail email account?
A Potentially, yes.
Q Why potentially?
A Because I don't recall deleting these emails.
Q Do you still have any access to your Fox News email account that you had when you were there?
A No, I do not.
Q In the course of your reporting on Dr. Chen, did you communicate with sources via text message?
A I communicated via text with Stephen Rhoads who spoke to us on the record.
Q Anyone else?
A I generally avoid texting with confidential sources.



Q So is the answer to my question no, that there were, there were no text messages, or you're not sure?
A Probably not.
Q Have you deleted at any time any text messages pertaining to your reporting on Dr. Chen?
A No.
Q Your text messages with Mr. Rhoads, for example; my understanding is those texts or at least some of them were sent from and received to a 917 area code number.
Does that sound familiar?
A Yes. That sounds like my Fox phone.
Q Okay. That was -- my next question was: Were you texting with Mr. Rhoads on a Fox-issued phone or your personal cell phone?
A Boy, you're really testing my memory here, because it's six years ago, but if your records indicate a 917, that would likely be the Fox News cell phone that was assigned to me.
Q So that's a phone that was provided to you by your then employer, Fox News?
A Yes.
Q Did you return that phone to Fox News when you left?



A I did.
Q Did you delete any materials, whether text messages or any other materials, from that phone before you returned it to Fox News?
A Not to my knowledge, no.
Q Do you still have access to, today, for example, your text messages with Mr. Rhoads?
A Whatever would be on my phone, the legacy messages.
Q But anything that was on a Fox News phone, is it your testimony you do not have access to?
A No.
Q Do you know if you ever texted with Mr. Rhoads using your personal cell phone?
A Yes.
Q You believe you did?
A I think I did.
Q Is there any particular reason why you might at one time text from a Fox-issued phone and another time from your personal device?
A Sometimes convenience.
Q In terms of the preparation of the February and April 2017 digital stories about Dr. Chen, the ones that were published on the Fox News website, what program or software did you use to draft those?

Page 146

MR. PHILBIN: I'm sorry. Could you repeat the question?
BY MR. PHILLIPS:
Q Yes. My question is just about the preparation of the stories about Dr. Chen for the Fox News website and how were they drafted.
For example, did you do it on Microsoft Word or Word Perfect or something of that nature?
A My recollection is that we drafted the stories not in a communal doc, if that's what you're asking me, but, you know, in an email, and then we would share the email.
Q Okay. So your understanding was that it wasn't like a Word processing --
A No.
Q -- program? So you would -- if you were taking the pen on drafting the story, you would write it up in an email and then send that to --
A That's my recollection.
Q And that would be you, Ms. Browne, and Ms. Upson sending emails around?
A Uh-huh.
Q Were drafts -- I guess before the story gets posted on Fox News' website, it can be the Chen story or any other story, I presume it has to be committed

Page 147

to some format other than email.
Does that make sense?
A Yes, yes.
Q Okay. What format is that?
A Well, the, the process would be that someone from the digital desk would take the copy, review the copy, and then put it into that format. I don't know the name of the program that they were using for publication.
Q Did you or Ms. Upson or Ms. Browne ever commit the draft of the story to any format other than email, or is it your understanding that you would simply provide an email to the digital folks at Fox News?
A My recollection is that we would provide it to the digital folks.
Q In email form?
A Yes.
Q Okay.
So with respect to the digital stories about Dr. Chen from February and April 2017, would drafts of those stories reside in any form other than emails between you Ms. Upson and Ms. Browne, to your knowledge?
A I don't know the answer to that question. I

Page 148

just don't know.
Q Before the stories about Dr. Chen were published, the digital stories, would they have been reviewed by an editor at Fox News?
A Yes.
Q Who is that person?
A In this case they would have been reviewed by the legal department, and then also -- I think the editor at that time was Judd Berger, who was in Washington.
Q Okay. So with respect to -- I guess let's start with Mr. Berger. If you wanted Mr. Berger to review the draft of say the February 2017 story about Dr. Chen, in what form would that have been provided to him?
A My recollection is we would take the draft which was in email form and provide it to him, generally after it had been reviewed by Legal in this case.
Q And I have the same question as to Legal. Would that have been -- would the story have been provided to them in email form?
A I think, I think so, yes. There was not a shared drive, if this is what you're asking me, for that process, as I recall.

Page 149

Q In the course of your reporting on Dr. Chen, did you take any handwritten notes?
A Yes.
Q Where did you save handwritten materials?
A In my notebook.
Q Okay. Where is that notebook today?
A I got rid of a lot of my notebooks when I left.
Q When you left Fox News?
A When I left Fox News.
Q So your testimony today is that any handwritten notes you had pertaining to your reporting on Dr. Chen, you would have destroyed when you left Fox News in 2019?
A I may still have some among the limited records, but I cleared out what was contained within, you know, the box. I cleared out a lot of those records.
Q And are you saying that was when you left Fox News or that was in 2022 or some other time?
A Primarily in 2019, and then I went through my notes again in early 2022 and cleared out some of those records and additional reporting records I had at that time.
Q During your testimony today, Ms. Herridge,

you've declined to identify for me the person or persons that provided you the materials we've talked about, such as photographs of Dr. Chen, immigration records, FBI interviews, summaries.
Is that fair?
A Yes, and respectfully.
Q I didn't mean to suggest otherwise.
A Okay.
Q The person or persons who you are declining to identify for me here today, did you have an agreement of confidentiality with that person or persons?
A Yes.
Q And how is that memorialized?
A It was a discussion.
Q It's not committed to writing or anything like that?
A No.
Q And what was the agreement?
MR. PHILBIN: You can answer.
THE WITNESS: Okay. Reporters make a commitment to confidential sources to protect their identity in the course of their reporting. I've done this in many of my projects. This is not the only time, and I remain committed to that



pledge.
BY MR. PHILLIPS:
Q We talked about Stephen Rhoads today. He appears on camera in the broadcast reports from April and February of 2017, correct?
A Yes.
Q So I presume that because he was interviewed on camera and identified in the reporting, Mr. Rhoads was not a confidential source; is that correct?
MR. PHILBIN: Let me object to the extent that the question is trying to find out if there were other things that Mr. Rhoads might have provided on a confidential basis; in other words, dividing his role into two -- him into two roles, confidential source for some things, on-the-camera source for other things.
BY MR. PHILLIPS:
Q My question was -- because Mr. Rhoads appeared on camera for an interview, I presume that he was not a confidential source for your reporting. You did not have some agreement to keep his identity confidential.
Is that fair?
A He did an on-camera interview with us, correct. We identified him.



Q Okay. Did you have some agreement with Mr. Rhoads to keep his identity confidential in some other respect? I guess I'm --
MR. PHILBIN: Objection.
MR. PHILLIPS: -- not trying to get Major or Mr. Philbin's objection, but I'm confused.
MR. PHILBIN: Well, objection. Let me spell out the objection.
Hypothetically speaking, it's conceivable that the same individual would appear on camera as an on-the-record source, but for other aspects of reporting for other things, it could be a confidential source. So to the extent that you're asking if Mr. Rhoads was also, in some other capacity, a confidential source, I'm objecting on privilege.
BY MR. PHILLIPS:
Q Well, Mr. Rhoads identified himself in the broadcast report as a confidential informant for the FBI, correct?
A Yes.
Q He discussed how he worked at UMT, correct?
A Yes.
Q I guess I'm trying to understand. Given all that, am I correct that there was not an agreement



with Mr. Rhoads to maintain his identity as confidential?
MR. PHILBIN: Again I'm going to object, because if you want to find out whether there was an agreement to keep his identity confidential as to the things for which he appeared on the record in the report, I think the answer is obvious. There was no agreement to keep that confidential.
If you're asking if he was otherwise, for other things, a confidential source, I'm objecting on First Amendment privilege grounds.
BY MR. PHILLIPS:
Q Are you going to follow your counsel's objection and decline to answer my question?
A Yes.
Q Did you have any kind of confidentiality agreement with Mr. Rhoads with respect to this reporting?
MR. PHILBIN: Objection. That directly asks whether he served in the capacity as a confidential source.
BY MR. PHILLIPS:
Q Are you going to decline to answer my question?
A Respectfully, yes.

Q Other than your counsel, have you ever told anyone the identity of a source or sources that provided you the materials pertaining to Dr. Chen that we've been focusing on today; mainly, the photographs, immigration records, and FBI interview materials?
A I've actually discussed the sources with nobody.
Q None of your colleagues at Fox News?
A No.
Q So none of your editors ever asked you for the identity of the source that provided you those materials?
A No.
Q How did your editors at Fox News satisfy themselves that the information provided by your source, the materials provided by your source or sources was trustworthy without knowing their identity?
MR. PHILBIN: Objection. That goes to the editorial process.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Yes.
Q With respect to the same materials we keep



talking about, the photographs, the immigration records, the FBI interviews, I assume there was no agreement with your source or sources to keep those materials confidential; is that fair?
A Yes.
Q Were there any materials you were provided in the course of your reporting on Dr. Chen that you agreed to keep -- that you agreed with a source to keep confidential and not use in your reporting?
A What do you mean by "not use"?
Q Not include, in sum or substance, in the stories themselves or not included as images in the broadcast report.
MR. PHILBIN: I'm going to object to that, because that would go to revealing whether there's other information gathered in the news gathering process that was confidential. It was -- there was a promise of confidentiality as to it.
BY MR. PHILLIPS:
Q That is my question, yes.
Did you make a promise of confidentiality as to any materials, not identity of persons, but materials that you obtained in the course of your reporting on Dr. Chen?



A Ask me the question again.
Q Did you make an agreement with any source, during the course of your reporting on Dr. Chen, that you would maintain information or materials as confidential, aside from the identity of the person providing you with information?
A And what do you mean by "confidential"? Do you mean --
Q I'll give you a hypothetical.
A Okay, yes, that would, that would help. Thank you.
Q Obviously there are a lot of materials that, as we discussed today, you received from a source or sources that were included in the published reporting. Did you ever receive any materials, documents, photographs, the like, from a source or sources where there was an agreement that, while you could be provided that information, you could not include it in your reporting for public consumption?
A So, just so I understand the question, so you're asking me was I provided materials that I agreed not to publish?
Q Right, like, you know, are you familiar with the phrase "off the record"?
A Yes.



Q Did any source or sources for your reporting on Dr. Chen provide you with any materials, any documents or files that were off the record and not for publication?
A Not, not to my recollection, no.
Q Has Mr. Rhoads ever been a source for any of your reporting aside from your reporting on Dr. Chen?
MR. PHILBIN: I'll object to the extent that it would reveal a confidential source relationship in some other reporting.
BY MR. PHILLIPS:
Q Are you going to accept your counsel's instruction as to that aspect of my question?
A I'm just, I'm just thinking. I, I don't, I don't believe so. He may have told me about a National-Guard-related story at one point, but I'm not sure. I don't think I pursued it.
Q Okay, okay. Let me, to make sure we're clear, take it in two pieces.
A Yes, mm-hmm.
Q So other than your reporting on Dr. Chen, has Mr. Rhoads ever served as a nonconfidential source as to any other reporting that you've done in your career?
A For some reason, I feel like, I feel like

maybe we interviewed him for something else. I can't recall. I'd have to go back and look.
Q Okay. Do you ever recall Mr. Rhoads having served as a confidential source for any reporting other than your reporting on Dr. Chen?
MR. PHILBIN: Objection; privilege.
BY MR. PHILLIPS:
Q Are you going to decline to answer that question?
A Yes.
Q Do you recall that in 2015 you authored a story for Fox News about a State Department translator named Xiaoming Gao?
A Yes.
Q Was Mr. Rhoads the source for that story in any capacity?
A Possibly.
Q Let me see if I can jog your recollection.
A Yeah, sure.
MR. PHILLIPS: That is Plaintiff's Exhibit 7.
(Exhibit 7 was marked for identification.)
BY MR. PHILLIPS:
Q So, Ms. Herridge, I've handed you what we



marked as Plaintiff's Exhibit 7.
A Yes.
Q Do you recognize this as an April 2015 story that you authored for Fox News' website about that State Department translator Gao?
A Yes.
Q Do you see that the second and third paragraphs in the story refer to a recently unsealed FBI affidavit by Timothy S. Pappa?
A Yes.
Q And actually, I should be more clear. It's the first paragraph that refers to the "newly unsealed court documents."
A I do see that.
Q And then the second and third paragraphs clarify that that is an affidavit executed by Mr. Pappa?
A Mm-hmm.
Q Okay. Did Mr. Rhoads alert you to the existence of that affidavit?
MR. PHILBIN: Objection to the extent it would involve revealing a confidential source that's privileged.
BY MR. PHILLIPS:
Q Does that question involve revealing a



confidential source?
MR. PHILBIN: I think it's clear that unless Ms. Herridge remembers him being an on-the-record source, it's privileged and she can't answer.
MR. PHILLIPS: Well, I don't think that's exactly true, because Ms. Herridge just described to me how there is an understanding and discussion of confidentiality with the source in order to withhold their identities.
BY MR. PHILLIPS:
Q So what I've just asked you was: Was there some agreement with Mr. Rhoads to keep his identity as a source confidential as respects this story?
MR. PHILBIN: Objection, Counsel. You just asked if she had an agreement with him as a confidential source, which is the same as asking was he a confidential source, which is privileged.
MR. PHILLIPS: Okay. Let's take that from a different direction. What I asked her in the first instance was, did Mr. Rhoads alert you to the existence of this Pappa affidavit, and you objected to the extent that he was a confidential source, but if he was not a confidential source, she needs to answer that question.



So I'm, I'm a little confused about like how you're approaching this here. You're putting the cart before the horse.
MR. PHILBIN: Actually, Counsel, it's you that's getting it backward here.
If you want to ask her was Stephen Rhoads an on-the-record source for this story, you can ask her that. If he's not an on-the-record source for the story, then if he was the source, which she may or may not recall, he's a confidential source by definition.
MR. PHILLIPS: Is that your position here today, that that is the dichotomy? You're either an on-the-record source or you're a confidential source?
MR. PHILBIN: Well, there's no --
MR. PHILLIPS: Let me ask the witness.
BY MR. PHILLIPS:
Q Ms. Herridge, do you ever obtain information from sources where there's no agreement of confidentiality to maintain that source's identity, but when you ultimately publish the story, you may not necessarily identify that source?
Can you imagine a scenario where that would happen?

Page 162

A Sorry. Just repeat that to me again.
Q Sure. Are there ever occasions in the course of your news gathering, not necessarily with respect to Dr. Chen, but where a person either provides you information or points you in a direction to go find information, and you may have no express agreement of confidentiality with that person, but you don't necessarily end up naming them in the story, because, of course, you can't name every single person you talk to in the --
A Right.
Q -- course of your reporting, right? That make sense?
A Mm-hmm.
Q Okay. I'm asking you: Did Stephen Rhoads direct you to this Timothy Pappa affidavit that's referenced in your reporting on this translator Gao?
MR. PHILBIN: And I'll object again to the extent it will reveal a confidential source. I think what you're trying to ask, Counsel, is: Did Stephen Rhoads provide you information for this story on a nonconfidential basis? That's a question she can answer.
BY MR. PHILLIPS:
Q That's a good question. Did Mr. Rhoads

Page 163

provide you information regarding this story on a nonconfidential basis?
A He suggested that I check with the Maryland court if there were records that were unsealed.
Q So it was Mr. Rhoads that directed you to locate this affidavit from Timothy Pappa?
A I obtained the affidavit, as I recall, from the courthouse.
Q What did you discuss with Mr. Rhoads with respect to this story?
A He told me that it might be a story of interest to me, and that Ms. Gao (pronounced "jow") --
Q That's what I'm going with.
A I think it's Ms. Gao. I believe Ms. Gao may have worked in the same building as your client.
Q Obviously, Agent Timothy Pappa was involved in the investigation of Ms. Gao, as the story reflects, correct?
A Yes.
Q Did Mr. Rhoads convey to you what his interest was in you locating this affidavit or in any way why he was offering that information to you?
A Not that I recall. I can't really speak to his intent.
Q Well, I'm asking you as you understood it or

Page 164

as he conveyed it to you. For example, did he make any reference in your conversations to Agent Pappa?
A He may have.
Q What do you remember about that?
A That it -- if he did reference it, that it was a case that Agent Pappa was, was working, had been working.
Q Did he tell you that he knew Agent Pappa?
A I think I, I knew that they knew each other.
Q How did you know that?
A I -- to the best of my recollection, I think there was a, a wedding, may have been a wedding that I went to. I can't recall who was getting --
Q Maybe Mr. Rhoads' wedding?
A It may have been. I was, I was -- yeah, it may have been Mr. Rhoads' wedding, and I think he was there.
Q Agent Pappa was there?
A Yes.
Q Did you know Agent Pappa prior to that wedding?
A No.
Q So you met his at the wedding?
A To the best of my recollection, yes.
Q Do you know if that was before or after

Page 165

April of 2015?
A I don't remember.
Q Did Mr. Rhoads convey to you, in sum or substance, that he was directing you to that affidavit at the behest of Agent Pappa?
A Not that I recall, no.
Q Did you have any discussions with Mr. Rhoads at all about Agent Pappa's feelings about the investigation, his intent, anything of that nature?
A I guess my sense at that time was that there was frustration.
Q On the part of Agent Pappa?
A Yes.
Q Regarding the fact that Gao was not charged?
A Yes.
Q Did you ever speak to Agent Pappa in the course of your reporting on Ms. Gao?
A I don't believe so, no.
Q Do you know if you reached out -- once you obtained his affidavit, did you reach out for comment or anything like that?
A My recollection is that I relied on the affidavit, the court record, and that I contacted the FBI for comment.
MR. PHILBIN: Andy, we've been going for

about an hour and 20 minutes. Is there a breaking point?
MR. PHILLIPS: Yeah, sure. I'm just trying to move along to -- I know. What time is your call, Ms. Herridge?
THE WITNESS: You know, it's been moved, so we'll just keep going.
MR. PHILLIPS: Well, if you want to take a break.
MR. PHILBIN: Now or --
MR. PHILLIPS: Well, I'm moving on, so if you want to take a break now, that's fine.
THE VIDEOGRAPHER: Off the record at 2:21.
(Whereupon, a short recess was taken.)
THE VIDEOGRAPHER: We're back on the record at 2:31.
BY MR. PHILLIPS:
Q Ms. Herridge, I have a few more questions about Plaintiff's Exhibit 7, your April 2015 story about Xiaoming Gao.
The story itself identifies Agent Timothy S. Pappa, correct?
A Yes.
Q I'm not sure we've gotten this on the record, but can you just tell me, from your


understanding and perspective, who is Agent Timothy Pappa?
A He was an FBI counter-intelligence investigator.
Q And he was involved in the investigation into Xiaoming Gao?
A Yes.
Q Was Agent Pappa also involved in the investigation into Dr. Chen?
A Yes.
Q At the time you published your February 2017 digital and broadcast stories about Dr. Chen, were you aware of Agent Pappa's involvement in the investigation?
A Yes.
Q Is there any particular reason why Agent Pappa wasn't identified in any of your reporting on Dr. Chen?
MR. PHILBIN: Objection to the extent that goes to the editorial process.
BY MR. PHILLIPS:
Q My question stands, subject to the objection, I suppose.
A I'll decline to answer.
Q Outside of the editorial process, meaning


your communications with your colleagues at Fox News, did anyone else ever ask you to keep Agent Pappa's name out of your reporting on Dr. Chen?
MR. PHILBIN: Objection to the extent it relates to a confidential communication, something from a confidential source.
BY MR. PHILLIPS:
Q Are you going to answer my question?
A No.
Q Did Stephen Rhoads ever ask you not to identify Agent Pappa in your published reporting on Dr. Chen?
MR. PHILBIN: The same objection if it relates to something in a confidential communication to an agreement of confidentiality of some sort.
BY MR. PHILLIPS:
Q Can you answer my question?
A I'm declining.
Q Did Mr. Rhoads ever, outside of any express confidentiality agreement, just in conversation, a guy who was an on-the-record source for your reporting, did he ever ask you not to name Agent Pappa in your reporting on Dr. Chen?
MR. PHILBIN: I'm going to object again.


That goes to the news gathering process, and these are questions that are designed to elicit information that would help identify the confidential source, so on that basis I'm objecting on privilege.
BY MR. PHILLIPS:
Q I think what I'm trying to do is elicit information that was not subject to an agreement of confidentiality, and I think that you're trying to retroactively create one, because I just asked: Outside of the bounds of any confidentiality agreement, did Mr. Rhoads, who we all agree was an on-the-record source for your reporting, did he ever ask you not to name Agent Pappa in your reporting on Dr. Chen?
MR. PHILBIN: And I'm going to object again, because the privilege relates not just to confidential agreements or confidential sources, but as the cases I cited in the beginning, such as In Re Slack, hold, it can be things that are both confidential and nonconfidential.
It applies to the news gathering role, and it applies to resource materials prepared by a reporter in anticipation of writing a news article. That's Maughan versus NL Industries,

524 F. Supp. 93, and these are questions that go to part of the news gathering process as to what was to be included or not at the request of sources, and I am going to object on privilege.

MR. PHILLIPS: So just -- I want to clarify your position for the record, is that conversations that she had with Stephen Rhoads, even outside of an agreement of confidentiality, she is not going to testify about today?

MR. PHILBIN: Not if it is going to provide information that could help lead to the identity of a source, which I believe this question would.

MR. PHILLIPS: All I asked was whether Mr. Rhoads ever spoke to her about including or not including Agent Pappa's name in the reporting. I don't know how -- how does that --

MR. PHILBIN: I understand the question, and my objection stands.

MR. PHILLIPS: Your objection is that the answer to that question could identify the confidential source?

MR. PHILBIN: Could lead to the identity, could help provide information that would be pieced together with other information that would be part of a mosaic that would help you to



identify potentially confidential sources, yes.

BY MR. PHILLIPS:

Q Okay. So Ms. Rhoads [sic], are you going --

A Not Ms. Rhoads.

Q Ms. Herridge, are you going to decline to answer my question as to whether Mr. Rhoads ever asked you not to include Agent Pappa's name in your reporting on Dr. Chen?

A Respectfully, yes.

(Exhibit 10 was marked for identification.)

BY MR. PHILLIPS:

Q Let me hand you what we've marked as Plaintiff's Exhibit 10.

Ms. Herridge, is Plaintiff's Exhibit 10 an exchange of emails between you and Mr. Rhoads on June 2, 2016?

A Yes.

Q And I think we already discussed that [redacted].com was your personal email address?

A Yes.

Q Do you still use that email address?

A Yes.

Q On the morning of June 2, 2016, Mr. Rhoads emailed you, saying, "I am assuming that all is well



for our 9:00 a.m. meeting tomorrow."

Do you see that?

A Yes.

Q Do you know what that was in reference to?

A Based on the timing, I think it was either an in-person meeting or the interview itself.

Q Okay. Your response, which looks like might have had some typos in it --

A It does look that way.

Q Maybe you can help me. Can you help me understand what you were conveying to Mr. Rhoads in your response at 11:22 a.m. that morning?

A It appears from the email that I had spoken to his wife, and that I was all set to meet him, or again it may have been the interview was conducted on that day.

Q Because you did say -- you make a mention of an interview in your email, correct?

A Yes, yes.

Q Did you have any discussions -- well, let me back up.

So you did, of course, conduct an on-camera interview with Mr. Rhoads for this story, correct?

A Yes.

Q And was that subject to any agreement of



confidentiality as to his identity?

A No.

Q Were there any other materials provided by -- any other materials or information provided to you by Mr. Rhoads that were subject to an agreement that you would maintain his identity as the provider of that information as confidential?

MR. PHILBIN: Objection. That essentially asks was he a confidential source, so it's privileged.

BY MR. PHILLIPS:

Q Are you going to decline to answer my question?

A Respectfully, yes.

Q Can you tell me about any other discussions you had with Mr. Rhoads concerning Dr. Chen, aside from his on-camera interview?

MR. PHILBIN: I'm going to object on privilege grounds, because that's going to the news gathering process. Again, it's very broad. Things that aren't in the stories that you can glean from the stories are going to be subject to the privilege.

BY MR. PHILLIPS:

Q Are you going to accept that instruction and

Page 174

decline to answer my question?
A Yes. Thank you.
Q So are you going to decline to testify and are you declining to testify today regarding communications with sources, even that were not under an agreement of confidentiality?
MR. PHILBIN: Counsel, if you have specific communications that you know about and want to ask about, you can ask, and we'll see.
BY MR. PHILLIPS:
Q I just did. I've looked at phone records and text messages. You had a lot of communications with Mr. Rhoads about Dr. Chen, correct?
A I spoke with him with some frequency, as did my colleagues.
Q Can you give me a percentage breakdown of what amount of those communications were subject to confidentiality and what were not?
MR. PHILBIN: Objection. She hasn't testified that any of them were actually subject to confidentiality, because it's privileged whether he was providing information confidentially.
BY MR. PHILLIPS:
Q Okay. Well, earlier you testified that

Page 175

Mr. Rhoads directed you to the affidavit of Timothy Pappa with respect to the story about Xiaoming Gao, correct?
A (Nods.)
Q That's not information that appeared in your published reporting, correct?
A That's correct.
Q So is that -- that information is not confidential for our purposes today?
MR. PHILBIN: Objection; calls for a legal conclusion, and to the extent that I didn't object broadly in that case, because it's not this case, doesn't eliminate the ability to maintain the privilege in the questions about this case.
BY MR. PHILLIPS:
Q You told me that you spoke with Mr. Rhoads with some frequency about Dr. Chen in the course of your reporting.
Can you tell me about your recollection of any of those conversations, aside from the on-camera interview?
MR. PHILBIN: Again, Counsel, to the extent it wants information that is nonpublic that was part of the news gathering process related to

Page 176

this story, that's covered by the privilege. There's been no ruling from the court narrowing the privilege in that regard. Cases that I've cited say it applies to both confidential and nonconfidential information gathered as part of the news gathering process, so I'm going to object.
MR. PHILLIPS: For the record, I'm obviously going to disagree as to your characterization of the court's ruling. The court ruled that the privilege was overcome even with respect to confidential information. Surely the greater includes the lesser, but if that's your position, it is what it is.
BY MR. PHILLIPS:
Q Did you ask Mr. Rhoads to do an on-camera interview for your reporting on Dr. Chen?
A Yes.
Q Was he agreeable to that? Was he reluctant? How would you characterize his participation?
A I think initially he was somewhat reluctant, but did ultimately agree to do the interview.
Q Did you ever share any drafts of your digital stories or the broadcast story scripts about Dr. Chen with Mr. Rhoads before publication?

Page 177

A I don't recall, no.
Q You don't recall or no?
A It would, it wouldn't -- I, I don't believe so, no.
Q Did Mr. Rhoads ever make any suggestions to you about the final content of the digital stories or broadcast reports about Dr. Chen?
A What do you mean by "suggestions"?
Q In terms of what to include, what not to include; what to emphasize, what not to emphasize.
A Well, speaking broadly, when you're dealing with sources, your communications are about accuracy.
Q Was there ever any piece of information that Mr. Rhoads said to you I prefer that you not include that in your published reporting?
A Not that I recall.
Q Okay. What about the identity of Agent Pappa?
MR. PHILBIN: Again, objection. We're going back to the same issue.
MR. PHILLIPS: Well, I'm trying to square that with her testimony that Mr. Rhoads never did make any such suggestions about what to include in the story, so --
MR. PHILBIN: Her testimony was she couldn't

recall any, and you've asked now to go back to the Agent Pappa issue to which I objected before.
BY MR. PHILLIPS:
Q Okay. Have you ever spoken to Agent Pappa?
A At the wedding where I met him.
Q And that was the first time -- was that the first time you ever heard the name -- well, strike that.
Were you aware of Agent Timothy Pappa prior to meeting him in person at Mr. Rhoads' wedding?
A I don't recall.
Q Well, do you recall if the wedding was before or after April 2015 when you --
A I don't, actually.
THE REPORTER: I didn't get the end of the question. "Before or after April 2015 when you" --
BY MR. PHILLIPS:
Q When you mentioned Agent Pappa in your reporting on Xiaoming Gao.
A I don't recall.
(Exhibit 12 was marked for identification.)
BY MR. PHILLIPS:
Q I'm going to hand you what we've marked as


Plaintiff's Exhibit 12.
Oh, I'm sorry. I'll give you a different copy. That's my copy. I'm going to hand you a clean copy of what we marked as Plaintiff's Exhibit 12.
Do you recognize this as an exchange of emails between you and Mr. Rhoads in February of 2017?
A Yes.
Q And it looks like on February 20, 2017, you asked Mr. Rhoads the date of his wedding.
Do you see that?
A I do.
Q And he responded that his wedding was August 22, 2015?
A Yes.
Q Does that sound accurate to you?
A Yep, must have been.
Q Do you know why you were asking Mr. Rhoads about the date of his wedding in February of 2017?
A I don't, actually.
Q Looks like you sent that email about four days before your first digital and broadcast stories about Dr. Chen were published.
Was this in any way related to your reporting on Dr. Chen?
A Not that I recall. I think his wife was


sick at that time.
Q So if the wedding was in August of 2015, that actually would have been after you mentioned Agent Pappa in your reporting on Xiaoming Gao in April of 2015, correct?
A Yes.
Q So that suggests that you at least had some understanding of --
A Yes.
Q -- who Agent Pappa was before you met him in person at the wedding?
A Yes.
Q Prior to meeting him in person at the wedding, had you ever spoken to Agent Pappa?
A Not that I recall.
Q You said that you're aware he was at Mr. Rhoads' wedding?
A Yes.
Q How is it that you were aware of that? Were you introduced to him?
A I think we were at the same table.
Q Oh, really?
A He and his wife.
Q Okay. Did you speak with him about Dr. Chen during the wedding at all?


A No.
Q At the time of the wedding, were you aware of Agent Pappa's role in the Chen investigation?
A I think so.
Q But you never, during the entire evening, mentioned Dr. Chen or your reporting to him?
A It was a wedding.
Q Okay. Do you know whether he was aware that, at the time, you were reporting on Dr. Chen?
A I don't know.
Q So you told me that during the wedding on August 22, 2015, you had no conversations with Agent Pappa about -- in any way related to Dr. Chen; is that accurate?
A To the best of my recollection.
Q What about subsequent to the wedding; have you ever had any conversation or communication with Agent Pappa relating in any way to Dr. Chen?
MR. PHILBIN: Objection. That would get into identifying sources potentially for the story, so it's covered by the privilege.
BY MR. PHILLIPS:
Q Are you going to decline to answer my question?
A Yes.

Q Have you ever had any nonconfidential communications with Agent Pappa relating to Dr. Chen?
MR. PHILBIN: Again, objection, because the privilege applies to both confidential and nonconfidential communications. We're here because we have to preserve that objection to get appellate review. So based on the privilege, I'm objecting.
BY MR. PHILLIPS:
Q But I haven't asked about the substance of any communication in terms of news gathering. I merely asked whether you've ever had communication with Agent Pappa that was not subject to any agreement of confidentiality relating to Dr. Chen.
MR. PHILBIN: But if it's relating to Dr. Chen, it has to do with the news gathering process for the story.
MR. PHILLIPS: But I didn't ask, I didn't ask what they talked about, what information he provided.
MR. PHILBIN: And I'm still going to object, because it would lead to information for identifying sources for the story.
BY MR. PHILLIPS:
Q So if you ever had a communication with


Agent Pappa relating to Dr. Chen that was not subject to an agreement of confidentiality, you still would not testify today about that conversation; is that correct?
MR. PHILBIN: If it was tested -- the question was, I believe, Counsel, relating to Dr. Chen, so it's relating to the story.
BY MR. PHILLIPS:
Q If you had any communications with Agent Pappa at any time relating to Dr. Chen that were not subject to an agreement of confidentiality, am I correct that you are still going to decline to testify about those conversations today?
A I'm going to take the advice of my attorney.
Q And decline to answer the question?
A Yes.
Q Was it Mr. Rhoads that informed you of the U.S. Attorney's Office's decision not to prosecute Dr. Chen?
A I can't recall whether we discussed that in the interview that we did.
Q Okay.
A But we discussed it.
Q You did discuss it with Mr. Rhoads. Do you know if he was the one who informed you the


prosecutors had made the decision not to prosecute Dr. Chen?
A Yes.
Q Yes, he was?
A (Nods.)
Q Did he tell you where he learned that information?
MR. PHILBIN: I'm going to object to the extent that that would lead to revealing a confidential source.
BY MR. PHILLIPS:
Q Well, but I'm asking about Mr. Rhoads' source, not Ms. Herridge's.
I asked: Did Mr. Rhoads tell you where he learned the information that you just testified he provided to you?
A No.
Q No, he did not?
A No.
Q Did Mr. Rhoads ever convey to you his understanding of Agent Pappa's feelings about the decision not to prosecute Dr. Chen?
A Based on what I knew at the time, the agents, including Agent Pappa, were frustrated by the decision, yes.


Q From your understanding, why did Mr. Rhoads cooperate with your reporting on Dr. Chen? Did you have a sense of what he hoped to achieve?
MS. VIGEN: Objection; calls for speculation.
BY MR. PHILLIPS:
Q You can answer.
MR. PHILBIN: You can answer.
THE WITNESS: All right. I think he was very concerned about national security, issues related to our service members and the security of their personal information and research.
BY MR. PHILLIPS:
Q Was Mr. Rhoads upset about the Department of Defense's funding of UMT via the tuition assistance program?
A Well, as he states in our television report, he says, to paraphrase it, it was a bad deal for the service members and a bad deal for the taxpayers.
Q Was it your understanding, based on your conversations with him, that one of the goals he hoped to achieve by cooperating with your reporting was revocation of that DOD tuition assistance funding?
MS. VIGEN: Objection; calls for speculation to the extent he didn't say any of these things

to her.
BY MR. PHILLIPS:
Q You can answer.
A He was very concerned that the U.S. government was funding an operation that he believed put service members' personal information and their research at risk.
Q And did he convey to you, in sum or substance, that bringing publicity to the investigation of Dr. Chen could help to achieve a revocation of that DOD funding?
A When someone goes on the record with you, by its very nature, their goal is to bring more attention, to shine a spotlight on the situation.
Q And did he hope that by -- did he convey to you that he hoped that by shining a spotlight on the situation, that might help to encourage the Department of Defense to suspend or revoke its funding of UMT?
A I think I've respectfully already answered your question. He was deeply concerned about what he thought was the poor stewardship of U.S. taxpayer dollars for a school that he believed put national security interests, military service members' records at risk.
Q And is it your understanding that he


believed that he could effect change in that regard by helping to shine a spotlight on the issue via your reporting?
A Any whistleblower who comes forward, in my experience -- and this is certainly not the first whistleblower I have ever dealt with -- they do so at great personal risk, because they believe that the larger principle is more important.
Q I guess I'm going to have to keep asking it until I get a direct answer, but my question really is: Did you ever have any discussions with Mr. Rhoads wherein he indicated that he believed or hoped that participating in your reporting could lead to a decision by the Department of Defense to suspend or revoke funding to UMT?
A It's very difficult for me to answer a question about Mr. Rhoads' intent beyond what I've already told you. He was deeply -- let me finish please. He was deeply concerned about the stewardship of taxpayer dollars at an institution that he believed was putting service members' personal information and their research at risk. I think his own words sum up his view, which was it was a bad deal for the service members and for the taxpayer.
Q Mr. Rhoads' view, as conveyed to you, was


that the DOD should not be providing tuition assistance funding to UMT; is that fair?
MS. VIGEN: Objection. That's not her testimony.
BY MR. PHILLIPS:
Q I just asked if that's a fair characterization.
A He was very concerned that U.S. taxpayers were funding a school that created national security risks, in his view.
Q And he felt that the DOD should not be providing that funding, correct?
MS. VIGEN: Objection; calls for speculation.
BY MR. PHILLIPS:
Q Is that your understanding based on your many conversations with Mr. Rhoads about the subject?
A I feel uncomfortable making an assessment of Mr. Rhoads' intentions and motivation.
Q So my question is a little bit different, though. I'm asking you what Mr. Rhoads conveyed to you in terms of his motivations and intentions.
Did Mr. Rhoads ever convey to you, in sum or substance, that he hoped that his participation with your reporting would lead to a revocation or


suspension of UMT's Department of Defense funding?
A Again, I, I feel somewhat uncomfortable answering what his intentions were, but he made very clear to me that he was distressed, concerned about the fact that UMT was being financed by the U.S. government.
Q And he hoped to put a stop to that, correct?
MS. VIGEN: Objection; calls for speculation.
BY MR. PHILLIPS:
Q Let me rephrase.
Did he ever convey to you that he hoped that his participation with your reporting would put a stop to that funding?
A He was very clear with me that he hoped that this would bring attention to the issue, and he was encouraged by the congressional participation.
Q Did Mr. Rhoads, in fact, help you to engage with congressional offices to bring more attention to the Department of Defense's funding of UMT?
A My recollection is that he did engage with members of Congress. There may have been a few emails where he connected us with those offices, but there was also interest beyond Mr. Rhoads' efforts.
Q What was your understanding of why

Mr. Rhoads was undertaking those efforts?
A I'm going to say it again, respectfully.
He was deeply concerned about U.S. taxpayer money funding a school which he felt created national security risks for service members and their research.
Q Did you ever have any conversations with Stephen Rhoads about the prospect or potential of the Department of Defense revoking UMT's tuition assistance fund?
A It was one of a number of options that could have been reached by the Defense Department.
Q Did you have a conversation or multiple conversations with Mr. Rhoads about that, that that could be an outcome of your reporting?
A When you're dealing with any whistleblower, it's not uncommon for them to ask you what you think could happen here.
Q Okay, but my question was: With respect to Mr. Rhoads, did you and he ever have a conversation about the potential or prospect for the Department of Defense to revoke UMT's tuition assistance fund? Is that a conversation you two ever had?
A It was always a possibility that the money could be terminated or diminished.
Q And you and Mr. Rhoads discussed that



possibility?
A Certainly.
Q And did he express a favorable view of that prospect or an unfavorable view of that prospect to you?
A I think Mr. Rhoads' words speak for themselves in the broadcast.
Q I'm not asking you about Mr. Rhoads' words in the broadcast.
I asked you: Did Mr. Rhoads ever convey to you that he had a favorable or unfavorable view of the prospect that the Department of Defense might revoke UMT's tuition assistance funding?
A I keep coming back to the same thing. I'll a little concerned about characterizing his conversations and what his intent was.
Q Yeah, but I'm asking you about conversations you were a part of, so I need you to answer that question.
A So ask me the question again.
Q Let's go back.
You testified that you did, in fact, have conversations with Mr. Rhoads about the fact that your reporting could potentially lead to the DOD to revisit its decision to give tuition assistance funding to



UMT, correct?
A Yes.
Q Okay. In the course of those conversations, did Mr. Rhoads convey to you in any way that he hoped that would happen, that he hoped that would not happen, that he thought that would be a good thing, that he thought that would be a bad thing? Did he express any value judgment whatsoever about the prospect of the Department of Defense revoking tuition assistance funding to UMT, ever in any conversation with you?
And I'm asking you that question under oath, Ms. Herridge.
A Yes. He -- you know, my impression, my memory is that he preferred to see an outcome when there was no longer government funding for the school.
(Exhibit 14 was marked for identification.)
BY MR. PHILLIPS:
Q I'm going to hand you what we've marked as Plaintiff's Exhibit 14.
MR. PHILBIN: I take it this is not subject to the protective order?
MR. PHILLIPS: It does not have a stamp on it. It was produced by Mr. Rhoads. They are



text messages between Mr. Rhoads and Ms. Herridge.
(Witness peruses document.)
BY MR. PHILLIPS:
Q Ms. Rhoads -- I gotta stop doing that. Ms. Herridge, let me know when you're ready for me to pose a question.
A All right. Just a minute. I'm just going to look through this.
(Witness peruses document.)
THE WITNESS: I think you've given me two copies.
BY MR. PHILLIPS:
Q I didn't intend to. You have two copies of Plaintiff's Exhibit 14?
A Yes.
Q So as I mentioned, this is a document that was produced by Mr. Rhoads, and I understand it to be text messages between you and Mr. Rhoads.
Having had a chance to review the document for a few minutes, do you agree with that characterization?
A Yes.
Q Okay. I'd like to direct you to the page that has -- well, let me back up.

Page 194

Since this is your first deposition, you may not know this, but these numbers in the bottom right are referred to as Bates numbers.
A Okay.
Q Can I ask you to turn to the Bates Rhoads 80.
MR. PHILBIN: Counsel, before you proceed, can I just clarify? This document also seems, towards the end at Bates 103, 104, to have text messages from someone else.
MR. PHILLIPS: Oh, that's true. I believe it's Pamela Browne. I don't know why these were combined into one document, but I'm only going to ask about Ms. Herridge's communications with Mr. Rhoads.
BY MR. PHILLIPS:
Q And so we're clear on which is which, Ms. Herridge, the number that you see at the top, (917)328-4691; is that your cell phone number?
A Yes.
Q Is that still your cell phone number?
A No.
Q That was the Fox one?
A Yes.
Q Gotcha. Okay.

Page 195

So on the page Rhoads 80, do you see that on Sunday, April 9, 2017, at 5:28 p.m., you sent a text to Mr. Rhoads, that says, "DOD confirmed Friday, UMT under review due Fox report. That review continues. Who can we contact in the reserves who showed interest?"
A Yes.
Q So it looks like you were informing Mr. Rhoads on April 9, 2017, which was a Sunday, that on Friday, the Department of Defense confirmed to you that they had put UMT's funding under review?
A Yes.
Q It says "under review due Fox report." Is that meant to say "due to Fox report"?
A Yes.
Q So you were conveying to Mr. Rhoads in this text message that the Department of Defense had put UMT's funding under review due to your reporting?
A Yes.
Q Why were you informing Mr. Rhoads of that?
A He expressed an interest in knowing if there were any developments as a result of the reporting.
Q Including as to the funding of UMT by the Department of Defense?
A All developments.

Page 196

Q Is it your understanding that ultimately the Department of Defense did revoke its Memorandum of Understanding with UMT that allowed UMT to receive tuition assistance funding?
A Yes, there was a publicly available statement with its finding.
Q Is it your understanding that your reporting played a role in that decision?
A I don't know what the internal DOD factors were that helped them reach that conclusion.
Q Did you ever speak with James Gillis in your, in connection with your reporting on Dr. Chen?
MR. PHILBIN: Object to the extent that could involve confidential communications.
THE WITNESS: I don't recall speaking with Mr. Gillis. It's possible, but I don't recall.
BY MR. PHILLIPS:
Q Do you know if you ever reached out to his office for comment on your reporting on Dr. Chen?
A Yes, on several occasions.
Q And did they provide you a statement, or did they decline to comment?
A I think generally they declined to comment. They might have provided some verbiage about -- as they do in these cases, but that's my recollection.

Page 197

Q Did you ever speak with the U.S. Attorney General about Dr. Chen?
A U.S. Attorney General?
Q Yes.
A At that --
Q At that time.
A At that time.
Q This would have been in 2017.
A That would have been --
Q Jeff Sessions.
A Jeff Sessions. I, I recall seeing him at Fox News. I think he was doing a guest segment. I may have alerted him to some recent reporting we had done, but I don't know if there was anything further that developed from that.
Q Okay. Do you recall in February of 2017 having a conversation with Attorney General Sessions that lasted an hour or so?
A 2017?
Q Yes.
A What was the date?
Q February of 2017.
A February of 2017. Boy, an hour. I don't recall an hour. I recall seeing him at the Fox News office.

Page 198

Q You don't recall doing an interview with him or anything like that in that time frame?
A My, my recollection is that he was doing a guest segment.
Q Does the phrase "Sex, Lies and Chinese Spies" mean anything to you?
A No.
Q Was that ever like a working title for any of your reporting with Dr. Chen or otherwise?
A Not that I recall, no.
Q In the April 2017 broadcast report that we reviewed earlier about the congressional committee looking into Dr. Chen and UMT, there's an interview of Congressman Chaffetz included in that report.
A Yes.
Q Do you remember that?
A Mm-hmm.
Q Did you conduct that interview?
A Likely.
Q I think -- we don't necessarily need to go back and look at that. That looked like it took place maybe in the Capitol building.
A It was on Capitol Hill. It may have been me. Would not have been unusual if it was me.
Q Okay. Do you know if that was a planned or

Page 199

coordinated interview, or did you catch him in the halls, any reflection of that?
A No. Obviously my reputation precedes me, right?
I think I requested the interview. At that time, my memory is that he was the chairman of the oversight committee. Is that correct?
Q That sounds right.
A Yes. Okay.
Q If we could take one more look at Plaintiff's Exhibit 14, the text messages with Mr. Rhoads.
A Okay.
Q Can I ask you to look at page Rhoads 76, five pages earlier than we were before.
Starting at the bottom of page 76 and continuing on to 77, do you see that on February 27, 2017, Mr. Rhoads texted you about someone named Barb Baker who works for Mr. LaHood?
A Mine is cut off here.
Q If you go to the next page, you'll see that somehow --
A Oh, I see it there. Pardon me. Yep. Okay. Yep.
Q And he provided a phone number, it looks

Page 200

like, for that person?
A Mm-hmm.
Q Do you know who that was that Mr. Rhoads was suggesting you talk to?
A My recollection is that Barb Baker worked in Representative LaHood's office at that time.
Q Mr. LaHood being a congressman from Illinois?
A Yes.
Q Do you know why Mr. Rhoads was suggesting that you speak to someone in Representative LaHood's office?
A My recollection is that he had made contact with his office, or his office had expressed an interest in the story. I don't recall which it was.
Q So I take it this is in the wake of the first digital and broadcast report, right? That was February 24, 2017, and these texts are on --
A Yes.
Q -- February 27, so just a few days later, right?
A Yes.
Q So is it fair to say that after the original stories were published, Mr. Rhoads was working with you to try to bring congressional attention to the

Page 201

issue?
A Well, he was certainly trying to bring congressional attention to the issue, and if he made contact with an office, he would forward -- in this case, it appears he's forwarded that information to me. I don't recall Congressman LaHood becoming involved in the case.
Q Did Mr. Rhoads ever ask you to provide him with any documents or materials that you gathered in the course of your reporting on Dr. Chen?
A Not to my recollection, no.
Q Did you ever provide any documents to Mr. Rhoads pertaining to Dr. Chen?
A No, not that I recall.
Q I mentioned earlier that Mr. Rhoads testified about coming to the Fox News offices and viewing some materials pertaining to Dr. Chen that he had.
Do you recall that?
A Yes.
Q And that was not a clear question. I meant not the question I asked earlier, but do you recall the meeting itself with Mr. Rhoads?
A Yes.
Q And did you, in fact, at Fox News offices

show him some of the materials that you had gathered regarding Dr. Chen?
A Yes. What I, what I don't know is whether this was in the course of the on-camera interview.
Q You don't have a recollection of whether there was a separate meeting where you and Mr. Rhoads looked at things like photographs and immigration records pertaining to Dr. Chen?
A I think we, we met a few times.
Q Is that something that you would have done in the course of your meetings with Mr. Rhoads, looked at those kinds of materials?
A In my investigations, it would not be uncommon to meet with a central interview a couple of times in advance of sitting down with them.
Q Okay. When you showed those kinds of materials to Mr. Rhoads, did you have an understanding of whether he had seen them before? I'm speaking specifically of the photographs, the immigration records, and the FBI interview summaries.
MR. PHILBIN: I'm going to object to that, because it could tend to go to revealing the source.
BY MR. PHILLIPS:
Q Are you going to decline to answer that



question, Ms. Herridge?
A Respectfully, yes.
MR. PHILLIPS: I believe I'm getting close. Why don't we take a ten-minute break for me to go over my notes and go from there.
MR. PHILBIN: Okay.
THE VIDEOGRAPHER: Off the record at 3:19.
(Whereupon, a short recess was taken.)
THE VIDEOGRAPHER: We are back on the record at 3:39.
BY MR. PHILLIPS:
Q All right, Ms. Herridge, hopefully just a few more questions for you.
I had asked you about whether you spoke with Mr. Rhoads about this lawsuit. I want to ask you more broadly, other than your counsel, of course: Who have you spoken to, if anyone, regarding Dr. Chen's lawsuit against the government?
A After there was an initial round of media stories about it, I had people at work ask me, and I just directed them to what's in the court record.
Q Okay. Outside of folks at work, anyone else?
A I've spoken with my husband about it.
Q What about -- I'm not asking for names yet,



but what about any sources for your reporting on Dr. Chen?
A No.
Q Was it ever contemplated that the reporting on Dr. Chen would be part of a broader series or reporting effort than solely focusing on Dr. Chen?
A By, by Fox News?
Q Yes.
A You know, it's possible.
Q I'm asking if you recall anything in that regard.
A I, I don't recall that there were, you know, substantive conversations about doing that.
Q Okay.
We spoke earlier about your reporting on Xiaoming Gao. Did you ever have any conversations with Mr. Rhoads connecting the Gao reporting to your Chen reporting?
A My recollection is that she was a, you know, a translator, and the, the office explained she was a contract worker; I believe is in the same building as UMT.
Q Okay, and you think you had conversations with Mr. Rhoads about that?
A I may have, or I may have, you know, I may



have Googled it and found the address. I think the unsealed records identify where she worked, I think. I think.
Q Did you ever have any conversations with Mr. Rhoads where you discussed the fact that the, one of the principal FBI investigators in the Gao case, Agent Pappa, was also a lead investigator on the Chen case?
A I, I knew that he was involved in both cases. I may have discussed it with Mr. Rhoads. I'm not sure whether I knew that from the documents or whether I knew that initially or independently from Mr. Rhoads.
Q Okay. You don't recall ever having any conversations with Mr. Rhoads about the fact that Agent Pappa was heavily involved in both investigations?
A I probably did at some point.
Q Do you recall any substance?
A What I knew is that he was one of the principal investigators in -- I would say in both cases.
Q And in both cases, Agent Pappa was frustrated by the outcome, meaning the outcome of no prosecution?

Page 206

A I think that's a fair assessment.
(Exhibit 1 was marked for identification, redacted version.)
BY MR. PHILLIPS:
Q I want to hand you -- Ms. Herridge, I earlier handed you a document that I had introduced as Plaintiff's Exhibit, but I had to claw it back because it was not a properly redacted document.
I'm going to hand you our new Plaintiff's Exhibit 1. This is the public redacted version of the United States District Court for the District of Columbia's August 1, 2023 Order in this case.
Do you recognize it?
A Yes.
Q Obviously, today I've asked you a lot of questions about who may have provided you Privacy Act protected material regarding Dr. Chen, and you've declined to answer those questions.
Is that fair?
A Yes.
Q And your basis for doing so is a First Amendment right or privilege?
A Yes.
Q All right. Looking at the Order, I'd like you to take a look at the last sentence on the first

Page 207

page, and I'll go ahead and read it for you.
It says, "But applying the binding case law" -- let me actually read that whole paragraph.
It says, "The Court recognizes both the vital importance of a free press and the critical role that confidential sources play in the work of investigative journalists like Herridge, but applying the binding case law of this Circuit, the Court concludes that Chen's need for the requested evidence overcomes Herridge's qualified First Amendment privilege in this case. The identity of Herridge's source is central to Chen's claim, and despite exhaustive discovery, Chen has been unable to ferret out his or her identity. The only reasonable option left is for Chen to ask Herridge herself."
Do you understand that the court in this case ruled that, in fact, your First Amendment objections to identifying your source or sources was overcome?
A Yes, in this opinion.
Q And that Dr. Chen was entitled to obtain that information from you in a deposition, correct?
A Yes.
Q Despite the District Court's conclusion, you have declined to comply with that order here today; is

Page 208

that fair?
A Yes. I'd like to say what I said earlier, which is I have complete respect for this court and its authority and the Order, and I have no desire to defy a court order, but my understanding is that the courts have ruled that in order to seek judicial, further judicial review on this matter, I must now defy the Order of this court, and for that reason, I'm respectfully invoking my First Amendment rights and declining to answer those questions.
MR. PHILLIPS: Ms. Herridge, I want to thank you for your time today. I have no more questions today. Obviously, Dr. Chen reserves her right to seek further relief from the court and to continue this deposition at a further date, but no more questions for today.
MR. PHILBIN: Okay. The government?
MS. VIGEN: Yes, just a little bit.
* * * * *
EXAMINATION BY COUNSEL FOR DEFENDANTS
BY MS. VIGEN:
Q Good afternoon, Ms. Herridge. I'm Leslie Vigen with the U.S. Department of Justice. We represent the defendants in this case, and I'm just going to ask you a couple of additional questions.

Page 209

A Okay.
Q I'd like you to turn to what the plaintiffs have marked as Exhibit Plaintiff's Exhibit 2, which is the first Fox News online report published February 24, 2017.
A Yes.
Q Thank you.
Now, we've talked a lot today about a number of documents and photos referenced in the several Fox News reports, and I'm just going to start with one photo.
I'd like you to look at that exhibit, Plaintiff's Exhibit 2, and look at the first photo contained on that page, which is described in the article here as a photo that, quote, "shows Frame saluting his wife, Chen, who is holding a uniform."
Do you see the photo to which I'm referring?
A Yes.
Q Would you have, without this photo, published this report about Chen?
MR. PHILLIPS: Objection to form. Calls for speculation.
MR. PHILBIN: And I'll object, because it goes to editorial decision-making and for a view on editorial decision-making that may be

protected by the privilege.
BY MS. VIGEN:
Q And are you going to decline to answer that question on advice of your counsel?
A Respectfully, yes.
Q Ms. Herridge, I've discussed with your counsel, with Mr. Philbin, we intend to ask a number of questions about all of the documents that have been discussed during this deposition, that will be requesting essentially the same information as to each of these documents.
It's my understanding that Mr. Philbin will lodge the same objection to each of these documents, and perhaps Mr. Phillips will do the same if you like.
Is that fair?
MR. PHILBIN: It is. I will lodge the same objection.
MR. PHILLIPS: I may -- my objection went to speculation. I may or may not lodge that objection, but if where we're going is -- and understanding that if you were to ask those questions, Mr. Philbin would object and the witness would decline to answer, I have no objection to agreeing that you don't need to do that for every document and picture.



MS. VIGEN: Thank you, Mr. Phillips. That is where we're going.
BY MS. VIGEN:
Q Ms. Herridge, sort of the same question as to you: Would you also follow your counsel's advice as to declining to answer each of those questions based on Mr. Philbin's objection?
A Yes, I would.
MS. VIGEN: So based on previous discussions with Mr. Philbin and our discussions on the record here, we're going to reserve our right to ask those questions, should the, should the court rule that your First Amendment objections are overruled, should a higher court, should the DC Circuit rule that.
And we will also ask the same question as to the documents collectively, and I'll ask: Is it, is it correct to say that you would lodge the same objection to the question, in light of all of these documents, if these documents were not in your possession, would you have still published the story?
Would you lodge the same objection to that question?
MR. PHILBIN: I believe so. Just to



clarify, what you'd be asking is if everything that the plaintiff claims is covered by the Privacy Act, if all of that were excised, would they still have published the story?
MS. VIGEN: That's right. Thank you for asking the question in a clearer way than I did.
MR. PHILBIN: I would make the same objection, yes.
BY MS. VIGEN:
Q And would you also decline to answer that question based on advice of counsel?
A Yes.
MS. VIGEN: That's all we had. We wanted to put on the record that we intend to ask those questions, should the court overrule the First Amendment arguments here, and that's all the government has, unless -- that's all the government has. Thank you.
* * * * *
EXAMINATION BY COUNSEL FOR DEPONENT
BY MR. PHILBIN:
Q Okay. I'll be very brief. Just a few questions.
Ms. Herridge, earlier I think you were confused temporarily about some timing, and I wanted



to give you an opportunity to clarify.
When Mr. Phillips was asking you about some documents, and you at one point said "earlier this year" and then clarified that you meant early in 2022.
Can you just explain what is it that makes you clear about the timing? What are the events that --
A It had been five years since the story had been published, and I just want to be clear that I would in no way destroy any records or delete any records, having received a subpoena, and that was true in this case.
Q And you received the subpoena in June of 2022?
A I believe it was June of 2022, yes.
Q Okay. I'm going to hand you -- now, these are not premarked. I guess first a question.
Did there ever come a time when you were concerned about some concerning events that, in your mind, might be connected to this case?
A Yes.
(Deponent Exhibit 1 was marked for identification.)
BY MR. PHILBIN:
Q So I handed you a document that's now been

Page 214

marked as Exhibit deponents 1.
Do you recognize this document?
A Yes.
Q And what is it?
A It's a Washington, D.C. police report.
Q Can you tell us what the event was that caused you to file this police report?
A In late May of last year, my vehicle was broken into and ransacked. Whoever went into the vehicle opened the mail inside the vehicle and also took a legal pad that had some of my reporters' notes on it. There was money in the vehicle, but it was untouched.
Q So the only thing that was taken was a legal pad with some of your notes on it?
A To the best of my knowledge, yes.
Q And were there other cars parked on the street at the time?
A There were.
Q What sort of car is your car?
A I have a white Honda Fit. It's a 2014 or a 2015.
Q And were there other cars parked in proximity to it?
A Yes. The cars that were immediately next to

Page 215

my car on the same side of the street and then across the street were high-end sports cars.
Q And were they broken into or damaged in any way?
A They were not.
Q Did this lead you to believe that your car in particular was targeted?
MR. PHILLIPS: Objection; form. Calls for speculation.
BY MR. PHILBIN:
Q Just what you believed at the time.
A I believed that the vehicle, my vehicle, had been targeted, yes.
Q On page 2 of this exhibit, there is a box that says "Narrative" above it.
Do you see that?
A I do see that.
Q So if you could sort of skip to the second line, there's a sentence starts "The following morning."
A Yes.
Q Could you just read from there to the end?
A "The following morning, I found the rear passenger window was smashed in, with all glass removed from the window. Appears my vehicle was

Page 216

targeted by individual/individuals searching for business records, computers, electronics. For example, all mail was opened with contents scattered around the vehicle. No money was taken. Break-in may be effort to intimidate, pattern of harassment related to my work. Two BMWs next to my vehicle were not broken into."
MR. PHILBIN: And then if I could have this marked as deponent's Exhibit 2.
(Deponent's Exhibit 2 was marked for identification.)
MR. PHILLIPS: I'm going to object to this line of questioning on relevance grounds, but go ahead.
BY MR. PHILBIN:
Q I've handed you what's been marked as Deponent's Exhibit 2.
Can you identify these documents?
A Yes. The first photo is a photo that I took on the morning I discovered the break-in. That's the rear left window that had been smashed in. Page 2 captures the ransacking of the vehicle, as does page 3. On the upper part of page 3, I think you can start to see some of the personal mail.
Fourth page, it's the personal mail, and

Page 217

then the last page shows you the proximity of my vehicle to the other two sports cars that were on the road.
And I'd also just draw your attention to the side mirror. It's what I would call an in-city car. It has a lot of dings and is missing a part right there as well, so this is quite a different vehicle.
Q Not an expensive looking vehicle?
A No. That's correct.
Q Was there any other incident around this time that caused you some concern?
MR. PHILLIPS: Objection; form. Relevance.
BY MR. PHILBIN:
Q You can answer.
A About two days after my car was broken into, it was very early in the morning, about 6:00 a.m., and I was leaving the house to go running in the park, which is my usual habit, and as I came out of the house and entered into Rock Creek Park, I looked over and I saw a man crouched in the bushes with a camera aimed at our home.
I saw him quickly. He may have been Asian, he may have been Hispanic, but as soon as he realized that I had seen him, he fled on foot.
Q And did you say anything at the time, make

any utterance?
MR. PHILLIPS: Objection; form, relevance.
THE WITNESS: I screamed.
BY MR. PHILBIN:
Q And then, and then what?
MR. PHILLIPS: Same objection.
THE WITNESS: I kept running into the park.
This event was deeply distressing to myself and to our children. Our youngest son is a special needs child, and for people's full context, he nearly died as a baby, and I gave the liver for his liver transport, and he is deeply connected to me and relies on me completely.
So when he perceives a threat to me, he takes it very personally, and this was very distressing for him, and he's a child that already struggles.
BY MR. PHILBIN:
Q And have you ever had anything like this occur at any other point in your career?
MR. PHILLIPS: Objection; form rales.
THE WITNESS: Not, not in the 35 years that I have worked, no.



BY MR. PHILBIN:
Q And was there anything that, in your mind, at the particular time these two events happened so close to each other, that connected it to this case?
MR. PHILLIPS: Objection; form, relevance, calls for speculation.
THE WITNESS: My recollection is that I had heard from one of my team members on this reporting that they had been served with a subpoena, and my belief, based on the proximity of these events, is that to say they are all a coincidence is to disconnect the dots.
BY MR. PHILBIN:
Q Okay. Then the last thing just generally I wanted to ask you is, I know that you've made it clear on the record that you respect the court's order and you have no desire to disobey it, but the courts have effectively told you that the only way you can get judicial review is to disobey the order.
Are there other factors that make you think it's particularly important in this case for you to protect the confidentiality of your sources and therefore to insist on having judicial review?
MR. PHILLIPS: Objection; form.
THE WITNESS: There are two factors. The



first is that there really is a sacred trust between reporters and their sources, and this is true for me and other journalists that work, and I remain committed to that pledge in this story and all of the reporting that I do.
And the second reason is, based on my reporting in this case and the Defense Department's publicly available finding that denied your client money on a national security grounds, it is my belief that she was a colonel in the Chinese military, and that she was engaged in espionage.
MR. PHILBIN: Thank you. I don't have any other further questions.
MR. PHILLIPS: Nothing further from me.
THE VIDEOGRAPHER: Read and sign?
MR. PHILBIN: Well, subject to being able to review the transcript.
THE VIDEOGRAPHER: We are off the record at 4:00.
(Discussion held off the video record.)
MR. PHILLIPS: What's the standard turnaround versus a rush?
THE REPORTER: The standard turnaround is two weeks.



MR. PHILLIPS: Can I get it a little sooner than that?
THE REPORTER: Well, what would you like, Mr. Phillips?
MR. PHILLIPS: Is early next week possible?
THE REPORTER: Yes.
Mr. Philbin, do you want a copy of the transcript?
MR. PHILBIN: Yes, please.
THE REPORTER: And Ms. Vigen, do you -- does the Department want a copy of the transcript?
MS. VIGEN: Yes, we do. Yes, please. Thank you.
THE REPORTER: And Mr. Phillips wants it on an expedited basis. Do you two also want it on an expedited basis, which means next Monday?
MS. VIGEN: We don't need it expedited.
MR. PHILBIN: We'd like it at the same time.
THE REPORTER: Okay.
(Signature having not been waived, the video deposition of CATHERINE HERRIDGE was concluded at 4:00 p.m.)

ACKNOWLEDGEMENT OF WITNESS

I, Catherine Herridge, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any corrections appear on the attached Errata sheet signed by me.

__________________ ______________________________

(DATE) (SIGNATURE)



E R R A T A S H E E T

IN RE: Yanping Chen vs. FBI, et al

RETURN BY:

| PAGE | LINE | CORRECTION AND REASON |
|---|---|---|
| ____ | _____ | ____________________________________ |
| ____ | _____ | ____________________________________ |
| ____ | _____ | ____________________________________ |
| ____ | _____ | ____________________________________ |
| ____ | _____ | ____________________________________ |
| ____ | _____ | ____________________________________ |
| ____ | _____ | ____________________________________ |
| ____ | _____ | ____________________________________ |
| ____ | _____ | ____________________________________ |
| ____ | _____ | ____________________________________ |
| ____ | _____ | ____________________________________ |
| ____ | _____ | ____________________________________ |
| ____ | _____ | ____________________________________ |
| ____ | _____ | ____________________________________ |
| ____ | _____ | ____________________________________ |
| ____ | _____ | ____________________________________ |
| ____ | _____ | ____________________________________ |
| ____ | _____ | ____________________________________ |
| ____ | _____ | ____________________________________ |

_______ _________________________________________

(DATE) (SIGNATURE)



CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC

I, Laurie Donovan, Registered Professional Reporter, Certified Realtime Reporter, and notary public for the District of Columbia, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 2nd day of October 2023.

My commission expires: July 14, 2027

*Laurie Donovan*

LAURIE DONOVAN
NOTARY PUBLIC IN AND FOR
THE DISTRICT OF COLUMBIA

## Exhibits

**EX 0001 Catherine Herridge DEPONENT'S 092623**
5:17 18:22 206:2,10 213:22

**EX 0001 Catherine Herridge PTLF 092623**
5:20 24:1,5,6 26:25 28:10 33:4,20 34:25 36:8,16 37:5 38:4,19,24 40:4 42:12,20 49:13 52:20 59:4 69:7 84:13,15 209:3,13 216:9,10,17

**EX 0002 Catherine Herridge DEPONENT'S 092623**
6:3 62:24 63:3,6 64:16 68:6 71:17 118:4,18 119:17,23

**EX 0002 Catherine Herridge PTLF 092623 (1)**
6:8 73:8,11,13,17 79:10 83:22 84:6,7 88:23 92:15 97:17 106:14

**EX 0003 Catherine Herridge PTLF 092623**
81:22 82:3

**EX 0004 Catherine Herridge PLTF 092623 FD**
6:12 110:1,3,10,13 113:19 115:2 116:5 119:13,22 120:20

**EX 0006 Catherine Herridge PLTF 092623 FD**
6:14 158:20,21,22 159:1 166:19

**EX 0007 Catherine Herridge PTLF 092623**
6:14 158:20,21,22 159:1 166:19

**EX 0010 Catherine Herridge PTLF 092623**
6:18 171:10,14,15

**EX 0012 Catherine Herridge PTLF 092623**
6:20 178:22 179:1,4

**EX 0014 Catherine Herridge PTLF 092623**
6:22 192:17,21 193:15 199:11

## 1

**1**
18:22 19:18,19 20:16 33:20 36:7,16 37:4 38:3,19,23 40:4 42:11 127:7 206:2,10,12 213:22 214:1

**10**
15:6 171:10,14,15

**103**
194:9

**104**
194:9

**10:11**
8:3,12

**1155**
8:13

**118-CV-3074**
8:10

**11:09**
58:23

**11:20**
59:1

**11:22**
172:12

**12**
178:22 179:1,4

**12:22**
108:20

**14**
192:17,21 193:15 199:11

**1631**
21:7

**18**
13:15,22

**189**
27:12

**198**
16:24

**1982**
49:20

**1987**
21:20 42:25 43:8 49:21

**1996**
21:22 22:1

**1999**
43:3

**1:03**
108:24

**1:10**
74:2 112:8 113:17

**1:25**
116:4

**1:36**
136:10

**1:38**
119:22 120:19

**1:46**
136:14

**1:51**
84:6

## 2

**2**
11:15 24:1,5,6 26:25 28:10 33:4,20 34:25 36:8,16 37:5 38:3,4,19,23,24 40:4 42:12,20 49:13 52:20 59:4 69:7 84:13,15 171:17,24 209:3,13 215:14 216:9,10,17,21

**20**
166:1 179:8

**2009**
28:18 29:7

**200d**
30:15,21

**2012**
28:18,22,23 29:6 30:10,

20 35:17 52:20,25 53:4,20 54:12 55:7 56:9,20 57:16 61:2, 14 65:22 79:14,17,19, 22 83:13 86:12

**2013**
75:1

**2014**
75:3 214:21

**2015**
77:5 78:6 124:7 158:11 159:3 165:1 166:19 178:13,16 179:13 180:2,5 181:12 214:22

**2015/2016**
22:10

**2016**
22:10,12 77:4 78:6 122:6 123:21 142:7 171:17,24

**2017**
24:7,10,17 25:2 35:14 42:10 59:5 63:11 64:13 73:19 83:22 84:14 109:13,16,21 110:15 111:14,19 112:14,25 113:13 114:7 116:19,20 118:1 119:16 121:19 122:12,20 123:21 145:23 147:21 148:13 151:5 167:11 179:6,8,18 195:2,9 197:8,16,19, 22,23 198:11 199:18 200:18 209:5

**2019**
21:16,17,23 22:1,18 106:7 137:25 140:14 149:14,21

**2020**
11:15 137:25

**2021**
138:25

**2022**
18:10 136:23 137:11 139:8,12 149:20,22 213:4,14,15

**2023**
8:11 18:16 19:18,19 20:16 127:7 136:4 137:11 206:12

**22**
131:21 179:13 181:12

**24**
24:7,10,17 59:5 73:19 84:14 200:18 209:5

**25**
13:25

**26**
8:11

**27**
199:17 200:20

**28**
63:11 109:20 118:1 119:16

**2:20**
85:15

**2:21**
166:13

**2:31**
166:16

**2:48**
88:22

**2nd**
16:23 27:12

## 3

**3**
62:24 63:3,6 64:16 68:6 71:17 118:4, 18 119:17,23 216:23

**30**
115:1

**302**
53:16 54:16, 20,22 56:2

**35**
31:16 34:7 218:23

**38**
119:12

**39**
34:8

**3:04**
92:14

**3:09**
94:3

**3:19**
203:7

**3:39**
203:10

**3rd**
34:7

## 4

**4**
15:13 73:8, 11,13,17 79:10 83:22 84:7 88:23 92:15 97:17 106:14

**45**
79:9

**4:00**
220:20

**4:36**
97:16 98:5

## 5

**5**
79:17 81:22 82:3

**524**
16:17 170:1

**5:28**
195:2

**5:44**
106:12

## 6

**6**
110:1,3,10, 13 113:19 115:2 116:5 119:13,22 120:20

**64**
42:21,24

**6:00**
217:16

## 7

**7**
158:21,22

159:1 166:19
**76**
199:14,16
**768**
16:23 27:11
**77**
199:17

**8**

**80**
194:6 195:1

**9**

**9**
195:2,9
**917**
144:10,19
**917 328-4691**
194:19
**93**
16:17 31:16 34:7 170:1
**9:00**
172:1

**A**

**a.m.**
8:3 172:1,12 217:16
**ABC**
21:19
**ability**
127:16 175:13
**able**
138:14 220:17
**above**
70:5 215:15
**academic**
30:12 111:9
**academy**
59:11
**academy's**
59:12
**accept**
157:12 173:25
**accepted**
22:24
**access**
61:6 132:22 143:16 145:6,11
**accessed**
59:14,20
**accolades**
114:20
**accord**
15:5,22
**account**
131:6 142:10 143:11,17
**accuracy**
177:12
**accurate**
107:25 179:15 181:14
**achieve**
185:3,22 186:10
**acknowledgment**
11:18 12:2
**acquired**
61:9
**acquisition**
69:24
**across**
215:1
**Act**
19:21 20:6 127:10 129:4 137:23 206:16 212:3
**acted**
75:25
**acting**
76:9 78:1,16
**action**
12:20 13:19 15:15 103:3
**add**
40:24 127:13
**added**
68:12 89:20 93:18 97:1
**addition**
13:25 125:4
**additional**
149:23 208:25
**address**
21:6 141:4,5,10,18,20,21,24 142:1,3,4,21 143:2,7 171:20,22 205:1
**administrator'**
61:5
**advance**
122:9 123:16,24 202:15
**advanced**
80:23 81:15
**advice**
12:5 30:6,7 81:21 183:14 210:4 211:5 212:11
**advise**
76:2
**affidavit**
159:9,16,20 160:22 162:16 163:6,7,21 165:4,20,23 175:1
**affiliate**
80:7,8
**affiliated**
45:5
**afternoon**
208:22
**afterwards**
111:22
**agencies**
29:4,20
**agencies'**
28:21
**agency.'**
56:24
**agent**
23:21 97:22 98:6 99:3 100:3 105:9,18 163:16 164:2,6,8,18,20 165:5,8,12,16 166:21 167:1,8,13,16 168:2,11,23 169:14 170:15 171:7 177:17 178:2,4,9,19 180:4,10,14 181:3,12,18 182:2,13 183:1,9 184:21,24 205:7,16,23
**agent's**
99:2
**agents**
53:24 56:25 79:13 184:24
**ago**
107:22 108:17 138:21 144:18
**agree**
27:3 57:17 75:8 169:12 176:22 193:21

**agreeable** 176:19
**agreed** 109:3,6,8 155:8 156:22
**agreeing** 210:24
**agreement** 150:11,19 151:21 152:1,25 153:5,8,17 155:3 156:2, 17 160:12,15 161:20 162:7 168:15,21 169:8,12 170:8 172:25 173:5 174:6 182:13 183:2,11
**agreements** 169:18
**ahead** 42:23 44:21 52:24 72:17 109:25 136:21 207:1 216:14
**aimed** 217:21
**air** 121:22
**aired** 73:18 90:13 106:18 109:13 110:14 123:17
**airing** 122:11
**alert** 159:19 160:21
**alerted** 197:13
**alerting** 97:23
**alleged** 63:7
**allegedly** 29:20 44:7
**allow** 10:21
**allowed** 13:3 23:10 50:14 112:20 126:22 196:3
**allows** 11:16
**alter** 16:2
**ambiguous** 37:15 65:16
**Amendment** 14:13 16:12, 15 20:13 21:4 25:20, 24 26:2,13 27:9 29:14 30:3 31:25 34:5,17 36:1 38:21 39:20 153:11 206:22 207:10,17 208:9 211:13 212:16
**amount** 174:17
**Andy** 8:19 9:25 72:23 97:8 165:25
**angle** 73:3 89:12
**answer** 10:20,21 16:11 17:9, 25 20:13,17, 18 21:5 27:18 28:6, 8,25 29:16, 18 30:6 31:4 32:2,4 33:22 34:23 35:6 36:5,10 37:1,10 38:10,20 39:6,13,23 40:21 41:10, 21 42:5,16 43:15,19 44:3,14 45:22 46:11, 20 47:8,21 48:3,14,25 49:9 50:7 51:22 52:5, 15 55:4,18 56:6 57:11 58:9 60:3,8, 17,24 61:19 62:2,13,21 66:2,18 67:11,20 68:2 69:2,13 71:2,13 75:15 76:3,4 77:21 78:3, 12,21 79:6 80:2,4,6 81:3,12,14, 19 83:8,18 85:3 86:5,16 87:13,21 88:3,19 91:2,12,23 92:11 93:2, 9,23 94:1 95:8,22 96:6,13 97:5 98:18,24 99:14,25 100:7,23 101:5,15 103:14 105:6,14,24 107:6,20 113:8,9,11 118:23 119:1,10 121:6 122:2, 17,25 124:3 125:7,17 126:10 127:14,20 129:11,19 130:4,6 131:12 133:2,6 134:14 136:19 142:24 144:1 147:25 150:20 153:7,14,23 154:22 158:8 160:4,25 162:23 167:24 168:8,18 170:20 171:6 173:12 174:1 181:23 183:15 185:7,8 186:3 187:10,16 191:18 202:25 206:18 208:10 210:3,23 211:6 212:10 217:14
**answered** 20:19 26:22 66:7 120:3 121:5 186:19
**answering** 65:24 100:16 189:3
**answers** 20:4
**anticipation** 16:19 169:24
**anyone** 63:19 111:17 143:23 154:2

168:2 203:17,22
**apparently** 69:18 126:5
**appeared** 124:9 125:5 151:19 153:6 175:5
**appearing** 32:23 70:9
**appears** 32:19 33:4 69:21 70:5 84:19 85:19 94:13,14 118:12 119:3 133:16 151:4 172:13 201:5 215:25
**appellate** 182:7
**applications** 45:1
**applies** 15:13 16:18 31:18 36:2 169:22,23 176:4 182:4
**applying** 207:2,7
**appreciate** 15:1
**approaching** 161:2
**April** 63:11 109:16,20 110:15 116:20 118:1 119:16 122:20 145:23 147:21 151:4 159:3 165:1 166:19 178:13,16 180:4 195:2, 9 198:11
**area** 49:19 127:12 144:10
**arguments** 212:16
**Arlington** 27:2
**arms** 49:17 69:24
**Army** 32:7,24 69:20
**around** 78:5 139:3 146:21 216:4 217:10
**arrow** 89:15 96:19, 24
**arrows** 89:18 90:3 93:14
**article** 16:20 169:25 209:15
**Asian** 217:22
**asked** 18:13 20:19 24:17 38:9 45:4 48:6 50:21 89:6 90:10 107:23 118:18,22 120:3 121:5 128:8 129:4 136:25 154:10 160:11,15,20 169:10 170:13 171:6 178:1 179:9 182:10,12 184:14 188:6 191:10 201:22 203:14 206:15
**asking** 30:1 51:3,12 53:16,17 54:1,17 58:1 72:22 102:17,18,20 107:16 118:13 119:2 121:1 124:22 126:1,13,15 130:11 146:11 148:24 152:14 153:9 156:21 160:16 162:15 163:25 179:17 184:12 187:9 188:21 191:8,17 192:12 203:25 204:10 212:1,6 213:2
**asks** 44:9 54:5 66:15 153:19 173:9
**aspect** 157:13
**aspects** 152:11
**assert** 26:13 34:18
**assessment** 188:18 206:1
**assigned** 144:20
**assist** 63:19
**assistance** 18:12 110:23 112:21 185:15,23 188:2 190:9, 21 191:13,25 192:10 196:4
**Assistant** 101:25
**assisted** 64:4
**association** 134:8
**assume** 124:17 155:2
**assuming** 171:25
**assumption** 35:9,11,15 36:12,18,19 66:8,9 70:21 86:10 117:18
**attend** 20:2
**attention** 28:9,15 52:19 59:6, 13 64:15 117:19 186:14 189:16,19 200:25 201:3 217:4
**attorney** 17:19 81:21 102:1 183:14 197:1,3,17
**Attorney's** 102:7,23 103:9,19 104:11 183:18
**attorneys** 17:14
**attract** 59:12
**attributable** 82:17
**audio/visual** 113:19 116:5

**August**
18:16 19:18, 19 20:16 127:7 179:13 180:2 181:12 206:12
**authenticity**
41:25 42:11 49:4 68:22 78:16 101:1
**author**
24:22 25:17 63:13 102:21
**authored**
158:11 159:4
**authority**
20:8,24 208:4
**authorized**
41:15 48:20 92:7 95:17
**available**
196:5 220:8
**avenue**
50:23
**avenues**
141:12
**avoid**
143:24
**awards**
114:20
**aware**
51:16 80:18, 19 137:22 138:1 167:13 178:9 180:16,19 181:2,8

**B**

**baby**
218:11
**back**
19:14 22:15 37:18 40:2 45:16 57:14 58:25 59:3 72:20 80:14 81:23 82:23 103:6 108:23 109:11 120:15 121:20 124:16 129:23 136:13 158:2 166:15 172:21 177:20 178:1 191:14,21 193:25 198:21 203:9 206:7
**background**
23:12
**backward**
161:5
**bad**
185:18,19 187:23 192:7
**Baier**
73:21 106:3, 18
**Baker**
199:19 200:5
**Barb**
199:18 200:5
**bare**
127:22
**based**
94:9 111:6 172:5 182:7 184:23 185:20 188:16 211:7,9 212:11 219:10 220:6
**basis**
36:19 59:18 108:12 151:13 162:22 163:2 169:4 206:21
**Bates**
194:3,5,9
**bear**
34:6
**began**
11:12 21:15, 19 27:7 75:3 114:5
**begin**
10:19,22 12:9 14:22
**beginning**
111:1 113:17 169:19
**begins**
8:5 28:10 42:21 44:20 52:20 53:4 59:7 64:18
**behalf**
8:15,20,23 9:7,11
**behest**
165:5
**behind**
24:15
**Beijing**
42:25 61:5
**belief**
35:13 219:10 220:10
**believe**
14:12 19:5 26:22 36:17 41:4 51:6 64:14 76:5 80:7 82:11, 17 92:18 103:21 119:15 122:5 133:21 134:10 136:2 137:5 145:16 157:15 163:14 165:18 170:12 177:3 183:6 187:7 194:11 203:3 204:21 211:25 213:15 215:6
**believed**
186:5,22 187:1,12,20 215:11,12
**bell**
142:2
**belonged**
35:5,11 66:6
**belonging**
65:20
**below**
64:20 69:16 71:22
**Berger**
148:9,12
**best**
22:5,9,14 23:3 25:11 29:1 51:4,6 77:4 102:16, 19 106:25 108:10 111:21 113:11 164:11,24 181:15 214:16
**better**
65:18
**big**
116:15 135:20
**bills**
34:9
**Bin**
49:18 69:22 71:24
**binder**
82:2
**binding**
207:2,8

**bit**
45:17 78:6 102:13 120:14 122:8 125:25 188:20 208:18
**Blasko**
88:25 89:7, 10,19
**blue**
68:7 89:15, 18 90:3 93:14 96:19, 24
**blur**
99:11
**blurred**
99:5,17 100:4 101:10
**blurring**
99:8 100:18, 19
**blurs**
98:11
**BMWS**
216:6
**bottom**
59:6 82:8 96:19 194:2 199:16
**bounds**
169:11
**box**
126:14 128:12,13,14 129:16,18,21 134:1 149:17 215:14
**Boy**
75:1 144:17 197:23
**break**
15:25 16:3 19:10 55:23 58:21 59:4 136:9,16 137:5,9 166:9,12 203:4
**break-in**
216:4,20
**breakdown**
174:16
**breaking**
55:22 108:19 166:2
**Bret**
73:21 106:3, 18
**brief**
212:22
**briefly**
9:24
**bring**
186:13 189:16,19 200:25 201:2
**bringing**
104:12 186:9
**broad**
129:10 173:20
**broadcast**
72:16 73:6, 17,25 77:3,5 83:22 89:3, 11 90:7,14, 15 93:18 94:4,10 98:1 101:18,24 106:2 109:13,15 110:14,18 112:14 114:6 121:19,20,23 122:9,11 123:15 124:9 125:5,12 133:17 137:17 151:4 152:19 155:13 167:12 176:24 177:7 179:21 191:7,9 198:11 200:17
**broadcasts**
134:4
**broader**
42:8 204:5
**broadly**
16:24 27:12 33:16 102:24 175:12 177:11 203:16
**broken**
214:9 215:3 216:7 217:15
**Browne**
25:1,3,12 26:8 63:24 64:8 72:14 110:24 124:14 146:20 147:10,23 194:12
**Browne's**
26:20
**bubble**
68:7
**building**
163:15 198:22 204:21
**Bureau**
8:8
**bushes**
217:20
**business**
216:2

**C**

**cable**
73:18 109:14 110:15 121:23 123:17
**call**
104:4 107:2, 6 166:5 217:5
**called**
131:19 138:9
**calls**
40:25 100:13 113:3 114:11 175:10 185:4,24 188:13 189:8 209:21 215:8 219:6
**camera**
8:15 74:3 151:4,8,19 152:10 217:20
**capacity**
152:15 153:20 158:16
**Capitol**
198:22,23
**caption**
32:18 64:24 71:22
**captions**
68:7,11,18
**captures**
216:22
**car**
214:20 215:1,6 217:5,15
**care**
126:11
**career**
21:19 157:24 218:21
**careful**
140:24
**Carol**
9:4

**cars**
214:17,23,25 215:2 217:2
**cart**
161:3
**carve-out**
13:20,24
**case**
8:10 10:1,3 11:15 13:14 17:7 18:10 21:3 26:9 30:14,21 102:2 103:10,18 104:10,16,25 148:7,19 164:6 175:12,13,15 201:5,7 205:6,8 206:12 207:2,8,11, 17 208:24 213:12,20 219:4,21 220:7
**cases**
169:19 176:3 196:25 205:10,22,23
**catch**
199:1
**categories**
30:15
**Catherine**
9:17
**caused**
214:7 217:11
**CBS**
21:13,14,15, 17 22:20,24 23:5
**cell**
144:16,19 145:14 194:19,21
**central**
202:14 207:12
**certain**
30:2 35:7 36:11,14 72:21
**certainly**
48:8 49:14 93:15 127:11 132:11 187:5 191:2 201:2
**certificate**
94:9,11,20 95:12 96:1, 18,25 124:11 133:15
**certificates**
95:14
**Chaffetz**
198:14
**chairman**
49:20 199:6
**challenged**
53:24 56:25
**chance**
137:9 193:20
**change**
187:1
**channel**
21:23 73:18 109:14 110:15 121:23 123:17
**characterization**
53:25 56:25 57:22 176:9 188:7 193:22
**characterize**
176:20
**characterizing**
56:15 191:15
**charge**
69:23
**charged**
165:14
**charges**
103:2 104:12
**Chase**
9:6
**check**
82:14 163:3
**checked**
45:6 90:9 134:7
**Chen**
8:7,21,24 9:11,25 10:3 19:22,23 27:1,7 28:3 30:12 32:6, 9,19,23 33:2 38:2 42:21, 24 43:8 44:24 45:6 49:16,18,20 53:1,13,21 54:12,23 55:8 56:21, 23 57:8,16, 20 58:13,16 59:10 61:12 64:9,25 65:20 66:6 69:18,21,22 70:3,9,16 71:5,24 72:16 73:18 75:6,9,19 77:9 78:2,9 79:11,21 83:23 84:9, 21 85:20,24 86:20 89:7, 12 90:9,18 91:7 94:5 97:24 102:2 103:10,18,20 104:10,12, 16,25 105:1, 11,18,19 107:10 109:16 110:14 111:8,14,25 112:15 114:19 115:13,25 116:9,17 117:14,20,22 119:18 120:1,22 121:4,19 124:18 125:4,21 129:7 130:12 131:2 132:10 133:15,22 134:7,11 135:13,25 136:3 137:4 139:7,23 140:1,16 141:2 142:21 143:2,6,10, 19 144:6 145:23 146:5,24 147:21 148:2,14 149:1,13 150:3 154:3 155:7,25 156:3 157:2, 7,21 158:5 162:4 167:9, 12,18 168:3, 12,24 169:15 171:8 173:16 174:13 175:18 176:17,25 177:7 179:22,24 180:24 181:3,6,9, 13,18 182:2, 14,16 183:1, 7,10,19 184:2,22 185:2 186:10

196:12,19 197:2 198:9, 13 201:10, 13,17 202:2, 8 204:2,5,6, 18 205:7 206:17 207:13,15,21 208:13 209:16,20
**Chen's** 43:2 44:7 45:2,11,18, 25 46:14,23 50:1,16 51:16 52:1,8 53:25 56:25 61:3,13,24 62:7 70:20 71:23 72:2 83:1,12 86:9,13 94:11,16,19 95:12,25 117:17 126:6 137:23 203:17 207:9,12
**chief** 21:24 22:7
**child** 218:10,17
**children** 218:9
**China** 59:15,21
**China's** 32:8
**Chinese** 32:11 43:1 44:7,25 45:3,20 49:22 56:23 63:8 69:19 89:4 111:9, 25 198:5 220:11
**choked** 80:21
**Cipollone** 9:1,7
**Circuit** 207:8 211:15
**cite** 27:11 34:6
**cited** 169:19 176:4
**citizen** 45:7 94:6
**city** 80:21
**civilian** 56:23
**claim** 78:16 127:10 207:12
**claimed** 44:25
**claiming** 107:14
**claims** 212:2
**clarification** 54:15
**clarified** 213:4
**clarify** 38:5 51:13 58:18 124:5 130:7 136:18 159:16 170:5 194:8 212:1 213:1
**claw** 206:7
**clawed** 81:23
**clean** 10:14,25 139:15 179:3
**cleaned** 140:2
**cleaning** 139:13
**clear** 12:5 16:4,16 26:1 30:25 85:6 113:16 127:19 157:19 159:11 160:2 189:4,15 194:17 201:21 213:6,9 219:15
**clear-out** 135:20,21
**cleared** 135:5,7 149:16,17,22
**clearer** 212:6
**client** 12:5 35:12 76:2 108:6 115:12 136:7 163:15 220:9
**Clinton** 140:8
**close** 203:3 219:4
**code** 144:11
**coincidence** 219:12
**collaborative** 25:16
**colleagues** 110:23 125:10 154:8 168:1 174:15
**collected** 128:5
**collectively** 211:17
**colonel** 56:21 220:10
**colonel's** 32:11
**Columbia** 8:9
**Columbia's** 206:12
**combined** 194:13
**come** 27:6 30:21 213:18
**comes** 107:6 187:4
**comment** 89:7 107:16 165:20,24 196:19,22,23
**commit** 147:11
**commitment** 109:2 150:22
**committed** 146:25 150:16,25 220:4
**committee** 111:15 198:12 199:7
**committees** 111:3,18
**communal** 146:10
**communicate** 111:17 141:17 142:6,9 143:5,20
**communicated** 78:8 141:3 142:20 143:21
**communicating** 100:12 141:13
**communication** 141:7 142:16 168:5,15 181:17 182:11,12,25

**communications**
111:19 141:1 168:1 174:5, 8,12,17 177:12 182:2,5 183:9 194:14 196:14
**communist**
32:8 45:5 90:11 134:8
**compelled**
16:25 27:13
**complete**
10:19,21 20:7,23 208:3
**completed**
123:11,16
**completely**
218:14
**complexity**
108:3
**comply**
20:21 207:25
**compound**
76:19
**computer**
128:9 132:16
**computers**
216:2
**conceivable**
152:9
**concern**
12:17 217:11
**concerned**
185:10 186:4,20 187:19 188:8 189:4 190:3 191:15 213:19
**concerns**
98:2
**concluded**
109:2
**concludes**
207:9
**conclusion**
175:11 196:10 207:24
**conditional**
80:5
**conduct**
79:13 172:22 198:18
**conducted**
77:2 172:15
**conference**
136:12
**confidential**
11:17 15:11 17:8 27:16, 23 30:25 31:17 34:14 39:19 78:1, 17,25 99:23 143:24 150:22 151:9,13,15, 20,22 152:2, 13,15,19 153:2,5,8, 10,21 155:4, 9,17 156:5,7 157:9 158:4 159:22 160:1,13,16, 17,23,24 161:10,14 162:19 168:5,6,14 169:4,18,21 170:21 171:1 173:7,9 175:9 176:4, 12 182:4 184:10 196:14 207:6
**confidentiality**
150:11 153:16 155:18,22 160:8 161:21 162:7 168:15,21 169:9,11 170:8 173:1 174:6,18,21 182:14 183:2,11 219:22
**confidentially**
174:23
**confirm**
78:25
**confirmed**
195:3,10
**confirming**
17:3
**confused**
120:14 136:22 152:6 161:1 212:25
**confusion**
84:3 137:13
**Congress**
63:6 189:22
**congressional**
111:3,15 189:17,19 198:12 200:25 201:3
**congressman**
198:14 200:7 201:6
**connected**
76:18 189:23 213:20 218:13 219:4
**connecting**
204:17
**connection**
196:12
**consideration**
114:17
**consistently**
45:3,19
**consumption**
156:19
**contact**
51:2 75:22 76:24 195:5 200:13 201:4
**contacted**
50:25 106:3, 19 165:23
**contained**
47:14 87:17 91:18 96:2 149:16 209:14
**contains**
19:6
**contemplated**
204:4
**content**
57:15,19 177:6
**contents**
216:3
**context**
75:2 76:8 94:7 107:16 118:17 218:11
**continue**
23:15 109:4 208:15
**continues**
114:1 195:4
**continuing**
101:18 199:17
**contract**
22:10,23 23:2,3,7,18, 22,23 98:3 204:21
**contractors**
61:4
**convenience**
145:21
**conversation**
138:10

168:21 181:17 183:3 190:12,19,22 192:10 197:17
**conversations** 83:13 138:20 164:2 170:7 175:21 181:12 183:13 185:21 188:17 190:6,13 191:16,17,23 192:3 204:13,16,23 205:4,15
**convert** 12:25
**converted** 14:8
**convey** 105:18 163:20 165:3 184:20 186:8,15 188:23 189:12 191:10 192:4
**conveyed** 62:17 164:1 187:25 188:21
**conveying** 172:11 195:16
**cooperate** 185:2
**cooperating** 185:22
**coordinated** 199:1
**copies** 14:2 135:1 136:2 193:12,14
**copy** 11:13 19:8, 12 39:10 47:2 50:21 51:5,7 52:8 64:14 67:7 71:7 87:7 94:16,19 126:9 130:1 133:10,11, 19,23 134:1, 9,15,16,17, 24 147:6,7 179:3,4
**corner** 82:9
**correct** 12:1 18:12 20:2 21:25 24:18 26:18 53:2,21 57:20 64:10 70:10 73:24 75:9 82:16 84:16 85:12 89:8,13 98:8,12 106:17 110:17,25 112:22 117:23 118:20,21, 24,25 137:7, 8,12 141:20 151:5,9,25 152:20,22,25 163:18 166:22 172:18,23 174:13 175:3,6,7 180:5 183:4, 12 188:12 189:7 192:1 199:7 207:22 211:18 217:9
**corrected** 19:9
**correspondent** 21:12,22,24 22:6,8,16,21
**COSTIND** 49:20
**counsel** 8:17 9:20 11:13 12:17 18:5,9,13 19:4 20:19 23:9 25:22 26:4 38:5 56:14 81:24 86:6 88:20 109:3 126:20 137:10 138:15 154:1 160:14 161:4 162:20 174:7 175:23 183:6 194:7 203:16 208:20 210:4,7 212:11,20
**counsel's** 30:5,7 31:3 34:23 36:4, 25 39:23 42:17 43:14 47:9 60:2 117:2 119:9 121:12 122:16 153:13 157:12 211:5
**counter-intelligence** 30:14 102:25 104:3,6 167:3
**couple** 123:18 138:21 202:14 208:25
**course** 12:22 19:22 33:21 45:10, 24 49:25 53:11 54:12, 24 57:25 58:16 61:22 65:3 66:21 70:13 72:2 81:11 84:21 85:24 86:20 90:21 92:21 94:15 101:8 103:3 115:16 118:18 119:25 121:2 124:17 126:3 128:5,11,17 129:5 130:11 131:1 141:3 142:20 143:6,19 149:1 150:23 155:7,24 156:3 162:3, 9,12 165:17 172:22 175:18 192:3 201:10 202:4,11 203:16
**court** 8:9,14 9:13 10:13 11:14 14:23 18:14, 17 19:19 20:2,7,9,24, 25 23:10 34:8 73:9 82:12 104:5 126:21 159:13 163:4 165:23 176:2,10 203:21 206:11 207:4,8,16 208:3,5,8,14 211:12,14 212:15
**court's**

| | | | |
|---|---|---|---|
| [redacted] | | | |

41:12 142:25 150:9 168:19 174:4 208:10 211:6
**deep**
115:24
**deeply**
186:20 187:18,19 190:3 218:8, 13
**defendants**
34:15 109:4 208:20,24
**defense**
10:5 97:23 98:7 106:4, 5,6,19,23 107:10,16,17 108:2,5,7 112:9,17,19, 22 113:1,12, 25 114:5 186:18 187:14 189:1 190:8,11,21 191:12 192:9 195:10,17,24 196:2 220:7
**Defense's**
185:15 189:20
**define**
37:22
**defined**
15:9,12
**defines**
15:7
**definition**
38:1 161:11
**definitions**
15:5
**defy**
20:9,22,25 208:5,8
**delay**
122:10
**delete**
129:25 130:25 140:24 145:2 213:10
**deleted**
135:7 143:1 144:5
**deleting**
143:14
**denied**
45:3,19 56:21 220:9
**Dennis**
88:25
**denying**
17:3
**department**
10:4,5 28:15 97:23 98:7 102:15 104:20 106:3,5,6, 19,23 107:10,15,17 108:2,5,7 112:10,17, 19,22,25 113:12,25 114:5 148:8 158:12 159:5 185:14 186:17 187:14 189:1,20 190:8,11,20 191:12 192:9 195:10,17,24 196:2 208:23
**Department's**
220:8
**depend**
130:22
**depict**
71:18
**depicted**
115:10
**deponent**
9:2,8 212:20 213:22
**deponent's**
216:9,10,17
**deponents**
214:1
**deposed**
138:7
**deposition**
8:6,12 10:3, 7 11:12,18 12:8 14:9,21 15:21 17:13, 23 18:6,10, 14,18 19:20 20:1,15 23:11 77:6 109:1,5 126:22,24,25 138:8,15,24 139:2 194:1 207:22 208:15 210:9
**describe**
54:6
**described**
74:3 77:15 160:6 209:14
**describes**
57:15,19 103:7
**describing**
90:9 103:8
**description**
120:21
**designated**
12:20 13:13 15:10
**designed**
169:2
**desire**
20:8,25 208:4 219:17
**desk**
147:6
**desktop**
131:10 132:8
**destroy**
14:12 213:10
**destroyed**
14:3 135:1 136:2 137:6, 11 149:13
**detail**
105:21
**details**
25:23
**determine**
16:7,9
**developed**
197:15
**development**
49:18
**developments**
195:22,25
**device**
145:20
**dichotomy**
161:13
**died**
218:11
**different**
14:20 54:4, 15,16 56:13 130:8 134:4 160:20 179:2 188:20 217:7
**difficult**
104:4 187:16
**digital**
39:10 47:2 67:7 71:6 84:14 87:7 109:21 112:14 114:6 118:2 119:16 120:21 121:18 122:19 123:12 125:5,13 126:18 128:9

129:7,24 131:14 145:23 147:6,13,16, 20 148:3 167:12 176:24 177:6 179:21 200:17
**digitally** 126:8
**diminished** 190:24
**dings** 217:6
**direct** 28:9 52:18 59:5 64:15 110:7 119:12 162:16 187:10 193:24
**directed** 49:17 163:5 175:1 203:21
**directing** 49:22 165:4
**direction** 160:20 162:5
**directly** 31:19 37:7 39:18 153:19
**directs** 127:8
**disagree** 127:6 176:9
**disagreement** 102:3,10,14, 22 103:8,23 104:1,18,19
**disclose** 41:5,16 48:20 92:7 95:17
**disclosed** 15:14,15
**disclosing** 17:20
**disclosure** 16:25 27:13 103:4
**disconnect** 219:12
**discovered** 216:20
**discovery** 11:16 13:18 15:10,11,16 16:7 31:18, 20 207:13
**discuss** 26:23 163:9 183:24
**discussed** 33:19 70:6 97:23 126:3 152:22 154:6 156:13 171:19 183:20,23 190:25 205:5,10 210:6,9
**discussing** 98:6 118:17
**discussion** 82:19 103:1 150:15 160:8 220:21
**discussions** 23:6,17 165:7 172:20 173:15 187:11 211:9,10
**disobey** 20:11,15 219:17,19
**display** 72:24
**disseminating** 13:18
**dissertation** 49:16 50:2, 17,22 51:1, 5,17 52:2,9 126:6
**distressed** 189:4
**distressing** 218:8,17
**district** 8:9 18:13 19:19 20:15, 21,22 102:2 206:11 207:24
**dividing** 151:14
**doc** 146:10
**docket** 19:9
**doctor** 56:22
**document** 11:22 12:18 18:20 19:1 24:18 43:23 47:14,17 50:4 53:8,15 54:1,6 55:2, 9,12,14,16 56:4,13 57:3,24 58:3,6 60:21 62:17 67:15, 16 82:21 87:17,18 90:8,13,20 91:17,18 92:3,6,20,23 93:5,12,16 94:8,22,25 95:18 96:1,2 127:2 129:3, 4 130:15 134:9 138:22 193:3,10,17, 20 194:8,13 206:6,8 210:25 213:25 214:2
**documentary** 124:19
**documents** 16:6,8 17:3, 4,10,15,22, 24 18:2 30:13 31:6, 8,12,22 46:3 56:13,16 57:4,7 58:1 77:16 111:7, 25 112:2,4 123:22 125:3,11,23 126:24 127:1,4,11, 18 156:15 157:3 159:13 201:9,12 205:11 209:9 210:8,11,13 211:17,20 213:3 216:18
**DOD** 98:3 185:23 186:11 188:1,11 191:24 195:3 196:9
**doing** 75:4 193:5 197:12 198:1,3 204:13 206:21
**dollars** 186:22 187:20
**Donovan** 8:14
**dot-com** 103:21
**dots** 219:12

**dozen**
64:21
**draft**
25:15 145:25 147:11 148:13,16
**drafted**
146:6,9
**drafting**
63:20 64:4 123:4 146:17
**drafts**
16:20 146:23 147:21 176:23
**draw**
117:19 217:4
**drew**
28:14
**drill**
102:12
**drive**
73:9 126:19 128:10 131:10 132:8 148:24
**due**
109:2 195:4, 13,14,18
**duly**
9:18

**E**

**earlier**
64:13 78:6 117:18 118:1 122:5,8 134:14 135:22 136:4 137:6,11 140:21 174:25 198:12 199:15 201:15,22 204:15 206:6 208:2 212:24 213:3
**early**
28:18 29:6 136:23 139:8,12 149:22 213:4 217:16
**Eastern**
102:1
**editing**
131:14,15 132:12,21
**editor**
148:4,9
**editorial**
25:21,23 26:12,24 42:2 49:7 64:2 68:25 78:19 101:3 121:25 122:14,23 123:8 124:1 125:15 128:1 131:22 154:20 167:20,25 209:24,25
**editors**
154:10,14
**effect**
187:1
**effectively**
219:18
**effort**
25:16 64:6,7 72:13 204:6 216:5
**efforts**
189:24 190:1
**either**
161:13 162:4 172:5
**electronic**
128:18 130:1,3,14, 16,18,20,25 131:8,25 132:9 133:10 140:20
**electronics**
216:2
**element**
112:23
**elicit**
169:2,7
**eliminate**
175:13
**Ellis**
9:1,7
**email**
98:2,5,10, 14,21 99:8, 10,11,18 101:1,10 107:3,5 131:6 132:7 141:1,4,5, 10,17 142:4, 8,10,21 143:2,7,11, 17 146:11, 12,18 147:1, 12,13,17 148:17,22 171:20,22 172:13,18 179:20
**emailed**
128:19 171:25
**emailing**
98:12 99:5
**emails**
97:22 125:22 140:8 143:1, 10,15 146:21 147:22 171:16 179:6 189:22
**emphasize**
177:10
**emphasizing**
56:22
**employed**
21:9,18
**employer**
144:22
**employment**
23:13
**encompass**
15:18
**encourage**
15:24 186:17
**encouraged**
189:17
**end**
14:4,11 106:2 111:10 162:8 178:15 194:9 215:22
**ended**
109:12
**energies**
22:22
**enforcement**
28:16 74:12, 16
**engage**
189:18,21
**engaged**
23:21 75:18 220:11
**entered**
11:14 19:19 217:19
**entire**
25:20 53:15 80:21 137:15 181:5
**entities**
41:3
**entitled**
34:14 127:8 207:21
**entity**
41:2
**epaulettes**
89:11,16

**espionage** 220:12
**essentially** 103:23 173:8 210:10
**established** 26:5,7,10
**et al** 8:8
**evening** 181:5
**event** 12:24 17:10 214:6 218:8
**events** 213:6,19 219:3,11
**eventually** 59:12
**evidence** 207:9
**exact** 106:9
**exactly** 36:21 72:23 78:4 124:6 139:16 160:6
**EXAMINATION** 9:20 208:20 212:20
**exchange** 171:16 179:5
**excised** 212:3
**exclusively** 32:5 33:8,14 65:1
**Excuse** 94:17
**executed** 30:20 81:7 82:25 159:16
**execution** 83:11
**exhaustive** 207:13
**exhibit** 11:19 12:2 18:22 24:1,5,6 26:25 28:10 33:4,20 34:25 36:8,16 37:5 38:4,19,24 40:4 42:12,20 49:13 52:20 59:4 62:24 63:3,6 64:16 68:6 69:7 71:17 73:8,11,13,17 79:10 81:22 82:3 83:22 84:6,13,15 88:23 92:15 97:17 106:14 110:1,3,10,13 113:19 115:2 116:5 118:4,18 119:13,17,22,23 120:20 158:20,22 159:1 166:19 171:10,14,15 178:22 179:1,4 192:17,21 193:15 199:11 206:2,7,10 209:3,12,13 213:22 214:1 215:14 216:9,10,17
**exist** 134:15
**existence** 127:3,22 159:20 160:22
**existing** 23:2
**exists** 131:7
**exited** 136:12
**expense** 34:9
**expensive** 217:8
**experience** 44:25 187:5
**expert** 89:4
**experts** 32:10
**expiration** 23:1,22
**expired** 23:4
**explain** 14:18 33:13 55:12 102:16 213:5
**explained** 20:23 104:2 204:20
**explicitly** 15:9 29:12
**expose** 104:5
**express** 162:6 168:20 191:3 192:8
**expressed** 195:21 200:14
**extent** 16:5 25:22 26:11 29:10,24 30:23 31:10 34:2 35:20 116:22 124:21,22 151:10 152:13 157:8 159:21 160:23 162:19 167:19 168:4 175:11,23 184:9 185:25 196:13
**extraordinary** 80:20

**F**

**F.R.D.** 31:16
**fact** 45:11,25 50:1 53:12 114:5 137:10 138:8,13 165:14 189:5,18 191:22,23 201:25 205:5,15 207:17
**factor** 114:17
**factors** 196:9 219:20,25
**fair** 33:12 57:21 64:12 104:13 106:11 124:20 128:21 150:5 151:23 155:4 188:2,6 200:23 206:1,19 208:1 210:15
**familiar** 11:20 19:3 73:5 144:12 156:23
**family** 64:25 66:5 69:21 70:4,21 117:22

**far**
24:18 38:9 63:15 140:20
**farther**
102:13
**fast**
97:12
**father**
49:17,18 69:22 70:10, 17 71:6,24 72:2
**father's**
119:19 120:23 121:4 133:23
**favorable**
191:3,11
**FBI**
10:4 28:15 30:10 52:25 53:4,12,14, 20 54:12,21, 23 55:7 56:10,20 57:7,8,16,20 58:12,15 61:4,13,23 62:7 65:21 78:1,17,24 80:20 82:25 97:22 98:6, 11 99:2,4 100:3,10,11 101:10 102:3,15,22 103:8,17,24 104:15,24 105:9 132:24 134:23 150:4 152:20 154:5 155:2 159:9 165:24 167:3 202:20 205:6
**FBI's**
102:8
**February**
24:7,10,17 25:2 35:14 42:10 59:5 64:13 73:19 83:22 84:14 109:13 111:14,19 112:14,25 114:7 116:19 122:12,20 145:22 147:21 148:13 151:5 167:11 179:6,8,18 197:16,22,23 199:17 200:18,20 209:5
**federal**
8:8 29:4,20 30:16 53:24 56:24 59:13, 19 79:13
**Federighi**
9:4
**feel**
118:2 157:25 188:18 189:2
**feelings**
165:8 184:21
**felt**
130:13 188:11 190:4
**ferret**
207:13
**fifth**
49:15
**fifty**
83:21
**file**
47:14,25 67:7,24 71:7 73:13,15 79:9 84:7 85:16 87:7, 17,18,25 91:17,18 96:1,2 97:11,17 106:13 110:10 113:19 115:2 116:5 118:9 119:3 126:14 129:8 130:14,18,21 131:10,25 132:8,14 214:7
**filed**
10:3
**files**
47:2,13 73:10 126:18 128:9 129:24 130:3,16,23, 25 131:4,8, 13 132:1,9, 11 133:3,10 135:6,20 140:15,20 157:3
**filming**
80:15
**final**
177:6
**finalized**
123:4
**financed**
189:5
**find**
127:18 131:4 151:11 153:4 162:6
**finding**
141:13 196:6 220:8
**fine**
81:12 166:12
**finish**
55:24 187:18
**firm**
8:25 9:7
**first**
9:18 14:13 16:12,14 20:12 21:4 25:20,24 26:2,13 27:9 29:13 30:3 31:25 33:5, 25 34:5,17, 25 36:1 38:21 39:20 50:15 51:17 54:19 63:22 65:6 74:2,24 75:3 76:7,24 77:25 78:8 82:8 86:1 90:23 111:18 122:11 137:22 139:14 153:11 159:12 160:21 178:6,7 179:21 187:5 194:1 200:17 206:21,25 207:10,17 208:9 209:4, 13 211:13 212:15 213:17 216:19 220:1
**Fit**
214:21
**five**
12:8 14:21 137:17,18 199:15 213:8
**five-minute**
58:21 136:8
**flash**
116:9
**flashes**
90:7
**fled**
217:24
**flip**
32:14

**focus**
22:22
**focusing**
40:3 154:4 204:6
**folder**
131:9 132:15
**folks**
68:12 89:21 147:13,16 203:22
**follow**
30:5,7 31:3 34:22 36:4, 25 39:22 43:14 60:2 81:9 117:2 119:9 121:12 122:16 153:13 211:5
**follow-up**
64:12 109:15,17,21 110:13
**following**
32:16 100:22 215:19,23
**follows**
9:19
**foot**
217:24
**footage**
79:11,21
**Forces**
140:13
**foreclose**
104:20
**foreign**
22:6 45:3,20
**forgotten**
137:15
**form**
11:19 22:22 38:22 39:10 60:21 67:5 90:9,17 92:19 129:7 130:14 147:17,22 148:14,17,22 209:21 215:8 217:12 218:2,22 219:5,24
**format**
67:18 71:7, 10 91:20 96:4 147:1, 4,7,11
**forward**
187:4 201:4
**forwarded**
201:5
**found**
72:5 205:1 215:23
**four**
111:3 179:20
**Fourth**
216:25
**Fox**
21:22,25 22:3,8,11, 18,23 23:1, 6,18,20,21, 23 24:6,19 25:3 28:3 30:14 31:7 32:6 33:8 45:1,18 63:6,8,10,19 64:18 65:1 68:13 69:17 72:9 75:4 77:8,23 80:7,9 89:21 93:18 94:12 97:2 99:11 100:17 101:25 103:8 106:3,4 109:15 110:14 111:6,14,24 112:9,13 113:22 114:6,18,21 121:18 122:21 123:5,23 126:8,25 127:16 128:1 131:6,20,24 135:5,8,19, 21 140:14,16 141:4,10 143:6,16 144:13,19, 22,24 145:4, 10,24 146:5, 24 147:13 148:4 149:9, 10,14,20 154:8,14 158:12 159:4 168:1 194:23 195:4,13,14 197:12,24 201:16,25 204:7 209:4, 9
**Fox's**
73:18 109:13 112:24 114:10 121:23 123:17
**Fox-issued**
144:15 145:19
**frame**
30:12,13 32:9,19 33:2 78:5 111:9 114:4 138:19 139:1,10 198:2 209:15
**free**
118:2 207:5
**frequency**
174:14 175:18
**Friday**
195:3,10
**front**
115:3
**frustrated**
184:24 205:24
**frustration**
165:11
**full**
130:22 218:10
**fund**
114:1 190:9, 21
**funded**
43:2 44:7
**funding**
106:20 185:15,23 186:5,11,18 187:15 188:2,9,12 189:1,14,20 190:4 191:13,25 192:10,16 195:11,18,23 196:4
**funds**
98:3
**future**
13:8
**fuzzy**
50:18

**G**

**gained**
16:10
**Gao**
158:13 159:5 162:17 163:12,14,17 165:14,17 166:20 167:6 175:2 178:20

180:4
204:16,17
205:6
**Garrett**
9:3
**gather**
129:6
**gathered**
13:5 14:15
16:21 29:11
45:13 74:17
77:9 124:23
128:17,19
155:16 176:5
201:9 202:1
**gathering**
17:2 25:21
26:24 27:10,
15,21 29:12,
25 30:24
31:11 39:1,2
40:7 42:2,14
43:11,25
45:13 47:4,
16 49:7
51:19 55:13
61:16 63:16
66:15 76:21
79:3 83:6
87:10 88:10,
17 99:23
101:12
107:12
122:14
124:23
125:22 126:4
131:1 155:17
162:3 169:1,
22 170:2
173:20
175:25 176:6
182:11,16
**gave**
49:19 218:11
**general**
49:17,18
69:23 71:24
102:1
114:21,23
121:16 126:1
129:5 197:2,
3,17
**generally**
126:16 130:5
137:20
143:24
148:18
196:23
219:14
**genesis**
27:5
**George**
9:1,7 43:2
44:8 49:16
50:1,16,21,
25 52:1,9
85:20 126:6
**getting**
23:12 54:9
107:8 127:24
128:23
132:18
138:12 161:5
164:13 203:3
**Gillis**
102:1
196:11,16
**give**
10:3 108:4
119:1 140:5
156:9 174:16
179:2 191:25
213:1
**given**
10:7 12:5
152:24
193:11
**giving**
31:10
**glass**
215:24
**glean**
173:22
**Gmail**
141:20,21
**goal**
186:13
**goals**
185:21
**God**
82:15
**goes**
30:23 38:25
40:6 42:1
43:10,24
45:12 47:4,
16 49:6
55:11 61:15
66:14 68:24
78:18 79:2
83:5 88:9
98:15 99:22
101:2,11
107:12
121:24
122:13,22
123:25
125:14
142:13,14
154:19
167:20 169:1
186:12
209:24
**going**
19:13 23:15
25:23 26:13,
19 27:18
28:6 29:16,
24 30:5 31:3
32:2 34:22
36:4,21,25
37:10 38:17,
20 39:6,13,
22 40:10,21
41:10,21
42:5,8,13,
14,16 43:14
44:3,17
45:16 46:11,
20 47:8,21
48:3,14,25
49:9 50:7
51:19,22
52:5,15,18
54:8,14,25
55:4,18,21
56:6 57:11
58:2,9 59:7,
9 60:2,8,17,
24 61:19
62:2,13,21
63:2 65:11
66:2,18
67:2,11,20
68:2,17
69:2,13
71:2,13
72:17,18,24
73:7 75:15
76:2,23
77:21 78:12,
21 79:6
80:2,24
81:3,7,9,16,
19 82:2,22
83:8,18
85:3,10
86:5,16
87:3,13,21
88:3,15,17,
19 90:2
91:2,12,23
92:11 93:2,
9,23 95:8,22
96:6,13
97:5,12
98:18,24
99:14,21,25
100:7,22
101:5,15,19,
22 103:14
105:6,14,20,
24 106:12
107:13
109:25
113:17 116:4
117:2,13
119:9 121:12
122:2,16,25
124:3,17
125:17
126:20 127:6

128:1,15,16, 22 129:23 136:5 137:16,19 138:7 142:19 153:3,13,23 154:22 155:14 157:12 158:8 163:13 165:25 166:7 168:8,25 169:16 170:4,9,10 171:3,5 173:12,18, 19,22,25 174:3 176:6, 9 177:19 178:25 179:3 181:23 182:21 183:12,14 184:8 187:9 190:2 192:20 193:8 194:13 202:21,25 206:9 208:25 209:10 210:3,20 211:2,11 213:16 216:12

**good**
9:22,23 108:19 130:10 162:25 192:6 208:22

**Googled**
205:1

**Gotcha**
72:7 80:12 194:25

**gotta**
193:5

**government**
9:5 12:19 16:7 35:22, 23,24 36:9, 15 43:1 44:7 92:3 95:13, 15 186:5 189:6 192:16 203:18 208:17 212:17,18

**government's**
83:14

**graduate**
32:20

**graphic**
96:24

**graphics**
89:16,20 93:16 97:1

**grave**
69:22 70:9, 16 71:6 119:19 120:23 121:4 133:23

**great**
126:11 187:7

**greater**
176:12

**ground**
10:9

**grounds**
25:24 26:3 30:3 153:11 173:19 216:13 220:10

**guess**
25:13 53:17, 25 81:9 99:3 102:12 107:8 116:16 126:1 128:4 129:23 131:6 132:16 133:14 146:23 148:11 152:3,24 165:10 187:9 213:17

**guest**
197:12 198:4

**guy**
168:21

**H**

**habit**
217:18

**halls**
199:2

**hand**
63:2 82:2 97:14 171:13 178:25 179:3 192:20 206:5,9 213:16

**handed**
135:8 158:25 206:6 213:25 216:16

**handful**
18:1 134:25

**handing**
24:4

**handled**
127:25

**handwritten**
149:2,4,12

**happen**
80:24 161:25 190:17 192:5,6

**happened**
219:3

**happy**
72:22 83:25 104:16 110:7 111:2 127:18

**harassment**
216:5

**hard**
39:10 47:1 67:7 71:7 96:16 126:8, 19 128:10 131:10 132:8 133:10,11 134:1,16,24

**hard-copy**
134:17 135:10 136:25 139:22 140:15

**Harrington**
9:6

**hat**
71:19

**head**
11:2,4 25:7

**hear**
106:9 114:2 116:12

**heard**
11:22 178:7 219:8

**heavily**
205:16

**held**
8:12 22:17 34:8 82:19 220:21

**help**
17:6 18:21 55:9 69:10 71:10 72:21 87:11 93:21 108:15 114:4 138:22,25 156:10 169:3 170:11,23,25 172:10 186:10,17 189:18

**helped**
63:22 138:14 196:10

**helpful**
110:7

**helping**
187:2

**helps**
94:4 113:16
**Herridge**
8:6 9:2,17, 22 11:12 12:10,18 13:22 16:6 17:12 18:8 19:13,17 21:6 26:5 27:18 28:2,9 30:9 31:23 32:3 34:4,22 35:24 37:3, 19 39:16,22 40:1,10,14 41:22 49:13 52:16,18 54:11 59:3 63:5 68:17 72:15 73:1, 7,15 82:22 84:4 88:22 92:14 94:3 100:20 109:8,11 110:6 114:15 127:1,9 136:16 149:25 158:25 160:3,6 161:19 166:5,18 171:5,15 192:13 193:2,6 194:18 203:1,12 206:5 207:7, 15 208:11,22 210:6 211:4 212:24
**Herridge's**
14:5 15:19 17:8 29:25 31:14 184:13 194:14 207:10,11
**hid**
45:1
**high-end**
215:2
**higher**
211:14
**highlighting**
93:13
**highly**
30:15 102:25
**Hill**
198:23
**Hispanic**
217:23
**historical**
72:5
**hold**
169:20
**holding**
32:9 33:3 83:24 84:10 89:8,13 134:12 209:16
**holds**
16:24 31:16
**home**
21:6 30:11 79:12,22 83:1,12 86:13 133:13 134:1 139:19 217:21
**Homeland**
10:5
**Honda**
214:21
**honestly**
51:14 113:10
**hope**
186:15
**hoped**
185:3,21 186:16 187:12 188:24 189:7,12,15 192:4,5
**horse**
161:3
**Hotmail**
141:23 142:10 143:1,11
**hour**
55:22 97:9 166:1 197:18,23,24
**house**
65:21 217:17,19
**human**
38:18
**husband**
30:13 35:12 83:24 84:10 111:9 134:12 203:24
**hypothetical**
156:9
**Hypothetically**
152:9

**I**

**i.e.**
15:15
**identification**
18:23 24:2 62:25 73:12 77:18 79:4, 25 81:23 110:4 158:23 171:11 178:23 192:18 206:3 213:23 216:11
**identified**
39:4 72:9 79:10 82:3 88:24 89:3 90:15 92:18 151:8,25 152:18 167:17
**identifies**
53:7 55:1 166:21
**identify**
19:20 31:20 34:19 36:22 40:19 41:7, 18 47:5,18 48:22 52:12 54:5 61:16 67:2 71:10, 23 73:8 74:21 87:3, 11 88:10 89:25 91:20 93:21 101:12 116:24 141:11 150:1,10 161:23 168:11 169:3 170:20 171:1 205:2 216:18
**identifying**
35:25 37:7 38:15 39:3 43:12 44:1 59:23 67:18 68:8,15 69:9,11 73:16 86:3 89:23 90:25 92:9 93:7,20 95:20 96:4 105:22 129:1 141:7 181:20 182:23 207:18
**identities**
160:9
**identity**
17:7 31:19 34:3 46:17

65:25 91:5 126:23 127:15 150:23 151:21 152:2 153:1,5 154:2,11,18 155:23 156:5 160:12 161:21 170:11,22 173:1,6 177:17 207:11,14
**Illinois** 200:8
**image** 68:12,18 83:23 84:9 96:25 98:10 118:14,18 120:22
**images** 71:17 140:21 155:12
**imagine** 128:15,16 161:24
**immediate** 22:13
**immediately** 32:15 69:16 94:5 214:25
**immigration** 28:16 45:1, 2,11,18 46:1,8,14,23 47:11,24 48:10,17 49:4 59:10 90:17 91:6, 15 92:2,19 124:10 126:5 132:23 134:6,22 135:17 150:3 154:5 155:1 202:7,19
**importance** 207:5
**important** 10:15 49:21 187:8 219:21
**imposed** 13:21
**impression** 192:14
**in-city** 217:5
**in-person** 172:6
**incident** 80:16 217:10
**include** 16:21 135:12,24 155:11 156:18 171:7 177:9,10,14, 23
**included** 155:12 156:14 170:3 198:14
**includes** 176:13
**including** 12:14 14:2 16:20 18:2 170:14,15 184:24 195:23
**incorporated** 43:23 67:15
**independent** 32:10
**independently** 205:12
**indicate** 27:19 41:4 100:16,17 144:19
**indicated** 187:12
**indicative** 31:24
**individual** 37:23 38:13 40:11 71:18 88:24 91:9 92:6 95:3 99:9 100:11 101:9 115:12,13 116:18 117:10,20 152:10
**individual/ individuals** 216:1
**individuals** 37:24 64:21 68:8
**Industries** 16:17 169:25
**inform** 77:25
**informant** 78:1,17 79:1 152:19
**information** 16:21 17:1 26:12 27:14, 16,22 29:11, 19 30:2,19, 23 31:10,13 34:2,13 36:21 37:25 40:18 41:7, 18 43:7,17, 22 44:1,6, 10,12 47:5, 18 48:22 52:12 55:15 60:5,12,20 61:9 62:6,16 63:16 65:8 71:10 74:18, 21 75:22,23 76:20 77:17 88:11,13,16 91:20 99:22
107:9,15 126:22 129:6 130:12 131:1 154:15 155:16 156:4,6,18 161:19 162:5,6,21 163:1,22 169:3,8 170:11,23,24 173:4,7 174:22 175:5,8,24 176:5,12 177:13 182:19,22 184:7,15 185:12 186:6 187:21 201:5 207:22 210:10
**informed** 183:17,25
**informing** 195:8,20
**initial** 203:19
**initially** 176:21 205:12
**inquiry** 107:8 108:1 127:12
**insert** 16:14
**inside** 214:10
**insist** 219:23
**inspiration** 49:19
**instance** 160:21
**institution** 187:20

**instruction** 31:4 34:23 36:5 37:1 39:23 42:17 43:15 47:9 60:3 86:6 88:20 100:22 117:3 119:10 121:13 122:17 157:13 173:25
**intelligence** 21:24 22:8
**intend** 20:4,21 127:17 193:14 210:7 212:14
**intent** 16:5 83:14 163:24 165:9 187:17 191:16
**intention** 20:14
**intentions** 188:19,22 189:3
**interactions** 76:8
**interest** 23:19 28:21 163:12,21 189:24 195:6,21 200:15
**interested** 28:3 29:5
**interests** 186:23
**interim** 116:19
**interject** 12:4
**internal** 103:1 196:9
**internet** 128:19
**interrupt** 10:21 19:4
**interview** 53:1,4,8,12, 14,16,21,24 54:7,12,21, 23 55:8 56:10,11,17, 21,24 57:7, 16,20 58:12, 15 61:23 62:8 75:4 77:1,3,12,13 88:24 89:6 122:6,11 123:24 124:6 132:24 151:19,24 154:5 172:6, 15,18,23 173:17 175:22 176:17,22 183:21 198:1,13,18 199:1,5 202:4,14,20
**interviewed** 123:21 151:7 158:1
**interviews** 57:8 134:23 150:4 155:2
**intimidate** 216:5
**introduce** 8:17
**introduced** 180:20 206:6
**investigating** 29:20 63:7 111:4
**investigation** 8:8 64:18 74:9,11,13, 14,16 78:2 97:24 104:3 111:7 112:9, 13 113:23 140:10 163:17 165:9 167:5,9,14 181:3 186:10
**investigations** 22:22 102:25 104:7 111:15,24 202:13 205:17
**investigative** 13:6 14:6,16 16:11 17:5 21:12 22:21 25:4,6,7 28:17 132:2 207:7
**investigator** 167:4 205:7
**investigators** 59:13,19 103:18 104:16,25 205:6,21
**invoking** 20:12 21:4 38:20 208:9
**involve** 159:22,25 196:14
**involved** 24:25 31:17 72:12 80:15 132:4,20 163:16 167:5,8 201:7 205:9, 16
**involvement** 167:13
**involving** 56:15 77:15
**issue** 177:20 178:2 187:2 189:16 201:1,3
**issued** 18:17
**issues** 185:10

**J**

**James** 102:1 196:11
**jargon** 33:11
**Jeff** 197:10,11
**job** 124:11
**jog** 158:18
**Johnson** 8:15
**join** 22:20
**joined** 21:22 22:3 23:5
**joining** 21:17
**joint** 64:6,7
**Jones** 9:10
**journalism** 37:25 114:20
**journalists** 16:25 27:13 207:7 220:3
**jow** 163:12
**JPEG** 130:15
**Judd** 148:9
**judgment** 192:8

**judicial**
20:11 21:2 138:17,18 208:6,7 219:19,23
**June**
11:15 18:10 142:7 171:17,24 213:13,15
**Justice**
10:4 28:15 102:15 104:20 208:23

**K**

**Katherine**
8:6
**keep**
130:19 151:21 152:2 153:5,8 154:25 155:3,8,9 160:12 166:7 168:2 187:9 191:14
**kept**
128:12 129:21 133:12 218:7
**Kil**
9:4
**Kim**
8:15
**kind**
97:14 114:19 126:14 131:10 132:17 137:18 139:12 153:16
**kinds**
126:7 132:24 202:12,16
**knew**
75:25 137:24 164:8,9 184:23 205:9,11,12, 20
**know**
10:18 11:3 22:7,12 25:14 28:11 35:2,16 36:7,15 50:24 52:21 65:14 66:5 70:19 72:11, 12,20 74:19 75:19 80:14, 24 82:24 85:6 86:11, 22 88:6 91:5 94:1,7 95:2 97:18 100:20 102:20,24 107:2,4,21 108:7 113:9, 10 115:7,10 127:3 130:4, 5,15 131:18, 19 132:14,19 134:3 135:15 139:13,17 145:13 146:11 147:7,25 148:1 149:17 156:23 164:10,20,25 165:19 166:4,6 170:16 172:4 174:8 179:17 181:8,10 183:25 192:14 193:6 194:2,12 196:9,18 197:14 198:25 200:3,10 202:3 204:9, 12,19,25 219:15
**knowing**
154:17 195:21
**knowledge**
35:20 80:23 81:15 102:19 143:4 145:5 147:24 214:16
**known**
30:14 69:20

**L**

**lag**
123:10
**Lahood**
199:19 200:7 201:6
**Lahood's**
200:6,11
**language**
106:9
**laptop**
72:25
**large**
82:2 130:24
**larger**
67:16 87:18 91:18 96:2 187:8
**lasted**
197:18
**late**
79:19 214:8
**launching**
59:10
**Laurie**
8:14
**law**
74:12,16 207:3,8
**lawsuit**
12:15 13:4 137:23 138:5,7 203:15,17
**lawyer**
58:18
**lead**
17:6 26:6,16 27:22 31:13 34:3,13 37:7 38:14 39:3 40:18 41:7, 17 43:11,25 46:17 47:18 48:22 52:11 55:13,15 63:15 65:9, 24 67:18 68:15 69:10 71:10 74:21 76:20 77:18 79:3,25 86:3 91:20 102:20 110:22 141:12 170:11,22 182:22 184:9 187:13 188:25 191:24 205:7 215:6
**leadership**
28:14,22 29:5,22
**leading**
35:25
**learn**
43:7 44:6 60:5 61:12
**learned**
184:6,15
**leave**
22:18 23:1, 19 109:1 130:24 140:15

**leaving**
217:17
**led**
112:25
**left**
23:4 82:9 93:14 128:4 135:5,18,20 140:14 144:25 149:8,9,10, 13,19 207:15 216:21
**legacy**
145:8
**legal**
8:16 12:5 148:8,18,20 175:10 214:11,14
**legally**
41:5,15 48:20 92:7
**Lele**
43:1 61:3
**Leslie**
9:3 208:22
**lesser**
176:13
**level**
105:21
**Liberation**
32:7,24 69:20
**Lies**
198:5
**light**
82:10 211:19
**lightest**
82:16
**limited**
12:15 133:3, 8 149:15
**line**
215:19 216:13
**listed**
24:9
**litigation**
12:14 14:4, 11 34:16 138:2
**little**
24:15 45:17 50:18 78:6 96:16 102:13 120:14 122:8 125:25 161:1 188:20 191:15 208:18
**live**
21:7
**lived**
130:3
**liver**
218:12
**LLP**
8:20,23 9:10
**local**
80:8,9
**locate**
163:6
**locating**
163:21
**lodge**
81:16 210:13,16,19 211:18,23
**London**
21:19
**London-based**
22:6
**long**
21:14
**longer**
13:8 22:22 192:16
**look**
16:3 22:15 96:17 131:5 158:2 172:9 193:9 198:21 199:10,14 206:25 209:12,13
**looked**
64:13 174:11 198:21 202:7,11 217:19
**looking**
59:4 94:8 96:17 113:12 118:1 120:19 198:13 206:24 217:8
**looks**
172:7 179:8, 20 195:8 199:25
**lot**
135:6 149:7, 17 156:12 174:12 206:15 209:8 217:6
**lunch**
97:9 108:19, 21 109:12

**M**

**made**
30:10,24 104:11 116:10 184:1 189:3 200:13 201:3 219:15
**Madison**
21:7
**mail**
214:10 216:3,24,25
**mailbox**
130:23
**maintain**
133:13 153:1 156:4 161:21 173:6 175:14
**maintained**
126:8,19 128:10
**maintaining**
132:3
**Major**
152:5
**make**
10:23 11:4 12:4 15:21 16:4 105:20 125:24 147:2 150:21 155:22 156:2 157:18 162:13 164:1 172:17 177:5,23 212:7 217:25 219:20
**makes**
97:10 213:5
**making**
188:18
**man**
217:20
**management**
19:23 27:2 29:21 64:10 111:5 112:21 131:11 132:8
**March**
138:25
**mark**
110:1
**marked**
11:17 18:22 24:1,4 62:24 63:2 73:11 81:22 82:4 110:3 158:22 159:1 171:10,13 178:22,25 179:4 192:17,20 206:2 209:3 213:22 214:1

216:9,10,16
**markets** 111:5
**marking** 82:6
**Maryland** 163:3
**material** 11:16 12:13, 21 13:1,18 14:1,2,8,14 15:8,9,10,11 19:21 124:22 135:15,22 206:17
**materials** 15:14,15,19 16:18 18:4 19:7 20:6 33:18 34:10, 20 35:17 77:8 121:17 124:19 125:22 126:7,17 128:18 130:5,19 131:25 132:3,25 134:18,24 135:10,12,25 136:3 137:1, 11 139:6,22 140:1,3,6,22 145:2,3 149:4 150:2 154:3,5,12, 16,25 155:4, 6,23,24 156:4,12,15, 21 157:2 169:23 173:3,4 201:9,17 202:1,12,17
**Matt** 9:10
**matter** 8:7 102:9 208:7
**matters** 127:10,22
**Maughan** 16:16 169:25
**mean** 13:4 27:6 29:1 33:8,14 35:3 53:14 54:15 67:6 74:10 76:13 87:7 116:14 132:18 135:7 150:7 155:10 156:7,8 177:8 198:6
**meaning** 80:8,24 167:25 205:24
**means** 37:20
**meant** 195:14 201:21 213:4
**mechanics** 132:19
**media** 33:15 203:19
**meet** 74:24 172:14 202:14
**meeting** 18:5 77:10, 15,22 172:1, 6 178:10 180:13 201:23 202:6
**meetings** 202:11
**Meier** 8:20,22
**member** 45:4 90:10
**members** 24:23,24 117:22 185:11,19 187:24 189:22 190:5 219:8
**members'** 186:6,23 187:21
**Memorandum** 98:6 106:5 108:8 112:19 113:1 130:17 196:2
**memorialized** 150:14
**memory** 22:14 50:18 108:13 109:18 144:17 192:15 199:6
**mention** 172:17
**mentioned** 140:20 178:19 180:3 181:6 193:17 201:15
**message** 143:20 195:17
**messages** 144:2,6,8 145:3,7,9 174:12 193:1,19 194:10 199:11
**met** 9:24 17:14, 18 164:23 178:5 180:10 202:9
**method** 39:4 47:4 62:18 87:10
128:23,24 141:7
**methods** 39:1 103:4 104:6 142:14
**Microsoft** 146:7
**mid-1980s** 85:19 88:8
**military** 32:7,11 44:25 45:4, 20 63:8 69:19 74:4 89:4 111:5, 10 112:1 134:12 186:23 220:11
**mind** 55:23 213:20 219:2
**Mine** 199:20
**minute** 83:21 115:1 119:12 193:8
**minutes** 12:8 14:21 90:6 91:16 166:1 193:21
**mirror** 217:5
**missing** 217:6
**misspoke** 137:20 141:23
**misstates** 51:9
**mm-hmm** 157:20 159:18 162:14 198:17 200:2
**modifying** 14:23

**moment**
34:6
**money**
190:4,23 214:12 216:4 220:9
**morning**
9:22,23 171:24 172:12 215:20,23 216:20 217:16
**mosaic**
170:25
**motivation**
188:19
**motivations**
188:22
**MOU**
114:6
**move**
166:4
**moved**
166:6
**movements**
34:11
**moving**
166:11
**multi-million-dollar**
59:11
**multiple**
57:4,7 190:12

**N**

**name**
9:25 25:5 27:23 31:13 94:13 98:11 99:5,9,17 100:4,10 101:10 106:24 131:17 147:8 162:9 168:3, 23 169:14 170:15 171:7 178:7
**named**
158:13 199:18
**names**
27:23 31:14 203:25
**naming**
162:8
**narrated**
111:1
**narrating**
73:24 110:17
**narration**
79:11 85:18 88:7 90:8 92:18 94:5 97:20,21 101:24 103:7 112:8 113:15 115:22 116:10 120:22
**Narrative**
215:15
**narrow**
125:2 139:10
**narrowing**
176:2
**national**
22:16 185:10 186:22 188:9 190:4 220:9
**National-guard-related**
157:16
**natural**
55:22
**naturalization**
94:9,12,20 95:12,14,25 96:18 124:11 133:15 135:17
**naturalized**
45:7 94:6
**nature**
51:2 146:8 165:9 186:13
**Naval**
28:17
**NCIS**
28:17
**necessarily**
161:23 162:3,8 198:20
**need**
11:1,3 19:14 101:21 109:1 137:19 191:18 198:20 207:9 210:24
**needs**
127:20 160:25 218:10
**network**
22:19
**never**
177:22 181:5
**newly**
159:12
**news**
16:20 17:2 21:13,14,15, 17,19,22,25 22:4,8,11, 18,21 23:5, 21,24 25:3, 21 26:23 27:9,15,21 28:3 29:11, 24 30:14,24 31:7,11 32:6 33:8,10,16 39:1,2 40:6 42:2,14 43:11,25 45:1,13,18 47:4,16 49:7 51:19 55:13 61:16 63:6,8 64:18 65:1 66:15 68:13 69:17 75:4 76:21 77:8, 23 79:3 83:6 87:10 88:10, 17 89:21 93:18 99:11, 23 101:12 106:3,4 107:12 109:14 110:14 111:7,14,24 114:22 121:18 122:13 123:23 124:23 125:21 126:4,8 131:6,20,25 135:5,8,19, 21 140:14,16 141:4,10 143:7,17 144:19,22,24 145:4,10,24 146:6 147:14 148:4 149:9, 10,14,20 154:8,14 155:16 158:12 162:3 168:1 169:1, 22,24 170:2 173:20 175:25 176:6 182:11,16 197:12,24 201:16,25 204:7 209:4, 10

**News'**
24:6,19 63:10 122:21 123:5 146:24 159:4
**NL**
16:16 169:25
**nods**
11:2,4 175:4 184:5
**non-immigrant**
42:25 43:9
**non-privileged**
127:9,21
**nonconfidential**
27:16 157:22 162:22 163:2 169:21 176:5 182:1,5
**nonpublic**
175:24
**Northern**
30:11 80:10, 22
**Northwest**
8:13 21:7
**nos**
11:3
**notebook**
149:5,6
**notebooks**
149:7
**notes**
16:20 127:13 149:2,12,22 203:5 214:11,15
**November**
21:15
**number**
8:10 117:22 144:11 190:10 194:18,19,21 199:25 209:8 210:7
**numbers**
194:2,3

**O**

**O'BRIEN**
9:1
**oath**
9:19 11:7 192:12
**object**
25:24 30:3 42:13 54:8, 25 58:2 126:20 128:1,22 136:6 151:10 153:3 155:14 157:8 162:18 168:25 169:16 170:4 173:18 175:12 176:7 182:21 184:8 196:13 202:21 209:23 210:22 216:12
**objected**
160:23 178:2
**objecting**
12:6 26:2 152:16 153:11 169:5 182:8
**objection**
16:14 17:16 23:9 25:19 27:8 28:4 29:9,23 30:22 31:9 34:1 35:19 36:20 37:6, 15 38:14,25 39:11,18 40:6,17,24 41:6,17 42:1 43:10,24 44:9 45:12 46:5,9,16 47:3,15 48:1,12,21 49:6 50:5 51:9,18 52:3,10 54:3 55:11 56:3, 14 57:9 58:7 59:22 60:6, 15,22 61:15, 25 62:11,19 65:7,16,23 66:14,25 67:9,17,25 68:14,24 69:8 70:25 71:9 74:20 75:13,20 76:15,20 77:14 78:10, 18 79:2,24 80:5 81:1,17 83:5,16 85:1 86:2,14 87:1,9,19 88:1,9,15 89:22 90:24 91:10,19 92:8,24 93:6,19 94:23 95:6, 19 96:3,11 97:3 98:15, 22 99:12,19 100:5,13,15 101:2,11 103:12 105:4,12,21 107:11,18 113:3 114:11 115:8,19 116:22 117:11 119:7 120:3,7,10 121:5,10,24 122:13,22 123:7,25 124:21 125:14 127:19,24 128:8 134:20 136:5 141:6 142:13,22 152:4,6,7,8 153:14,19 154:19 158:6 159:21 160:14 167:19,23 168:4,13 170:18,19 173:8 174:19 175:10 177:19 181:19 182:3,6 185:4,24 188:3,13 189:8 209:21 210:13,17, 18,20,24 211:7,19,23 212:8 215:8 217:12 218:2,6,22 219:5,24
**objections**
207:18 211:13
**obligation**
14:10
**obtain**
33:25 34:15 37:13 43:17 44:12 46:14 47:2 50:4,11 51:5,7 52:1, 8 58:12,15 65:6 72:1 79:21 84:23 86:1,19 87:6,16 90:23 91:17 93:5 94:16,

19,22,25
95:25 115:18
117:7 119:25
125:3 126:4
129:24
161:19
207:21
**obtained**
17:1 27:14
32:6 33:8,
14,17,21
34:24 65:1,
3,12 69:17
70:12 72:5
75:21 84:20
85:23 89:20
90:4,20
92:20 95:12
115:15
116:18 117:5
118:22
124:18
128:11
130:12 131:1
155:24 163:7
165:20
**obtaining**
50:24
**obvious**
153:7
**obviously**
100:20
156:12
163:16 176:8
199:3 206:15
208:13
**occasion**
77:7
**occasions**
162:2 196:20
**occur**
111:19
218:21
**occurred**
114:10 122:6
135:18
**offered**
23:23,25
**offering**
163:22
**office**
61:5 77:7
102:8,23
103:9 104:11
107:1 123:23
196:19
197:25
200:6,12,14
201:4 204:20
**Office's**
103:19
183:18
**officer**
32:7,24
69:19 70:3
**offices**
83:12
189:19,23
201:16,25
**okay**
10:9 35:9
53:6,19
54:22 56:20
57:23 58:22
65:14 72:12
74:24 84:4
97:20 98:4
104:9,23
108:14
113:18 115:1
118:16
120:19 121:7
123:15
128:15
129:23
130:10 131:8
133:6 134:6,
17 135:1,18
136:25
139:14
140:14 142:9
144:14
146:13
147:4,19
148:11 149:6
150:8,21
152:1 156:10
157:18 158:3
159:19
160:19
162:15 171:3
172:7 174:25
177:17 178:4
180:24 181:8
183:22
190:18 192:3
193:24
194:4,25
197:16
198:25
199:9,13,23
202:16
203:6,22
204:14,23
205:14
208:17 209:1
212:22
213:16
219:14
**on-air**
122:6
**on-camera**
77:2,13
88:24 151:24
172:22
173:17
175:21
176:16 202:4
**on-the-camera**
151:16
**on-the-record**
152:11 160:3
161:7,8,14
168:22
169:13
**once**
165:19
**one**
19:6 22:16
30:15 34:6
36:8 42:8
45:17 50:14
53:5 69:9
71:18,19
97:14 103:21
112:23
114:16,22,24
115:1 118:5
119:12
133:14 134:3
138:6 145:19
157:16
169:10
183:25
185:21
190:10
194:13,23
199:10
205:5,20
209:10 213:3
219:8
**ones**
112:6 133:9
145:24
**online**
59:11 111:4
209:4
**opened**
214:10 216:3
**operation**
74:18 186:5
**operator**
8:15
**opinion**
104:18
207:20
**opportunity**
14:22 22:20
23:25 108:4
213:1
**opposed**
72:7
**option**
207:14
**options**
190:10
**order**
11:14,16,19,
24 12:3,7,
11,12,24
13:2,7,10,

12,16 14:1, 11,19,24 15:4,7,12, 18,23 16:1,7 18:17 19:7, 19 20:8,9, 10,11,16,22, 24,25 21:2,3 82:5,13,22 127:7,13,19 160:9 192:23 206:12,24 207:25 208:4,5,6,8 219:16,19

**ordered** 20:2 82:11

**organization** 33:15,16,17 37:24

**orient** 138:25

**original** 18:2 20:17 200:23

**originally** 18:9 35:3,4

**origination** 134:5

**outcome** 190:14 192:15 205:24

**outside** 15:20 18:5 79:12,22 167:25 168:20 169:11 170:8 203:22

**overcome** 176:11 207:19

**overcomes** 207:10

**overlapping** 120:15

**overrule** 212:15

**overruled** 211:14

**oversight** 199:7

**P**

**p.m.** 195:2

**pad** 214:11,15

**page** 32:14 33:5, 20 36:7,16 37:4 38:3, 19,23 40:4 42:11,19 49:12 52:19, 22 53:18 59:7 64:16 68:6 71:16 82:8 193:24 195:1 199:14,16,21 207:1 209:14 215:14 216:21,22, 23,25 217:1

**pages** 34:25 199:15

**Pamela** 25:1,3,11 26:8,20 63:24 110:24 194:12

**paper** 25:14

**papers** 139:18

**Pappa** 105:10,18 159:9,17 160:22 162:16 163:6,16 164:2,6,8, 18,20 165:5, 12,16 166:22 167:2,8,17 168:11,23 169:14 175:2 177:18 178:2,4,9,19 180:4,10,14 181:13,18 182:2,13 183:1,10 184:24 205:7,16,23

**Pappa's** 100:3 165:8 167:13 168:2 170:15 171:7 181:3 184:21

**paragraph** 13:15,21,25 15:6,13 28:10,13,24 29:6 30:9 31:6 32:5, 16,22 33:1 42:20 44:20 45:17 47:12 48:10,18 49:15 52:19, 25 53:3,7,20 54:2 55:7,25 56:2,9,20 57:19,24 59:6 61:2 64:17,20 69:16 70:2, 5,8 159:12 207:3

**paragraphs** 159:8,15

**paraphrase** 185:18

**Pardon** 52:22 94:17 140:4 199:23

**park** 217:17,19 218:7

**parked** 214:17,23

**part** 14:6 17:1,5 25:4 27:14 29:11 30:21, 24 35:16 47:25 50:15 63:22 67:23 74:9,10,13 87:24 96:10 131:15 165:12 170:2,25 175:25 176:5 191:18 204:5 216:23 217:6

**participating** 187:13

**participation** 176:20 188:24 189:13,17

**particular** 17:4 31:12, 22 39:4 50:19 51:15 54:6 55:1, 12,14 56:4, 16 145:18 167:16 215:7 219:3

**party** 13:12,17,22, 23 14:3 32:8 45:5 90:11 108:4 134:8

**passenger** 215:24

**past** 114:24

**Patrick** 8:25

**pattern** 216:5

**PDF**

129:25 130:14
**pen** 146:17
**Pentagon** 28:16
**people** 97:2 203:20
**people's** 32:7,24 69:19 218:10
**perceives** 218:15
**percentage** 174:16
**Perfect** 146:8
**period** 133:4 140:9, 12
**permitted** 41:5
**person** 38:18 41:2 86:23 95:5 98:11 99:4 116:10 121:9 126:16 148:6 150:1,9,11 156:5 162:4, 7,9 178:10 180:11,13 200:1
**personal** 70:19 86:9 117:17 141:5,9,17 142:4,21 144:16 145:14,20 171:20 185:12 186:6 187:7,21 216:24,25
**personally** 132:23 218:16
**persons** 41:2 150:2, 9,12 155:23
**perspective** 167:1
**pertaining** 90:17 91:6 125:4 135:25 137:3 139:22 140:15 143:2,10 144:6 149:12 154:3 201:13,17 202:8
**peruses** 19:1 193:3, 10
**Ph.d.** 43:3
**Philbin** 8:25 11:13 12:4 16:3 17:16,18,25 20:19 23:9 25:19 26:4 27:8 28:4,25 29:9,23 30:22 31:9 33:22 34:1 35:6,19 36:10,20 37:6 38:5, 10,14,25 39:11,18 40:6,17 41:6,17 42:1,13 43:10,19,24 44:9,14 45:12,21 46:5,9,16 47:3,15 48:1,12,21 49:6 50:5 51:9,18 52:3,10 54:3,25 55:11 56:3, 14 57:9 58:2,7 59:22 60:6,15,22 61:15,25 62:11,19 65:7,23 66:14,25 67:9,17,25 68:14,24 69:8 70:25 71:9 72:23 73:1 74:20 75:13,20 76:4,15,19 77:14 78:3, 10,18 79:2, 24 81:1,16 83:5,16 85:1 86:2,14 87:1,9,19 88:1,9,15 89:22 90:24 91:10,19 92:8,24 93:6,19 94:23 95:6, 19 96:3,11 97:3,8 98:15,22 99:12,19,22 100:5,15 101:2,11 103:12 105:4,12,20 107:11,18 109:8 113:8 115:8,19 116:22 117:11 119:7 120:10,16 121:6,10,24 122:13,22 123:7,25 124:21 125:7,14 126:10,20 127:21 128:22 129:9,19 131:12 133:2 134:20 136:5,18 141:6,12 142:13,16,22 146:1 150:20 151:10 152:4,7 153:3,19 154:19 155:14 157:8 158:6 159:21 160:2,14 161:4,16 162:18 165:25 166:10 167:19 168:4,13,25 169:16 170:10,17,22 173:8,18 174:7,19 175:10,23 177:19,25 181:19 182:3,15,21 183:5 184:8 185:8 192:22 194:7 196:13 202:21 203:6 208:17 209:23 210:7,12,16, 22 211:10,25 212:7,21 213:24 215:10 216:8,15 217:13 218:4,19 219:1,13 220:13,17
**Philbin's** 152:6 211:7
**Phillips** 8:19,20,23

9:21,25 15:1 17:11,17,21 18:3,20 19:2,10,13, 16 20:20 23:12,14 24:3,16 26:1,15 28:1,5 29:3, 15 30:4 31:2 32:1 33:24 34:21 35:8 36:3,13,24 37:9,17 38:8,12,16 39:5,12,21 40:9,20 41:1,9,20 42:4,15 43:13,21 44:2,11,16 45:16,23 46:6,10,19 47:7,20 48:2,13,24 49:8 50:6 51:11,21 52:4,14 54:9,10 55:3,17,24 56:1,5,19 57:10 58:5, 8,20 59:2 60:1,7,16,23 61:18 62:1, 12,20 63:1 65:10,17 66:1,17 67:1,10,19 68:1,16 69:1,12 71:1,12 72:25 73:3, 14 74:23 75:14,24 76:6,16,22 77:20 78:7, 11,20 79:5 80:1 81:2,18 82:1,6,10, 14,20 83:7, 17 85:2 86:4,15 87:2,12,20 88:2,12,18 90:1 91:1, 11,22 92:10 93:1,8,22 94:24 95:7, 21 96:5,12 97:4,10,13 98:17,23 99:13,20,24 100:6,21 101:4,14 103:13 105:5,13,23 106:15 107:13,19 108:18 109:6,10,25 110:5,11 113:5,14,21 114:13 115:9,21 116:7 117:1, 12 119:8 120:4,8,11, 17,18 121:8, 11 122:1,15, 24 123:9 124:2 125:1, 9,16 126:12 127:6 128:3 129:2,13,22 131:16 133:5 134:21 136:8,15,20 141:9,15 142:15,18,23 146:3 151:2, 17 152:5,17 153:12,22 154:21 155:20 157:11 158:7,20,24 159:24 160:5,10,19 161:12,17,18 162:24 166:3,8,11, 17 167:21 168:7,17 169:6 170:5, 13,19 171:2, 12 173:11,24 174:10,24 175:16 176:8,15 177:21 178:3,18,24 181:22 182:9,18,24 183:8 184:11 185:6,13 186:2 188:5, 15 189:10 192:19,24 193:4,13 194:11,16 196:17 202:24 203:3,11 206:4 208:11 209:21 210:14,18 211:1 213:2 215:8 216:12 217:12 218:2,6,22 219:5,24 220:15,22

**phone**
9:9 107:2,6 134:3,15 140:21 144:13,15, 16,20,21,24 145:3,8,10, 14,19 174:11 194:19,21 199:25

**photo**
32:8,19,22 33:2,3 64:25 65:3,6 66:5 69:21 70:2, 22 119:4 134:2 209:11,13, 15,17,19 216:19

**photograph**
32:15 65:12, 14,20 66:13, 22 67:5,14, 23 68:5,8, 10,22 69:5, 17 70:4,9, 12,16,20,24 71:5 84:12, 18,20 85:8, 23 86:1,9, 11,19 87:6, 16 88:6,14 89:8,18 90:3 115:4,7,11, 15,18,23 116:9,17 117:6,7,14, 17,20,21,25 118:23 119:3,6,18, 21,22,25 120:5,12,20 121:2,4,14 133:22 134:11,13

**photographic**
71:17

**photographs**
33:19,25 34:24 35:2, 4,16 36:7,16 37:4,13 38:3,18,23 39:9,17,24 40:3,12,15 41:3,14,25 42:11 69:6 71:22 72:1, 10 124:8,10, 19 125:3,11,

22 126:5 132:23 134:22 135:16 150:3 154:4 155:1 156:16 202:7,19

**photos**
32:5 33:7 36:17,22 69:17 71:23 72:4 111:7, 25 112:2,4 115:23 116:11,14 209:9

**phrase**
156:24 198:5

**physical**
47:1 87:7 128:13,14 129:18 133:19 136:2 139:6

**pick**
120:15 124:11

**picture**
64:20 85:19 116:15 210:25

**piece**
177:13

**pieced**
170:24

**pieces**
72:18 157:19

**Piro**
31:16 34:7 46:18

**PLA**
49:17 56:22 64:25 69:20, 23 70:3

**place**
51:17 77:23 124:6 129:21

138:20,25 198:21

**plaintiff**
8:21,24 9:20 10:1 17:7 109:7 212:2

**plaintiff's**
15:3 24:5 26:25 28:10 33:4,20 34:25 36:8, 16 37:5 38:3,19,24 40:4 42:12, 19 49:13 52:20 59:4 63:3,5 64:16 68:6 69:7 71:16 73:8, 16 79:10 82:3 83:21 84:6,13 88:23 92:15 97:17 110:1, 13 115:2 118:4,17 119:13,17, 22,23 158:20 159:1 166:19 171:14,15 179:1,4 192:21 193:15 199:11 206:7,9 209:3,13

**plaintiffs**
34:13 209:2

**planned**
198:25

**platform**
96:10

**play**
72:18 110:1 111:2 113:15,17 116:1,4 207:6

**played**
73:13 106:13 110:10 113:19 116:6 196:8

**player**
49:21

**please**
8:17 9:13 81:13 106:10 187:19

**pledge**
151:1 220:4

**point**
15:6 22:16 45:21 55:22 72:21 108:19 126:21 127:2 138:6 157:16 166:2 205:18 213:3 218:21

**pointing**
89:16 96:20

**points**
162:5

**police**
214:5,7

**Policy**
43:3

**poor**
186:21

**portion**
97:25

**portions**
110:8

**pose**
23:15 193:7

**position**
15:3,17,24 16:2 22:24 161:12 170:6 176:13

**positions**
102:8

**possessed**
13:1 36:17

**possession**
14:6 15:20 16:9 17:5 35:4,21,22 36:9,15 37:4 66:12 75:21 137:3 143:9 211:21

**possibility**
190:23 191:1

**possible**
82:16 196:16 204:9

**Possibly**
158:17

**posted**
146:24

**potential**
190:7,20

**potentially**
12:21,24 14:10,15,19 31:23 34:3 35:25 36:22 39:2 40:18 45:14 51:20 52:11 65:9 89:24 116:24 143:12,13 171:1 181:20 191:24

**Powerpoint**
47:25 67:24 87:25 96:10 130:15

**practice**
114:21

**precedes**
199:3

**precludes**
13:17

**prefer**
177:14

**preferred**
192:15

**premarked**
213:17

**preparation**
17:23 145:22 146:5
**prepare**
17:13 18:5
**prepared**
14:25 16:19 26:23 80:4,6 169:23
**prescheduled**
109:2
**present**
12:18
**presented**
11:13
**preserve**
182:6
**president**
30:12 111:8
**press**
107:1 207:5
**presume**
146:25 151:7,19
**prevents**
99:8
**previous**
211:9
**previously**
66:7
**primarily**
110:20 149:21
**primary**
25:16 128:6
**principal**
63:13 205:6, 21
**principle**
187:8
**print**
82:10,16 129:25
**printed**
67:6 87:7 129:17 130:18
**prior**
21:17 22:13 41:24 51:10 61:13 75:12 77:13 83:11 136:24 137:6 139:4,5 164:20 178:9 180:13
**Privacy**
19:21 20:6 127:10 129:4 137:23 206:16 212:3
**privilege**
14:14 16:13, 15,18,24 17:16 25:19, 20 26:14 27:8,9,12 29:9,14,23 30:22 31:1, 9,18,25 34:1,5,12, 17,18 35:19 36:1,20 37:6 38:25 40:8, 17 41:6 42:1 43:10,24 44:9 45:12 46:5,9,16 47:3,15 48:12,21 49:6 50:5 51:18 52:3, 10 54:3 56:3 57:9 58:7 59:22 60:15, 22 61:15,25 62:11,19 65:7,23 66:14,25 67:9,17 68:14,24 69:8 70:25 71:9 74:20 75:13,20 76:20 77:14 78:10,18 79:2,24 81:1 83:5,16 85:1 86:2,14 87:1,9 88:9, 15 89:22 90:24 91:10, 19 92:8,24 93:6,19 94:23 95:6, 19 96:3 97:3 98:15 99:12, 19 100:5,15 101:2,11 103:12 105:4,12 107:11,14 117:11 119:7 120:10 121:10 122:22 141:6 142:13 152:16 153:11 158:6 169:5,17 170:4 173:19,23 175:14 176:1,3,11 181:21 182:4,7 206:22 207:11 210:1
**privileged**
39:20 124:24 159:23 160:4,18 173:10 174:21
**privileges**
61:5
**prizes**
114:22,24
**probably**
51:7 97:10 137:25 139:3,4 143:8 144:4 205:18
**probe**
30:16
**probing**
127:2
**proceed**
102:4,11 103:2 104:4, 8,11 194:7
**proceeding**
12:16 104:5
**process**
25:21,23 26:12,24 27:10,21 29:12,25 31:12 39:1 40:7 42:2,3, 14 43:11,25 45:14 47:4, 16 49:7 51:19 55:14 59:10 61:10, 16 66:15 68:25 76:21 78:19 79:3 83:6 87:10 88:10,17 99:23 101:3 107:12 121:25 122:14,23 124:1,23 125:15 128:1 131:14,15 132:4,12 137:16 147:5 148:25 154:20 155:17 167:20,25 169:1 170:2 173:20 175:25 176:6 182:17
**processing**
146:14

**produced** 12:19 13:13 15:14 16:6 192:25 193:18
**producers** 64:2,3
**producing** 13:17,22,23 14:3
**product** 17:20
**production** 131:22 132:14,21
**program** 49:22 56:23 73:22 145:25 146:16 147:8 185:16
**projects** 150:24
**promise** 155:18,22
**pronounced** 163:12
**proper** 14:18
**properly** 206:8
**properties** 83:15
**prosecute** 103:19 105:1,11,19 183:18 184:1,22
**prosecution** 205:25
**prosecutors** 184:1
**prospect** 190:7,20 191:4,12 192:9
**protect** 13:10 150:22 219:22
**protected** 12:13,20 13:1,13 14:1,2,8 15:7,9 34:12 129:4 206:17 210:1
**protection** 13:24 14:18
**protective** 11:14,15,24 12:3,7,11,12 13:7,10,11, 12,16,25 14:19,24 15:4,7,12, 18,22 16:1 19:7 82:5, 12,21 192:23
**protects** 16:25 25:20 27:9,13,15
**protocol** 131:24
**provenance** 121:1
**provide** 20:4 38:2 40:15 47:5 60:11 62:6 66:22 73:9 75:22 77:17 98:21 107:9 121:3 147:13,15 148:17 157:2 162:21 163:1 170:10,23 196:21 201:8,12
**provided** 38:18 39:9, 17,24 40:5, 11 41:3 43:22 46:24 47:1,13 48:9 50:10,17 58:6 60:20 68:22 69:6 70:15,23 85:8 87:24 88:14 91:6 92:6,23 96:9 98:14 107:15 117:14 118:19 119:6 120:5,13 121:14 144:21 148:14,22 150:2 151:13 154:3,11,15, 16 155:6 156:18,21 173:3,4 182:20 184:16 196:24 199:25 206:16
**provider** 173:6
**provides** 37:24 162:5
**providing** 72:7 77:16 156:6 174:22 188:1,12
**provision** 13:11
**proximity** 214:24 217:1 219:10
**pry** 25:22 29:24
**public** 30:10 43:3 156:19 206:10
**publication** 147:9 157:4 176:25
**publicity** 186:9
**publicly** 73:5 196:5 220:8
**publish** 122:21 156:22 161:22
**published** 24:6,13,19 35:14 42:9 63:10 123:5, 12,20 145:24 148:3 156:14 167:11 168:11 175:6 177:15 179:22 200:24 209:4,20 211:22 212:4 213:9
**publishing** 41:24
**pull** 83:25 84:2 85:13
**purge** 130:24
**purpose** 12:14 13:3 108:1
**purposes** 13:19 175:9
**pursue** 49:19
**pursued** 157:17
**Pusch** 8:20,23
**push** 45:16
**put** 14:17 20:15 25:14 112:10 113:1,25 125:11,12 129:17 147:7

186:6,22 189:7,13 195:11,17 212:14
**putting** 15:1 110:20 112:18 161:2 187:21

**Q**

**qualified** 207:10
**quarters** 42:20
**quash** 18:14
**quashed** 126:24
**question** 10:17,19,22 16:12 20:6, 13,18 21:5 23:15,16 24:14 26:3, 23 28:7 29:10,17 30:6 31:4 32:3 34:23 36:5 37:1,11 39:7,14 40:22 41:11, 22 42:6,17 43:15 44:4 45:22,24 46:12,21 47:9,22 48:4,15 49:1,10 50:8,12,14 51:23 52:6, 16 53:25 54:4,5 55:5 56:7 57:12, 18 58:10,14 60:3,9,18,25 61:20 62:3, 14,22 65:18, 24 66:3,19 67:12,21 68:3 69:3,14 71:3,14 75:16,24 76:3,4,19 77:22 78:13, 22 79:7 80:3,4,6 81:4,14,20 83:9,19 85:4 86:6,17 87:14,22 88:4,20 91:3,13,24 92:12 93:3, 10,24 94:1 95:9,23 96:7,14 97:6 98:19,25 99:15 100:1, 8,17,23 101:6,16,22 103:15 105:7,15,25 107:9,20 113:6,8 116:8 119:10 120:12 121:2 122:3,17,19 123:1 124:4 125:2,18 126:2 129:5, 10,11,24 130:4,6 131:22 133:6 142:24 144:1,14 146:2,4 147:25 148:20 151:11,18 153:14,24 154:23 155:21 156:1,20 157:13 158:9 159:25 160:25 162:23,25 167:22 168:8,18 170:12,17,20 171:6 173:13 174:1 178:16 181:24 183:6,15 186:20 187:10,17 188:20 190:18 191:19,20 192:12 193:7 201:21,22 203:1 210:4 211:4,16,19, 24 212:6,11 213:17
**question-and-answer** 10:12
**questioned** 59:13,19
**questioning** 216:13
**questions** 17:9 20:5 27:19 34:19 39:19,24 44:22 55:19 72:19 110:2, 8 121:16 127:14,20 166:18 169:2 170:1 175:14 203:13 206:16,18 208:10,13, 16,25 210:8, 22 211:6,12 212:15,23 220:14
**quick** 10:10
**quickly** 217:22
**quite** 217:7
**quote** 111:3,10 209:15
**quotes** 57:14

**R**

**radio** 21:21
**raid** 35:18 61:3, 14 65:21 79:13,23 80:19,20,24 86:12
**raids** 28:23 30:10 83:1,4
**raised** 12:7 14:21
**rales** 218:22
**ranks** 21:21
**ransacked** 214:9
**ransacking** 216:22
**reach** 76:13,14 78:24 165:20 196:10
**reached** 108:5,6,9 165:19 190:11 196:18
**read** 15:25 28:19 30:17 32:12, 16,23 42:23 43:5 44:22 45:8 49:23 59:16 101:20

120:16 138:3 207:1,3 215:22 220:16

**reading**
15:4

**ready**
193:6

**real**
10:10

**realized**
217:23

**rear**
215:23 216:21

**reason**
10:25 11:9 20:12 123:20 145:18 157:25 167:16 208:8 220:6

**reasonable**
207:14

**recall**
50:20 51:14 57:5,6 72:4, 11 74:5 77:10 78:4,8 79:15 83:25 85:7,18,21 89:1 90:7 97:25 102:5 106:8,24 107:22 109:15,17 111:11 112:11 114:21,25 123:3,10 132:7 133:16 134:13 138:1,10,12, 16 143:14 148:25 158:2,3,11 161:10 163:7,23 164:13 165:6 177:1,2,16 178:1,11,12, 21 179:25 180:15 183:20 196:15,16 197:11,16,24 198:1,10 200:15 201:6,14,19, 22 204:10,12 205:14,19

**receive**
13:23 38:22 61:23 67:5, 14,23 69:5 71:6 112:21 156:15 196:3

**received**
12:22 19:22 31:23 34:20 41:13 43:3 48:17 49:5 68:10,19 89:24 92:2 93:17,20 97:1 99:10 101:1 116:24 128:24,25 138:9 143:11 144:10 156:13 213:11,13

**recent**
197:13

**recently**
159:8

**recess**
58:24 108:21 136:11 166:14 203:8

**recognize**
24:5,8 73:17 159:3 179:5 206:13 214:2

**recognizes**
207:4

**recollection**
22:5,9 23:3 25:11 29:2 51:4,7 72:19 76:7 77:4 106:25 108:10 111:21 113:11 122:7 123:18,19 131:3 146:9, 19 147:15 148:16 157:5 158:18 164:11,24 165:22 175:20 181:15 189:21 196:25 198:3 200:5,13 201:11 202:5 204:19 219:7

**record**
9:24 14:17 15:2 16:5 26:2,7,9 42:23 44:22 50:19 51:15 58:23,25 75:5,10 82:19 91:6, 15 92:2 95:13 108:20,23,25 134:6 136:10,13 143:22 153:6 156:24 157:3 165:23 166:13,15,25 170:6 176:8 186:12 203:7,9,21 211:11 212:14 219:16 220:19,21

**recording**
131:25

**records**
34:9 45:2, 11,19 46:1, 8,15,23 47:11,24 48:10,18 49:4 59:14, 20 95:15 124:10 126:5 132:24 134:22,25 136:24 140:7,13 144:18 149:16,18,23 150:4 154:5 155:2 163:4 174:11 186:23 202:8,20 205:2 213:10,11 216:2

**redacted**
18:24 19:6,8 206:3,8,10

**refer**
20:17 28:23 29:8 31:15 138:14 159:8

**reference**
28:21 70:2 116:10 119:17 134:7 164:2,5 172:4

**referenced**
28:24 35:18 111:23 133:1 134:19 162:17 209:9

**references**
52:25 97:21

**referred**
47:11,24 48:10,18

54:1 56:17 57:23 116:20 138:17 194:3
**referring** 13:15 32:23 33:3 46:7 53:3 55:10 56:2 57:3 70:4 77:2 112:2,14,18 115:24 119:23 209:17
**refers** 31:6 33:1 53:20 55:7 56:9,10 70:8 115:23 159:12
**reflected** 30:2 63:16
**reflecting** 54:22 57:8
**reflection** 199:2
**reflects** 163:18
**refresh** 72:18 109:18
**refuse** 81:12
**regard** 46:4 176:3 187:1 204:11
**regarding** 106:20 107:10 163:1 165:14 174:4 202:2 203:17 206:17
**regime,'** 45:6
**relate** 128:25
**related** 19:21 20:5 111:17 129:10,20 132:10 140:7,13 175:25 179:23 181:13 185:11 216:5
**relates** 168:5,14 169:17
**relating** 126:22 135:12 136:3 139:7 140:1 181:18 182:2,14,15 183:1,6,7,10
**relation** 77:17
**relationship** 157:10
**relevance** 23:9 123:8 216:13 217:12 218:2 219:5
**relevant** 127:10,11,12 130:13
**relied** 165:22
**relief** 208:14
**relies** 218:13
**reluctant** 176:19,21
**remain** 150:25 220:4
**remains** 29:13 30:25
**remember** 51:2 124:6 132:9 164:4 165:2 198:16
**remembers** 160:3
**remotely** 59:14,20
**removed** 215:25
**renew** 127:16
**renewal** 98:3
**renewing** 23:7,18
**repeat** 23:16 57:18 58:14 146:1 162:1
**rephrase** 189:11
**replaced** 18:23
**report** 24:8 63:8 64:13 73:17, 22,25 77:3 83:22 88:7 89:3,11 90:7,14,16 93:18 94:4, 12 101:18,24 102:10 106:18 109:13,16,17 110:14,18,21 113:13 122:12 133:1,17 142:12 152:19 153:7 155:13 185:17 195:4,13,14 198:11,14 200:17 209:4,20 214:5,7
**reported** 107:23
**reporter** 8:14 9:13 10:13 16:19, 22 21:21 24:14 26:6, 16 28:2 34:11 37:19 63:15 73:9 102:21 110:22 169:24 178:15 220:24
**reporter's** 16:13,15,17, 24
**reporters** 150:21 220:2
**reporters'** 214:11
**reporting** 12:23 13:6,8 14:7,16 16:11 17:5 19:23 26:21 27:7,20 33:21 38:2 45:10,25 49:25 51:25 53:11 54:13, 24 57:25 58:16 61:10, 22 62:5 63:20,23 64:1 65:4 66:21 70:13 72:2 75:6,9, 12,19 76:13 84:21 85:24 86:20 90:21 92:21 94:15, 18 101:8 105:17 111:14 112:25 114:10,19 115:16 116:19,20 120:1 121:3, 17 124:18 125:20

128:6,12,17 129:6,11,21 130:12,13 132:10 134:19 136:3 137:4 139:23 140:3,9,16 141:2,4 142:21 143:2,6,19 144:6 149:1, 12,23 150:23 151:8,20 152:12 153:18 155:7,9,25 156:3,14,19 157:1,7,10, 21,23 158:4, 5 162:12,17 165:17 167:17 168:3,11,22, 24 169:13,14 170:16 171:8 175:6,19 176:17 177:15 178:20 179:24 180:4 181:6,9 185:2,22 187:3,13 188:25 189:13 190:14 191:24 195:18,22 196:7,12,19 197:13 198:9 201:10 204:1,4,6, 15,17,18 219:9 220:5, 7

**reports** 18:2 72:16 111:18 112:5 114:22 121:19,21,23 123:23 124:9 125:12,13 151:4 177:7 209:10

**represent** 8:18 9:25 19:18 109:4 138:15 208:24

**Representative** 200:6,11

**representing** 9:1

**reputation** 199:3

**request** 107:5 170:3

**requested** 199:5 207:9

**requesting** 210:10

**requires** 103:3

**requiring** 18:17 19:20

**research** 43:2 44:8 72:6 185:12 186:7 187:22 190:5

**researchers** 72:9

**reserve** 211:11

**reserves** 195:5 208:13

**reside** 147:22

**resource** 16:18 169:23

**resources** 101:25

**respect** 20:7,23 26:20 63:25 78:2 103:9 104:10 112:17 119:2 128:9 141:2 147:20 148:11 152:3 153:17 154:25 162:4 163:10 175:2 176:11 190:18 208:3 219:16

**respectfully** 21:4 29:18 32:4 37:12 40:23 44:5 47:10 49:11 60:4,19 62:15 65:13 66:4,20 67:13 69:15 71:4 77:24 78:23 85:5 86:7 88:5 90:5 91:4,14 93:4 95:10, 24 98:20 100:9 103:16 105:8 117:4, 15 121:15 122:18 125:19 142:25 150:6 153:25 171:9 173:14 186:19 190:2 203:2 208:9 210:5

**respective** 102:8

**respects** 160:13

**respond** 108:4

**responded** 179:12

**response** 107:5 172:7, 12

**responses** 11:1

**responsibility** 124:13 128:7

**responsible** 110:20

**rest** 109:4 130:19

**restrictions** 12:11 13:20

**result** 114:10 195:22

**retrieve** 19:11

**retroactively** 169:10

**return** 14:12 144:24

**returned** 14:3 145:4

**reveal** 45:14 51:20 116:23 157:9 162:19

**revealed** 111:7,24

**revealing** 115:20 155:15 159:22,25 184:9 202:22

**review** 17:15,24 18:4 20:11 21:2 45:11, 25 46:3 50:1 53:12 54:11, 19,22 61:23 108:8,11 112:10,18,23 113:2 114:1, 9 147:6 148:13 182:7 193:20

195:4,11,13, 18 208:7 219:19,23 220:18
**reviewed** 11:23,24 17:19,23 18:1 30:13 31:7 45:2,18 57:6,24 121:18 148:4,7,18 198:12
**reviewing** 106:5 107:24 109:12 112:19 114:5
**revisit** 191:24
**revocation** 185:23 186:11 188:25
**revoke** 186:18 187:15 190:21 191:12 196:2
**revoking** 190:8 192:9
**Rhoads** 44:21,24 74:3,7,19,25 75:4,8,11,19 76:8,12,24 77:1,6,22,25 78:9,25 82:25 83:14 97:22 98:5, 12,21 99:5 100:11 122:6 123:21 138:4,11 141:16 142:7,10 143:21 144:8,15 145:7,14 151:3,8,12, 18 152:2,14, 18 153:1,17 157:6,22 158:3,15 159:19 160:12,21 161:6 162:15,21,25 163:5,9,20 165:3,7 168:10,20 169:12 170:7,14 171:3,4,6, 16,24 172:11,23 173:5,16 174:13 175:1,17 176:16,25 177:5,14,22 179:6,9,17 183:17,24 184:14,20 185:1,14 187:11 188:17,21,23 189:18 190:1,7,13, 19,25 191:10,23 192:4,25 193:1,5,18, 19 194:5,15 195:1,3,9, 16,20 199:12,14,18 200:3,10,24 201:8,13,15, 23 202:6,11, 17 203:15 204:17,24 205:5,10,13, 15
**Rhoads'** 78:16 138:24 164:14,16 178:10
180:17 184:12 187:17,25 188:19 189:24 191:6,8
**rid** 136:23 137:20 139:6 140:6 149:7
**right** 24:12 28:19 30:17 32:12 43:5 45:8 49:23 52:22 59:3,16 73:15 79:18 102:12 108:18 109:11,19, 23,24 115:22 116:8 156:23 162:11,12 185:9 193:8 194:2 199:4, 8 200:17,21 203:12 206:22,24 208:14 211:11 212:5 217:6
**rights** 14:13 20:13 21:4 38:21 208:9
**ring** 142:1
**rising** 21:20
**risk** 186:7,24 187:7,22
**risks** 188:10 190:5
**road** 217:3
**Rock** 217:19
**role** 17:2 27:1,15 74:15 131:22,23 151:14 169:22 181:3 196:8 207:5
**roles** 25:3 26:20 63:25 151:14
**room** 33:10 136:12
**Rosslyn** 111:6
**round** 203:19
**rule** 114:23 211:13,15
**ruled** 20:10 21:2 176:10 207:17 208:6
**rules** 10:10
**ruling** 176:2,10
**run** 106:7
**running** 217:17 218:7
**rush** 220:23

## S

**sacred** 220:1
**salute** 69:22 70:9
**saluting** 32:9 33:2 70:16 71:5 119:18 120:22 121:4 133:23 209:16

**satisfy**
154:14
**save**
131:8,9
132:1 149:4
**saved**
129:14
130:16
131:13
132:11
**saving**
132:7,9
**saying**
29:4 149:19
171:25
**says**
13:16 14:1
27:12 28:13
29:6 30:9
32:5,18 33:7
42:24 44:24
45:18 46:7
49:15 53:23
56:15,20
59:9 61:2
69:17 85:18
127:21
185:18
195:3,13
207:2,4
215:15
**scattered**
216:3
**scenario**
161:24
**school**
32:20 63:7
74:8,18
111:4
112:10,18
113:13,25
186:22 188:9
190:4 192:16
**school's**
28:14,22
29:5
**scope**
127:5
**screamed**
218:3
**screen**
90:8 91:16
92:17 93:12
98:5,11
115:5 116:9
117:21
125:11
**scripts**
176:24
**search**
28:23 30:20
35:17 61:14
65:21 79:13,
22 81:6,15
82:25 83:3,
11,14 86:12
**searched**
72:11
**searching**
216:1
**second**
34:25 42:19
64:16 68:6
71:16 159:7,
15 215:18
220:6
**seconds**
79:9 115:2
119:13
**security**
10:5 185:10,
11 186:23
188:9 190:5
220:9
**see**
14:23 16:1
24:9 32:14
42:20 53:9
57:1 61:7
63:5 64:17,
22 68:5
69:25 71:20
73:2,4 82:6
89:15 93:13
94:13 96:16,
19 113:16
115:4 119:21
132:5 142:8
158:18
159:7,14
172:2 174:9
179:10
192:15
194:18 195:1
199:17,21,23
209:17
215:16,17
216:24
**seeing**
92:17 99:9
197:11,24
**seek**
20:10 21:2
208:6,14
**seeks**
31:19
**segment**
85:13 111:1
197:12 198:4
**seized**
35:17 65:20
86:12
**select**
124:8
**self-explanatory**
33:9
**send**
146:18
**sending**
146:21
**senior**
21:12 22:16,
21 69:23
**sense**
10:23 11:4
15:21 97:10
125:24
138:19 147:2
162:13
165:10 185:3
**sensitive**
30:15 103:1
104:5
**sentence**
53:23 56:10
206:25
215:19
**sentences**
56:12
**separate**
202:6
**September**
8:11
**series**
204:5
**served**
18:9 75:11
153:20
157:22 158:4
219:9
**service**
28:17
185:11,19
186:6,23
187:21,23
190:5
**session**
10:12 109:12
**Sessions**
197:10,11,17
**set**
12:8 14:22
29:12 172:14
**several**
140:7 196:20
209:9
**Sex**
198:5
**shakes**
11:2
**Shannon**
8:22
**share**
146:12
176:23
**shared**
148:24
**shine**
186:14 187:2

**shining**
186:16
**short**
55:23 58:24 136:11 166:14 203:8
**shoulder**
89:16
**show**
11:2,16 16:6 18:20 30:14 32:6,19,23 69:18 85:19 115:24 202:1
**showed**
34:10 77:8 195:5 202:16
**showing**
14:9 33:2 77:15
**shown**
15:20 91:15 93:12 94:12 98:4,10 115:4 117:20
**shows**
32:8 83:23 89:11 115:23 209:15 217:1
**shred**
139:18,21,25
**shredder**
139:19
**sic**
171:3
**sick**
180:1
**side**
28:14 71:17, 18 93:14 215:1 217:5
**sign**
12:2,10 14:25 220:16
**signed**
13:2
**signing**
12:6
**signs**
11:18
**similar**
34:10 134:14
**Similarly**
16:23
**simply**
15:21 23:19 75:24 147:13
**single**
40:5,11 57:3 128:12 129:21 162:9
**sit**
18:17 19:20 85:7 86:22 95:2 99:4
**sitting**
83:23 84:9 202:15
**situation**
14:20 186:14,17
**skip**
215:18
**Slack**
16:23 27:11, 17 31:15 169:20
**slightly**
42:8
**small**
97:14
**smashed**
215:24 216:21
**software**
145:25
**solely**
204:6
**son**
218:9
**Sophia**
9:4
**sort**
25:22 33:10 34:13 68:7 80:5 128:23 140:10 168:16 211:4 214:20 215:18
**sound**
24:12 79:18 109:23,24 144:12 179:15
**sounds**
24:18 33:10 109:18 144:13 199:8
**source**
17:8 19:21 20:5 27:23 31:14,17,21, 24 34:3 35:25 36:23 37:7,14,16, 20,23 38:1, 6,7,15,22 39:3,16,19 40:2,5,15,19 41:8,15,18 43:12,18 44:1,10,13, 18 45:14 46:17,24 47:6,18 48:9,19,23 49:5 50:10, 17 51:25 52:12 55:15 58:13,16 59:23 60:11, 14 61:17 62:6,10,16 65:9,25 66:22,24 67:3,6,18 68:11,15,23 69:6 70:15, 23 71:8,11 72:7 74:22 75:8,11,18, 21,22,25 76:9,12 77:19 79:4, 25 81:6 84:23,25 85:7 86:19 87:4,11 88:11,14,16 89:24,25 90:4,25 91:5,21 92:9 93:7,17,21 94:25 95:17, 20 96:4,9 98:16 101:13 103:5 104:24 105:3,17,22 115:20 116:25 117:8 118:19 119:5 120:6,13 121:3,13 134:4 137:13 141:11 151:9,15,16, 20 152:11, 13,15 153:10,21 154:2,11,16 155:3,8 156:2,13,16 157:1,6,9,22 158:4,15 159:22 160:1,4,8, 13,16,17,24 161:7,8,9, 11,14,15,23 162:19 168:6,22 169:4,13 170:12,21 173:9 184:10,13 202:23 207:12,18

**source's**
31:19 161:21
**sources**
17:8 19:21 20:5 27:24 29:25 31:14 34:4,14 36:1,23 37:8 38:15 39:3 40:15,19 41:8,15,19 43:12 45:15 46:18 47:6, 19 48:23 51:20 52:13 55:16 59:23 61:17 65:9, 25 66:16 69:10,11 75:23 79:4 86:3 103:4, 5,7,11 104:5 105:17 115:20 126:23 127:15 129:1 141:3,8,14 142:12,17,20 143:5,20,25 150:22 154:2,6,17 155:3 156:14,16 157:1 161:20 169:18 170:4 171:1 174:5 177:12 181:20 182:23 204:1 207:6,18 219:22 220:2
**space**
49:22 56:23
**speak**
58:18 83:3 101:9 106:22 137:9 138:4 163:23 165:16 180:24 191:6 196:11 197:1 200:11
**speaking**
33:16 75:3 89:10 102:24 106:18 123:12 126:16 152:9 177:11 196:15 202:18
**special**
73:22 100:3 140:12,13 218:10
**specific**
58:1 110:7 126:13 129:3 133:14 174:7
**specifically**
30:1 46:3 53:7 55:8 66:16 73:21 107:23 111:23 116:16 126:23 135:15 202:19
**specification**
38:6
**specifying**
31:12,22 47:17 55:14 56:4
**speculate**
102:18
**speculation**
35:10 40:25 100:14 113:4 114:12 185:5,24 188:14 189:9 209:22 210:19 215:9 219:6
**spell**
152:7
**spend**
131:20
**spent**
131:21
**Spies**
198:6
**spoke**
75:10 82:24 139:1 143:22 170:14 174:14 175:17 203:14 204:15
**spoken**
172:13 178:4 180:14 203:17,24
**sports**
215:2 217:2
**spotlight**
186:14,16 187:2
**spurred**
111:14
**square**
177:21
**stage**
34:15
**stalled**
102:3
**stamp**
119:12 192:24
**standalone**
47:13 67:15 87:17 91:17 96:1
**standard**
220:22,24
**standing**
79:12,22
**stands**
142:22 167:22 170:18
**start**
50:13 54:18 63:22 73:7 106:12 128:4 148:12 209:10 216:23
**started**
27:19,20
**starting**
111:24 199:16
**starts**
215:19
**state**
8:18 15:2 108:25 158:12 159:5
**stated**
30:19 79:11 88:7 106:17 117:18
**statement**
59:18 196:6, 21
**states**
18:13 42:25 43:8 64:14, 24 94:5 101:25 185:17 206:11
**station**
80:9
**stay**
23:25
**staying**
23:20
**step**
109:3
**Stephen**
74:3,7,24 83:14 122:6 138:4 141:16 143:21 151:3 161:6

162:15,21 168:10 170:7 190:7
**steps** 42:10 49:3 68:21 100:25
**stewardship** 186:21 187:19
**stipulated** 11:14
**stop** 106:16 189:7,13 193:5
**storage** 126:15 127:3
**store** 125:21
**stored** 125:23 127:11,23
**stories** 73:6 103:22 108:16 112:15 114:7 120:1 122:19,21 123:3,4,11, 13,16 125:6, 21 145:23 146:5,10 147:20,22 148:2,3 155:12 167:12 173:21,22 176:24 177:6 179:21 200:24 203:20
**story** 24:6,13,19, 22,25 25:15 26:3,6,16, 21,25 27:5,7 29:13 30:2, 20,25 31:11 32:15 33:7, 21 34:11 35:14,18 41:24 42:9 45:10 46:7 47:25 49:25 53:11 54:13, 24 55:10 57:14,15,25 58:17 59:5, 19 61:10,22 62:5 63:6, 13,17,20,23 64:1,5,9,12 65:4 66:10, 21 70:13 72:3 76:1,9 84:14,15 90:21 92:21 94:16,19 101:9 102:21 108:3 109:22 115:16 118:2 119:16,18 120:21 122:9 132:21 137:18 146:17,23, 24,25 147:11 148:13,21 157:16 158:12,15 159:3,8 160:13 161:7,9,22 162:8,22 163:1,10,11, 17 166:19,21 172:23 175:2 176:1,24 177:24 181:21 182:17,23 183:7 200:15 211:22 212:4 213:8 220:4
**street** 8:13 21:7 214:18
215:1,2
**strike** 178:7
**struggles** 218:18
**struggling** 97:18
**student** 61:6
**students'** 59:14,20
**study** 49:19
**stuff** 139:13
**subject** 13:7 19:7 29:13 31:1, 24 34:16 40:7 82:4, 12,21 167:22 169:8 172:25 173:5,22 174:17,20 182:13 183:1,11 188:17 192:22 220:17
**submit** 114:18,22
**submitted** 26:8 114:24, 25
**subpoena** 18:10,14 136:24 137:17 138:9 140:25 213:11,13 219:10
**subpoenaed** 126:24,25
**subpoenas** 127:16
**subsequent** 135:21
181:16
**substance** 107:7 155:11 165:4 182:10 186:9 188:24 205:19
**substantive** 20:4 104:2 204:13
**suddenly** 13:6
**suggest** 51:25 150:7
**suggested** 163:3
**suggesting** 72:8 200:4, 10
**suggestions** 177:5,8,23
**suggests** 53:24 56:24 180:7
**suit** 137:24
**sum** 155:11 165:3 186:8 187:22 188:23
**summaries** 132:24 150:4 202:20
**summary** 53:8,12,15, 16,24 54:7, 11,21,23 55:9 56:11, 18,24 57:16, 20,23 58:12, 15 61:23
**summer** 23:4
**Sunday** 195:2,9
**Supp** 16:17,23 27:11 170:1

**supported** 123:23
**supporting** 49:21
**supports** 37:25
**suppose** 129:25 167:23
**supposed** 106:7
**sure** 48:7 53:6,19 82:7 104:22 107:7,24 116:2 118:3, 13 126:1 144:3 157:17,18 158:19 162:2 166:3,24 205:11
**Surely** 176:12
**suspect** 73:4
**suspend** 186:18 187:14
**suspension** 189:1
**swear** 9:13
**sworn** 9:18
**system** 126:14,15 131:11,14,17 132:2,7,9

**T**

**table** 180:21
**take** 15:25 16:3 18:19 19:14 42:10 45:21 49:3 58:20 68:21 72:17 79:20 82:22 96:17 100:25 136:8 147:6 148:16 149:2 157:19 160:19 166:8,12 183:14 192:22 199:10 200:16 203:4 206:25
**taken** 8:7 58:24 88:8 108:22 136:11 166:14 203:8 214:14 216:4
**takes** 218:16
**taking** 10:13 103:2 146:17
**talk** 10:15 136:6 162:10 200:4
**talked** 69:7 112:6 132:25 133:16 134:6,18,23 140:22 150:2 151:3 182:19 209:8
**talking** 11:20 47:12 56:12 68:5 89:19 119:15 136:23 155:1
**taping** 122:10
**targeted** 215:7,13 216:1
**Tavoulareas** 31:16 34:7 46:18
**taxpayer** 98:3 186:21 187:20,24 190:3
**taxpayer-backed** 63:7
**taxpayer-funded** 111:4
**taxpayers** 185:19 188:8
**team** 24:23,24 124:14 219:8
**technology** 19:24 27:2 49:18 64:10 69:23 111:6 112:21
**Technology's** 29:21
**telephone** 34:9 82:24
**television** 21:21 64:3 185:17
**tell** 26:19 27:5 36:14 37:3 38:17 40:11 54:19 62:10 65:11 66:12, 24 68:18 76:23 84:25 85:10 86:25 90:2 101:22 106:2 107:13 119:5 121:13 128:15 130:7 142:19 164:8 166:25 173:15 175:20 184:6,14 214:6
**telling** 17:22
**temporarily** 212:25
**ten-minute** 203:4
**tend** 101:12 202:22
**term** 15:12 37:20 139:15
**terminated** 190:24
**terms** 13:2,9 15:13,22 24:12 76:12 128:18 132:1 139:1 141:1 145:22 177:9 182:11 188:22
**terrible** 50:12,14
**terrific** 22:20
**test** 22:14
**tested** 183:5
**testified** 9:18 77:6 122:5 123:22 137:5 138:8, 13 174:20,25 184:15 191:22 201:16
**testify** 11:10 44:17 117:3,13 170:9 174:3, 4 183:3,12
**testimony** 11:6 51:10

137:7,10 145:11 149:11,25 177:22,25 188:4
**testing**
144:17
**text**
143:20,21 144:2,5,8 145:2,7,19 174:12 193:1,19 194:9 195:2,17 199:11
**texted**
145:13 199:18
**texting**
143:24 144:15
**texts**
125:22 144:9 200:18
**thank**
9:12 10:11 19:11,15 30:7 39:15 41:12 55:6 63:4 109:9 110:9 116:3 130:10 156:11 174:2 208:11 209:7 211:1 212:5,18 220:13
**thanks**
49:16
**thing**
191:14 192:6,7 214:14 219:14
**things**
11:1 34:8,10 52:11 54:15 116:23 126:4 127:23,25 128:5,7,18,19,24,25 131:9 132:6 137:19 140:24 151:12,15,16 152:12 153:6,10 169:20 173:21 185:25 202:7
**think**
10:17 15:17 26:4 33:9,12 48:6 50:24 57:21 72:8 78:5 79:19 80:11 90:15 104:1 108:10,18 125:25 127:4,19 131:13 134:2 135:16 137:19,24 138:13,21 139:12,15,21 140:11 141:21 145:17 148:8,23 153:7 157:17 160:2,5 162:20 163:14 164:9,11,16 169:7,9 171:19 172:5 176:21 179:25 180:21 181:4 185:9 186:19 187:22 190:16 191:6 193:11 196:23 197:12 198:20 199:5 202:9 204:23 205:1,2,3 206:1 212:24 216:23 219:20
**thinking**
157:14
**third**
28:10 49:12 52:19 59:7 159:7,15
**thought**
186:21 192:6,7
**thousands**
108:16
**threat**
218:15
**three**
32:10 42:20 90:6 91:16 103:7
**threw**
135:9
**thumb**
73:9
**ties**
45:1,3,19 63:8 115:24
**time**
8:12 22:23 25:2 35:13 36:8,18 41:13 48:17 66:9 68:10,19 72:20 78:5 80:11,18,19 89:19 90:4 92:1 93:17 95:11 97:1 99:10 113:13 114:4 119:12 123:10 125:20 130:8 135:4,6,18 138:19 139:1,3,10,25 140:3,6,8 141:19,22,24 143:3 144:5 145:19,20 148:9 149:20,24 150:25 165:10 166:4 167:11 178:6,7 180:1 181:2,9 183:10 184:23 197:6,7 198:2 199:6 200:6 208:12 213:18 214:18 215:11 217:11,25 219:3
**time-stamped**
115:1
**times**
202:9,15
**timestamp**
85:15 88:22 90:6 92:15 97:16 106:12 119:21 120:19
**timing**
18:19 34:2,11,19 46:17 52:11 65:8 77:16 86:2 90:24 93:7 113:16 115:19 116:23 117:5 136:22 137:14 172:5 212:25 213:6
**Timmann**
8:22
**Timothy**
100:3 105:10 159:9 162:16 163:6,16

166:21 167:1 175:1 178:9
**tip**
81:6
**title**
22:3,13 198:8
**titled**
63:6
**titles**
22:17
**today**
10:2,12 11:6,10 12:7 17:13,23 18:18 20:1 85:7 95:2 112:6 131:4 132:22,25 133:20,24 134:9,18,23 140:22 145:6 149:6,11,25 150:10 151:3 154:4 156:13 161:13 170:9 174:4 175:9 183:3,13 206:15 207:25 208:12,13,16 209:8
**today's**
8:11 20:14
**token**
10:20
**told**
61:4,12,13 79:17 88:13 101:25 104:24 106:4 138:6,24 154:1 157:15 163:11 175:17 181:11 187:18 219:18
**tomorrow**
172:1
**top**
24:9 33:4 64:17 84:13 194:18
**totalitarian**
45:6
**touch**
76:11 138:12
**traffic**
80:21
**trafficking**
140:10
**transcript**
10:14 11:1,3 220:18
**translator**
158:12 159:5 162:17 204:20
**transmitted**
35:23
**transport**
218:12
**travel**
34:9
**true**
160:6 194:11 213:11 220:3
**trust**
220:1
**trustworthy**
154:17
**truthfully**
11:10
**try**
10:15,20 33:13 52:1 73:3 101:22 110:6 130:8 139:18 200:25
**trying**
25:13,17 29:10 51:12 55:12 102:12 140:11 151:11 152:5,24 162:20 166:3 169:7,9 177:21 201:2
**tuition**
112:21 185:15,23 188:1 190:8,21 191:13,25 192:9 196:4
**turn**
49:12 194:5 209:2
**turnaround**
220:23,24
**Turning**
42:19 44:20
**two**
19:5 30:10 33:19 56:12 71:17 76:17 110:23 151:14 157:19 190:22 193:11,14 216:6 217:2,15 219:3,25 220:25
**tying**
111:7,25
**type**
47:17 55:1 131:25
**typical**
23:22
**typos**
172:8

**U**

**U.S.**
8:9,16 32:20 45:7 94:6 101:25 102:7,23 103:9,19 104:10 183:18 186:4,21 188:8 189:5 190:3 197:1,3 208:23
**Uh-huh**
146:22
**uh-huhs**
11:4
**ultimately**
161:22 176:22 196:1
**UMT**
27:7 28:3 30:11 38:2 43:4 59:20 61:4 64:9 72:16 74:14 83:1 106:20 114:6 120:1 152:22 185:15 186:18 187:15 188:2 189:5,20 192:1,10 195:3,23 196:3 198:13 204:22
**UMT's**
83:12 98:6 106:5 108:8 113:1 189:1 190:8,21 191:13 195:11,18
**unable**
11:9 207:13
**uncomfortable**
188:18 189:2
**uncommon**
104:6 190:16 202:14
**undated**
32:18 64:25

69:21 71:23
**understand**
10:2 11:5,6, 8 18:8,16 19:17 25:13, 17 37:20 55:9 74:15 86:8 102:7 113:6 117:21 118:13 120:20,24 126:15 152:24 156:20 170:17 172:11 193:18 207:16
**understanding**
12:1 20:9 21:1 26:18 40:1,14 41:14 48:19 54:19 65:19 74:17 92:1,5 95:11,16 98:7 99:3 102:17,22 103:17 104:9,15 105:9 106:6 108:8 109:20 111:13 112:20,24 113:1 114:9, 14,16 117:16 129:9 130:17 144:9 146:13 147:12 160:7 167:1 180:8 184:21 185:1,20 186:25 188:16 189:25 196:1,3,7 202:17 208:5 210:12,21
**understood**
163:25
**undertaking**
190:1
**unfavorable**
191:4,11
**unhappy**
103:18,24 104:25 105:10,19
**uniform**
32:10,11 33:3 69:18 70:3 83:24 84:10 89:7, 11,12 134:12 209:16
**uniforms**
65:1
**unit**
25:4,5,6,8 132:2
**United**
18:13 42:24 43:8 206:11
**university**
19:23 27:1 29:21 30:11 43:2 44:8 49:16 50:2, 21,25 51:8 52:9 64:10 85:20 111:5 112:20 126:6
**university's**
111:8
**unreasonable**
15:4
**unsealed**
159:8,12 163:4 205:2
**untouched**
214:13
**unusual**
198:24
**upcoming**
139:2
**upfront**
44:24
**upper**
216:23
**upset**
185:14
**Upson**
25:1 26:8,19 63:24 64:8 72:14 110:24 124:14 146:21 147:10,23
**Upson's**
25:3
**usual**
217:18
**utterance**
218:1

**V**

**vague**
37:15 65:16 115:8 134:20
**value**
192:8
**variety**
124:19
**various**
22:17
**vehicle**
214:8,10,12 215:12,25 216:4,6,22 217:2,7,8
**verbal**
11:1
**verbally**
43:23 60:21 62:17
**verbiage**
196:24
**verify**
41:25 42:10 49:3 68:21 78:15 100:25
**version**
18:24 19:9 119:2 130:20 206:3,10
**versions**
19:5
**versus**
8:7 16:16 34:7 46:18 169:25 220:23
**veteran**
74:4
**video**
8:14 72:21 73:15 74:2 79:9,11 80:7 83:23 85:13, 15 88:7 90:7 91:16 97:17 106:18 109:16 110:12 112:8 115:2,22 118:9 119:3 220:21
**video-recorded**
8:6
**video/audio**
73:13 106:13 110:10
**VIDEOGRAPHER**
8:5 9:9,12 58:23,25 108:20,23 136:10,13 166:13,15 203:7,9 220:16,19
**videos**
72:24
**view**
41:4 187:23, 25 188:10 191:3,4,11 209:24

**viewers**
99:9 100:12
**viewing**
201:17
**Vigen**
9:3 109:3 185:4,24 188:3,13 189:8 208:18,21,23 210:2 211:1,3,9 212:5,9,13
**violation**
14:13
**Virginia**
27:2 30:11 80:10,22 102:2 111:6
**vis-a-vis**
123:4
**visa**
42:25 43:9
**visuals**
124:9
**vital**
207:5
**vouchers**
34:9

**W**

**wake**
200:16
**Wang**
43:1 61:3
**want**
10:14 14:17 15:2 16:1 25:22 26:11 48:6 54:6 56:16 58:18 59:5 64:15 72:15,20 96:16 104:20 108:4 153:4 161:6 166:8,12 170:5 174:8 203:15 206:5 208:11 213:9
**wanted**
53:6 131:4 148:12 212:13,25 219:15
**warrant**
28:23 35:17 61:14 65:21 79:13,23 81:7,15 83:1,4 86:12
**warrants**
30:20 83:12
**Washington**
8:13 21:8 43:2 44:8 49:16 50:1,16,21,25 52:2,9 85:20 126:6 148:10 214:5
**Watch**
138:17,18
**watched**
73:16 110:12
**watching**
79:12
**Watkins**
8:20,23
**way**
12:22 42:21 45:5 76:17 80:15 130:8 163:22 172:9 179:23 181:13,18 192:4 212:6 213:10 215:4 219:18
**weapons**
140:10
**wearing**
64:25 69:18 70:3 71:19
**website**
24:7,19 63:10 122:21 123:6 125:12 145:24 146:6,24 159:4
**wedding**
164:12,14,16,21,23 178:5,10,12 179:9,12,18 180:2,11,14,17,25 181:2,7,11,16
**weeks**
220:25
**went**
50:20 85:20 149:21 164:13 210:18 214:9
**whatsoever**
192:8
**whistleblower**
74:4 187:4,6 190:15
**white**
214:21
**wide**
124:18
**wife**
32:9 33:2 172:14 179:25 180:23 209:16
**Wilmerhale**
9:10
**window**
137:18 215:24,25 216:21
**wing**
32:8
**withdraw**
107:18 127:23
**withheld**
100:12
**withhold**
160:9
**witness**
9:14 11:17,18 18:1 19:1 23:13 29:1 33:23 35:7 36:11 38:11 43:20 44:15 58:4,22 76:5 78:4 113:10 121:7 125:8 126:11 127:17 129:12,20 131:13 133:3 150:21 161:17 166:6 185:9 193:3,10,11 196:15 210:23 218:3,7,23 219:7,25
**wondering**
116:16
**word**
18:19 79:20 97:19 130:15 146:7,8,14
**words**
25:14 53:17 151:13 187:22 191:6,8
**work**
17:20 25:15 59:12 132:20 140:7 203:20,22 207:6 216:6 220:3
**work-related**
139:17

**worked**
21:20,23 56:22 74:8, 10,12,15 124:14 152:22 163:15 200:5 205:2 218:24
**worker**
204:21
**working**
21:15 36:18 104:16,25 164:6,7 198:8 200:24
**works**
61:3 199:19
**worlds**
54:16
**worries**
94:18
**write**
146:17
**writing**
16:19 24:25 150:16 169:24
**wrong**
128:16
**wrote**
26:3 49:20 66:10

**X**

**Xiaoming**
158:13 166:20 167:6 175:2 178:20 180:4 204:16

**Y**

**Yanping**
8:7,21,24 9:25 30:12 32:19 64:25 71:23 111:8
**yeah**
22:15 33:12 65:18 82:8 84:2 108:15 139:5,9 158:19 164:15 166:3 191:17
**year**
43:4 79:19 108:16 135:23 136:4 137:6,16 213:4 214:8
**Year's**
139:13
**years**
22:19 107:21 108:17 131:20 137:17,18 138:21 144:18 213:8 218:23
**yellow**
93:13
**yeses**
11:3
**young**
32:6,24 69:18
**youngest**
218:9

**Z**

**zoomed-in**
89:12