PUBLIC VERSION

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| YANPING CHEN, | ) | |
| | ) | |
| Plaintiff, | ) | **Case No. 1:18-cv-03074-CRC** |
| | ) | |
| v. | ) | **Hon. Christopher R. Cooper** |
| | ) | **United States District Judge** |
| FEDERAL BUREAU OF | ) | |
| INVESTIGATION, | ) | |
| U.S. DEPARTMENT OF JUSTICE, | ) | |
| U.S. DEPARTMENT OF DEFENSE, U.S. | ) | **ORAL ARGUMENT REQUESTED** |
| DEPARTMENT OF HOMELAND | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendants. | ) | |

---

**NON-PARTY CATHERINE V. HERRIDGE'S MEMORANDUM IN RESPONSE TO
THE ORDER TO SHOW CAUSE**

Patrick F. Philbin (D.C. Bar No. 453620)
Kyle T. West (D.C. Bar No. 24093346)
Chase Harrington (D.C. Bar No. 1619501)
ELLIS GEORGE CIPOLLONE
O'BRIEN LLP
1155 F Street, N.W.
Suite 750
Washington, DC 20004
(202) 249-6633
pphilbin@egcfirm.com

*Counsel for Catherine V. Herridge*

December 14, 2023

## TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY ...................................................................................1

       1.      Rather than Making a Finding of Contempt, the Court Should
Modify Its Disclosure Order. ..............................................................2

       2.      Any Contempt Sanction Should Be Nominal and Should Be
Stayed...................................................................................................5

BACKGROUND ................................................................................................................7

      A.     Ms. Herridge's Work as an Investigative National Security Journalist.................7

      B.     Ms. Herridge's Reporting on Plaintiff and Evidence That Plaintiff Was a
Former Colonel in the People's Liberation Army—the Military Arm of the
Chinese Communist Party...................................................................................8

      C.     DOD Determines that ███████████████████ and
Publicly Announces that Funding to Her School Must Be Terminated "On
National Security Grounds".................................................................................11

      D.     Plaintiff Sues the Government and Ultimately Subpoenas Ms. Herridge to
Uncover Ms. Herridge's Confidential National Security Sources........................12

      E.     Ms. Herridge Seeks to Appeal Without the Burden and Expense of a
Contempt Proceeding, But Plaintiff Insists on a More Expensive Process ..........13

      F.     Ms. Herridge Is Deposed and Declines to Reveal Her Confidential
Source(s), and Plaintiff Seeks Contempt Sanctions.............................................14

LEGAL STANDARD.........................................................................................................16

ARGUMENT .....................................................................................................................17

I.     The Court Should Not Hold Ms. Herridge in Contempt and Instead Should
Modify Its Disclosure Order. ...........................................................................................17

      A.     The Court Should Consider Additional Information Bearing on the *Zerilli*
Balance of Interests...........................................................................................19

             1.      Forcing Disclosure of Ms. Herridge's Sources Would Have a
Broad Chilling Effect Undermining the Ability of the Press to
Keep the People Informed. ...................................................................19

             2.      Forcing Disclosure of Ms. Herridge's Source(s) Raises National
Security Concerns That Should Be Considered Under *Zerilli*.................21

i

**TABLE OF CONTENTS**
**(Continued)**

**Page**

II.     The Court Cannot Hold Ms. Herridge in Contempt for Refusing to Answer
        Questions Intruding on Matters Within the Reporter's Privilege *Other Than* the
        Identity of Confidential Source(s). ...................................................................26

III.    If the Court Enters a Contempt Order, Any Fine Should be Nominal and It Should
        Be Stayed Pending Appeal...............................................................................28

        A.      Any Sanction Should Be Nominal.......................................................29

        B.      The Court Should Reject Compensatory Sanctions for Costs or Fees
                Related to Ms. Herridge's Deposition or this Contempt Motion...........32

        C.      Any Contempt Sanction Should Be Stayed Pending Appeal. ...............35

CONCLUSION......................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

## <u>CASES</u>

*Akiachak Native Cmty. v. Jewell*,
    995 F. Supp. 2d 7 (D.D.C. 2014) ...........................................................................37

*Atlanta Journal-Constitution v. Jewell*,
    555 S.E.2d 175 (Ga. App. 2001) ...........................................................................18

*Blocksom & Co. v. Marshall*,
    582 F.2d 1122 (7th Cir. 1978) ...............................................................................17

*Bruno & Stillman, Inc. v. Globe Newspaper Co.*,
    633 F.2d 583 (1st Cir. 1980) ..................................................................................18

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991) ..................................................................................................35

*Citizens for Responsibility & Ethics in Washington v. Office of Admin.*,
    565 F. Supp. 2d 23 (D.D.C. 2008) .........................................................................37

*State ex rel. Classic III, Inc. v. Ely*,
    954 S.W.2d 650 (Mo. App. 1997) ..........................................................................19

*Cobell v. Norton*,
    224 F.R.D. 266 (D.D.C. 2004) ...............................................................................17

*Cuomo v. U.S. Nuclear Regulatory Comm'n*,
    772 F.2d 972 (D.C. Cir. 1985) (per curiam) .........................................................36

*Guantanamera Cigar Co. v. Corporacion Habanos, S.A.*,
    750 F. Supp. 2d 31 (D.D.C. 2010) .........................................................................29

*Harris v. One Hope United, Inc.*,
    28 N.E.3d 804 (Ill. 2015) .......................................................................................32

*Hatfill v. Ashcroft*,
    No. 1:03-cv-01793-RBW (D.D.C. Oct. 2, 2007) ...................................................35

*Hatfill v. Mukasey*,
    539 F. Supp. 2d 96 (D.D.C. 2008) ...............................................................32, 35, 36

*Hatfill v. Mukasey*,
    No. 08-5049, Doc. No. 1104546 (D.C. Cir. March 11, 2008) ..........................32, 36

# TABLE OF AUTHORITIES
## (Cont'd)

**Page(s)**

*Hecht Co. v. Bowles*,
  321 U.S. 321 (1944) ................................................................................................29

*Herridge v. Chen*,
  No. 23-5198, Doc. No. 2018838 (D.C. Circuit Sept. 25, 2023) .......................................14, 30

*Hospitality Staffing Sols., LLC v. Reyes*,
  736 F. Supp. 2d 192 (D.D.C. 2010) ...........................................................................36

*Hutira v. Islamic Repub. of Iran*,
  211 F. Supp. 2d 115 (D.D.C. 2002) ...........................................................................27

*In re Paoli R.R. Yard PCB Litig.*,
  221 F.3d 449 (3d Cir. 2000) .....................................................................................33

*In re Roche*,
  448 U.S. 1312 (1980) ............................................................................................37

*In re Search of: 2122 21st Road North, Arlington, Virginia*,
  No. 1:12- sw-01002-JFA (E.D. Va. Mar. 10, 2017) .......................................................3

*In re Slack*,
  768 F. Supp. 2d 189 (D.D.C. 2011) ...........................................................................27

*Landmark Legal Found. v. EPA*,
  272 F. Supp. 2d 70 (D.D.C. 2003) .............................................................................35

*Lee v. Dep't of Justice*,
  327 F. Supp. 2d 26 (D.D.C. 2004) .......................................................................34, 35, 36

*Lee v. Dep't of Justice*,
  428 F.3d 299 (D.C. Cir. 2005) ..................................................................................37

*Maness v. Meyers*,
  419 U.S. 449 (1975) ..............................................................................................36

*Maughan v. NL Indus.*,
  524 F. Supp. 93 (D.D.C. 1981) .................................................................................27

*Molock v. Whole Foods Mkt. Grp.*,
  317 F. Supp. 3d 1 (D.D.C. 2018) .......................................................................13, 16, 29

*N.Y. Times Co. v. United States*,
  403 U.S. 713 (1971) ..........................................................................................21, 38

# TABLE OF AUTHORITIES
## (Cont'd)

Page(s)

*NAACP v. Button*,
371 U.S. 415 (1963) ......................................................................31, 33

*Negley v. FBI*,
766 F. Supp. 2d 190 (D.D.C. 2011) ..................................................28

*NRDC v. Train*,
510 F.2d 692 (D.C. Cir. 1974) ..........................................................29

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
324 U.S. 806 (1945) ..........................................................................33

*Robert Half Int'l Inc. v. Billingham*,
315 F. Supp. 3d 419 (D.D.C. 2018) ..................................................36

*Said v. Nat'l R.R. Passenger Corp.*,
390 F. Supp. 3d 46 (D.D.C. 2019) ..............................................17, 18

*Toledo Scale Co. v. Computing Scale Co.*,
261 U.S. 399 (1923) ..........................................................................35

*United States v. Cuthbertson*,
630 F.2d 139 (3d Cir. 1980) ..............................................31, 34, 36

*United States v. Cutler*,
6 F.3d 67 (2d Cir. 1993) ....................................................29, 31, 36

*United States v. Latney's Funeral Home, Inc.*,
41 F. Supp. 3d 24 (D.D.C. 2014) ................................................17, 30

*United States v. Libby*,
467 F. Supp. 2d 20 (D.D.C. 2006) ....................................................11

*United States v. Two Gen. Elec. Aircraft Engines*,
317 F. Supp. 3d 516 (D.D.C. 2018) ..................................................29

*United States v. United Mine Workers of Am.*,
330 U.S. 258 (1947) ..........................................................................17

*Whole Woman's Health v. Smith*,
896 F.3d 362 (5th Cir. 2018) ............................................................14

*Zerilli v. Smith*,
656 F.2d 705 (D.C. Cir. 1981) .................................................. *passim*

**TABLE OF AUTHORITIES**
**(Cont'd)**

Page(s)

**STATUTES**

18 U.S.C. app. III §§ 1–16 ................................................................11

28 U.S.C. § 1291 ...............................................................................14

28 U.S.C. § 1292(b) ....................................................................13, 30

**RULES**

Fed. R. Civ. P. 54(b) .........................................................................17

**OTHER AUTHORITIES**

11A C. Wright, A. Miller, & M. Kayne, Fed. Prac. & Proc. § 2960 (3d ed. 1998) ......................17

Air Force News Service, *CSAF Issues Warning of PLA Recruitment of U.S. Air Force Members, Veterans* (Sept. 8, 2023) ........................................10, 24

Awards and Recognitions, Cong. Medal of Honor Soc'y, https://www.cmohs.org/about-the-society/awards .................................8

Catherine Herridge, Pamela K. Browne & Cyd Upson, *Fox News investigation: DoD-funded school at center of federal probes over suspected Chinese military ties*, FOXNews.com (Feb. 24, 2017) ..........................8, 9, 10, 11

Catherine Herridge, Pamela K. Browne & Cyd Upson, *Congress investigating taxpayer-backed school over alleged ties to Chinese military after Fox News report*, FOXNews.com (updated May 1, 2017) ................................9, 10

Catherine Herridge, Pamela K. Browne & Cyd Upson, *FBI 'reopening' probe of DoD-funded school with suspected Chinese military ties, rep says* (June 28, 2017) ........................................................................9

Catherine Herridge & Jessica Kegu, *Uzbek base that housed U.S. troops allegedly had "7 to 9 times higher than normal" radiation, yellowcake uranium*, CBS News (Oct. 26, 2020) .........................................8

Catherine Herridge & Jessica Kegu, *In last hours of presidency, Trump signs executive order for veterans who served at toxic base after 9/11*, CBS News (Jan. 27, 2021) ....................................................................8

Dan Lamothe, *China's military seeks to exploit U.S. troops, veterans, general warns*, Wash. Post (Sept. 8, 2023) .......................................10, 11, 24

vi

# TABLE OF AUTHORITIES
## (Cont'd)

**Page(s)**

Ellen Nakashima, *Chinese breach data of 4 million federal workers*, Wash. Post
(July 4, 2015) ........................................................................................................23

Exec. Order No. 13982, 86 Fed. Reg. 6833 (Jan. 19, 2021) ...........................................8

Karen H. Greve, *Graymail: The Disclose or Dismiss Dilemma in Criminal
Prosecutions*, 31 Case W. Reserve L. Rev. 84 (1980) .............................................11

Natalie Gross, *DoD bans popular TA school from accepting the benefit* Military
Times (Apr. 6, 2018) ...........................................................................................1, 11

Michael Kaplan & Catherine Herridge, *Army to award Purple Hearts to 50
soldiers injured in Iran missile attack following CBS News investigation*,
CBS News (Dec. 20, 2021), .....................................................................................7

S. Rep. No. 96-823 (1980) ...........................................................................................11

"Winners: SEJ 20th Annual Awards for Reporting on the Environment," Soc'y
of Env't Journalists (Oct. 20, 2021), https://perma.cc/FR4C-86MZ ...................7, 8

PUBLIC VERSION

## INTRODUCTION AND SUMMARY

The Department of Defense (DOD) has determined that ███████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████ In an official decision in 2018, DOD cut off taxpayer

funding for a university founded and run by Plaintiff.  DOD determined that the university ██████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████ DOD publicly announced that it was cutting off

funds "on national security grounds."[1]

Plaintiff did not challenge DOD's determinations in court.  Instead, she filed this Privacy

Act suit arguing that she should be paid taxpayer funds as damages to compensate her for the

stream of taxpayer funds that DOD cut off for national security reasons.  Her theory: DOD never

would have taken action to address a national security risk if it had not been for a series of articles

published by Ms. Herridge.  Ms. Herridge believes that summary judgment briefing would

establish that DOD's independent national security decision—███████████████████

███████████████—breaks any alleged causal chain that could be traced to Ms. Herridge's

articles and would eliminate any need for discovering Ms. Herridge's source(s).  The Court,

however, has ordered Ms. Herridge to hand over to Plaintiff her confidential national security

source(s) now.  To preserve her right to appeal, Ms. Herridge respectfully declined to disclose her

source(s) at a deposition and Plaintiff now seeks a contempt order.

---

[1] Natalie Gross, *DoD bans popular TA school from accepting the benefit*, Military Times (Apr. 6, 2018), https://tinyurl.com/3sfzyxbu.

1. **Rather than Making a Finding of Contempt, the Court Should Modify Its Disclosure Order.**

Ms. Herridge does not intend to burden the Court by re-arguing her points under *Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981). Because the Court has discretion to modify its order, however, Ms. Herridge believes it is important for the Court to consider additional information that is relevant under *Zerilli* balancing.

First, Ms. Herridge has submitted declarations from the Dean of the Columbia Journalism School, Jelani Cobb, and from Steve Coll, a two-time Pulitzer Prize winning investigative journalist specializing in the national security field. As they explain, holding Ms. Herridge in contempt would have a broad chilling effect on investigative journalism by deterring sources from working with journalists. As a result, it would undermine the ability of the press to fulfill its function of keeping the people informed about their government. *See* Decl. of Jelani Cobb ¶¶ 11–12 ("Cobb Decl.") (Ex. B); Decl. of Steve Coll ¶ 11 ("Coll Decl.") (Ex. C). The Court did not previously have before it declarations from experts in the field, and it should take them into account to reevaluate the balance the Court struck under *Zerilli*.

Second, the Court should consider the national security risks implicated by this case. Ms. Herridge has submitted declarations from two former counterintelligence officials. William Evanina was director of the National Counterintelligence and Security Center and Holden Triplett led the FBI's office in China and served as FBI Faculty Chair at the National Intelligence University. As they explain, based on their review of record materials, there is a serious risk that Plaintiff was involved in making information about U.S. military members available to the CCP, and disclosing the identity of Ms. Herridge's source(s) to Plaintiff would entail a further national security risk. *See* Decl. of William R. Evanina ¶¶ 11, 22 ("Evanina Decl.") (Ex. D); Decl. of Holden Triplett ¶¶ 15, 19 ("Triplett Decl.") (Ex. E).

**PUBLIC VERSION**

The information in the record is telling. ██████████████████████████████

██ Plaintiff ████████████████████████ who has more than a decade-long history of lying about her service in the PLA. ████████████████ She lied about it on immigration forms (which allowed her to become a U.S. citizen), she lied about it on multiple occasions to federal investigators, and she was recorded encouraging a confidential source for the FBI to lie about it for her—to a federal grand jury. ████████ Aff. in Support of Two Appls. for Search Warrants at 8–14, *In re Search of: 2122 21st Road North, Arlington, Virginia*, No. 1:12- sw-01002-JFA (E.D. Va. Mar. 10, 2017), ECF No. 1 (filed in this case as ECF No. 94-11).

While her deception was ongoing, she set up and ran the University of Management and Technology (UMT), a university in Arlington, Virginia, ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████ in 2018 DOD publicly terminated UMT's participation in the taxpayer funded DOD Tuition Assistance Program "on national security grounds." *Id.* at 1.

Mr. Evanina and Mr. Triplett explain that the record materials indicate a serious risk that Plaintiff was involved in making information about U.S. military members available to the CCP.

PUBLIC VERSION

The information that UMT gathered on service members, including training history, coincides exactly with information that CCP intelligence services would find valuable and would seek to obtain.  Information that became public only three months ago reinforces that point.  In September 2023, the Chief of Staff of the Air Force issued a service-wide warning that the PLA was actively using front companies to target veterans with particular skills to "fill gaps" in the PLA's capabilities.  Mem. from Gen. Charles Q. Brown, Jr., Chief of Staff, USAF, Sept. 5, 2023 (Ex. F).  The fact that the training histories gathered by UMT match the information needed to target former service members in a known CCP intelligence-gathering effort strongly bolsters the conclusion that there is a serious risk that Plaintiff and UMT were involved in making information available to the CCP.  Triplett Decl. ¶ 15.

        As Mr. Evanina and Mr. Triplett explain, the mere fact that Plaintiff was not prosecuted does not undermine their assessment of risk.  In counterintelligence cases, the government often decides not to prosecute, even when it has sufficient evidence, to avoid disclosing sensitive sources and methods of gathering information.  *Id.* ¶ 18; Evanina Decl. ¶¶ 20–21.  And DOD's decision to cut off Plaintiff's funds was based squarely on a determination that she did, in fact, pose a national security risk.

        Forcing Ms. Herridge now to turn over her confidential source(s) means (under the premise of Plaintiff's case) disclosing the identity of a government employee(s) who had access to detailed information about a counterespionage investigation to a person who was found to be a national security risk—and, indeed, may have been collecting intelligence for the CCP.  Such a disclosure necessarily creates additional risk.  And that risk ought to be taken into account under the *Zerilli* balancing test.  Under the Court's current approach to *Zerilli*, such risks are excluded from

consideration, because all that matters is whether the information Plaintiff seeks is "central" to her case and whether she exhausted other alternatives. The Court should modify that approach.

The Court has recognized that "[r]equiring an investigative reporter to divulge her source is serious business, and it is better to be safe than sorry when it comes to First Amendment rights." Opinion and Order at 3, ECF No. 152 ("Certification Order"). Especially in the national security context of this case, the way to be safe rather than sorry is, at a minimum, to require Plaintiff to establish that she can survive summary judgment on other elements of her case (such as causation) *before* forcing Ms. Herridge to take the irretrievable step of turning over her confidential national security source(s).

**2.      Any Contempt Sanction Should Be Nominal and Should Be Stayed.**

If the Court enters a contempt order, it should impose only a nominal sanction. Ms. Herridge has made it clear that the last thing she wanted to do in this case was to violate a court order. She took every step she possibly could to bring an interlocutory appeal in order to avoid the need to disobey the Court's order to secure an appeal. The Court determined, however, in its discretion, *see* Opinion and Order at 2, ECF No. 158 ("Reconsideration Order"), to make contempt the only path to an appeal. Ms. Herridge believes as a matter of conscience that pursuing an appeal is essential for preserving her constitutional rights, protecting her most important professional obligations as a journalist, and avoiding a further national security risk. Imposing a substantial fine on Ms. Herridge for pursuing the only available avenue for an appeal would be inequitable and improperly burden the exercise of her First Amendment rights—especially where the Court itself has acknowledged that she may have a meritorious appeal and "there is good reason to believe this case might generate en banc activity that could upend existing precedents." Certification Order at 3.

PUBLIC VERSION

The Court should reject Plaintiff's request for *compensatory* contempt sanctions.  It takes extraordinary chutzpah for Plaintiff to ask for an award of costs and attorney's fees for Ms. Herridge's deposition and this contempt proceeding.  Ms. Herridge sought an interlocutory appeal precisely to "sav[e] the parties from [the] needless expense" of these proceedings.  Mem. ISO Mot. for Interlocutory Appeal at 2, ECF No. 144-1.  Plaintiff fought to block an appeal and insisted on the more expensive deposition-and-contempt pathway—even though it was clear that Ms. Herridge would not disclose her confidential source(s).  Having secured the more expensive process she demanded, Plaintiff is in no position to ask the Court—as a matter of *equitable* discretion—to make Ms. Herridge pay for it.  Such a sanction would also be unprecedented. Plaintiff cannot point to a single case in similar circumstances in which a journalist was required to pay plaintiff's costs and fees for pursuing the only avenue to appeal.  This Court should not be the first to impose such an impermissible burden on the exercise of a journalist's First Amendment rights.

Finally, any sanction should be stayed pending appeal.  The Court has acknowledged that "there are substantial grounds for difference of opinion" over the ruling requiring disclosure of Ms. Herridge's confidential source(s) and that "there is good reason to believe this case might generate en banc activity that could upend existing precedents."  Certification Order at 3.  In a case presenting such serious questions under the First Amendment, Ms. Herridge should not be forced to face the irreparable harm of either being coerced to reveal her confidential source(s) or racking up daily fines simply for exercising her right to seek appellate review.

PUBLIC VERSION

## BACKGROUND

### A.    Ms. Herridge's Work as an Investigative National Security Journalist

Catherine Herridge is an Emmy Award-winning investigative journalist with 32 years of experience reporting on national security and intelligence matters.  She is currently Senior Investigative Correspondent at CBS News.  Over the course of her career, she has covered matters involving all elements of the U.S. Intelligence Community, including the FBI, the Department of Justice, the CIA, the Defense Intelligence Agency (DIA), the National Security Agency (NSA), the National Geospatial-Intelligence Agency (NGA), and the Director of National Intelligence (DNI).  *See* Decl. of Catherine V. Herridge ¶ 3, ECF No. 96-4 ("Herridge Decl.").

Her work has repeatedly focused on stories raising issues of accountability in matters that will have a concrete, positive impact on the lives of members of the military and veterans.  For example, she worked on investigative reporting that uncovered the true extent of the injuries U.S. servicemembers suffered from the Iranian ballistic missile attack on a U.S. base in Iraq in January 2020.  The government had downplayed the injuries, even to the point of denying servicemembers the Purple Hearts they rightly deserved.  As a result of Ms. Herridge's reporting, 50 soldiers received Purple Hearts.  *See* Michael Kaplan & Catherine Herridge, *Army to award Purple Hearts to 50 soldiers injured in Iran missile attack following CBS News investigation*, CBS News (Dec. 20, 2021), https://perma.cc/G564-ZNYU; *see also* Herridge Decl. ¶ 7.

Ms. Herridge also received the Kevin Carmody Award for Outstanding Investigative Reporting for a series of reports that exposed serious health hazards from toxic waste at a U.S. military base in Uzbekistan where thousands of U.S. servicemembers have been stationed.  *See* "Winners: SEJ 20th Annual Awards for Reporting on the Environment," Soc'y of Env't Journalists (Oct. 20, 2021), https://perma.cc/FR4C-86MZ.  As the citation for that award explains, her

PUBLIC VERSION

"tenacious reporting" led to a promise from the Acting Secretary of Defense to remedy the situation. *Id.* Indeed, it drove legislation and led to an Executive Order in January 2021[2] mandating a comprehensive study to address the health consequences for those who served at the base.[3]

Ms. Herridge and the CBS News Investigative Unit's Emmy-nominated series "Decades of Exposure" probing toxic water supplies at Camp Lejeune is credited with helping to spur passage of the Camp Lejeune Justice Act in August 2022 as part of the PACT Act, benefiting nearly a million veterans.

Ms. Herridge's work has earned the Congressional Medal of Honor Society's Tex McCrary Award for Journalism, which "is reserved for those persons from the fourth estate who, *through their life's work*, have distinguished themselves by service or unbiased coverage of the United States Military through journalism in peace and war." Awards and Recognitions, Cong. Medal of Honor Soc'y, https://www.cmohs.org/about-the-society/awards (emphasis added).

**B.     Ms. Herridge's Reporting on Plaintiff and Evidence That Plaintiff Was a Former Colonel in the People's Liberation Army—the Military Arm of the Chinese Communist Party**

In 2017, Ms. Herridge, then the Chief Intelligence Correspondent for Fox News Network, was the lead reporter on three articles[4] and related broadcast reports focusing on another matter

---

[2] Exec. Order No. 13982, 86 Fed. Reg. 6833 (Jan. 19, 2021).

[3] *See* Catherine Herridge & Jessica Kegu, *Uzbek base that housed U.S. troops allegedly had "7 to 9 times higher than normal" radiation, yellowcake uranium*, CBS News (Oct. 26, 2020), https://perma.cc/EY4F-KQLG; Catherine Herridge & Jessica Kegu, *In last hours of presidency, Trump signs executive order for veterans who served at toxic base after 9/11*, CBS News (Jan. 27, 2021), https://perma.cc/K93D-EGAW.

[4] *See* Catherine Herridge, Pamela K. Browne & Cyd Upson, *Fox News investigation: DoD-funded school at center of federal probes over suspected Chinese military ties*, FOXNews.com (Feb. 24, 2017), https://www.foxnews.com/politics/fox-news-investigation-dod-funded-school-at-center-of-federal-probes-over-suspected-chinese-military-ties ("February Article"); Catherine Herridge,

that involved U.S. servicemembers potentially being placed at risk.  Her reports described a counterespionage investigation into Plaintiff and a possible PLA intelligence operation focused on gathering information about U.S. military personnel.  Plaintiff founded and runs the University of Management and Technology (UMT), a university in Arlington, Virginia that caters primarily to U.S. military personnel.

The stories presented evidence that Plaintiff had been a colonel in the PLA and that she sought to hide that fact by lying on immigration forms and telling others to lie under oath to conceal her past.  Among other things, the stories featured on-camera interviews with Stephen Rhoads, a whistleblower who had worked at UMT and had served as an undercover FBI informant for the counterespionage investigation.  Rhoads explained that Plaintiff had admitted that she had been a colonel in the PLA and made efforts to conceal that fact.  "One of the first sentences she [Plaintiff] ever threw out—after she found out I was an Army officer, was, 'Well . . . I was a colonel in the army.'"  February Article at 2.  When Rhoads asked where she trained, Plaintiff "laughed and said, 'Oh, no, I was in the Chinese army, you know.'"  *Id.*  But when Rhoads told Plaintiff that the FBI wanted him to testify before a grand jury, Plaintiff told him to lie: "Oh, you don't tell them anything.  We don't know each other. . . . You don't—you don't know I was a colonel in the P.L.A.  They'll never have proof to say that."  *Id.* at 3.

_____

Pamela K. Browne & Cyd Upson, *Congress investigating taxpayer-backed school over alleged ties to Chinese military after Fox News report*, FOXNews.com (updated May 1, 2017), https://www.foxnews.com/politics/congress-investigating-taxpayer-backed-school-over-alleged-ties-to-chinese-military-after-fox-news-report ("April Article"); Catherine Herridge, Pamela K. Browne & Cyd Upson, *FBI 'reopening' probe of DoD-funded school with suspected Chinese military ties, rep says*, FOXNews.com (June 28, 2017), https://www.foxnews.com/politics/fbi-reopening-probe-of-dod-funded-school-with-suspected-chinese-military-ties-rep-says.  These articles are attached as Exhibits B, D, E to Ms. Herridge's Mem. ISO Mot. to Quash, ECF Nos. 94-3, 94-5, 94-6.

Rhoads also explained how UMT could be used by the CCP to collect information on U.S. servicemembers who attended the school.  According to Rhoads, UMT was collecting copious amounts of information about U.S. servicemembers' military history that could then be remotely accessed: "It got uploaded into an O-drive, they called it . . . their personal military bio, you know, where they were trained, how they were trained, how long, that could be remotely accessed."  *Id.* Plaintiff asked Rhoads specifically to recruit students for UMT at one of the Air Force's most technology-and-research-heavy locations—Ohio's Wright-Patterson Air Force Base.  *Id.*  An expert on the Chinese military, Peter Mattis, explained why a school like UMT would be of interest to the Chinese military.  The personnel records would provide a "curated database" that would be of interest for two reasons: "The first is, militaries everywhere want to know what a potential adversary might look like—what are their capabilities, how will they act?  The second is this might also serve as a vehicle for recruiting individuals."  April Article at 2.

In fact, information that has subsequently become public shows that the data gathered by UMT would have fit perfectly into an ongoing, coordinated effort by the PLA to identify, target, and recruit former U.S. servicemembers with particular training or skill sets.  On September 5, 2023, the Chief of Staff of the Air Force sent a memorandum to all Airmen warning that foreign companies were being used by the PLA to "targe[t] and recrui[t] U.S. and NATO-trained military talent" to "exploit your knowledge and skill to fill gaps in their military capability."  Ex. F.  Using front companies that might seem innocuous, the PLA is focused on "exploit[ing] veterans with valuable skills" to get them to "train the trainer."[5]

---

[5] Air Force News Service, *CSAF Issues Warning of PLA Recruitment of U.S. Air Force Members, Veterans* (Sept. 8, 2023), https://www.af.mil/News/Article-Display/Article/3520635/csaf-issues-warning-of-pla-recruitment-of-us-air-force-members-veterans/; *see also* Dan Lamothe, *China's*

PUBLIC VERSION

Rhoads explained that UMT was also receiving approximately $250,000 to $300,000 per month in taxpayer dollars from DOD. *Id.* at 1. UMT was a participant in DOD's tuition assistance program. As Rhoads summed up the situation: "It's a bad deal for the soldiers . . . it's a bad deal for the taxpayer." *Id.*

Finally, Ms. Herridge's stories explained that, according to sources, the FBI and the U.S. Attorney's Office were not able to agree whether to prosecute Plaintiff and that the conflict had been based in part on concerns about disclosing intelligence gathering sources and methods.[6] February Article at 3.

    **C.**    **DOD Determines** ███████████████████████████ **and Publicly Announces that Funding to Her School Must Be Terminated "On National Security Grounds"**

DOD publicly announced in 2018 that it had concluded an inquiry into Plaintiff and UMT and had determined that UMT must be terminated from the tuition assistance program "on national security grounds." Gross, *supra* note 1.

DOD formally determined that ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

*military seeks to exploit U.S. troops, veterans, general warns*, Wash. Post (Sept. 8, 2023), *available at* https://tinyurl.com/mrvcmhdv.

[6] Prosecuting an espionage case consistent with the defendant's constitutional rights may force the government to disclose classified information, including sensitive intelligence gathering sources and methods. The government may decide that the prosecution is not worth further compromising national security. *See generally* Karen H. Greve, *Graymail: The Disclose or Dismiss Dilemma in Criminal Prosecutions*, 31 Case W. Reserve L. Rev. 84 (1980). The Classified Information Procedures Act ("CIPA"), 18 U.S.C. app. III §§ 1–16, does not eliminate this dilemma. It primarily provides procedures allowing courts to rule on evidentiary issues "to permit the government to ascertain the potential damage to national security of proceeding with a given prosecution before trial." *United States v. Libby*, 467 F. Supp. 2d 20, 24 (D.D.C. 2006) (quoting S. Rep. No. 96-823, at 1 (1980)).

PUBLIC VERSION

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ Plaintiff never challenged those factual determinations in court.

> **D.      Plaintiff Sues the Government and Ultimately Subpoenas Ms. Herridge to Uncover Ms. Herridge's Confidential National Security Sources**

Rather than challenging DOD's findings, Plaintiff sued several agencies under the Privacy Act seeking to have the federal government compensate her for the revenue she lost when DOD found UMT to be a national security threat and publicly announced that fact.  She sought to blame her losses, not on DOD's national security finding, but instead on an alleged leak of Privacy Act information to Ms. Herridge.

Over the next several years, Plaintiff obtained substantial discovery into the details of the counterespionage investigation into her activities.   She conducted eighteen depositions of government personnel with knowledge of the investigation or related briefings and received 8,000

PUBLIC VERSION

pages of documents from the FBI alone.  Govt's Opp. to Plf's Second Mot. to Compel at 3, ECF

No 67.

On June 16, 2022, Plaintiff served Ms. Herridge with subpoenas for documents and a

deposition seeking to discover the confidential source(s) for Ms. Herridge's stories.  Ms. Herridge

moved to quash the subpoenas, invoking the First Amendment reporter's privilege and a federal

common law reporter's privilege.  *See* ECF No. 94-1.  On August 1, 2023, the Court denied Ms.

Herridge's motion to quash and held that Ms. Herridge should be required to reveal her confidential

national security source(s).  *See* Memorandum Opinion and Order, ECF 140 ("Disclosure Order").

### E.   Ms. Herridge Seeks to Appeal Without the Burden and Expense of a Contempt Proceeding, But Plaintiff Insists on a More Expensive Process

In an effort to reduce litigation expenses and streamline further proceedings, Ms. Herridge

moved to have the Disclosure Order certified for interlocutory appeal under 28 U.S.C. § 1292(b).

*See* ECF No. 144.  As Ms. Herridge explained at the time, certifying an immediate appeal would

"sav[e] the parties from needless expense."  Mem. ISO Mot. for Interlocutory Appeal at 2, ECF

No. 144-1 (quoting *Molock v. Whole Foods Mkt. Grp.*, 317 F. Supp. 3d 1, 6 (D.D.C. 2018)).  Ms.

Herridge made it unequivocally clear that, if she were deposed, she would not reveal her

confidential source(s).  *See id.*  As a result, Ms. Herridge argued that an interlocutory appeal was

by far the more efficient route for reaching the court of appeals in this case: "Immediate appeal

will save resources by obviating the need for Plaintiff to schedule a deposition, wait for Ms.

Herridge to refuse to answer questions, and then move for an order of contempt.  And it would

also avoid the need for the parties (and the Court) to prepare and address a largely duplicative

round of briefing on the motion for a contempt order."  *Id.* at 14.

Nonetheless, Plaintiff adamantly opposed Ms. Herridge's effort to reduce litigation

expenses and insisted that the Court (and Plaintiff) must pursue the more expensive and

PUBLIC VERSION

burdensome route of taking Ms. Herridge's deposition and then pursuing proceedings on contempt before Ms. Herridge could appeal.  *See* Pltf's Omnibus Mem., ECF No. 147.  On September 6, 2023, the Court denied Ms. Herridge's motion for an interlocutory appeal.  Certification Order at 1.  On Ms. Herridge's motion for reconsideration, the Court explained that, although the Court could have authorized an interlocutory appeal, the Court had determined in its discretion not to do so and that Ms. Herridge would be required to go through the contempt pathway before she could appeal.  Reconsideration Order at 2.

Ms. Herridge also sought to avoid the expense of a deposition and contempt proceedings by attempting to appeal from the Disclosure Order directly under 28 U.S.C. § 1291 pursuant to the collateral order doctrine.  *See, e.g., Whole Woman's Health v. Smith*, 896 F.3d 362, 368 (5th Cir. 2018) ("[I]nterlocutory court orders bearing on First Amendment rights remain subject to appeal pursuant to the collateral order doctrine.").  The D.C. Circuit, however, dismissed that appeal for lack of jurisdiction, holding that Ms. Herridge could defy the Disclosure Order and "appea[l] from any contempt citation."  *Herridge v. Chen*, No. 23-5198, Per Curiam Order 1, Doc. No. 2018838 (D.C. Circuit Sept. 25, 2023).  Accordingly, Ms. Herridge was left with no avenue for an appeal other than through a contempt hearing.

### F.    Ms. Herridge Is Deposed and Declines to Reveal Her Confidential Source(s), and Plaintiff Seeks Contempt Sanctions

On September 26, 2023, Plaintiff deposed Ms. Herridge.  When Plaintiff's counsel asked Ms. Herridge to identify her confidential source(s), Ms. Herridge made clear that she fully respected the Court's order and had no wish to defy it, but that the Court's rulings left her with no other alternative to secure appellate review of her rights.  As she stated:

> I have complete respect for the court and its authority and for the order.  I have no desire to defy a court order, but my understanding is that the courts have ruled that in order to seek further judicial review, I must now disobey the order, and for that

14

reason, among others, I am invoking my First Amendment rights and declining to answer the question.

Deposition of Catherine V. Herridge Dep. at 19:17-20:13 ("Herridge Dep.") (Ex. G).

In addition, Ms. Herridge explained particular a concern that reinforced her reasons for asserting privilege to secure appellate review.  Ms. Herridge does not want to provide any additional information about U.S. government personnel who may have been involved in a counterintelligence investigation to a person whom DOD publicly announced was a national security risk.  *Id.* at 220:6-12.

Because Ms. Herridge had made clear that she would not disclose her confidential source(s), the deposition could have been brief.  Plaintiff's counsel could have asked directly about confidential source(s), elicited an assertion of privilege, and established that Ms. Herridge would similarly assert privilege to all questions about confidential source(s).  Plaintiff then could simply have stipulated to preserve the ability to question Ms. Herridge further after an appeal, in the event that the Court's Disclosure Order was upheld.  That is what the government did in less than five minutes at the end of the deposition.  Herridge Dep. 210:6-212:18.

Instead, Plaintiff's counsel questioned Ms. Herridge on the record for over four hours, asking her individually about the source for every photograph and document that appeared in the stories, requiring Ms. Herridge to assert privilege over and over again to preserve her right to have an appellate court hear her claims under the First Amendment and common law privileges.

Plaintiff's counsel also asked numerous questions about matters that were not privileged, which Ms. Herridge answered.  *See, e.g.*, 24:24-25:6, 35:2-12; 75:18-76:5; 77:25-78:6; 130:11-133:4; 146:4-147:18; 148:2-19; 149:1-18; 150:9-151:1; 154:1-7; 183:17-23; 184:14-24; 185:1-186:7; 200:10-15; 204:10-13.  And Plaintiff's counsel also lengthened the deposition by asking questions about Ms. Herridge's newsgathering process that are subject to the First Amendment

PUBLIC VERSION

reporter's privilege and that were *not* covered by the Court's Disclosure Order. That order overrode the privilege solely with respect to Ms. Herridge's confidential source(s) for alleged Privacy Act information about Plaintiff.

On October 30, 2023, Plaintiff filed a motion seeking to have Ms. Herridge held in contempt for disobeying the Court's Disclosure Order. Application for Order to Show Cause, ECF No. 159-2 ("Contempt Motion"). Plaintiff asks the Court to impose a fine escalating from $500 per day to $5,000 per day to coerce Ms. Herridge's compliance with that order. Contempt Mot. at 19.

In addition, Plaintiff asks the Court to impose a *compensatory* sanction requiring Ms. Herridge "to compensate [Plaintiff] for the costs and [attorneys'] fees associated with preparing for and taking the deposition and for preparing this [Contempt] Motion." Contempt Mot. at 20. Plaintiff is literally asking the Court—as an exercise of its *equitable* discretion—to require Ms. Herridge to pay for the costs and fees of the very deposition and contempt proceeding that Ms. Herridge took every possible step to avoid by seeking an immediate interlocutory appeal—an appeal that she sought precisely to "sav[e] the parties from needless expense." Mem. ISO Mot. for Interlocutory Appeal at 2, ECF No. 144-1 (quoting *Molock v. Whole Foods Mkt. Grp.*, 317 F. Supp. 3d 1, 6 (D.D.C. 2018)). Plaintiff asks for that compensation even though Plaintiff, by contrast, voluntarily *insisted* on incurring those extra expenses, knowing full well that the deposition would be futile and that Ms. Herridge would not disclose her confidential source(s).

## LEGAL STANDARD

The Court may hold Ms. Herridge in contempt only if Plaintiff carries her burden of demonstrating "by clear and convincing evidence that: (1) there was a clear and unambiguous court order in place; (2) that order required certain conduct by [Ms. Herridge]; and (3) [Ms.

Herridge] failed to comply with that order." *United States v. Latney's Funeral Home, Inc.*, 41 F. Supp. 3d 24, 29–30 (D.D.C. 2014).

Even where an order has been violated, rather than entering a finding of contempt, it is always open to a court to modify or revise the underlying order. Under Federal Rule of Civil Procedure 54(b), "any order . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). The Court may reconsider a prior order "as justice requires." *Said v. Nat'l R.R. Passenger Corp.*, 390 F. Supp. 3d 46, 50 (D.D.C. 2019) (brackets, quotation marks, and citations omitted). "[A]sking 'what justice requires' amounts to determining, within the Court's discretion, whether reconsideration is necessary under the relevant circumstances." *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004).

## ARGUMENT

### I.   The Court Should Not Hold Ms. Herridge in Contempt and Instead Should Modify Its Disclosure Order.

Rather than holding Ms. Herridge in contempt, the Court should modify its underlying Disclosure Order that overrode the First Amendment reporter's privilege and required Ms. Herridge to disclose her confidential source(s). It is well settled that "a defendant in a civil-contempt proceeding may challenge the underlying decree." 11A C. Wright, A. Miller, & M. Kayne, Fed. Prac. & Proc. § 2960 (3d ed. 1998); *Blocksom & Co. v. Marshall*, 582 F.2d 1122, 1124 (7th Cir. 1978) ("[C]ivil contempt may be defended on the ground that the underlying order was erroneously issued."); *see also United States v. United Mine Workers of Am.*, 330 U.S. 258, 295 (1947) (distinguishing civil from criminal contempt on this point). Indeed, the entire purpose of this contempt proceeding is to ensure that, if the Court adheres to its decision requiring Ms.

PUBLIC VERSION

Herridge to disclose her confidential source(s), there will be an appealable order that will allow Ms. Herridge to present her arguments in support of quashing the subpoena to the court of appeals. It is necessarily open to Ms. Herridge to reassert those arguments in this proceeding before presenting them on appeal.[7]  In addition, the Court may revise its prior order at any time "as justice requires." *Said v. Nat'l R.R. Passenger Corp.*, 390 F. Supp. 3d 46, 50 (D.D.C. 2019).

Ms. Herridge does not intend to burden the Court by reproducing here all of her arguments concerning the First Amendment reporter's privilege, the proper scope of balancing under *Zerilli*, or the federal common law reporter's privilege.  As Ms. Herridge has explained, *Zerilli* calls for a broad-ranging balancing inquiry that "weigh[s] the public interest in protecting the reporter's sources against the private interest in compelling disclosure." *Zerilli*, 656 F.2d at 712.  Proper evaluation of that balance may require the Court to consider issues in the posture of partial summary judgment before ordering the disclosure of confidential source(s)—to determine, for example, whether Plaintiff will be unable to establish elements of her Privacy Act claim, such as causation of damages.  *See* Mem. ISO Mot. to Quash at 27–28.

That is exactly the sort of inquiry that other courts have required before compelling disclosure of confidential sources.  As the First Circuit explained, before a court compels discovery of confidential sources protected by the First Amendment privilege, "plaintiff should show that it can establish jury issues on the essential elements of its case not the subject of the contested discovery." *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 597 (1st Cir. 1980); *see also, e.g.*, *Atlanta Journal-Constitution v. Jewell*, 555 S.E.2d 175, 181 (Ga. App. 2001) (requiring plaintiff to show that he can prove other elements of his case before compelling

---

[7] *Cf.* Mem. ISO Mot. for Interlocutory Appeal at 14, ECF No. 144-1 (explaining that there would likely be "a largely duplicative round of briefing on the motion for a contempt order").

PUBLIC VERSION

disclosure and explaining, "[w]e recognize that, in many respects, the application of this balancing test will involve legal analysis similar to, perhaps even identical to, that required in ruling upon a motion for summary judgment"); *State ex rel. Classic III, Inc. v. Ely*, 954 S.W.2d 650, 659 (Mo. App. 1997) (demanding analysis of the strength of plaintiff's case, because "[i]f the case is weak, then little purpose will be served by allowing such discovery, yet great harm will be done by revelation of the privileged [confidential source] information"). There is no point in overriding First Amendment protections and disclosing confidential source(s) in aid of a claim that will fail (or largely fail) on summary judgment.

As this Court has acknowledged, "[r]equiring an investigative reporter to divulge her source is serious business, and it is better to be safe than sorry when it comes to First Amendment rights." Certification Order at 3. One way to be safe rather than sorry in this case would be to evaluate whether (and to what extent) Plaintiff's Privacy Act claim may survive summary judgment *before* taking the irretrievable step of compelling disclosure of confidential source(s). Ms. Herridge incorporates here by reference her prior arguments on all these points from her briefing on the Motion to Quash. *See* Mem. ISO Mot. to Quash at 13–45; Reply ISO Mot. to Quash at 3–25, ECF No. 129.

## A. The Court Should Consider Additional Information Bearing on the *Zerilli* Balance of Interests.

The Court should also consider additional information bearing on the balance of interests.

### 1. Forcing Disclosure of Ms. Herridge's Sources Would Have a Broad Chilling Effect Undermining the Ability of the Press to Keep the People Informed.

The Court now has the benefit of submissions from experts in the field of journalism and investigative reporting explaining the chilling effect that entering a contempt sanction against Ms. Herridge would have on the functioning of a free press. The Dean of the Columbia Journalism

School, Jelani Cobb, explains that confidential sources are "vital for the functioning of a free and independent press."  Cobb Decl. ¶ 5.  As he explains, one of the most important functions of the press "is to ensure accountability of government officials to the people by keeping the people informed about their government." *Id.* ¶ 6.  The press cannot play that informational role, however, without confidential sources.  Without confidential sources, reporters cannot "contradict official government narratives on sensitive matters of policy" or uncover other government actions that might be hidden from view.  *Id.* ¶ 7.  But sources will come forward with such information only if they can be given credible assurances of confidentiality.  As a result, "[t]he act of disclosing a confidential source, even as the result of a court order, erodes the ability of journalists everywhere to credibly promise confidentiality to sources who demand it, and would have a chilling effect on the flow of important information to journalists reporting on government matters." *Id.* ¶ 11.  That is why, at Columbia, journalists are taught that a pledge of confidentiality is "a sacred aspect of the profession that, if broken, would undermine the ability of the press to fulfill its core function of informing the populace about the government's actions." *Id.* ¶ 13.

Concerns for preserving the confidentiality of sources are particularly acute in the field of national security reporting.  Steve Coll, a professor at the Columbia Journalism School and a two-time Pulitzer Prize winning investigative journalist in the national security field, explains that the press "could not effectively report" on matters of national security and international affairs without using confidential sources.  Coll Decl. ¶6.  Based on his experience as a reporter focusing on national security and international affairs, "it simply is not possible" to contradict official government positions on these important topics—or to evaluate leaks directed by high-level officials—without using confidential sources who have access to protected information.  *Id.* ¶ 6–8. As Mr. Coll further explains, "a contempt order that successfully forces a reporter to disclose a

national security source would have a broad chilling effect on the flow of critical information to the press and thus to the people." *Id.* ¶ 11. The effect of a contempt order in this case thus would be much broader than simply its impact on Ms. Herridge. "It would have a ripple effect discouraging government personnel with critical knowledge—including whistleblowers with knowledge of wrongdoing or government incompetence—from serving as sources." *Id.* The result would be "undermin[ing] the ability of the press to hold powerful decisionmakers accountable before the public" and "impair[ing] the ability of the press to fulfill its function of keeping the people informed about the actions of their government." *Id.* The effect of such an order, in other words, would be to hobble the ability of the press to "bare the secrets of government and inform the people." *N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring).

Under *Zerilli*, the Court should take into account the broad, systemic effects that would result from forcing disclosure of sources in this case.

> **2.    Forcing Disclosure of Ms. Herridge's Source(s) Raises National Security Concerns That Should Be Considered Under *Zerilli*.**

The Court should also take into consideration the national security implications of its order requiring Ms. Herridge to reveal the identity of her confidential national security source(s) to Plaintiff—a former colonel in the PLA whom DOD has expressly determined to be a national security risk. ████████████ The elephant in the room in this case is the fact that, although Plaintiff was not criminally prosecuted, DOD formally determined that she was a national security risk and there remains a serious risk that the she was, in fact, involved in providing U.S. servicemember information to the CCP. That risk is plain on the face of DOD's determination that Plaintiff is a national security risk ███████████████████████████

███████████████████████████████████████████

That means that the Court's Disclosure Order requires disclosing information—presumptively the

identity (or identities) of government employee(s) who had access to details of a counterintelligence investigation—to a person who potentially was collecting intelligence for the CCP. As explained below, that necessarily raises a national security risk. And that risk ought to be taken into account in the way the Court weighs interests under the *Zerilli* balancing test.

Along with this opposition, Ms. Herridge is submitting two declarations from experts in the field of counterintelligence to explain the national security implications of this case and to place the Disclosure Order in context so that the Court may fully evaluate the implications of that order. William Evanina spent 24 years working in counterintelligence in the FBI and CIA. Evanina Decl. ¶ 2. From 2009 through 2013, he served as a Special Agent in Charge in the FBI's National Security Office overseeing counterintelligence operations with respect to Russia and counterterrorism, and from 2013 through 2014, he ran the FBI and CIA's joint Counterintelligence Division/Counterespionage Group. *Id.* ¶¶ 3–4. In 2014, he became Director of the National Counterintelligence and Security Center within the Office of the Director of National Intelligence, a position he held until 2021. *Id.* at ¶ 5. Holden Triplett served for almost 15 years with the FBI. Triplett Decl. ¶ 2. He was stationed with the FBI in Moscow and in Beijing and then served as Director for Counterintelligence at the National Security Council. *Id.* ¶ 3–4. His last position in government was as FBI Faculty Chair at the National Intelligence University. *Id.* at ¶ 2.

As Mr. Evanina and Mr. Triplett explain, in their opinion, several factors lead them to conclude that there is a serious risk that Plaintiff was using UMT to provide information on U.S. servicemembers to the CCP. Evanina Decl. ¶ 19; Triplett Decl. ¶¶ 15–17. The affidavit the FBI submitted to secure a search warrant in 2012 provides substantial evidence that Plaintiff was a colonel in the PLA. DOD's decision finding that ████████████████████████████████ ████████████████████████████████ And Plaintiff's repeated deceptions about her past

detailed in the FBI affidavit—which included lying on immigration forms, lying to federal investigators, and encouraging others to lie for her—buttress the assessment that there is a serious risk that she was involved in collecting information for the CCP.  Evanina Decl. ¶ 11; Triplett Decl. ¶¶ 15–17.

In addition, using an organization like UMT to collect information and the type of information UMT was collecting from U.S. servicemembers fit the pattern of CCP intelligence methods.  Evanina Decl. ¶ 11; Triplett Decl. ¶¶ 10–16.  The CCP is adept at using "non-traditional collectors," including academics and front organizations, to carry out information gathering in the United States.  Evanina Decl. ¶¶ 12–13; Triplett Decl. ¶ 12.  Non-traditional collectors are in positions involving legitimate work and research, and they use those positions to collect information.  Evanina Decl. ¶¶ 12–13; Triplett Decl. ¶ 12.  UMT fit that pattern.  Evanina Decl. ¶ 11; Triplett Decl. ¶¶ 10–16.

Past cases show that the CCP has been focused on gathering large swaths of data about U.S. government personnel, security clearance holders, and servicemembers.  Evanina Decl. ¶ 13–16.  The CCP, for example, was behind the hacking of the Office of Personnel Management, an incident in which security clearance questionnaire information (SF86s) for millions of U.S. government employees was stolen.  *See* Ellen Nakashima, *Chinese breach data of 4 million federal workers*, Wash. Post (July 4, 2015), https://perma.cc/ES7C-59MQ.  Such information is highly valuable for the CCP, as it provides a guide to U.S. government personnel who may be targeted for recruitment.  Evanina Decl. ¶ 14; Triplett Decl. ¶¶ 14–15.  Here again, the type of information about servicemembers that UMT was gathering, which included military training history and information on a student's assigned unit, is the type of information the CCP would seek to gather.  *See* Evanina Decl. ¶¶ 17–18; Triplett Decl. ¶¶ 14–16.

PUBLIC VERSION

In fact, information that has become public only recently further confirms that the data gathered by UMT would have fit perfectly into an ongoing effort by the PLA to identify, target, and recruit former U.S. servicemembers with particular training or skill sets.  On September 5, 2023, the Chief of Staff of the Air Force set a letter to all Airmen warning that foreign companies were being used by the PLA to "targe[t] and recrui[t] U.S. and NATO-trained military talent" to "exploit your knowledge and skill to fill gaps in their military capability."  Ex. F.  Using front companies that might seem innocuous, the PLA is focused on "exploit[ing] veterans with valuable skills" to get them to "train the trainer."[8]  The fact that the information about servicemembers' training history that was being stored at UMT coincides exactly with the type of information that the government has now publicly warned the PLA would target to "fill gaps" in its capabilities provides strong support for the assessment that there is a serious risk that Plaintiff and UMT were involved in providing information to the CCP.  Evanina Decl. ¶ 17–18; Triplett Decl. ¶¶ 14–16.

As Mr. Evanina and Mr. Triplett explain, the fact that Plaintiff was not ultimately prosecuted does not undermine their assessment that there is a serious risk that Plaintiff was making U.S. servicemember information available to China.  Counterespionage cases are often not prosecuted even when the government has sufficient evidence to convict.  Evanina Decl. ¶¶ 20–21; Triplett Decl. ¶ 18.  That is because bringing a prosecution will often risk disclosing sources and methods of gathering information, and the government may decide that it better serves the interests of the United States to stop the intelligence activity rather than to risk disclosing sources

---

[8] Air Force News Service, *CSAF Issues Warning of PLA Recruitment of U.S. Air Force Members, Veterans* (Sept. 8, 2023), https://www.af.mil/News/Article-Display/Article/3520635/csaf-issues-warning-of-pla-recruitment-of-us-air-force-members-veterans/; *see also* Dan Lamothe, *China's military seeks to exploit U.S. troops, veterans, general warns*, Wash. Post (Sept. 8, 2023), *available at* https://tinyurl.com/mrvcmhdv.

PUBLIC VERSION

and methods in a prosecution.  Evanina Decl. ¶ 21; Triplett Decl. ¶ 18.  A decision not to prosecute does not establish an absence of genuine national security risk.  To the contrary, the only actual finding in this record is DOD's finding that Plaintiff *did* present a national security risk and that she had created a vulnerability for DOD personnel that required DOD to take action.

Requiring Ms. Herridge now to identify her confidential national security source(s) to Plaintiff raises a further risk.  The basic premise of Plaintiff's case is that a government employee with detailed knowledge of the counterespionage investigation into Plaintiff leaked information to Ms. Herridge.  Given Plaintiff's allegations, the Court must proceed on the assumption that ordering disclosure of Ms. Herridge's confidential source(s) would require handing over to a person whom DOD deemed to be a national security risk the identity of U.S. government personnel who were involved in a counterespionage investigation.  That inherently raises additional risk.  As Mr. Triplett explains, "[e]very piece of information that is disclosed about counterintelligence operations and personnel can allow an adversary to build a more complete picture of counterintelligence operations and capabilities.  In my assessment, providing the names of counterintelligence personnel to a person whom DOD has found to be a national security risk creates an additional risk that should be avoided."  Triplett Decl. ¶ 19.

Ms. Herridge submits that the Court should properly take at least two distinct risks into account in "weigh[ing] the public interest in protecting the reporter's sources against the private interest in compelling disclosure."  *Zerilli*, 656 F.2d at 712.  Where there is a substantial risk that Plaintiff's "private interest in compelling disclosure" also raises a national security risk, that should be taken into account in the Court's balancing.  Similarly, if there is a substantial risk that Plaintiff was making U.S. servicemembers' information available to a foreign power—and thus that her "private interest" in this Privacy Act suit is, in effect, seeking taxpayer money to recover

funding for that conduct—that must matter under *Zerilli*.  The Court's current holding that the *Zerilli* balancing test is limited to considering (i) the centrality of the information sought, and (ii) exhaustion of alternative sources improperly prevents the Court from giving due weight to important circumstances in this case.

## II.   The Court Cannot Hold Ms. Herridge in Contempt for Refusing to Answer Questions Intruding on Matters Within the Reporter's Privilege *Other Than* the Identity of Confidential Source(s).

To the extent Plaintiff asks the Court to hold Ms. Herridge in contempt for refusing to answer questions that intrude on the First Amendment reporter's privilege *other than* questions targeted at the identity of Ms. Herridge's confidential source(s), that would be improper.  The Court has never ordered Ms. Herridge to answer such questions.

By its terms, the Court's Disclosure Order requires Ms. Herridge to answer only two types of questions: (i) questions "regarding the identity and intent of the source or sources of the documents and images allegedly provided to her in violation of the Privacy Act"; and (ii) questions regarding "any non-privileged other matters relevant to [Plaintiff's] Privacy Act claim."  Disclosure Order at 28.  As noted above, when Ms. Herridge was asked to reveal the identity of her source(s), she respectfully declined to answer in order to preserve her ability to have appellate review of her First Amendment rights.  *See, e.g.*, Herridge Dep. 19:17-20:13.  When she was asked about non-privileged matters, she answered.  Thus, she answered dozens of questions ranging from the names of other people who worked on the stories, *id.* at 24:24-25:6, to her interactions with Agent Pappa at a wedding, *see id.* at 180:13-181:4, to whether Agent Pappa was frustrated by the government's decision not to prosecute Plaintiff, *id.* at 184:14-25, to whether Stephen Rhoads (who had worked for the FBI as an informant) hoped that Ms. Herridge's stories would result in Plaintiff's DOD funding being cut off, *id.* at 190:6-192:16.

Plaintiff, however, appears to be asking the Court to hold Ms. Herridge in contempt for refusing to answer additional questions that intrude on the First Amendment reporter's privilege, but that are not covered by the Court's Disclosure Order. Plaintiff complains that Ms. Herridge declined to answer questions on matters such as "the preparation of the Fox News stories, the timing of their publication, and why certain materials and information were included or omitted." Contempt Mot. at 9. All of those questions intrude onto matters protected by the First Amendment reporter's privilege. It is well settled that the privilege broadly protects the newsgathering process. The privilege extends to information about a reporter's "newsgathering activities" to prevent questioning that would have a "chilling effect upon the newsgathering and editorial process." *Maughan v. NL Indus.*, 524 F. Supp. 93, 95 (D.D.C. 1981). As a result, the "privilege for journalists shields both confidential and nonconfidential information from compelled disclosure." *Hutira v. Islamic Repub. of Iran*, 211 F. Supp. 2d 115, 120 (D.D.C. 2002); *accord In re Slack*, 768 F. Supp. 2d 189, 193 (D.D.C. 2011). It broadly "protect[s] [reporters] from compelled disclosure of information which they have obtained as part of their newsgathering role," *In re Slack*, 768 F. Supp. 2d at 193, including "resource materials and notes" prepared "in anticipation of writing a news article," *Maughan*, 524 F. Supp. at 95. And it is established law that "a reporter cannot be made to disclose information . . . concerning his editorial judgment." *Id.*[9]

Because Plaintiff's questions—such as "why certain materials and information were included or omitted" in Ms. Herridge's stories, Contempt Mot. at 9—are plainly covered by the privilege (and also not covered by the Disclosure Order), Ms. Herridge was not required to answer

---

[9] Counsel for Ms. Herridge asserted privilege on these grounds, with case citations, at multiple points during the deposition. *See, e.g.*, Herridge Dep. 16:14-17:10 (citing *Maughan v. NL Indus.*, 524 F. Supp. 93 (D.D.C. 1981) and *In Re Slack*, 768 F. Supp. 2d 189 (D.D.C. 2011)); 25:19-26:14; 27:8-17; 30:22-32:4; 49:6-7; 78:18-19; 123:25-124:1; 125:14-15; 154:19-20; 167:19-20.

them.  At a minimum, Plaintiff cannot establish by "clear and convincing evidence" that there was a "clear and unambiguous court order" requiring Ms. Herridge to answer such questions.  *See Negley v. FBI*, 766 F. Supp. 2d 190, 193 (D.D.C. 2011).  The Court has never held that such matters are *not* covered by the privilege, nor has it held that Plaintiff has overcome the privilege on such matters.  Those questions have never been presented in this case.  As a result, the Court cannot hold Ms. Herridge in contempt for declining to answer questions intruding on the First Amendment privilege *other than* questions about the identity of Ms. Herridge's confidential source(s).

### III.    If the Court Enters a Contempt Order, Any Fine Should be Nominal and It Should Be Stayed Pending Appeal.

If the Court enters a contempt order, any sanction imposed on Ms. Herridge should be nominal.  As the Court is well aware, Ms. Herridge took every possible step to avoid a situation in which disobeying the Disclosure Order would be the only pathway for an appeal.  The Court determined, however, in its discretion, *see* Reconsideration Order at 2, that it would deny an interlocutory appeal and leave contempt as the only route to an appeal.  Under the circumstances, imposing a substantial fine on Ms. Herridge for pursuing the only available avenue for an appeal would be inequitable and improperly burden the exercise of her First Amendment rights.  And that is especially the case where the Court itself has acknowledged that she may have a meritorious appeal and "there is good reason to believe this case might generate en banc activity that could upend existing precedents."  Certification Order at 3.

The Court should reject Plaintiff's request for *compensatory* sanctions requiring Ms. Herridge to pay costs and attorney's fees for the deposition and this contempt proceeding.  Not only would such an award be unprecedented in any case involving an order to disclose a journalist's sources, it would be wholly inequitable where Ms. Herridge sought an interlocutory appeal precisely to "sav[e] the parties from needless expense."  Mem. ISO Mot. for Interlocutory

Appeal at 2, ECF No. 144-1 (quoting *Molock v. Whole Foods Mkt. Grp.*, 317 F. Supp. 3d 1, 6 (D.D.C. 2018). It takes extraordinary chutzpah for Plaintiff to ask the Court to force Ms. Herridge to pay for expenses that Ms. Herridge sought to avoid and that Plaintiff *insisted* on incurring— even though Plaintiff knew full well that a deposition would be futile and Ms. Herridge would not disclose her source(s).

Finally, the Court should stay any contempt sanction pending appeal. The Court has already held that this is a "truly exceptional case[]" raising serious questions. Certification Order at 3. Ms. Herridge should not be forced to face the irreparable harm of either being coerced to reveal confidential sources or paying fines simply for exercising her right to seek appellate review of her First Amendment rights.

### A.    Any Sanction Should Be Nominal.

If the Court determines it must hold Ms. Herridge in contempt, it should impose no more than a nominal sanction, such as the $1 per day fine entered by multiple courts in similar circumstances. *See, e.g.*, *United States v. Cutler*, 6 F.3d 67 (2d Cir. 1993).

Crafting a civil contempt remedy is an exercise of the court's "broad" equitable discretion. *United States v. Two Gen. Elec. Aircraft Engines*, 317 F. Supp. 3d 516, 522 (D.D.C. 2018) (quoting *United States v. Latney's Funeral Home, Inc.*, 41 F. Supp. 3d 24, 36 (D.D.C. 2014)). "'Flexibility rather than rigidity has distinguished' equity jurisprudence," *NRDC v. Train*, 510 F.2d 692, 713 (D.C. Cir. 1974) (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)), and the Court must be guided by the rule that the "purpose of civil contempt sanctions" is "not to punish." *Guantanamera Cigar Co. v. Corporacion Habanos, S.A.*, 750 F. Supp. 2d 31, 34 (D.D.C. 2010); *see also Hecht Co.*, 321 U.S. at 329–30 (finding sanction should comport with "practicality" and the "public interest").

Here, no more than a nominal sanction is warranted. Ms. Herridge is not flouting the Court's order. She made clear that she respected the Court's order and had no wish to defy it, and that the only reason she did not comply was that the courts have left her no alternative for securing appellate review of her First Amendment rights. *See* Herridge Dep. at 20:7-13 ("I have complete respect for the court and its authority and for the order. I have no desire to defy a court order, but my understanding is that the courts have ruled that in order to seek further judicial review, I must now disobey the order."); *see also id.* 20:23-21:5; 208:2-10. As the Court knows, Ms. Herridge pursued every possible avenue for securing an appeal *without* disobeying the Court's order, precisely because she wanted to do everything in her power to avoid the current situation. She sought an interlocutory appeal under 28 U.S.C. § 1292(b), *see* ECF No. 144, and also attempted to appeal under the collateral order doctrine, *see* ECF No. 150. The D.C. Circuit held that there was no jurisdiction under the collateral order doctrine, *see Herridge v. Chen*, No. 23-5198, Per Curiam Order 1, Doc. No. 2018838 (D.C. Cir. Sept. 25, 2023), and this Court decided, in its discretion, to deny an interlocutory appeal, *see* Reconsideration Order at 1. Those rulings have left Ms. Herridge with no avenue for securing appellate review of her First Amendment rights other than through contempt. In such circumstances, imposing a substantial sanction as the price for allowing Ms. Herridge to appeal would be inequitable.

That is especially true given that the Court itself has acknowledged that "there are substantial grounds for difference of opinion" concerning the proper application of the balancing test under *Zerilli*, and "there is good reason to believe this case might generate en banc activity that could upend existing precedents." Certification Order at 3. Imposing substantial fines on Ms. Herridge for seeking an appeal in such a case would improperly burden her First Amendment rights and send a signal chilling the free speech rights of other journalists. In the First Amendment

context, the Supreme Court has consistently recognized that "[t]he threat of sanctions may deter [speech] . . . almost as potently as the actual application of sanctions." *NAACP v. Button*, 371 U.S. 415, 433 (1963). Here, imposing significant fines on Ms. Herridge would have an unnecessary chilling effect on free speech rights and would wrongly impose what is, in effect, a penalty as the price for securing access to the courts to vindicate First Amendment freedoms.

Indeed, given the Court's recognition that this is a "truly exceptional case[]" in an area where the law is unsettled and an appeal is plainly warranted, Certification Order at 2–3, it is fair to conclude that, under the particular circumstances of this case, the proper purpose of any contempt sanction is not to coerce immediate compliance with the Court's Disclosure Order before any appeal, but rather to establish the procedural prerequisite of a final order that will allow Ms. Herridge to appeal. Any sanction should be calibrated to that limited purpose. Because a nominal sanction is sufficient to make "the underlying discovery dispute . . . ripe for appellate review," Certification Order at 4 (quotation omitted), that is the only sanction the Court should enter.

Not surprisingly, many courts in similar circumstances have held that, where a nonparty journalist has disobeyed an order to disclose a confidential source, there should be only a nominal contempt sanction of $1 a day. In *United States v. Cutler*, for example, the district court imposed a $1 per day sanction (and stayed it pending appeal) so that the reporters could pursue an "expedited appeal." 6 F.3d 67 (2d Cir. 1993). And in *United States v. Cuthbertson*, the district court imposed a $1-per-day sanction immediately after ruling on the motion to quash so that an appeal could ensue. 630 F.2d 139 (3d Cir. 1980). In both cases, the district courts recognized that, where (as here) the function of the contempt order was to create a final order subject to appeal, it would make no sense to impose crushing penalties on a non-party who simply wanted appellate review of their First Amendment rights. *See Cutler*, 6 F.3d at 75; *Cuthbertson*, 630 F.2d at 149.

PUBLIC VERSION

Indeed, at least one court has termed sanctions imposed to "facilitate . . . appellate review of [a] privilege issue" a "'friendly' contempt" meriting only a nominal $1 per day fine. *See Harris v. One Hope United, Inc.*, 28 N.E.3d 804, 806 (Ill. 2015) ("To facilitate One Hope's request for appellate review of the privilege issue, the court found One Hope's law firm in "friendly" contempt of court and fined it $1 per day."). A similar fine of $1 per day is all that is warranted in this case.[10]

### B.     The Court Should Reject Compensatory Sanctions for Costs or Fees Related to Ms. Herridge's Deposition or this Contempt Motion.

The Court should flatly reject the request for *compensatory* sanctions to reimburse Plaintiff for the expenses of a deposition and contempt proceeding that she insisted on pursuing—even when she knew full well that Ms. Herridge would not answer questions identifying confidential source(s). Ms. Herridge repeatedly sought to obtain an immediate interlocutory appeal to "sav[e] the parties [the] needless expense" of undergoing a futile deposition and then a contempt proceeding. Mem. ISO Mot. for Interlocutory Appeal at 2, ECF No. 144-1 (first brackets original, second added). Plaintiff nevertheless argued against an interlocutory appeal at every turn and insisted on the more expensive deposition-and-contempt route for perfecting an appeal. Under these circumstances, there is no justification for making Ms. Herridge foot the bill for Plaintiff's self-imposed expenses.

To start with, where the Court has made a contempt proceeding the *only* avenue available to Ms. Herridge to secure an appeal, it would place an unconstitutional burden on Ms. Herridge's

---

[10] *Hatfill v. Mukasey*, 539 F. Supp. 2d 96 (D.D.C. 2008), does not provide any meaningful precedent supporting a more onerous sanction in this case. When the district court in *Hatfill* entered a hefty sanction and refused to stay it, the court of appeals immediately issued a stay to ensure that the fine would have no effect pending the appeal. *Hatfill v. Mukasey*, No. 08-5049, Doc. No. 1104546 (D.C. Cir. March 11, 2008) (per curiam) (attached as Exhibit H); *see also infra* Part III.C. Nothing in the court of appeals' action endorsed the approach adopted by the district court in *Hatfill*.

32

PUBLIC VERSION

First Amendment rights to require Ms. Herridge to pay Plaintiff's fees and costs as the price for securing appellate review. Fee shifting in this scenario would effectively impose a penalty on Ms. Herridge simply for pursuing an appeal, and that result cannot be reconciled with the usual recognition in First Amendment jurisprudence that even the threat of sanctions can have an improper chilling effect on First Amendment rights. *See, e.g.*, *NAACP*, 371 U.S. at 433.

In addition, as a matter of equitable discretion in fashioning a contempt order, it would be improper to award compensatory sanctions to Plaintiff. "[H]e who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). Under that principle, Plaintiff cannot be awarded compensation for costs that Plaintiff herself insisted on creating. *Cf. In re Paoli R.R. Yard PCB Litig.*, 221 F.3d 449, 463, 467 (3d Cir. 2000) (explaining that the "'unclean hands' factor" permits a district court to "reduce a costs award, on equitable grounds, if the prevailing party, through bad faith or dilatory tactics, has turned a relatively simple case into a complex morass"). Here, Ms. Herridge did everything in her power to *avoid* the unnecessary expense of these proceedings by seeking an interlocutory appeal. As she argued in seeking that appeal: "Immediate appeal will save resources by obviating the need for Plaintiff to schedule a deposition, wait for Ms. Herridge to refuse to answer questions, and then move for an order of contempt. And it would also avoid the need for the parties (and the Court) to prepare and address a largely duplicative round of briefing on the motion for a contempt order." Mem. ISO Mot. for Interlocutory Certification at 14. Plaintiff, by contrast, argued against any interlocutory appeal and insisted that there must be a futile deposition followed by contempt briefing. *See* Pltf's Omnibus Opp'n at 7–8. Having insisted on the more expensive path to an appeal, Plaintiff cannot now claim that she deserves compensation for receiving the procedure that she asked for.

PUBLIC VERSION

Worse, Plaintiff also made the deposition much longer (and more expensive) than it needed to be.  Plaintiff's counsel could have asked a few questions to establish that Ms. Herridge would assert privilege over the identity of her source(s) and then could have stipulated to the right to continue the deposition after an appeal.  That is exactly the approach the government took. Herridge Dep. 210:6-212:18.  Instead, Plaintiff's counsel asked hours of questions on matters other than the identity of Ms. Herridge's confidential source(s).  Counsel asked about the nature of Fox's internal collaboration, *id.* 25:13-18, the identity of the Fox employee who decided to air the broadcast reports on the Fox cable channel, *id.* at 121:22-23, why there was a delay between taping the Rhoads interview and the broadcast, *id.* At 122:10-12, 123:20-24, the format and timing of Ms. Herridge's receipt of certain photographs, 39:9-10, 40:3-5, 65:6, 86:1, 88:6-8, and dozens of other questions invading the editorial and newsgathering process.  *See id.* at 27:5-7 (origins of the story), 28:2-3 (origin of Fox's interest in Plaintiff), 29:8 (origin of federal agency interest in Plaintiff), 31:6-7 (nature of documents Fox reviewed).  Plaintiff's counsel even asked about Fox's internal "file storage system," *id.* at 126:13-15—even though this Court specifically quashed the subpoenas seeking documents from Fox and from Ms. Herridge.  Disclosure Order at 28.  Thus Plaintiff needlessly prolonged the deposition by asking questions far afield from Ms. Herridge's sources. Ms. Herridge certainly cannot be made to bear that expense.

Plaintiff also cannot cite a single precedent to support the extraordinary sanction she seeks. She fails to cite any case in which a nonparty journalist, as the price to appeal an adverse disclosure order, was required to pay compensatory sanctions related to the costs of a deposition and contempt proceedings.  Such sanctions were expressly denied in *Lee v. Dep't of Justice*, 327 F. Supp. 2d 26, 33 (D.D.C. 2004); *see also Cuthbertson*, 630 F.2d at 149 (ordering each party to bear its own costs).  And the *Hatfill* court tacitly denied a similar request by failing to award fees and costs

34

despite a request.  *Compare* Mem. ISO Mot. That James Stewart Be Held In Civil Contempt at 7, *Hatfill v. Ashcroft*, No. 1:03-cv-01793-RBW (D.D.C. Oct. 2, 2007), ECF 204-1 (requesting "costs and fees associated with [a journalist's] deposition"), *with Hatfill v. Mukasey*, 539 F. Supp. 2d 96, 107 (D.D.C. 2008) (contempt order providing no compensatory sanctions).

The *only* precedent Plaintiff cites in support of her request for compensatory sanctions, *Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 70 (D.D.C. 2003), is irrelevant.  That case did not involve contempt on a refusal to disclose a journalist's confidential sources.  Instead, it involved a defendant that had "reformatted" hard drives and "erased and reused" "email backup tapes" thereby destroying documents that were subject to a preliminary injunction requiring preservation.  *Id.* at 74.  The court centered its analysis on the principle that an "award of costs and attorney's fees" is "an appropriate sanction for conduct which *abuses the judicial process*."  *Id.* at 86 (emphasis added, quotation omitted).  Ms. Herridge's decision to pursue the only path left open to her to secure appellate review of her First Amendment rights is not an "abuse of the judicial process," and the analysis in *Landmark Legal* has no bearing on this case.[11]

### C.   Any Contempt Sanction Should Be Stayed Pending Appeal.

Finally, if the Court enters a contempt order, any sanction should be stayed pending appeal. A stay pending appeal has routinely been granted in prior cases involving contempt sanctions imposed on journalists to compel the disclosure of confidential sources, *see, e.g.*, *Lee v. Dep't of*

---

[11] Plaintiff's passing suggestion that she could be entitled to the "entire cost of the litigation as a sanction," Contempt Mot. at 19, is even further afield.  Plaintiff does not actually request that relief for good reason.  The reference to such a sanction in *Landmark Legal* traces back to a 1923 decision that involved an improper attempt by a party to secure an injunction from a lower court preventing enforcement of a judgment issued by the Seventh Circuit and is wholly irrelevant here. *See Landmark Legal*, 272 F. Supp. 2d at 86 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991) (citing *Toledo Scale Co. v. Computing Scale Co.*, 261 U.S. 399, 428 (1923))).

*Justice*, 327 F. Supp. 2d 26, 33 (D.D.C. 2004), including cases involving only nominal fines. *See Cutler*, 6 F.3d at 70; *Cuthbertson*, 630 F.2d at 144. Indeed, when the district court denied a stay of contempt sanctions in *Hatfill*, *see* 539 F. Supp. 2d at 106, the D.C. Circuit immediately stepped in and granted a stay, *see Hatfill v. Mukasey*, No. 08-5049, Doc. No. 1104546 (D.C. Cir. March 11, 2008) (per curiam) (attached as Exhibit H). When Ms. Herridge previously sought a stay pending appeal in this case, this Court denied that motion based solely on the ground that, at that point in time, there was no jurisdiction for an immediate appeal. *See* Certification Order at 5. If the Court enters a contempt order, the jurisdictional problem will be solved and a stay will be warranted. All four factors that courts consider on a stay application overwhelmingly favor a stay here. *See generally Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985) (per curiam) (listing factors).

*First*, Ms. Herridge will "be irreparably harmed absent a stay." *Cuomo*, 772 F.2d at 974. If Ms. Herridge is coerced to reveal her source(s), her promise(s) of confidentiality will be irretrievably breached, the identity of the source(s) will be irrevocably disclosed, and no court will ever be able to unring the bell and make the identity of the source(s) secret again. *See Maness v. Meyers*, 419 U.S. 449, 458–60 (1975) (finding "[c]ompliance could cause irreparable injury because appellate courts cannot always 'unring the bell' once the information has been released"). Not surprisingly, "[c]ourts in this District have recognized that the disclosure of confidential information is, by its very nature, irreparable 'because such information, once disclosed, loses its confidential nature.'" *Robert Half Int'l Inc. v. Billingham*, 315 F. Supp. 3d 419, 433–34 (D.D.C. 2018) (quoting *Hospitality Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C. 2010)). It is also an irreparable harm to require Ms. Herridge to rack up potentially hundreds of thousands of dollars in fines as the price for obtaining judicial review of her First Amendment rights. *See In*

*re Roche*, 448 U.S. 1312, 1316 (1980) (Brennan, J., in chambers) (granting stay where reporter "must either surrender his secrets" or face civil contempt).

*Second*, Ms. Herridge's appeal presents, at a minimum, serious legal questions.  Where, as here, the movant makes a strong showing of irreparable injury, she need only raise a "serious legal question on the merits" to warrant a stay.  *Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 12 (D.D.C. 2014).   A "court is not required to find that ultimate success by the movant is a mathematical probability."  *Citizens for Responsibility & Ethics in Washington v. Office of Admin.*, 565 F. Supp. 2d 23, 28 (D.D.C. 2008) (quotation marks and citation omitted).

The "serious legal question" standard is plainly met here.  Ms. Herridge's appeal will present at least two serious legal questions: (1) whether analysis of the First Amendment reporter's privilege under *Zerilli* requires a broad-ranging balancing of interests or can be cabined largely to weighing the factors of centrality and exhaustion, and (2) the existence and applicability of a federal common law reporter's privilege.  This Court has already acknowledged that there are "substantial grounds for a difference of opinion regarding" both of these issues.  Certification Order at 2.  As the Court explained, given "the importance of the First Amendment issues here, there is good reason to believe this case might generate en banc activity that could upend existing precedents."  *Id.* at 3.

The last time the D.C. Circuit considered the scope of *Zerilli,* it resulted in a tied four-four vote denying rehearing en banc and no definitive resolution.  *See Lee v. Dep't of Justice*, 428 F.3d 299, 300 & nn. 1&5 (D.C. Cir. 2005) (Judges Edwards, Rogers, Tatel, and Garland voted to grant rehearing, and Judges Brown and Griffith did not participate).  This case could provide that resolution.  In addition, as this Court acknowledged, the D.C. Circuit might also "take the opportunity to reshape the legal landscape by recognizing a federal common law newsgathering

PUBLIC VERSION

privilege—an option that *Zerilli* and *Lee* leave open." Certification Order at 3. Thus, there can be no question that Ms. Herridge's appeal presents serious legal questions, and Ms. Herridge should not be fined while the court of appeals takes the time it needs to fully consider the important issues presented in this case.

*Third*, Plaintiff will not suffer any injury, much less irreparable injury, from a stay of a contempt sanction. If the Court enters a contempt order, an appeal as of right is inevitable and staying the contempt sanction will not delay Plaintiff's access to confidential sources. It will only ensure that Ms. Herridge is not erroneously penalized for pursuing an appeal in a case in which the Court itself has indicated there is "good reason to believe" there might be "en banc activity." Certification Order at 3. In addition, Plaintiff's claimed need for information from Ms. Herridge is not time sensitive. Plaintiff filed this case in 2018 and did not subpoena Ms. Herridge until 2022. The case has been pending for almost five years, and the subpoena to Ms. Herridge is a year and a half old. A short additional delay to address important constitutional issues and to ensure that Ms. Herridge's First Amendment rights are not irretrievably breached will not harm Plaintiff.

*Fourth*, the public interest also strongly favors a stay. Plaintiff is seeking to uncover confidential source(s) related to reporting on a counterintelligence probe into Plaintiff and UMT. The First Amendment interest in protecting the ability of journalists to gather information from confidential sources is at its zenith in such national security cases. "[C]onfidentiality is often essential" for a journalist "to establish[] a relationship with an informant." *Zerilli*, 656 F.2d at 711. Erroneously forcing disclosure of confidential sources before the court of appeals has had a chance to weigh in would risk broadly chilling all potential government sources from working with reporters and thereby impair the public's interest in being able to rely on the press to "bare the secrets of government and inform the people." *N.Y. Times Co. v. United States*, 403 U.S. 713,

**PUBLIC VERSION**

717 (1971) (Black, J., concurring).  And subjecting reporters to hundreds of thousands of dollars in fines as the price for securing appellate review of their privilege arguments—even where the court acknowledges that those arguments "might generate en banc activity," Certification Order at 3—would also chill journalistic activity by placing a prohibitive price tag on the assertion of First Amendment rights.

If the Court denies a stay, Ms. Herridge respectfully requests that the Court enter an administrative stay to allow Ms. Herridge sufficient time to seek a stay from the court of appeals.

## CONCLUSION

The Court should reject Plaintiff's request to hold Ms. Herridge in contempt.  Alternatively, the Court should impose only a nominal fine of $1.00 per day, payable to the Court, and should stay its order pending appeal.


December 14, 2023                    Respectfully submitted,

                                     /s/ *Patrick F. Philbin*
                                     Patrick F. Philbin (D.C. Bar No. 453620)
                                     Kyle West (D.C. Bar No. 24093346)
                                     ELLIS GEORGE CIPOLLONE
                                     O'BRIEN LLP
                                     1155 F Street, N.W.
                                     Suite 750
                                     Washington, DC 20004
                                     (202) 249-6633
                                     pphilbin@egcfirm.com