**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| YANPING CHEN,<br><br>*Plaintiff*,<br><br>v.<br><br>FEDERAL BUREAU OF INVESTIGATION, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>*Defendants*. | **Case No. 1:18-cv-3074-CRC** |

**BRIEF OF REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AS AMICUS CURIAE IN SUPPORT OF NON-PARTY CATHERINE V. HERRIDGE'S RESPONSE TO THE ORDER TO SHOW CAUSE**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTEREST OF AMICUS CURIAE ..................................................................................... 1

INTRODUCTION ................................................................................................................ 2

ARGUMENT ........................................................................................................................ 4

    I.    The immediate imposition of substantial contempt sanctions during the pendency of a journalist's appeal of the denial of her privilege claim, particularly in Privacy Act cases, threatens the newsgathering and reporting process. ................................................................................................................ 4

    II.    Recent changes to the Department of Justice's policy on compulsory process affecting the press underscore the sensitivity of forcing journalists to disclose confidential source information. .................................................................................. 8

    III.   Confidential sources are essential to the free flow of information to the public. ........... 10

CONCLUSION ................................................................................................................... 13

CERTIFICATE OF COMPLIANCE .................................................................................. 15

# TABLE OF AUTHORITIES

**Cases**

*Chen v. FBI*,
   No. 18-cv-3074 (CRC), 2023 WL 5289432 (D.D.C. Aug. 17, 2023) ...................................7, 8

*Grosjean v. Am. Press Co.*,
   297 U.S. 233 (1936) ...........................................................................................................2

*In re Roche*,
   448 U.S. 1312 (1980) ......................................................................................................5, 8

*Lee v. Dep't of Justice*,
   327 F. Supp. 2d 26 (D.D.C. 2004) .....................................................................................6

*Lee v. Dep't of Justice*,
   413 F.3d 53 (D.C. Cir. 2005) ..............................................................................................7

*Lee v. Dep't of Justice*,
   428 F.3d 299 (D.C. Cir. 2005) .......................................................................................7, 8

*Mgmt. Info. Techs., Inc. v. Alyeska Pipeline Serv. Co.*,
   151 F.R.D. 471 (D.D.C. 1993) .........................................................................................10

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
   559 F.2d 841 (D.C. Cir. 1977) ...........................................................................................6

*Zerilli v. Smith*,
   656 F.2d 707 (D.C. Cir. 1981) ................................................................................. *passim*

**Other Authorities**

Alexander M. Bickel, The Morality of Consent (1975) ................................................................11

Brief of Amici Curiae Media Organizations in Support of Appellant,
   *Hatfill v. Mukasey*, No. 08-5049 (D.C. Cir. Mar. 28, 2008) .............................................1

Brief of Amici Curiae Newsgathering Organizations and Reporters' Groups in Support of
   Appellants Urging Reversal,
   *Lee v. Dep't of Justice*, 413 F.3d 53 (D.C. Cir. 2005) (No. 04-5301(L)),
   2005 WL 319711 ..............................................................................................................12

Bruce D. Brown & Gabe Rottman, *The Nuts and Bolts of the Revised Justice Dept. News Media Guidelines*, Lawfare (May 23, 2023),
   https://perma.cc/Q6NR-XDMH .........................................................................................9

Charlie Savage, *Talks on Surveillance Law Simmer as its Expiration Date Looms*,
   N.Y. Times (Nov. 16, 2023),
   https://perma.cc/2B2N-DRLU ............................................................................................13

David Kravets, *Reporters Challenge Bonds' Leak Subpoena*,
   Associated Press (May 31, 2006),
   https://perma.cc/2JS6-5N7C ..............................................................................................12

Eric Umansky, *How American Journalists Covered Torture After 9/11*,
   Colum. Journalism Rev. (Sept./Oct. 2006),
   https://perma.cc/GU5N-D54D ..........................................................................................12

Gabe Rottman, *The Privacy Act and Media Leaks*,
   Reporters Comm. for Freedom of the Press (June 5, 2023),
   https://www.rcfp.org/the-privacy-act-and-media-leaks/ .....................................................3

*Introduction to the Reporter's Privilege Compendium*,
   Reporters Comm. for Freedom of the Press,
   https://www.rcfp.org/introduction-to-the-reporters-privilege-compendium/
   (last updated Nov. 5, 2021) ..................................................................................................2

James Risen & Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*,
   N.Y. Times (Dec. 16, 2005),
   https://www.nytimes.com/2005/12/16/politics/bush-lets-us-spy-on-callers-without-
   courts.html .........................................................................................................................13

Jesse Eisinger et al., *The Secret IRS Files: Trove of Never-Before-Seen Records Reveal
   How the Wealthiest Avoid Income Tax*, ProPublica (June 8, 2021),
   https://perma.cc/63FG-D5RA .....................................................................................13, 14

John N. Mitchell, U.S. Att'y Gen., *Free Press and a Fair Trial: The Subpoena
   Controversy*, Address Before the House of Delegates of the American Bar Association
   (Aug. 10, 1970),
   https://perma.cc/9NLP-BL52 ..............................................................................................9

Laura K. Donohue, *Section 702 and the Collection of International Telephone and
   Internet Content*,
   38 Harv. J.L. & Pub. Pol'y 117 (2015) .............................................................................13

Michael Farrell, *Anonymous Sources*, Soc'y Pro. Journalists,
   https://perma.cc/5BQBSRA3 ...........................................................................................11

Per Curiam Order,
   *Hatfill v. Mukasey*, No. 08-5049 (D.C. Cir. Mar. 11, 2008), Doc. No. 1104546 .......................6

Per Curiam Order,
   *Hatfill v. Mukasey*, No. 08-5049 (D.C. Cir. Nov. 17, 2008), Doc. No. 1149629 .......................6

Robert Faturechi, *ProPublica's Tax Revelations Lead to Calls for Reforms – and Investigation*, ProPublica (June 9, 2021), https://perma.cc/TN6Z-KGVK ...............................................................................................14

RonNell Andersen Jones, *Avalanche or Undue Alarm? An Empirical Study of Subpoenas Received by the News Media*, 93 Minn. L. Rev. 585 (2008)..........................................................................................5

Wes Davis, *US Congress Pushes Warrantless Wiretapping Decision Off Until April Next Year*, The Verge (Dec. 16, 2023), https://perma.cc/NHP7-XSX2..................................................................................13

**Regulations**

28 C.F.R. § 50.10 ...............................................................................................9, 10

**INTEREST OF AMICUS CURIAE**

Amicus curiae the Reporters Committee for Freedom of the Press (the "Reporters Committee") is an unincorporated nonprofit association founded by leading journalists and media lawyers in 1970, when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources.[1]  Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.  The Reporters Committee frequently serves as amicus curiae, including in this Court and in the U.S. Court of Appeals for the District of Columbia Circuit, in matters implicating the reporter's privilege and the use of confidential sources.  *See*, *e.g.*, Brief of Amici Curiae Media Organizations in Support of Appellant, *Hatfill v. Mukasey*, No. 08-5049 (D.C. Cir. Mar. 28, 2008).

Because of the vital role that confidential journalistic sources play in the free flow of information to the public, the Reporters Committee has a strong interest in ensuring that journalists can offer credible assurances of confidentiality to their sources.  The pending order to show cause has undermined that ability.  Accordingly, the Reporters Committee respectfully submits this amicus brief in support of non-party Catherine Herridge's response to the Court's order to show cause why she should not be held in contempt.

---

[1]   No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief.  No person other than amicus curiae or its counsel made a monetary contribution to the preparation or submission of this brief.

## INTRODUCTION

The compelled disclosure of the identities of a journalist's confidential sources has a particular and substantial impact on the integrity of the newsgathering and reporting process. Accordingly, amicus makes three points in support of non-party Catherine Herridge's response to this Court's order to show cause why she should not be held in contempt.

First, while Privacy Act cases involving efforts to compel the identities of confidential journalistic sources are rare, when they do occur, they are "hugely consequential for the work of the press." Gabe Rottman, *The Privacy Act and Media Leaks*, Reporters Comm. for Freedom of the Press (June 5, 2023), https://www.rcfp.org/the-privacy-act-and-media-leaks/; *Zerilli v. Smith*, 656 F.2d 707, 711 (D.C. Cir. 1981) ("Compelling a reporter to disclose the identity of a source may significantly interfere with this news gathering ability; journalists frequently depend on informants to gather news, and confidentiality is often essential to establishing a relationship with an informant."). In this case, a non-party journalist whose claim of privilege failed at the trial court must now face a finding of contempt and (potentially heavy) sanctions while she simultaneously seeks review of her privilege claim on appeal and continues her work as a correspondent at CBS News. As detailed in the attached declaration of Toni Locy, who faced a similar situation arising out of her reporting in the 2000s, that dynamic is profoundly disruptive to the ongoing work of journalists, and therefore to the free flow of information to the public. Furthermore, that disruption can be exacerbated by a reading of *Zerilli* that only considers whether the information sought is central to the claim and whether the plaintiff has reasonably exhausted other avenues to it (as opposed to weighing the public interest in unfettered reporting on government activities versus the private interest in disclosure). *Cf. Zerilli*, 656 F.2d at 712 ("[I]n the ordinary case the civil litigant's interest in disclosure should yield to the journalist's

2

privilege."). This is particularly so in Privacy Act cases where the journalist is a non-party. *Id.* at 715 (noting non-party journalist was "not asserting the privilege in order to protect himself from liability"). Acknowledging the burden that such discovery disputes impose on journalists and journalism, courts in this jurisdiction have stayed sanctions to permit journalists to appeal assertions of the reporter's privilege in Privacy Act cases.

Second, the Justice Department recently revised its internal policy governing the use of compulsory process to demand the production of information or testimony from a journalist or journalists' records from a third-party communications or business provider. While that policy reflects an act of voluntary forbearance by the Department, its existence underscores the weight of the public interest in protecting reporters from having to disclose the identity of their sources. Indeed, were this a criminal national security "leak" case being pursued by the Department, the policy would bar the government from seeking to compel the disclosure of source identity information from a reporter in Herridge's position. That the Justice Department has restrained itself from compelling the disclosure of such confidential source information in criminal cases speaks to the *Zerilli* balancing analysis in a civil Privacy Act claim, "where the public interest in effective criminal law enforcement is absent." *Zerilli*, 656 F.2d at 711.

Third, it bears emphasizing that credible assurances of confidentiality to journalistic sources have been, historically, an essential ingredient in a wide array of news reporting in the public interest, from Watergate to warrantless surveillance post-9/11 to recent coverage concerning tax avoidance strategies by wealthy Americans. Given the nature of Privacy Act cases, which necessarily involve alleged disclosures from government officials, compelling non-party journalists to identify confidential sources has carried a special threat through the years to some of the most important reporting on public institutions.

3

For all of these reasons, amicus respectfully urges the Court—if it declines to modify its disclosure order and finds Herridge in contempt—that it impose only nominal sanctions and that it stay any sanctions while Herridge pursues her appeal of the Court's denial of her motion to quash the plaintiff's subpoena.

**ARGUMENT**

I. **The immediate imposition of substantial contempt sanctions during the pendency of a journalist's appeal of the denial of her privilege claim, particularly in Privacy Act cases, threatens the newsgathering and reporting process.**

The requirement that Herridge be found in contempt for refusing to identify her source or sources before she can appeal the merits of the denial of her privilege assertion poses significant threats to the newsgathering and reporting process that transcend the facts of this case. As detailed in the declaration of Toni Locy submitted with this brief, the imposition of heavy contempt sanctions while a journalist's appeal is pending, among other things, significantly burdens the affected journalist's ability to obtain meaningful appellate review and simultaneously do her job. *See* Locy Decl. ¶ 11 ("The litigation burden itself would have impaired my ability to report as so much of my time was dominated by the case.").

That dynamic places journalists in an untenable situation, one that could systematically chill newsgathering more broadly. *See In re Roche*, 448 U.S. 1312, 1316 (1980) ("Without such a stay [of sanctions], applicant must either surrender his secrets (and moot his claim of right to protect them) or face commitment to jail."). While some journalists at large news organizations may have the institutional backing and resources to continue to work under such a burden, other journalists may have no choice but to accede to the personal and professional harm of complying. *See* Locy Decl. ¶ 12 ("Had the D.C. Circuit not granted an emergency stay of the fines, the financial burden would have been crushing and I could have faced bankruptcy."). And

4

journalists aware of that risk may simply avoid reporting that could put themselves in that situation in the first place.  RonNell Andersen Jones, *Avalanche or Undue Alarm? An Empirical Study of Subpoenas Received by the News Media*, 93 Minn. L. Rev. 585, 619 (2008) ("[R]eporters who feel threatened by subpoenas and the real possibility of jail time or substantial individual fines for noncompliance will shy away from stories that might give rise to subpoenas—especially those involving confidential sources, who will expect them to go to jail or pay the fines rather than revealing their identities.").  That chilling effect could apply with even greater force to stories likely to generate Privacy Act claims—namely reporting about ongoing and high-profile federal criminal investigations.  Locy Decl. ¶ 13 ("[A]bsent strong reporter privilege protections, efforts in such cases to force journalists to identify their confidential sources would make it much more difficult to report on the status of federal law enforcement investigations until someone is charged, tried, and convicted.").

In recognition of the harm such a burden would impose on the journalist subject to contempt sanctions, the D.C. Circuit and this Court have stayed sanctions against journalists pending appeal of the denial of privilege and the contempt citation in Privacy Act cases.  For instance, in Locy's case, the D.C. Circuit stayed the graduated fine order upon an emergency application.  *See* Per Curiam Order, *Hatfill v. Mukasey*, No. 08-5049 (D.C. Cir. Mar. 11, 2008), Doc. No. 1104546 ("Appellant has satisfied the stringent standards required for a stay pending appeal." (citing *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977))).  And, upon dismissal of the case following settlement with the government, the D.C. Circuit wrote that the case presented "close questions" under the First Amendment, including "analysis of . . . the appellant's interest in concealing her sources in order to protect the workings of the press."  *See* Per Curiam Order, *Hatfill v. Mukasey*, No. 08-5049 (D.C. Cir. Nov.

17, 2008), Doc. No. 1149629.  In *Lee v. Department of Justice*, this Court stayed the imposition of sanctions pending appeal in explicit recognition of the "constitutional issues" at stake.  327 F. Supp. 2d 26, 33 (D.D.C. 2004) ("[T]he journalists' argument that the fine should be nominal where constitutional issues will be presented on appeal can be addressed simply by staying the fine pending appeal.").

Further, a too-narrow reading of the required balancing of interests under *Zerilli* could compound this collateral harm to the newsgathering process in Privacy Act cases.  *Zerilli* instructs that the application of the reporter's privilege must "strik[e] the balance between the civil litigant's interest in compelled disclosure and the public interest in protecting a newspaper's confidential sources" and that courts doing so must be "mindful of the preferred position of the First Amendment and the importance of a vigorous press."  *Zerilli*, 656 F.2d at 712.  To be sure, *Zerilli* offered "a number" of "guidelines" to inform that balancing, including a requirement that the information sought go to the "heart of the matter" and that litigants "exhaust[] every reasonable alternative source of information" before they can pierce the privilege.  *Id.* at 712–14 (citation omitted).  Here, however, this Court appeared to conclude that centrality, exhaustion, and whether the reporter is a party are the exclusive factors a court may consider in its privilege analysis, *Chen v. FBI*, No. 18-cv-3074 (CRC), 2023 WL 5289432, at *4 (D.D.C. Aug. 17, 2023), and declined to address the collateral harm to the public interest in "protecting journalists' ability to report without reservation on sensitive issues of national security" from the compelled disclosure of source identity information, *see Lee v. Dep't of Justice*, 428 F.3d 299, 302 (D.C. Cir. 2005) (Tatel, J., joined by Garland, J., dissenting from denial of rehearing en banc).

This Court based that conclusion on its reading of the panel decision in *Lee v. Department of Justice*, 413 F.3d 53 (D.C. Cir. 2005), which, in affirming the finding of contempt

6

against four journalists in a Privacy Act case, found that the centrality and exhaustion requirements had been met. But that panel decision did not expressly foreclose the consideration of other factors; it just applied those two. More fundamentally, as noted by Judge Tatel in dissenting from the denial of rehearing en banc, were such an "arid two-factor test" the rule in Privacy Act cases, it would "allow[] the exigencies of even the most trivial litigation to trump core First Amendment values." *Lee*, 428 F.3d at 301 (Tatel, J., joined by Garland, J., dissenting from denial of rehearing en banc).[2] That is because, "[b]arring an unexpected confession by the leaker, in most such cases the subject of the leak will be able to satisfy the centrality and exhaustion requirements" and if the "privilege is limited to those requirements, it is effectively no privilege at all." *Id.* at 302 (Garland, J., joined by Tatel, J., dissenting from denial of rehearing en banc). And, while *Zerilli* may not call for a "free-form, anything-goes analysis," *Chen*, 2023 WL 5289432, at *3, it does indisputably call for courts to specifically weigh the "public interest in protecting the reporter's sources against the private interest in compelling disclosure," *Lee*, 428 F.3d at 301 (Tatel, J., joined by Garland, J., dissenting from denial of rehearing en banc) (citation omitted). To do otherwise would convert many, if not all, "ordinary" Privacy Act cases to "the most exceptional cases," *Zerilli*, 656 F.2d at 712, severely weakening the privilege in this circuit. At the very least, an "arid two-factor test" will necessarily discount the harm to the public interest in investigative national security reporting if the privilege is effectively negated in most Privacy Act cases.

---

[2] Judge Tatel and Judge Garland wrote separate opinions, in which each joined the other, in dissenting from the denial of rehearing en banc in *Lee*. Both noted that cabining the *Zerilli* balancing to the centrality and exhaustion factors would lead to the reporter's privilege being overcome with respect to most, if not all, Privacy Act subpoenas. Judge Garland also explicitly raised the concern that a cramped *Zerilli* rule could lead to broader harms to reporting on government activities. *See Lee*, 428 F.3d at 303 ("[B]ridled by nothing other than plaintiffs' private interests, the more such strategies succeed, the more they will be employed.").

In sum, the legal framework envisioned in this case governing subpoenas seeking confidential source identities in Privacy Act lawsuits could broadly harm the free flow of information to the public in two ways. First, it puts the reporter to the "unpalatable choice" of having to refuse to identify confidential sources, be held in contempt, and face jail or fines before she can appeal the denial of her privilege assertion. *In re Roche*, 448 U.S. at 1316. And, second, when courts limit the *Zerilli* balancing to just the centrality and exhaustion factors, they increase the litigation burden on the reporter and weaken the scope of the privilege. Amicus respectfully submits that this collateral harm to the public interest in effective newsgathering, particularly with respect to national security matters, warrants consideration when courts determine whether and how to impose a contempt citation or attendant sanctions.

**II.** **Recent changes to the Department of Justice's policy on compulsory process affecting the press underscore the sensitivity of forcing journalists to disclose confidential source information.**

Following a "bitter dispute" in the early 1970s over government attempts to compel journalists to disclose confidential source information, the Justice Department implemented an internal policy limiting its ability to use subpoenas targeting the press. John N. Mitchell, U.S. Att'y Gen., *Free Press and a Fair Trial: The Subpoena Controversy* at 4, Address Before the House of Delegates of the American Bar Association (Aug. 10, 1970), https://perma.cc/9NLP-BL52. These "news media guidelines" have been expanded over the years to other forms of compulsory process, and they went through a dramatic overhaul in 2022, following revelations that the Justice Department had, in 2020, authorized wide-ranging subpoenas and court orders for journalists' phone and email records in investigations into the unauthorized disclosure of classified information. *See* Bruce D. Brown & Gabe Rottman, *The Nuts and Bolts of the Revised Justice Dept. News Media Guidelines*, Lawfare (May 23, 2023), https://perma.cc/Q6NR-XDMH.

The 2022 revisions explicitly recognize "the important national interest in protecting journalists from compelled disclosure of information revealing their sources, sources [journalists] need to apprise the American people of the workings of their Government." 28 C.F.R. § 50.10(a)(2). The revised guidelines do so by imposing a bright-line rule prohibiting the use of compulsory process to obtain information from journalists acting within the "scope of newsgathering" with exceptions only for when the journalist consents, when exigent circumstances exist, and when the journalist is needed to authenticate already published information. *Id.* § 50.10(c). The prohibition defines "newsgathering" to include the receipt, possession, or publication of government information, including classified information. *Id.* § 50.10(b)(2)(ii)(A).

Although the revised guidelines reflect the Department's internal policy and are not directly at issue in this case, their existence is relevant to the weight of the public interest at stake here. Under the revised guidelines, were this a national security leak case, the Department of Justice would be restricted from using a subpoena to compel the disclosure of the identities of Herridge's source or sources. Indeed, the *only* circumstance in which the Department would use a subpoena to compel testimony from a journalist identifying confidential sources (outside of the narrow exceptions noted above) is when the journalist is directly suspected of criminal activity unrelated to newsgathering—that is, if the journalist was "not acting within the scope of newsgathering" and is the "subject or target of an investigation and suspected of having committed an offense." 28 C.F.R. § 50.10(d)(1)(i).[3] There is no scenario in the guidelines, other

---

[3] And even in such a case, unless there is no "nexus" to newsgathering, the guidelines still require approval by the deputy attorney general. *Id.* § 50.10(f).

9

than the narrow consent, exigency, and authentication exceptions noted above, contemplating a subpoena to a journalist in Herridge's position, even if this were a criminal matter.

The restriction set forth in the guidelines is notable given the clear command of the D.C. Circuit that in the "ordinary" civil case, where "the public interest in effective criminal law enforcement is absent," the "litigant's interest in disclosure should yield to the journalist's privilege." *Zerilli*, 656 F.2d at 711–12 ("[I]f the privilege does not prevail in all but the most exceptional cases, its value will be substantially diminished."). It also underscores the weight to be given the fact that Herridge is not a party to this civil dispute. *Mgmt. Info. Techs., Inc. v. Alyeska Pipeline Serv. Co.*, 151 F.R.D. 471, 477 (D.D.C. 1993) ("A leading indicator for the importance of the reporter's information to the case is whether the reporter is a party.").

That the nation's leading law enforcement agency has enacted a policy that would bar it from seeking to compel disclosure of the same information, including in a criminal matter, that Plaintiff seeks here highlights the profound public interest that is served by protecting confidential source identities. It counsels, at a minimum, in support of imposing only nominal sanctions on Herridge and staying any sanctions pending appeal.

**III.   Confidential sources are essential to the free flow of information to the public.**

The ability of journalists to assure sources that their identities will remain confidential is central to preserving the press's structural role as a check on government, particularly in the national security sphere. *See* Michael Farrell, *Anonymous Sources*, Soc'y Pro. Journalists, https://perma.cc/5BQBSRA3 ("Anonymous sources are sometimes the only key to unlocking that big story, throwing back the curtain on corruption, fulfilling the journalistic missions of watchdog on the government and informant to the citizens."). When sources stop talking to journalists because they fear that their identities cannot be protected, that loss impairs the

10

electorate's ability to make informed political, social, and economic decisions, and to hold elected officials and others in power accountable.  *See Zerilli*, 656 F.2d at 711.  Further, the information provided by confidential sources is often unavailable through other channels.  *See* Alexander M. Bickel, The Morality of Consent 84 (1975) ("Forcing reporters to divulge such confidences would dam the flow to the press, and through it to the people, of the most valuable sort of information: not the press release, not the handout, but the firsthand story based on the candid talk of a primary news source.").

Confidential sources have enabled journalists to tell some of the most important public interest stories of the last half-century.  As Carl Bernstein recalled with respect to Watergate, "Almost all of the articles I co-authored with [Bob] Woodward on Watergate could not have been reported or published without the assistance of our confidential sources and without the ability to grant them anonymity, including the individual known as Deep Throat."  David Kravets, *Reporters Challenge Bonds' Leak Subpoena*, Associated Press (May 31, 2006), https://perma.cc/2JS6-5N7C.  And, as relevant here, confidential sources have been particularly important to national security reporting, where government secrecy is at its zenith and investigative newsgathering is often the only way that newsworthy information about government activities can get to the public.  For instance, the Iran-Contra scandal, the massacre at My Lai during the Vietnam War, the Aldrich Ames spy scandal, revelations of "enhanced interrogation" tactics by intelligence agencies post-9/11, and detainee abuse at Abu Ghraib prison in Iraq were all brought to light through disclosures made by confidential sources.  *See* Brief of Amici Curiae Newsgathering Organizations and Reporters' Groups in Support of Appellants Urging Reversal at 3, *Lee v. Dep't of Justice*, 413 F.3d 53 (D.C. Cir. 2005) (No. 04-5301(L)), 2005 WL 319711; Eric Umansky, *How American Journalists Covered Torture After*

11

*9/11*, Colum. Journalism Rev. (Sept./Oct. 2006), https://perma.cc/GU5N-D54D.  And in the context of national security reporting, information provided by confidential sources is doubly crucial because of the universally acknowledged problem of government overclassification.  *See* Brief of Amici Curiae, 2005 WL 319711, at *4–5 ("Since virtually everything is classified, the verification of something as mundane as a press briefing involves talking to scores of sources who are not authorized to add further detail and could be subject to sanctions for doing so." (quoting Affidavit of Scott Armstrong ¶ 14 (J.A. 1796–97))).

Often, these disclosures will directly inform important public policy debates and give the electorate visibility into secret government actions that would otherwise go unexamined.  In 2005, for instance, *The New York Times* relied on confidential sources in breaking the news that the National Security Agency had been monitoring, without a warrant, communications in and out of the country involving suspected foreign terrorists.  James Risen & Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, N.Y. Times (Dec. 16, 2005), https://www.nytimes.com/2005/12/16/politics/bush-lets-us-spy-on-callers-without-courts.html.  That revelation led Congress to hold hearings and ultimately to pass Section 702 of the Foreign Intelligence Surveillance Act, which authorized the program under the auspices of the Foreign Intelligence Surveillance Court.  *See* Laura K. Donohue, *Section 702 and the Collection of International Telephone and Internet Content*, 38 Harv. J.L. & Pub. Pol'y 117, 124–42 (2015) (surveying history of Section 702, including the public debate facilitated by the 2005 news coverage). Indeed, because of the public controversy over the disclosures, Congress only authorized the collection program subject to reconsideration and reauthorization every five years.  *Id.* at 125. And the public policy debate spurred by *The Times*'s coverage, which relied on confidential sources, continues today, as Congress is locked in heated deliberations over whether and how to

reauthorize Section 702.  *See* Charlie Savage, *Talks on Surveillance Law Simmer as its Expiration Date Looms*, N.Y. Times (Nov. 16, 2023), https://perma.cc/2B2N-DRLU; Wes Davis, *US Congress Pushes Warrantless Wiretapping Decision Off Until April Next Year*, The Verge (Dec. 16, 2023), https://perma.cc/NHP7-XSX2.

  More recent disclosures likewise confirm the importance of news reporting that relies on the ability of reporters to promise sources confidentiality.  For instance, in a special report that prompted a Privacy Act claim against the Treasury Department and the Internal Revenue Service, ProPublica revealed, based on confidential tax documents, certain tax avoidance strategies uniquely available to wealthy Americans.  Jesse Eisinger et al., *The Secret IRS Files: Trove of Never-Before-Seen Records Reveal How the Wealthiest Avoid Income Tax*, ProPublica (June 8, 2021), https://perma.cc/63FG-D5RA; Robert Faturechi, *ProPublica's Tax Revelations Lead to Calls for Reforms – and Investigation*, ProPublica (June 9, 2021), https://perma.cc/TN6Z-KGVK.

  This discussion features only a small sampling of the journalism that could be impeded were reporters unable to assure sources that they will keep their identities confidential.  And it illustrates more precisely the contours of the public interest in protecting source identities, particularly in Privacy Act cases where the alleged harm arises from a government disclosure, not the actions of the non-party journalist, and where piercing the privilege has the potential to chill reporting more broadly.

## CONCLUSION

  For all these reasons, amicus respectfully urges the Court—if it declines to modify its disclosure order and finds Herridge in contempt—that it impose only nominal sanctions and that

13

it stay any sanctions while Herridge pursues her appeal of the Court's denial of her motion to quash the plaintiff's subpoena.

Dated:  January 4, 2024                     Respectfully submitted,

                                                              *s/Bruce D. Brown*
Bruce D. Brown
(D.C. Bar No. 457317)
   *Counsel of Record for Amicus Curiae*
Katie Townsend
(D.C. Bar No. 1026115)
Gabe Rottman
(D.C. Bar No. 992728)
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Ste. 1020
Washington, D.C. 20005
Telephone: 202-795-9300
bruce.brown@rcfp.org

*Counsel for Amicus Curiae*

14

## CERTIFICATE OF COMPLIANCE

This amicus curiae brief complies with the length permitted by LCvR 7(o)(4) because it does not exceed 25 pages. Pursuant to LCvR 7(o)(5), this brief complies with the requirements set forth in Fed. R. App. P. 29(a)(4).

Dated:  January 4, 2024                                    Respectfully submitted,

                                                           *s/Bruce D. Brown*_____
                                                           Bruce D. Brown
                                                           (D.C. Bar No. 457317)
                                                             *Counsel of Record for Amicus Curiae*