# CONFIDENTIAL—FILED UNDER SEAL

# EXHIBIT O

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

YANPING CHEN,
Plaintiff,
vs.
FEDERAL BUREAU OF INVESTIGATION, et al.,
Defendants.

Civil Action
No. 1:18-cv-3074(CRC)

VIDEOTAPED DEPOSITION OF [redacted]
(Via videoconference)
November 8, 2021

Reported by: John L. Harmonson, RPR
Job No. 201497

November 8, 2021

9:10 a.m.

Videotaped Deposition of [redacted], taken via videoconference with the witness and all parties appearing remotely, pursuant to the Federal Rules of Civil Procedure, subject to such stipulations as may be recited herein or attached hereto, before John L. Harmonson, a Registered Professional Reporter and Notary Public of the District of Columbia, who officiated in administering the oath to the witness.

[redacted]

You can answer.

THE WITNESS: I don't know.

BY MR. JONES:

Q. Is there any reason that you or Agent Pappa wouldn't go to DoD directly in order to set up a briefing?

A. Is there any reason why we wouldn't?

Q. Right.

A. It's a large organization, as you know. I don't know if Tim went direct with other elements or not. I know that we had this liaison in our office who had a connection down at [redacted]. So I believe that's why [redacted] was a liaison for that.

Q. All right. Let's scroll up. So in this email, [redacted] appears to write: "This is another update on the status of the briefing being given by FBI and HSI. I received an update today telling me that we are likely looking for a date around the second or third week of April. Leads are still coming in, and both agencies want to give you the very best briefing possible."

Do you see that?

A. Yes.

[redacted]

MR. COYLE: And, counsel, just for the record --

BY MR. JONES:

Q. Do you recall this --

MR. COYLE: Sorry. That appears at the bottom of the page ending in Bates number 243?

MR. JONES: Yes.

BY MR. JONES:

Q. [redacted], do you remember this discussion around the timing for the briefing that would be given by FBI and HSI?

A. No, I don't remember it.

Q. Where do you think [redacted] was getting information around the optimal time for a briefing on the Chen investigation?

MR. COYLE: Objection; calls for speculation.

You can answer.

THE WITNESS: I don't know. I don't know if he was talking within his circles or if he had open contact with Tim. I don't know.

BY MR. JONES:

[redacted]

Q. So you don't know if [redacted] and Mr. Pappa were speaking directly?

A. I don't know if they were or weren't.

Q. Is it possible that you were providing him with this information about the optimal timing for a briefing?

A. Can you scroll up? Is this email from me?

Q. By the time you get to the top of this chain, you're not involved.

A. Yeah, I -- so the question again, sir?

Q. Yeah.

The question is, is it possible that you're the one who is providing [redacted] with this information about the upcoming briefing?

A. I don't know. So the question is am I orchestrating the meeting itself?

Q. So I'm trying to understand [redacted] role --

A. Okay.

Q. -- and how -- you know, he appears to be attempting to coordinate this meeting, and I would like to understand at whose direction he's doing so and whether it's possible he's doing so

[redacted]
at your direction or if someone else was doing it.
A. Since he was assigned to our Sterling office and worked with all of our subsets within the National Security Group there in Sterling, I would imagine that this is coordination between him and my supervisor, [redacted].
Q. And why do you believe that it would be coordination with your supervisor as opposed to you?
A. [redacted] and [redacted] were, to my recollection, very close in terms of logistics and, you know, what [redacted] could offer his group in terms of law enforcement support.
Q. So it would be fair to say that [redacted] [redacted] and [redacted] collaborated more closely than you did with [redacted]?
A. Yes.
Q. All right. Let's scroll up. One more, let's go up one more email here. Actually, one more I think.
So [redacted] writes in this email that is at the top of page 242 Bates number, he says: "Today I was told that the FBI intends to

[redacted]

brief over at [redacted] to DoD seniors there on 7 May 2013. I was told that they plan to invite NCIS and OSI to that briefing, since both organizations were involved in the investigation during the earlier stages of the case. The FBI is offering to provide the rest of us with a separate briefing at [redacted]."

Do you recall a meeting at [redacted] [redacted] for DoD seniors?

THE WITNESS: Yes.

BY MR. JONES:

Q. Did you participate in that meeting?

A. I was present, from what I recall, at one [redacted] meeting.

Q. What happened at that meeting?

A. There were discussions about investigative findings.

Q. Who presented the investigative findings?

A. Agent Pappa.

Q. Did Agent Pappa use the PowerPoint deck that we've discussed previously?

A. I don't recall.

Q. Were any materials used in connection

[redacted]

A. Following the meeting? I don't remember.

Q. Did you communicate the DoD's lack of interest to [redacted]?

A. It's possible.

Q. Did you talk to anyone else about it?

A. No.

MR. JONES: All right. Let's go off the record.

THE VIDEOGRAPHER: 11:27 a.m. Eastern Standard Time. We're off the record.

(Recess taken.)

THE VIDEOGRAPHER: 11:32 a.m. Eastern Standard Time. We're back on the record.

BY MR. JONES:

Q. [redacted], I would like to direct you to an exhibit we're going to mark as 128. It's Bates number DHS_00000184 to 185.

(Exhibit 128 marked for identification and attached hereto.)

BY MR. JONES:

Q. Exhibit 128 is a two-page email document. Scroll down to the bottom of the document so that you can read it chronologically.

[redacted]

[redacted], do you recognize Exhibit 128?

A. Not offhand, no.

Q. Do you recall making a request of Agent Pappa for a copy of the PowerPoint show he put together?

A. Do I remember it? No.

Q. Do you recall the fact that you did ask him for a copy of the PowerPoint?

A. It appears as though I did ask.

Q. This email is dated November of 2013, which is roughly eight months after the presentations we were -- or the emails we were viewing previously about giving this presentation.

Why were you asking for a copy of the PowerPoint in November of 2013?

A. Most likely to put in my case file.

Q. What work, if any, were you doing on the Chen case in November of 2013?

A. I don't recall doing any work on that case at that point in time.

Q. Did you ever draft any central charging language for Dr. Chen?

[redacted]

A. Not that I recall offhand.

Q. Did you ever draft a criminal complaint?

A. I don't recall drafting a criminal complaint.

Q. There is a reference in this email to potentially providing the PowerPoint to someone named [redacted]. Do you know who that is?

A. Yes.

Q. Who is that?

A. That is a colleague of mine from ICE.

Q. Did he and Agent Pappa work in the same location at times?

A. Yes.

Q. Did Agent Pappa provide your colleague, [redacted], with a CD of investigative materials related to Dr. Chen?

MR. COYLE: Objection; calls for speculation.

You can answer.

THE WITNESS: I don't recall if he gave it to him or not.

BY MR. JONES:

Q. So you know you got the CD from Agent

[redacted]

Pappa at some point in time, but you're not sure exactly how it came to you. Is that right?

A. Yes.

Q. All right. I would like to now direct you to a document that's previously been marked as Exhibit 32.

(Exhibit 32, previously marked for identification, is attached hereto.)

BY MR. JONES:

Q. Exhibit 32 is a 132-page document, and I'll ask my colleague to scroll through the first ten pages of the PDF so that you can take a look at it.

[redacted], do you recognize Exhibit 32?

A. Yes.

Q. What is it?

A. It appears to be immigration paperwork, and it looks like fruits of the search.

Q. Have you ever -- did you ever see fruits of the search and the immigration paperwork presented in this format?

A. Yes.