# CONFIDENTIAL—FILED UNDER SEAL

# EXHIBIT P

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| YANPING CHEN, Plaintiff, vs. FEDERAL BUREAU OF INVESTIGATION, et al., Defendants. | Civil Action No. 1:18-cv-3074(CRC) |

DEPOSITION OF [redacted]

(Via videoconference)

September 10, 2021

Reported by: John L. Harmonson, RPR

Job No. 199030

September 10, 2021

9:01 a.m.

Deposition of [redacted], taken via videoconference with the witness and all parties appearing remotely, pursuant to the Federal Rules of Civil Procedure, subject to such stipulations as may be recited herein or attached hereto, before John L. Harmonson, a Registered Professional Reporter and Notary Public of the District of Columbia, who officiated in administering the oath to the witness.

[redacted]

stated, Tim Pappa.

Q. Did you have any role in preparing this presentation?

A. No, I did not.

Q. Do you remember speaking with Special Agent Pappa about this presentation?

A. No, not specifically about this presentation.

Q. What did you speak with -- what do you remember speaking with Agent Pappa about?

MR. COYLE: Objection; overbroad. Vague and ambiguous. Vague as to time.

You can answer.

THE WITNESS: Given the amount of years that have passed, I would just simply say about the investigation. But I don't know necessarily any one particular conversation I may have had with him with regards to the investigation.

BY MR. JONES:

Q. Other than the meeting with AUSA Gillis, did you meet with Agent Pappa at any other time regarding the investigation?

A. Yes.

[redacted]

Q. When?

A. I don't have a date for you. I would say possibly at [redacted], but I don't know a date. I don't have a date that I can give you, a firm date that I can give you for that particular meeting.

Q. I don't need a date. But when did you meet with Tim Pappa at [redacted]?

A. I don't know the date. I mean, I don't know the year either.

Q. Okay. For what purpose did you meet with Tim Pappa at [redacted]?

A. That was based on a briefing that I was invited to, and Tim Pappa and myself were there.

Q. Who was the briefing for?

A. It was DoD components. They were briefing us or we were -- it was a meeting, and I was invited to go. That's all I can recall, really.

Q. Did anyone else from DHS attend?

A. I really don't know the answer to that. I don't know if any of my ASACs may have gone. I do know I was there. [redacted]

[redacted]
was there. Those are the only individuals -- [redacted] and myself are the only individuals I can remember being there from DHS.

Q. Other than Special Agent Pappa, did any FBI employees attend this briefing?

A. I don't recollect.

Q. Who else attended the meeting?

A. I don't have names for you. Just different individuals from DoD at [redacted], different -- there were lots of people, so I really don't know. I didn't know any of those individuals.

Q. How big was the meeting?

A. Approximately 20 people.

Q. Which DoD components were represented?

A. I don't have a list for you. I can't recall all of them, to tell you the truth.

Q. Do you recall any?

A. DIA, maybe. That's the only one I can recollect.

Q. What was the purpose of this -- you referred to it as either a briefing or a meeting. What was the purpose of the gathering?

A. The purpose of it was to discuss the

[redacted]

vulnerabilities that the -- that universities such as the one we're speaking of may pose as far as individuals, whether it was a legitimate university and the individuals that attend. That was the purpose. That was the main takeaway that I can recall.

Q. Were universities other than UMT within the scope of this meeting?

A. I think so. I can't give you a definitive answer, but I think so. It was their presentation, so they gave that information freely to us.

Q. "They" being DoD?

A. Yes.

Q. I understand that you don't know a specific date or maybe even a specific year for this meeting, but let's try to place it in time.

Was it near the beginning or the end of your tenure as group supervisor?

A. If I were to guess, I would probably say towards the end.

Q. So it postdated the execution of the searches at Dr. Chen's home and office; is that right?

[redacted]

A. Correct.

Q. Understanding that DoD was presenting at this meeting, did FBI or DHS present any information in return?

A. No, I don't recall -- well, I know that DHS didn't, or HSI did not present. I can't speak for the FBI or anyone else. Predominantly it was DoD that was doing a lot of the talking -- a lot of the information sharing, I should say.

Q. Was the presentation at Exhibit 32 presented during the meeting with the DoD components in [redacted]?

A. I don't know. I don't know and I don't want to lock myself into something definitive. I can't recall that. It was a lot of information, but I don't -- I don't know. That's my best answer. I don't know.

Q. So it sounds like your best recollection is that DHS did not present at this meeting. Is that right?

A. Yes. Yes. I'm firm on that. Yes.

Q. Did you ever attend a meeting where the presentation of Exhibit 32 was broadcast up on a screen?

[redacted]

A. No, I can't recall that either. The two instances I told you were the only instances I recall.

Q. Okay. Did you ever provide this presentation to anyone else?

A. I think portions of this presentation were used, as I mentioned earlier, to brief my chain just on the significance of the case. I won't say in its entirety because it looks as though it's quite a bit of information in this particular slide. But portions of it was used to brief my chain, as we normally would with all cases that were ongoing at that time.

Q. As part of those briefings, could you have transferred some of the information within this presentation such that your supervisory chain would have a copy of information from within the presentation?

A. You're asking me if I could have submitted to my supervisor. There is always a possibility of that because you're going through an approval process, and when you're briefing higher chain individuals, SACs and so forth, you want to make sure that your primary supervisor is

[redacted]

okay with what you're presenting, whether it's the length, the scope or so forth.

So could I have submitted it to my supervisor, my primary supervisor as an approval process? Yes. Did I? I can't respond either way.

Q. It sounds as if from your answer -- and tell me if this isn't right -- that your primary mode would be to actually present this information in some sort of slide briefing to management where they were viewing it on a screen rather than receiving a copy to keep. Is that fair?

A. That is fair. I will also add that there are times where you're not -- we didn't necessarily have screens readily available like we do now. So I may have had a hard copy at that time to show my bosses.

Q. Who were the bosses to whom you may have provided a copy of portions of the presentation?

A. At that time, it would have been [redacted], which was [redacted], and [redacted] [redacted], who came in at a latter part before I

[redacted]

left.

Q. Did you ever brief one up from [redacted] and [redacted]?

A. Yes.

MR. COYLE: Objection; vague and ambiguous.

You can answer.

THE WITNESS: Yes. I briefed the deputy SAC, who was [redacted] at the time, and the SAC, which was [redacted]. That was the end portion before I departed that location. And that was more visual to show.

BY MR. JONES:

Q. What do you mean, it was more visual to show?

A. They were a part of the same meeting that I was briefing the ASACs. So it was more visual content, whether it be hard copy or whether it be on the screen.

Q. So [redacted]. And what is [redacted] first name?

A. The first name escapes me. I'll come back to that. It'll come back.

Q. That's fine.

[redacted]

So is your testimony that you did brief [redacted] and [redacted] on the Chen case, or that you may have done so?

A. I briefed them on the Chen case along with other cases. It's not just simply the Chen case. We had a litany of cases, so you only had a certain period of time that you can spend briefing. So we may have spent maybe two minutes on each case, depending on the number of cases we were briefing at that time.

Q. Okay. What was the context of those meetings? Periodic regular updates?

A. Yes. Yes, that's basically what the rationale behind meeting with them and briefing them on these were.

Q. Did you have an understanding of what confidentiality restriction applied to the presentation in Exhibit 32?

MR. COYLE: Objection; vague and ambiguous.

You can answer.

THE WITNESS: Confidentiality? Can you repeat that one more time, please?

BY MR. JONES:

[redacted]

says "6L5 student and exchange."

Is that the code to which you're referring that would allow CTCEU to have visibility into the investigation?

A. Yeah. To my knowledge, that would be one of the codes, yes.

MR. JONES: Very good. If you want to go off the record.

MR. COYLE: Sure. Thank you.

(Recess taken.)

BY MR. JONES:

Q. [redacted], please turn with me to page 134 of Exhibit 103. I'm going to draw your attention there.

[redacted], do you recognize this document?

A. Yes.

Q. What is it?

A. It's an email from Tim Pappa to [redacted] and [redacted] dated June 3, 2016.

Q. Can you help us understand why an email like this might be included in a file among other TECS information?

MR. COYLE: Objection; calls for

[redacted]

speculation.

You can answer.

THE WITNESS: No, I don't have an explanation for that.

BY MR. JONES:

Q. Would there be any situation in which a case agent would upload an email into the TECS system?

A. I would have to think of hypotheticals, but I can't say that I've seen that personally and I wouldn't know why the person would do that.

Q. Okay. Thank you.

So more substantively, I recognize that you're not on this email, but I wanted to point you to this discussion between Timothy Pappa and [redacted]. When Pappa references "a [redacted] briefing where I had all the evidence on slides," it says "you were there, your ASAC was there, our SAC was there. Do you have any documentation of that meeting?"

Do you see that?

A. Yes, I see that.

Q. Reviewing this now, are you familiar

[redacted]

with a [redacted] briefing where Timothy Pappa had all the evidence on slides?

A. No. I know there was a [redacted] briefing, but I wasn't part of that briefing. I didn't attend it, and I don't know what he may have brought at that point in time. But I do know there was a briefing at some point at [redacted].

Q. And so when Pappa refers to Tarantino's ASAC, who do you take that to be referring to?

MR. COYLE: Objection; calls for speculation.

You can answer.

THE WITNESS: Again, being that I'm not privy to this particular meeting, it would be whoever the ASAC was at that time. As you know, we had two different ASACs within two different periods of time.

BY MR. JONES:

Q. And those are the names you provided me at the beginning of our conversation today?

A. That is correct.

Q. And I believe you also mentioned that

[redacted]

there were various acting ASACs over the course of that period as well. Is that right?

A. Correct. As they were transitioned, there were one or two acting monthly or what have you over that period of time.

Q. Was [redacted] among those?

A. Yes, he was one of the acting.

Q. Do you recall who the other was?

A. During that time, no, I don't.

Q. I would like to direct you to page 158 of Exhibit 103. This is a document that I believe a little higher on the page says that it's dated February 19, 2013. There is a large law enforcement redaction at the top, and then references to four binders.

Am I accurately describing what's on this document?

A. Yes, based on what you're stating, that's what is on this document.

Q. To your knowledge, what binders are being referred to in this document?

A. I don't have an answer for you. I'm not privy to any particular binders.

Q. Were you ever aware of a set of

[redacted]

binders that purported to contain evidence related to the Chen investigation?

A. No, I was not.

Q. Turn to the next page. This is page 159 of the Exhibit 103. It appears to be an email between [redacted] and a name that is redacted for law enforcement privilege purposes on September 12, 2012. The subject matter appears to relate to the PLA and the CCP. [redacted], are you familiar with this document?

A. No, I'm not.

Q. Are you aware of any efforts that [redacted] took during the investigation of Dr. Chen to understand the functioning of the Chinese People's Liberation Army?

A. Can you repeat that again?

Q. Are you aware of any efforts that [redacted] undertook in the course of the Chen investigation to better understand the People's Liberation Army?

A. No. No.

Q. Would you consider [redacted] an expert on the People's Liberation Army?