# CONFIDENTIAL—FILED UNDER SEAL

# EXHIBIT S

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

YANPING CHEN, Plaintiff,

vs.

FEDERAL BUREAU OF INVESTIGATION, et al., Defendants.

Civil Action No. 1:18-cv-3074(CRC)

DEPOSITION OF TIMOTHY PAPPA

(Via videoconference)

November 19, 2021

Reported by: John L. Harmonson, RPR

Job No. 201308

November 19, 2021

8:52 a.m.

Deposition of TIMOTHY PAPPA, taken via videoconference with the witness and all parties appearing remotely, pursuant to the Federal Rules of Civil Procedure, subject to such stipulations as may be recited herein or attached hereto, before John L. Harmonson, a Registered Professional Reporter and Notary Public of the District of Columbia, who officiated in administering the oath to the witness.

T. PAPPA

here, it looks like there's a text message from you that says: "Yes, that will work. What do I need to know? How many people? Why? Do I do PowerPoint (to show pics) or just verbal with some handouts of pics?"

And Rhoads replies: "PowerPoint would be great. My white paper brief will follow you and your boss."

Do you see that?

A. I do.

Q. Did you ultimately end up using a PowerPoint to brief [redacted]?

A. I believe I did.

Q. Did you put it up on a screen?

A. From what I can recall, I ran the PowerPoint presentation off of a computer, a DoD computer.

Q. Were you all staring at like a small monitor?

A. Yeah. It was just myself and [redacted] [redacted].

Q. Okay. How did you -- how did you get the presentation onto the DoD computer?

A. From what I can recall, I brought it

T. PAPPA

on a CD.

Q. One of those CDs that we talked about earlier that was in the box at WFO?

A. I believe so.

Q. What did you do with the CD after the presentation?

A. I can't recall if I took it with me or not.

Q. Okay. Was it your general practice to provide copies of the presentation to others?

A. I don't know if there is a defined practice of providing it for them to take. But if I did leave the CD, it was not as a copy for someone. It was still meant to be destroyed or disposed of.

Q. Did you instruct [redacted] to dispose of the CD at the end of the meeting?

A. I don't recall what I may have said.

Q. Do you have any knowledge of what happened to the CD after you briefed [redacted]?

A. I don't recall what happened to that CD.

Q. So you don't know one way or the other

T. PAPPA

whether you took it with you or you left it there. Is that right?

A. That's right. I don't recall.

Q. But it was not your intention to give the CD to [redacted] to keep for his own use; is that right?

A. That was not my intention.

Q. Was it your intention to have Stephen Rhoads take possession of that CD?

A. That was not my intention. I just don't recall if I actually took it with me. I mean, I do recall that to be able to play that CD off of that computer, more than likely it would have had to have been put on the desktop of that computer. So I just don't recall if I took the CD or not, but the presumption was that that would be deleted.

Q. Whose computer was used in the briefing?

A. It was one computer out of a number of computers in [redacted].

Q. At [redacted]?

A. Yes.

Q. There is a reference here to Stephen Rhoads talking, saying: "My white paper brief will follow you and your boss."

Do you see that?

A. Yes.

Q. What was his white paper brief?

A. I don't recall a white paper from Stephen Rhoads.

Q. Do you recall any sort of briefing that he provided?

A. No. All I recall is having the briefing with [redacted].

Q. There's a reference here to your boss. At that point in time, would that have been SSA-14?

A. Correct.

Q. Did SSA-14 ultimately accompany you on the brief with [redacted]?

A. No, he did not.

Q. All right. I want to direct your attention to further down in this message. There's a reference to a meeting that will include the head of -- I take it that's Army

Reserve intel, big guns coming.

Do you remember this?

A. What's the date on these texts?

Q. Again, this is February of 2014.

A. Okay. I'm not sure. I mean, it seems vaguely familiar to me.

Q. Do you remember a briefing that you did separate from the one for [redacted] for some big guns from the military in February of 2014?

A. I don't recall that specific timeline. I do recall there is another meeting I attended with DoD representatives on [redacted] in a different building. I just don't recall if I actually presented anything at that meeting.

Q. Who participated in that meeting?

A. I need to consult with counsel for privilege.

Q. Sure.

(The witness and counsel confer.)

MR. COYLE: I'll object on law enforcement privilege grounds, but I'll allow the witness to answer in general terms.

THE WITNESS: Matt, in general, there were other DoD law enforcement agency representatives at that meeting.

BY MR. JONES:

Q. Is there anything about the context of the meeting that can help us place it in time in the sequence of the investigation?

A. I do know that that meeting was after the briefing with [redacted]. I don't know how long after. Other than that, I can't think of any other way to place that in context temporally.

Q. And you don't remember if you gave the PowerPoint presentation in that meeting?

A. I don't recall.

Q. Was Stephen Rhoads present for that meeting?

A. He was not.

Q. This is sort of an odd question, but I wanted to ask you about this text message in which Stephen Rhoads is saying that you should "Wear that dingy wife beater with the holes in it and a nipple ring."

Do you understand what that is a

T. PAPPA

Q. Did the 60 Minutes story on the People's Republic of China ever air, to your knowledge?

A. From what I can recall, there was a story done that did feature him, but it was nothing related to this case.

Q. Are you aware of whether any information related to Dr. Chen was provided to 60 Minutes as part of that reporting?

A. I'm not aware.

Q. All right. I would like to turn now to an exhibit we're going to mark as 176. We can take a break after that.

MR. COYLE: Oh, thank you. You read my mind.

MR. JONES: I'll try to get through this one quickly.

(Exhibit 176 marked for identification and attached hereto.)

BY MR. JONES:

Q. So Exhibit 176 is a continuation of what we understand to be text messages between yourself, Agent Pappa, and Stephen Rhoads. And in the first message dated February 21, 2014, it

states: "Tim, need names if possible of the attendees so I can make nameplates for the briefing table. It's a protocol process. Everybody has a nameplate at the table."

And it looks like you responded with the names of SSA-8 and SA-5. Do you see that?

A. I do.

Q. Did you perform a briefing at which SSA-8 and SA-5 also attended?

A. I don't recall if they came to this briefing.

Q. Do you recall if they came to any of the briefings that you gave on the Chen investigation?

A. I know they did not attend the briefing I had with [redacted]. I don't recall if they ever attended any of the other briefings.

Q. It appears that you write in the fourth message on Exhibit 176: "Is the screen for the PP very big? We had this problem at [redacted]. All slides are pics or documents superimposed, but it was still hard to see at end of table."

T. PAPPA

A. Uh-huh.

Q. What are you referring to there?

A. I'm referring to the briefing at [redacted] that occurred in approximately I think May of 2013.

Q. Was there a problem with the ability of the audience to see the PowerPoint at that meeting?

A. From what I recall, it was a big room, and the screen just wasn't very large; not as large as I expected. So people at the farther end, I don't think they could see it clearly.

Q. How did you transport the PowerPoint to [redacted] presentation?

A. I believe I brought a CD, but I may have also brought hard copy printouts just in case.

Q. Is there any way other than a CD that you could have gotten the PowerPoint up onto the screen?

A. For that briefing, no.

Q. You mentioned you think you may have brought hard copies. Why do you believe you may have brought hard copies?

T. PAPPA

A. I believe because this was an important brief. There were a lot of senior people there from DoD and senior people from my own agency. And just in case there was some kind of technical failure, I wanted that as backup.

Q. Did you ultimately distribute those hard copies?

A. I don't recall if I did, because I can't recall if I did actually bring hard copies. But I'm fairly certain that I brought a CD, uh-huh.

Q. Does the reference to the idea that it was hard to see at the end of the table lead you to believe one way or the other whether you had hard copies there?

A. That's a good point. Yeah, I guess that may also further that belief, uh-huh. But I can see also how people may have relied on the screen.

Another reason I'm questioning if I brought hard copies is if this was a large PowerPoint presentation, there would be a lot of paper I would be printing out.

So yeah, I'm fairly certain that I may

T. PAPPA

have just brought a CD.

Q. Did you at any time make printed copies of the PowerPoint?

A. I don't recall if I did.

Q. Do you recall any person to whom you gave a printed copy of the PowerPoint?

A. I don't recall.

Q. Did you have a color printer in your work space from which you could have created a PowerPoint?

A. Yes.

Q. I want to ask you about this text message where you then say: "Also, I think after initial stuff, you should still step out of the room during my brief. Then when I'm done, you will be back in for white paper, et cetera."

Do you see that?

A. I do.

Q. Why did you think that Stephen Rhoads should step out of the room during your brief?

A. The reason I mention that is because much like the briefing with [redacted], Stephen Rhoads was not present for it. He didn't have a need to know.