IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

YANPING CHEN, )
)
Plaintiff ) Civil Action No.
) 1:18cv3074 (CRC)
)
vs. )
)
FEDERAL BUREAU OF )
INVESTIGATION, et al., )
)
Defendants. )
)
------------------------------)

REMOTE DEPOSITION OF JAMES GILLIS

Thursday, October 7, 2021

Reported by:

KATHERINE P. FORD, RPR, CCR

JOB NO. 200467

October 7, 2021

8:00 a.m.

Deposition of JAMES GILLIS, before Katherine P. Ford, RPR, an online Notary Public of the Commonwealth of Virginia.

a collection of documents in hard-copy form. I believe that I received a similar collection of documents from Agent Pappa. I believe there was, well, I was -- I have seen a notebook that contained a collection of documents related to the investigation.

Q. When did you see that notebook?

A. I don't recall the specific date. I don't recall the specific date.

Q. What was the context?

A. It was a meeting at the headquarters, at [redacted].

Q. Who participated in this meeting?

A. I know that I was there, and Tim Pappa was there. I believe that there were one or more people in Tim Pappa's chain of command at the FBI, and then there were people from the Department of Defense. I'm not sure exactly what their -- you know, I know why they were there, but I'm not sure exactly what their position was.

Q. This meeting was at [redacted]?

A. It was. To the best of my recollection that is where it was, yes.

Q. What was the purpose of the meeting?

A. The purpose of the meeting was to advise them of the investigation, and in particular the concern that we had -- the concern that we had of Dr. Chen's access to information related to service members and the possibility that that information had been disseminated to the PRC and the PLA.

Q. Did anyone from DHS participate in that meeting?

A. I don't recall.

Q. How -- roughly how many attendees were there?

A. Eight to ten or so.

Q. You mentioned earlier that you brought a notebook in connection with this meeting. Who possessed the notebook?

A. My recollection is that identical copies of the notebook were distributed to all of those at the meeting.

Q. Did you receive a copy of the notebook?

A. I believe I did, yes.

Q. Who distributed the identical

copies?

A. I believe it was -- I believe it was Agent Pappa.

Q. Why were -- why were you involved in the meeting?

A. Because the information -- we had some questions for DoD that were relevant to the investigation.

Q. So was -- so it sounds like, tell me if this is wrong, there were two purposes of meeting: One was to apprise them of your concerns and the other was to get information from them that could further your investigation; is that fair?

A. That's correct, as best I recall it, yes.

Q. Who initiated this meeting?

A. It -- hmm. It could very well have been me. I know I was interested in having the meeting. I don't know whether I specifically requested it or I did through Agent Pappa or whether Agent Pappa initially suggested it and I agreed to it, but I wanted it to take place.

Q. Why did you think it was desirable

to have this meeting?

A. May I have a moment to discuss that?

Q. Sure.

(Discussion off the record.)

THE WITNESS: I am sorry, Matt, could you repeat your question, please?

BY MR. JONES:

Q. The question was why did you think it was desirable to have the meeting with the Department of Defense?

A. All right. So to the best of my recollection, our -- we were aware that Dr. Chen and her university were collecting information from and about service members in connection with a college credit program that I believe DoD was responsible for or was otherwise involved in.

And we were, to the best of my recollection, aware that that information was not secure against the dissemination to the People's Republic of China or to the People's Liberation Army. The information, we thought, could collectively be used to the damage of the national security. That was our concern, so

that's why we wanted DoD to be aware of it.
We were also aware, perhaps from prior meetings with DoD, but we were aware that, you know, there were, I believe, if I'm recalling it correctly, that there were somewhere in the neighborhood of 3,000 other providers of the kind that Dr. Chen -- of the kind that Dr. Chen and her university were. And so I wanted to know whether DoD was monitoring those other institutions to see what information they had access to and what they were doing with it. And so that was the principal question that I had that I wanted answered from this meeting.
Q. What did you hope that the DoD would do with respect to the University of Management & Technology in response to the information that you had provided them?
A. I didn't really have a hope, you know. Depending upon the answer to the question that I had, you know, if -- we were bringing to their attention what I thought was a potential security risk. I hoped that they would take whatever action they thought

necessary to disrupt what I thought was a national security risk.

I didn't really have a hope that they would -- well, I guess, you know, I had a -- I think that was, to the best of my recollection, that was my hope, that they would become aware of this, they would take whatever appropriate action was necessary. If, in fact, my suspicion that this could be damaging to the national security were accurate, then I certainly would hope that they would take corrective action to prevent it.

I also hoped that they would provide me with information that would assist in making a decision about whether the case should be prosecuted based upon those activities.

Q. Okay. Did you hope that the Defense Department would terminate the university's participation in the DoD education benefit program?

A. To the best of my recollection, I thought that if this was, in fact, a concern to the DoD, I suggested -- I believe I suggested that as one among other ways that you might --

one might disrupt the activity. In other words, it would take her out of access to the information that we were concerned about by terminating her relationship with DoD.

Q. Did you specifically ask DoD to remove her from the program?

A. I don't -- I don't recall, because I would have asked that if they thought it was a concern. I mean, I would hope that they would reach that conclusion on their own. But if not, I would have asked that they do so if I were going to be prosecuting the case.

You know, if I wasn't going to be prosecuting the case, I really didn't have a dog in the fight, you know. It seemed to me that they should do something about it. But so your question is whether I asked them to? I don't recall because I don't exactly recall how far along we were in terms of coming close to a decision on prosecution.

I do recall that that topic came up and I do recall that I suggested -- that that was a possible action to take if they had a concern about what she was doing.

J A M E S G I L L I S

Q. Did anyone at the DoD say anything about the potential removal of her from the program?

A. Yes.

Q. What did they say?

A. My recollection, as best I, you know, as best I can recall, and this is sort of an impressionistic summary of what I recall, and it was that DoD didn't want to terminate her, or at least they had a concern that if they did terminate her, that it would result in civil litigation.

Q. What was the -- did they provide any facts in support of that concern about civil litigation?

A. Not that I recall.

Q. Other than the threat of litigation, did the DoD representatives say anything else about the prospects of removing the university from the DoD educational benefits program?

A. Ask that again would you, please?

Q. Other than the threat of litigation, did the DoD representative say anything else about the prospect of removing the university

J A M E S G I L L I S

from the DoD tuition assistance program?

A. I, again, it's a -- I want to say an impressionistic summary of what one or more people said, but the gist was that they thought it would be much easier for them to terminate her contract if we prosecuted her.

Q. Did they say why they believe that to be the case?

A. I believe that was -- I don't recall, really. I don't recall. It's, but it, in general, I believe it had to do with criminal charges or criminal conviction being a sufficient, in their mind, a sufficient ground for terminating the contract.

Q. Who was in these -- this meeting? Were these lawyers? Were they program people?

MR. COYLE: Objection. Go ahead.

A. I think that there was at least some lawyer from, or two, from DoD. And where exactly they were, DoD is an awfully big place. I honestly don't know where they were, but I think there were a couple of lawyers, and I believe that either one of those lawyers or somebody else in the room was, you know, pretty

well-versed in or familiar with the program itself.

Q. Okay. Returning to the issue of the notebooks that were distributed in this meeting.

A. Yes.

Q. Were the notebooks collected at the end of the meeting or were participants permitted to take them?

A. I don't -- I don't recall.

Q. Did you keep your copy?

A. I don't -- I don't recall.

Q. Do you recall ever seeing that notebook again following that meeting?

A. I don't -- I don't recall. I don't think I saw that compilation as such other than at that meeting.

Q. Okay.

MR. JONES: Let's go off the record.

(A recess was taken.)

BY MR. JONES:

Q. Mr. Gillis, we are now back on the record at 12:36 p.m. following a lunch break.

Mr. Gillis, did you direct any of