# CONFIDENTIAL - FILED UNDER SEAL

# EXHIBIT 5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| YANPING CHEN, Plaintiff, vs. FEDERAL BUREAU OF INVESTIGATION, et al., Defendants. | Civil Action No. 1:18-cv-3074(CRC) |

DEPOSITION OF TIMOTHY PAPPA
(Via videoconference)
November 19, 2021

Reported by: John L. Harmonson, RPR
Job No. 201308

November 19, 2021

8:52 a.m.

Deposition of TIMOTHY PAPPA, taken via videoconference with the witness and all parties appearing remotely, pursuant to the Federal Rules of Civil Procedure, subject to such stipulations as may be recited herein or attached hereto, before John L. Harmonson, a Registered Professional Reporter and Notary Public of the District of Columbia, who officiated in administering the oath to the witness.

T. PAPPA

Q. What devices did you search?

A. I searched my Bureau-issued cell phone, and I also searched my personal mobile device.

Q. Did you identify any documents responsive to the subpoena?

A. I don't recall identifying any documents responsive to the subpoena.

Q. If you had identified any documents, would you have provided them to counsel?

A. Yes.

Q. I want to start with some questions about your background. What's your current employment?

A. With FBI.

Q. What is your title?

A. Supervisory special agent.

Q. What is your assignment within the FBI?

A. Currently, I'm assigned to the Headquarters Division known as Critical Incident Response Group.

Q. How long have you been in that role?

A. Approximately three years.

T. PAPPA

THE WITNESS: Upon completing training at the academy, I was assigned to a national security squad.

BY MR. JONES:

Q. I've read in your affidavit you described working on a counterintelligence squad that investigates cases related to national security. Is that a fair description of the squad to which you were assigned?

A. Yeah, that's a fair description.

Q. How long did you serve on that squad?

A. I served on that squad for approximately seven years and change.

Q. So is it correct that you served on that squad from roughly July 2008 to June 2015?

A. It would have been actually approximately November 2008, which would be the end of training, to approximately June 2015, right.

Q. While you were on that counterintelligence squad, did you become familiar with my client, Yanping Chen?

A. Yes.

Q. Were you the lead case agent on the

T. PAPPA

investigation of Dr. Chen?

A. Yes.

Q. When did you begin working on the Chen investigation?

MR. COYLE: Objection; law enforcement privilege.

I'm instructing the witness not to answer.

BY MR. JONES:

Q. Were you the original lead case agent on the Chen investigation?

A. Yes, I was.

Q. Were you involved in the investigation in March 2010 when trash covers were conducted at the University of Management and Technology?

MR. COYLE: Objection; law enforcement privilege.

I'm instructing the witness not to answer.

BY MR. JONES:

Q. During the investigation, did you have occasion to review Dr. Chen's immigration file?

A. Yes.

Q. How did you obtain Dr. Chen's

T. PAPPA

Q. During the course of the Chen investigation, did you ever create a visual presentation regarding the investigation?

A. Yes.

Q. What program did you use to create that presentation?

A. Microsoft PowerPoint.

Q. Did anyone assist you in the preparation of that PowerPoint?

A. I don't recall if anyone assisted me.

Q. On what machine did you use Microsoft PowerPoint to develop the visual presentation regarding the Chen investigation?

A. I believe I created it on a desktop computer assigned to me in my squad area.

Q. Was that computer uniquely assigned to you?

A. My profile was uniquely assigned to me, and I would log into my profile on that computer.

Q. I would like to direct you now to a document that we're going to mark as Exhibit 159. The Bates number is DHS_00001066.

(Exhibit 159 marked for identification

regarding the Chen investigation?

A. I don't recall.

Q. All right. Let's scroll up. It looks like you respond to [redacted]: "What kind of time do you have on Friday? Do you have a working unclass scanner at Gallery? I will try to" -- it says find -- I'm not sure -- "find it out at WFO" -- "find one or figure it out at WFO."

Do you recall working with [redacted] on a project that would have required having an unclassified scanner?

A. I don't recall.

Q. You mentioned previously the development of a PowerPoint presentation regarding the Chen investigation. Is that right?

A. That's right.

Q. Did [redacted] play any role in the development of that presentation?

A. I don't recall.

Q. Did you employ a scanner in preparing the PowerPoint presentation regarding the Chen investigation?

A. I did.

T. PAPPA

Q. For what purpose did you employ a scanner?

A. To scan documents and photographs that might be relevant for me to include in the presentation.

Q. Did those documents and photographs include documents and photographs seized during the search of Dr. Chen's home and office on December 5, 2012?

A. They did.

Q. In this email, you're describing looking for a working unclassified scanner. In connection with the Chen PowerPoint presentation, were you able to identify a working unclassified scanner?

A. I don't recall.

Q. All right. Let's scroll up.

[redacted] appears to reply to you on March 12, 2013, that he does "have an unclassified scanner at my desk at GP."

Do you understand GP to mean Gallery Place?

A. I do.

Q. Did you have a working space at

T. PAPPA

Q. Mr. Pappa, I would like to direct you now to a document that's previously been marked as Exhibit 32.

(Exhibit 32 marked for identification and attached hereto.)

BY MR. JONES:

Q. Exhibit 32 is a 132-page PDF document of what I understand was originally a PowerPoint presentation. I'll ask my colleague to maybe flip through the first dozen pages or so so you get a sense of what's here.

Agent Pappa, do you recognize Exhibit 32?

A. I do.

Q. What do you recognize it to be?

A. It appears to be the PowerPoint presentation I made.

Q. To confirm, Exhibit 32 appears to be the PowerPoint presentation that you drafted in early 2013 to present to DoD personnel; is that right?

A. I don't recall if it was specifically that one, but it does look familiar.

Q. Is there anything about this

Exhibit 32 that looks different to you from the presentation that you gave to DoD personnel in early 2013?

A. I don't recall if there is anything different.

Q. Where did you get the materials that you included in this presentation?

A. The majority of it was derived from the criminal search of her house and residence -- I mean her residence and office.

Q. How were the photos that were included in the presentation digitized for inclusion in the PowerPoint?

A. I would have scanned them.

Q. Can you walk me through really nitty-gritty logistically how that worked in terms of where you got the photos from through getting them into the digital file?

A. I would have -- generally speaking, I would have signed out a piece of evidence from the evidence vault. I would sign in terms of the chain of custody. I would have removed that evidence from its bag or whatever it was held in and then gone to a printer that had a scanner,

A. At times, that could be time-consuming, yes.

Q. Did you do it -- did you scan the records that went into this presentation all at once or over a period of time?

A. I don't recall.

Q. Let me direct you to page 3. Do you recognize page 3?

A. I do.

Q. What do you recognize it to be?

A. Also an immigration form associated with Yanping Chen.

Q. Where did you obtain the immigration form?

A. More than likely, I would have obtained a copy of it from DHS.

Q. From [redacted]?

A. More than likely, yes.

Q. Is there any other location from which you might have obtained the immigration file?

A. I don't recall. I mean, other than what I mentioned earlier today about I may have made a prior request, perhaps to USCIS, but I don't recall any other location.

Q. But these immigration files, to be clear, came from DHS records rather than from the searches of Dr. Chen's home and office; is that right?

A. That's correct.

Q. All right. Let's look at page 4. Agent Pappa, do you recognize page 4?

A. I do.

Q. What is it?

A. It looks like it's the same application for naturalization document that was submitted previously by Yanping Chen.

Q. Where did you obtain this document?

A. I would have obtained a copy of it from [redacted].

Q. And how did you get it into this presentation?

A. Again, more than likely, I would have scanned it through a printer into a digital format.

Q. Did you perform the cutting and pasting of excerpts of the document on page 4 to highlight particular information from the document?

T. PAPPA

and technicians who specialize in forensics on digital devices, and there is software available to help organize the copies of that content. And so on that software, in their location, in a secure location, we can review that content and essentially flag it, flag the files. And then a request is made to them to put those files onto a CD. And like I said, it becomes another item of evidence.

BY MR. JONES:

Q. Did you put the blue arrows on this image at page 31 of Exhibit 32?

A. I believe I did.

Q. Were you intending to draw attention to the pockets on the front of the uniform?

A. I was.

Q. All right. Let's go to the next page. Do you recognize the image on page 32 of Exhibit 32?

A. I do.

Q. What do you recognize it to be?

A. It's Yanping Chen pictured with another PLA general.

T. PAPPA

Q. From where did you obtain this photograph?

A. I believe it was also from the search.

Q. The search of Dr. Chen's residence?

A. I believe so.

Q. Do you know who the woman other than Yanping Chen is?

A. I believe her name is Nie Li.

Q. And did you scan this photograph into digital form using the same method you described previously?

A. Yeah. More than likely I would have, yes.

Q. Did you apply the blue arrows to this image for purposes of the PowerPoint?

A. Yes, I believe so.

Q. Let's turn to the next page, 33. Actually -- yes. And I want to -- on page 33, do you recognize the images on page 33?

A. Yes.

Q. What do you recognize them to be?

A. Can you restate the question again?

Q. Yes.

What do you recognize the images on

page 33 to be?

A. These appear to be images of various people who appear to be Chinese military officials.

Q. I want to direct your attention to the image on the far left in the center of the page. It has the letters B-i-n next to it. Do you see that?

A. Uh-huh. Yes.

Q. Do you recognize that image?

A. I believe also because it's over that bubble, that it's a picture of Yanping Chen's father, Chen Bin.

Q. From where did you obtain that photograph?

A. I don't recall where I obtained this photograph.

Q. Did you obtain any photographs of Yanping Chen's father during the search of her home?

A. I vaguely remember there being a photograph of him. I just don't recall if there were more than one. And I also know that there are publicly available pictures of her father.

So that's why I don't recall where I obtained this photo from.

Q. So to the best of your recollection, this image might have come from Yanping Chen's home, but it also might have come from an open source search; is that right?

A. That's right.

Q. All right. I want to move on to page 36. Do you recognize the images on page 36 of Exhibit 32?

A. Yes.

Q. What do you recognize them to be?

A. It appears to be a scan of Yanping Chen's passport or passports.

Q. From where did you obtain the passport that's scanned into Exhibit 36 -- or page 36 of Exhibit 32?

A. I don't recall, but I believe it may have been from the search.

Q. The search of her home?

A. Yes.

Q. And would you resort to FBI chain of custody logs to determine whether this was in fact obtained during the searches of Dr. Chen's

home or residence?

A. Yes, you could.

Q. Let's turn to page 37. Do you recognize the image on page 37?

A. Yes. It appears to be another immigration document tied to Yanping Chen.

Q. From where did you obtain the immigration document on page 37 in Exhibit 32?

A. I don't recall.

Q. Is there any reason to think this isn't one of the immigration documents that you obtained from [redacted]?

A. That's possible. That's certainly possible.

Q. Did you obtain any immigration documents during the search of Dr. Chen's home?

A. I don't recall.

Q. Were you responsible for the cutting and pasting of this particular portion of the immigration document at the center of page 37?

A. You know, I don't recall specifically with this document, but I believe it probably was me.

Q. All right. Let's go to page 41.

T. PAPPA

Agent Pappa, do you recognize the images on page 41 of Exhibit 32?

A. I do.

Q. What do you recognize them to be?

A. They appear to be -- I think it's David or John Frame, her husband, saluting Yanping Chen.

Q. How did you come into possession of the pictures that are located on page 41 of Exhibit 32?

A. I believe these photos were digital and that they were recovered during the course of the search warrant at her home, an image from one of her electronic devices.

Q. And so in order to obtain images of these, you would have gone through the process described with the other location that forensically imaged materials for your review; is that right?

A. That's correct.

Q. Do you recall specifically going to pick out pictures that you wanted to get copies of off the media that had been imaged from Dr. Chen's home?

T. PAPPA

in the northwest of China.

Q. Where did you obtain this photo?

A. These would have likely been obtained from the search of her residence.

Q. Is there any other location from which you would have obtained this photograph?

A. I don't recall.

Q. Do you recall when you first saw this picture?

A. I don't recall specifically when, but I do remember viewing this picture. It's familiar to me.

Q. Did you have access to it -- did you have access to it before the searches in December of 2012?

A. I don't recall. I don't recall having any access to this before that.

Q. Let's turn to page 124. Do you recognize the image at page 124 of Exhibit 32?

A. Yes.

Q. What do you recognize it to be?

A. It appears to be a testimonial document of the interview with Wang Lele, Yanping Chen's daughter.

T. PAPPA

Q. Did you conduct this interview on May 8, 2012, or thereabouts?

A. I believe I did.

Q. Did you draft this 302?

A. I believe I did.

Q. How did you obtain the digital image of this 302 included in the PowerPoint at Exhibit 32?

A. Well, because it appears to be a hard copy interview format, more than likely I would have scanned it from the printer to create a digital copy that was emailed to me.

Q. There's some highlighting and a single sentence on the 302. Did you apply that highlighting?

A. More than likely, I would have.

Q. And did you apply the blue arrow pointing to that highlighted portion of the 302?

A. More than likely, yes.

Q. Where was the hard copy of Lele Wang's 302 stored?

A. It would have been stored in the hard copy case file document -- or jacket.

Q. How did you organize 302s within the

T. PAPPA

jacket?

A. Much like they're organized in Sentinel. There will be sequential numbering, just one after the other, whatever step happened sequentially in the investigation.

Q. After you completed the presentation that is depicted here, where did you save it?

A. I don't recall where I saved it. I do recall that I burned it onto a CD. So more than likely, I saved it on the desktop.

Q. So your best recollection is you had a copy on your desktop, and then a copy on CD that would allow you to present in other locations. Is that right?

A. That's my best recollection.

MR. JONES: All right. We can go off the record.

THE VIDEOGRAPHER: We are off the record at 11:04 a.m. This marks the end of media 2.

(Recess taken.)

THE VIDEOGRAPHER: We are back on the record at 11:12 a.m. This marks the beginning of media 3.

T. PAPPA

Q. When did you meet her?
A. At Stephen Rhoads's wedding.
Q. Did that wedding occur in August of 2015?
A. I mean, I wouldn't know the date. You could throw out any date and I'm not sure. But I don't know if that's when it was.
Q. Does that -- I've seen the date somewhere August 22, 2015. Does that date roughly comport with your memory of when the wedding occurred?
A. It doesn't. I'm not doubting it; I just don't recall.
Q. Okay. That was the first time that you had met Catherine Herridge?
A. Yes.
Q. What did you say to her at that -- at the wedding?
A. All I recall is that it was just an introduction and like maybe formalities, but nothing beyond that.
Q. Did you tell her your name?
A. Stephen Rhoads introduced me to her. So he said my name, and I don't recall if he said

more than that. But he introduced me by name.
Q. Did he say who you worked for?
A. I don't recall what he said, but I think that was understood. Maybe he said something to that effect. It seems plausible he would have.
Q. Did you recognize her?
A. I don't recall if I recognized her. You know, I had seen her face on TV a few times. I knew that she was, like, a national reporter on national security issues. So I had seen that she had had some stories on the FBI before. But in terms of what she looked like in person, I don't remember if I recognized her. But Stephen Rhoads said her name too to make that introduction so...
Q. Okay. What did she say to you?
A. All I recall is the same kind of niceties and formalities, like "Nice to meet you." I don't recall if there was anything more than that.
Q. How long did this discussion last?
A. I don't recall. I'm going to estimate one to two minutes.
Q. Who else was there while you were

T. PAPPA

Q. Did you discuss any of your case work with Catherine Herridge at the wedding?

A. No.

Q. Prior to that meeting in person, had you ever spoken to Catherine Herridge before?

A. No.

Q. Prior to that meeting, did you know who Catherine Herridge was?

A. Yeah. Like I mentioned before, I had seen her name before on various stories. I had a general idea of she's a national security reporter for Fox News.

Q. What did you understand the relationship between Stephen Rhoads and Catherine Herridge to be?

A. I didn't know what the relationship was between them. I didn't know she was going to be there and that he was going to introduce me.

Q. Did you ever ask him, like, "How do you know this national news reporter?"

A. I don't recall if I did ask him that.

Q. Prior to the wedding, were you aware of Stephen Rhoads's association with Catherine Herridge?

day.

Q. Yeah.

So when you saw Catherine Herridge at the wedding a few months after that story came out, did you all discuss that she had previously done a story on your affidavit?

A. We didn't discuss that.

Q. You didn't say, "hey, you wrote a story about me"?

A. I didn't.

Q. And she didn't mention anything about writing a story about you?

A. No.

Q. Did Stephen Rhoads say anything about the fact that she had written a story about you?

A. I don't recall him saying anything at that moment about it.

Q. Did Stephen Rhoads say anything at any time about his friend Catherine Herridge writing a story about you?

A. I don't recall him ever referring to her as his friend. And I don't recall him ever talking about having some kind of role related to that.

published by Fox News six days after your communication with Stephen Rhoads titled "State Department contractor allegedly paid by Chinese agent to spy on Americans - yet no charges filed."

Do you recall seeing this article?

A. Yeah, I do recall seeing it.

Q. When did you first see this article?

A. I don't recall when I actually first saw it.

Q. How did you first learn of the article?

A. I don't remember.

Q. Do you remember any time at which you became aware of the article?

A. I don't recall.

Q. Did you ever discuss this article with any other person?

A. I don't recall. I mean, presumably I may have discussed this with people I work with, my squad, but I don't recall specific conversations.

Q. Did you speak to Catherine Herridge in connection with this article?

T. PAPPA

A. No.

Q. Did you speak to anyone at Fox News in connection with this article?

A. No.

Q. Did you provide any information to Stephen Rhoads to provide to Fox News in connection with this article?

A. No.

Q. Are you aware of Catherine Herridge ever reaching out to you for comment regarding this article?

A. I don't recall her ever doing that.

Q. Did Catherine Herridge ever try to ask you for comment?

A. I don't recall her ever doing that, no.

Q. Did anyone at Fox News ask you for comment?

A. I don't recall anybody from Fox News contacting me.

Q. Do you recall anyone asking you to comment on this article prior to its publication?

A. I don't recall anyone asking me to comment on it prior to its publication.

whether you took it with you or you left it there. Is that right?

A. That's right. I don't recall.

Q. But it was not your intention to give the CD to [redacted] to keep for his own use; is that right?

A. That was not my intention.

Q. Was it your intention to have Stephen Rhoads take possession of that CD?

A. That was not my intention. I just don't recall if I actually took it with me. I mean, I do recall that to be able to play that CD off of that computer, more than likely it would have had to have been put on the desktop of that computer. So I just don't recall if I took the CD or not, but the presumption was that that would be deleted.

Q. Whose computer was used in the briefing?

A. It was one computer out of a number of computers [redacted]

Q. [redacted]

Reserve intel, big guns coming.
Do you remember this?
A. What's the date on these texts?
Q. Again, this is February of 2014.
A. Okay. I'm not sure. I mean, it seems vaguely familiar to me.
Q. Do you remember a briefing that you did separate from the one for [redacted] for some big guns from the military in February of 2014?
A. I don't recall that specific timeline. I do recall there is another meeting I attended with DoD representatives on [redacted] in a different building. I just don't recall if I actually presented anything at that meeting.
Q. Who participated in that meeting?
A. I need to consult with counsel for privilege.
Q. Sure.
(The witness and counsel confer.)
MR. COYLE: I'll object on law enforcement privilege grounds, but I'll allow the witness to answer in general terms.

THE WITNESS: Matt, in general, there were other DoD law enforcement agency representatives at that meeting.

BY MR. JONES:

Q. Is there anything about the context of the meeting that can help us place it in time in the sequence of the investigation?

A. I do know that that meeting was after the briefing with [redacted]. I don't know how long after. Other than that, I can't think of any other way to place that in context temporally.

Q. And you don't remember if you gave the PowerPoint presentation in that meeting?

A. I don't recall.

Q. Was Stephen Rhoads present for that meeting?

A. He was not.

Q. This is sort of an odd question, but I wanted to ask you about this text message in which Stephen Rhoads is saying that you should "Wear that dingy wife beater with the holes in it and a nipple ring."

Do you understand what that is a

A. Uh-huh.

Q. What are you referring to there?

A. I'm referring to the briefing at [redacted] that occurred in approximately I think May of 2013.

Q. Was there a problem with the ability of the audience to see the PowerPoint at that meeting?

A. From what I recall, it was a big room, and the screen just wasn't very large; not as large as I expected. So people at the farther end, I don't think they could see it clearly.

Q. How did you transport the PowerPoint to [redacted] presentation?

A. I believe I brought a CD, but I may have also brought hard copy printouts just in case.

Q. Is there any way other than a CD that you could have gotten the PowerPoint up onto the screen?

A. For that briefing, no.

Q. You mentioned you think you may have brought hard copies. Why do you believe you may have brought hard copies?

T. PAPPA

A. I believe because this was an important brief. There were a lot of senior people there from DoD and senior people from my own agency. And just in case there was some kind of technical failure, I wanted that as backup.

Q. Did you ultimately distribute those hard copies?

A. I don't recall if I did, because I can't recall if I did actually bring hard copies. But I'm fairly certain that I brought a CD, uh-huh.

Q. Does the reference to the idea that it was hard to see at the end of the table lead you to believe one way or the other whether you had hard copies there?

A. That's a good point. Yeah, I guess that may also further that belief, uh-huh. But I can see also how people may have relied on the screen.

Another reason I'm questioning if I brought hard copies is if this was a large PowerPoint presentation, there would be a lot of paper I would be printing out.

So yeah, I'm fairly certain that I may

T. PAPPA

have just brought a CD.

Q. Did you at any time make printed copies of the PowerPoint?

A. I don't recall if I did.

Q. Do you recall any person to whom you gave a printed copy of the PowerPoint?

A. I don't recall.

Q. Did you have a color printer in your work space from which you could have created a PowerPoint?

A. Yes.

Q. I want to ask you about this text message where you then say: "Also, I think after initial stuff, you should still step out of the room during my brief. Then when I'm done, you will be back in for white paper, et cetera."

Do you see that?

A. I do.

Q. Why did you think that Stephen Rhoads should step out of the room during your brief?

A. The reason I mention that is because much like the briefing with [redacted], Stephen Rhoads was not present for it. He didn't have a need to know.

T. PAPPA

I'm asking does it appear to be the same material as your PowerPoint?

A. It does resemble to be -- it does resemble my material.

Q. So I want to recap on your testimony from today. You stated that you had a copy of that PowerPoint. Is that right?

A. Yes.

Q. And you're not aware of anyone else who had a copy of the PowerPoint. Is that correct?

A. I'm not aware of that, no.

Q. And your testimony is that you, the only person you know who had a copy of that PowerPoint, did not give it to Fox News. Is that your testimony?

A. My testimony is I did not give anything to Fox News. I don't know if there is anyone else who may have had a copy of my PowerPoint presentation.

Q. We talked through a few of those people today. You say -- let's go through them quickly.

[redacted]. Did he have a copy of