PUBLIC VERSION

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **YANPING CHEN,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 1:18-cv-03074** |
| **FEDERAL BUREAU OF INVESTIGATION, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF DEFENSE, and U.S. DEPARTMENT OF HOMELAND SECURITY,** | |
| **Defendants.** | |

**REPLY IN SUPPORT OF PLAINTIFF YANPING CHEN'S APPLICATION FOR AN ORDER TO SHOW CAUSE WHY NON-PARTY CATHERINE HERRIDGE SHOULD NOT BE FOUND IN CIVIL CONTEMPT FOR DEFIANCE OF THE COURT'S AUGUST 1, 2023 ORDER**

MEIER WATKINS PHILLIPS PUSCH LLP
Andrew C. Phillips (DC Bar No. 998353)
919 18th St. NW, Suite 650
Washington, DC 20006
Email: andy.phillips@mwpp.com

*Counsel for Plaintiff Yanping Chen*

January 5, 2024

i

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

      A.    U.S. Citizen Yanping Chen is an Accomplished Scientist and Educator. ........ 2

      B.    The FBI's Investigation of Dr. Chen Produced No Criminal Charges or
           Administrative Action. ........................................................................................ 3

      C.    With No Legal Avenue Against Dr. Chen Available, the FBI's "Only
           Hope Is Rhoads and Publicity." ......................................................................... 4

      D.    Fox News Broadcasts Leaked FBI Documents About Dr. Chen. ...................... 5

      E.    The FBI Leaks to Fox News Were Ruinous for Dr. Chen. ............................... 6

      F.    The U.S. Government and Herridge's Fight Against Accountability for
           the Illegal Leaks. ............................................................................................... 7

ARGUMENT .......................................................................................................................... 9

I.    Herridge Offers No Sound Basis for Reconsidering or Modifying the Order on
    the Motion to Quash. ................................................................................................. 9

      A.    Herridge Identifies No Authority Suggesting Any Error in the Court's
           Application of the Law. ...................................................................................... 9

      B.    Herridge's Damages Argument is Irrelevant to the Issue of Whether
           Herridge Violated the Court's Order. ............................................................... 11

      C.    Herridge's Suggestion that the Court Should Decide Who is Worthy of
           the Protection of the Law is Not Just Misguided, But Insidious. ..................... 14

      D.    Herridge's Newfound "National Security" Concern Rings Hollow ............... 15

      E.    Herridge's Scaremongering About the Effect of a Contempt Finding on
           the Functioning of the Press is Not Credible ................................................... 17

II.    A Contempt Sanction Must Have Teeth in Order to Fulfill its Purpose. ................... 20

CONCLUSION ..................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Exec. Office of the President,*
  1 F.3d 1274 (D.C.Cir.1993)..................................................................................1

*Atlanta Journal-Consitution v. Jewell,*
  555 S.E.2d 175 (Ga. App. 2001) ........................................................................12

*Bruno & Stillman Inc. v. Globe Newspaper Co.,*
  633 F.2d 583 (1st Cir. 1980) ..............................................................................12

*Carey v. Hume,*
  492 F.2d 631 (D.C. Cir. 1974)......................................................................12, 18

*Cuomo v. U.S. Nuclear Regulatory Comm'n,*
  772 F.2d 972 (D.C. Cir. 1985).............................................................................23

*Fleck v. Dep't of Veteran Affairs,*
  596 F. Supp. 3d 24 (D.D.C. 2022).......................................................................13

*Hatfill v. Gonzales,*
  505 F. Supp. 2d 33 (D.D.C. 2007)...................................................11, 13, 22, 23, 24

*Hatfill v. Mukasey,*
  539 F. Supp. 2d 96 (D.D.C. 2008)...................................................18, 22, 23, 24, 25

*In re Fannie Mae Securities Litig.,*
  552 F.3d 814 (D.C. Cir. 2009)............................................................................22

*Int'l Painters & Allied Trades Indus. Pension Fund v. ZAK Architectural Metal & Glass LLC,*
  736 F. Supp. 2d 35 (D.D.C. 2010).......................................................................1

*Lee v. Dep't of Justice,*
  401 F. Supp. 2d 123 (D.D.C. 2005)................................................11, 13, 15, 18

*Lee v. Dep't of Justice,*
  413 F.3d 53 (D.C. Cir. 2005).....................10, 11, 12, 13, 15, 18, 19, 22, 23, 24

*Lee v. U.S. Dep't of Justice,*
  327 F. Supp. 2d 26 (D.D.C. 2004).......................................................................22

*NLRB v. Blevins Popcorn Co.,*
  659 F.2d 1173 (D.C. Cir.1981)............................................................................22

iii

*Pierce v. Kadida*,
    No. 21-3326, 2022 WL 18529814 (D.D.C. Sept. 20, 2022) ............................................21

*State ex rel. Classic III, Inc. v. Ely*,
    954 S.W.2d 650 (Mo. App. 1997) ....................................................................................12

*United States v. Philip Morris USA Inc.*,
    287 F. Supp. 2d 5 (D.C. Cir. 2003) ............................................................................22, 23

*United States v. United Mine Workers of Am.*,
    330 U.S. 258 (1947) ....................................................................................................20, 22

*Zerilli v. Smith*,
    656 F.2d 705 (D.C. Cir. 1981)........................................................................10, 11, 12, 18

**Other Authorities**

Randall D. Eliason, *The Problems with the Reporter's Privilege*,
    57 Am. Univ. L. Rev., 1341, 1359 (2008)........................................................................20

## INTRODUCTION

All that is required for Catherine Herridge to be found in civil contempt of the Court's August 1, 2023 Order [Dkt. 140][1]—which required her to identify the government official who abused his authority by unlawfully leaking protected records—is for Dr. Chen to demonstrate that: (1) there was a court order in place; (2) the order clearly and unambiguously required certain conduct; and (3) Herridge failed to comply. *Int'l Painters & Allied Trades Indus. Pension Fund v. ZAK Architectural Metal & Glass LLC*, 736 F. Supp. 2d 35, 38 (D.D.C. 2010) (citing *Armstrong v. Exec. Office of the President*, 1 F.3d 1274, 1289 (D.C.Cir.1993)). Nowhere in her thirty-nine page Response[2] to the Court's Order to Show Cause does Herridge dispute that she willingly defied the Court's clear and unambiguous August 1 Order. Herridge instead devotes her Response to character attacks on Dr. Chen, arguments that have already been rejected by the Court, and hyperbolic scare tactics.

Herridge first argues that the Court should "modify" its August 1 Order based on a free-form balancing test, but offers no new authority suggesting the Court erred when it previously rejected this argument. Continuing to plow old ground, she next argues that Dr. Chen will be unable to establish causation for one category of damages she seeks, but ignores the Court's well-reasoned finding that it need not conduct a full-blown analysis of Dr. Chen's damages claims, and in any event Dr. Chen seeks other compensable damages. Herridge then doubles down on her also-rejected argument that Dr. Chen "had it coming," essentially asking the Court to rule that Dr. Chen is unworthy of the protection of the Privacy Act based on decades-old allegations related to her immigration paperwork over which Dr. Chen was never even charged—and even more

---

[1] Hereinafter, "Order on the Motion to Quash" or "MTQ Order."
[2] Non-Party Catherine V. Herridge's Mem. in Response to the Order to Show Cause ("Resp.") (Dec. 14, 2023) [Dkt. 170].

attenuated, baseless insinuations that Dr. Chen is a spy for a country she left thirty-six years ago. And finally, Herridge claims that being held in contempt for refusing to disclose which government official broke the law will sound a death-knell for the free press, even though it has been the law in this Circuit for decades that a journalist can be so compelled in a Privacy Act case, and there is no evidence this long-standing state of affairs has undermined journalists' ability to report.

At bottom, none of Herridge's arguments address the core issue of whether there was a clear order in place that she violated.  Nor do they acknowledge the powerful public interest in holding accountable government officials who abuse citizens' civil rights.  The irony underscoring all of Herridge's attacks on Dr. Chen, a law-abiding U.S. citizen, is that what is actually at issue here is **Herridge's** willfull flouting of the law to protect a rogue government official who also violated the law.  That conduct merits imposition of a sanction that is not "friendly" as Herridge requests, but that serves the intended purpose of securing her compliance with the law.

## BACKGROUND

### A.    U.S. Citizen Yanping Chen is an Accomplished Scientist and Educator.

Yanping Chen is a 70-year-old grandmother approaching the end of a successful career as a scholar, educator, and entrepreneur.  Before coming to the U.S. more than thirty-six years ago, Dr. Chen—trained as a medical doctor—spent a decade as a researcher for the Chinese astronaut program.  (Complaint ("Compl.") [Dkt. 1] ¶ 11.)  Building on that experience, in 1987 she enrolled at George Washington University, where she earned a Master's degree and then a Ph.D. in Public Policy, writing her dissertation about Chinese space policy.  (*Id.*)  While in graduate school, she met and married her husband, fellow academic John Davidson Frame.  (*Id.* ¶ 12.)  She became a permanent resident in 1993 and renounced her Chinese citizenship to become a U.S. citizen in 2001.  (*Id.*)

In 1998, Dr. Chen founded the University of Management and Technology ("UMT"), an

accredited institution based in Arlington, Virginia that provides post-secondary and graduate education to working adults.  (*Id.* ¶ 13.)  UMT, which was early to embrace online and distance learning, thrived under Dr. Chen's leadership.  Over the past 25+ years, more than 15,000 students have graduated from UMT at the associate's, bachelor's, master's, and doctoral levels.  Beyond her work at UMT, Dr. Chen has spent decades as a volunteer and philanthropist.  For more than 30 years, Dr. Chen has volunteered with the Project Management Institute, including serving on its global board of directors.  Through a private foundation, she and her husband have financially supported educational efforts globally and charitable projects in their local community.[3]

## B.    The FBI's Investigation of Dr. Chen Produced No Criminal Charges or Administrative Action.

Around 2009, the FBI launched an investigation into Dr. Chen searching for evidence that she lied on immigration forms about her work in the Chinese astronaut program.[4]  Led by FBI Special Agent Tim Pappa, agents dug through Dr. Chen's trash; interrogated her colleagues, friends, and family; obtained her immigration records; monitored her travel; secretly recorded her conversations; and deployed at least one undercover informant, Army officer Stephen Rhoads.  (*See* Compl. ¶ 16.)  As part of its investigation, in December 2012, the FBI executed searches at UMT's office and at Dr. Chen's home, seizing dozens of boxes of material, including tax and

---

[3] *See, e.g.*, Jo DeVoe, *Rosslyn-Based Online University Donates $50K to Help Local Businesses*, ARLnow (Dec. 29, 2020), https://www.arlnow.com/2020/12/29/rosslyn-based-online-university-donates-50k-to-help-local-businesses/.

[4] The government has brought—and been forced to abandon—several similar cases against Chinese researchers. *See, e.g.*, Shawna Chen, *DOJ Drops Cases Against 5 Chinese Researchers*, Axios (July 24, 2021), https://www.axios.com/2021/07/24/doj-chinese-researchers-china-initiative.  As FBI analysts have found, there is a lack of clarity on U.S. immigration forms regarding affiliation with the Chinese military, as among civilian workers at military-related organizations, there "are a significant number of doctors, nurses and other professionals that are at times are required to wear a military-type uniform, but who would not necessarily consider themselves soldiers."  (Exhibits to Defendant's Trial Brief and Memorandum Supporting Dismissal at Trial, *United States v. Tang*, 2:20-CR-0134 JAM (E.D. Cal. July 19, 2021), Dkt. 195.)

business records, communications, personal memorabilia, and personal photographs.  (*Id.* ¶ 20.)

Following the searches, the FBI tried to persuade DOJ prosecutors to criminally charge Dr. Chen.  Those efforts failed.  In April 2015, prosecutors told the FBI that ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

(Ex. A.)  In March 2016, prosecutors informed Dr. Chen that no charges would be filed against her.  (Compl. ¶ 22.)

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████ .  (*See, e.g.*, Ex. B.)  DOD not only rejected the call to terminate UMT, but affirmatively renewed UMT's participation in the Tuition Assistance program.

**C.    With No Legal Avenue Against Dr. Chen Available, the FBI's "Only Hope Is Rhoads and Publicity."**

████████████████████████████████████████████████████████████████

██████████████████████████ .  (Timothy Pappa Dep. Tr. 129:17-130:14 (Nov. 19, 2021)

(attached as Ex. 5 to Dr. Chen's Aug. 31, 2023 Opp'n to C. Herridge's Mot. to Quash [Dkt. 113]).)

Contemporaneously, in the spring of 2015, Agent Pappa prompted Rhoads to tip off Fox News reporter Catherine Herridge about another of his stalled investigations into a different Chinese woman, (Ex. C), which resulted in a Fox News story by Herridge.[5]  Rhoads shared Herridge's reporting with his superior officer, writing "Phase 1 has gone public.  COL Chen's story hits next

---

[5] Catherine Herridge, *State Dept. contractor allegedly paid by Chinese agent to spy on Americans – yet no charges filed*, Fox News (Apr. 22, 2015), https://www.foxnews.com/politics/state-dept-contractor-allegedly-paid-by-chinese-agent-to-spy-on-americans-yet-no-charges-filed.

week." (Ex. D.)  According to Rhoads, Herridge told him that a report about Dr. Chen was imminent, but for reasons unknown to him, it did not air. (Stephen Rhoads Dep. Tr. 128:3-20 (March 24, 2021) (attached as Ex. 18 to Dr. Chen's Aug. 31, 2023 Opp'n to C. Herridge's Mot. to Quash [Dkt. 113]).) Two months later, with no charges against Dr. Chen forthcoming, Agent Pappa suggested to Rhoads that media attention on Dr. Chen was desirable.  Responding to the email thread where they had discussed Herridge's report on an alleged Chinese agent, Agent Pappa wrote that "[t]he UMT stuff would be very timely ... now.." (Ex. E at DOD_00000262 (ellipses in original).)  In a text message later that day, Agent Pappa reiterated to Rhoads, "[c]ould [be] very timely with umt." (Ex. F at FBI0007659.)  Within minutes, Rhoads sent Herridge four text messages, and then responded to Agent Pappa, "[t]hanks.... in progress." (*Id.* at FBI00007660.)  In May 2016, after prosecutors officially declined any action, Agent Pappa— frustrated in his attempt to bring a criminal case against Dr. Chen—discussed his limited options with a fellow agent.  In a text message, Agent Pappa wrote, "our only hope is Rhoads and publicity." (Ex. G at FBI0007626.)  His colleague responded, "a hail mary, but sometimes those hit." (*Id.*)

### D.    Fox News Broadcasts Leaked FBI Documents About Dr. Chen.

Rhoads' efforts to obtain publicity about the FBI investigation of Dr. Chen bore fruit in late 2016.  That November, Rhoads updated Agent Pappa that Fox News would be reporting about Dr. Chen.  (Ex. H.)  Rhoads explained, "I set this thing in motion with the media years ago and can't turn it off now." (Ex. I at FBI0007633.)  Circulating word of Fox News' impending public reporting about Dr. Chen within the FBI, Agent Pappa said, "it's obvious that [Rhoads] has been key to facilitating this story." (Ex. H at FBI0007651.)

In February 2017, Fox News aired the first of three "exclusive" reports about Dr. Chen

during a primetime broadcast.[6]   That report relied heavily on selectively leaked information, documents, and photos from the FBI's investigative file on Dr. Chen, all of which had been compiled in a PowerPoint presentation drafted by Agent Pappa.   The broadcast featured information derived from and images of an FD-302 memorializing FBI interviews of Dr. Chen's daughter and Dr. Chen herself; information from and images of Dr. Chen's immigration and naturalization forms; and personal photographs of Dr. Chen seized during the December 2012 search.  Fox News also published an online version of the report, followed by broadcast and online stories on April 28, 2017 and June 28, 2017.

### E.   The FBI Leaks to Fox News Were Ruinous for Dr. Chen.

The Fox News reports, fueled by the FBI's selectively leaked records, were ruinous for Dr. Chen and UMT.  Students became wary of UMT.  Staff at UMT were threatened with violence. UMT's accreditor, UMT's education partners the Department of Veterans' Affairs and the Department of State, and members of Congress launched inquiries.  After the broadcast, Agent Pappa and Rhoads joyfully texted about the disclosures and the resultant pressure on DOD to terminate UMT from Tuition Assistance.  For example, Agent Pappa texted Rhoads, "It's the top story on fox news.  It's a pretty incredible story"; "its pretty awesome, including the quote about dod saying they were going to review the mou"; "[t]he story was fantastic."  (Ex. I at FBI0007633- 634.)  Rhoads later updated Agent Pappa, texting, "Finally got a home run.  You will be very happy with what happen in the next couple weeks.  I thank you again for all that you have done. … It finally got to the top."  (*Id.* at FBI0007634.)

Commenting in the first Fox News report, DOD—criticized for its association with UMT— indicated that it would review UMT's participation in its Tuition Assistance program.  But rather

---

[6] Fox News, *Taxpayer-funded school suspected of Chinese military ties*, YouTube (Feb. 24, 2017), https://www.youtube.com/watch?v=jh2Xk42PVA8.

than conduct any independent review, DOD terminated UMT by relying solely on the allegations about Dr. Chen that the FBI had presented to DOD years earlier.  [Dkt. 170-3; Dkt. 113-35.]  Although no facts or evidence had changed, the FBI leaks to Fox News led the Trump Administration to recycle the old allegations and terminate UMT.  [Dkt. 113-35.]

### F. The U.S. Government and Herridge's Fight Against Accountability for the Illegal Leaks.

For nearly seven years, Dr. Chen has sought accountability for the illegal leaks that destroyed her life, while the FBI and the U.S. government have fought to conceal facts and avoid responsibility.  Shortly after the first Fox News report was published in 2017, the FBI concluded that Fox News had published confidential FBI information and that Rhoads had provided at least some of that information.  (Ex. J at FBI0007644-45.)  But the FBI opened no criminal or internal misconduct investigation to determine who had illegally disclosed confidential FBI materials to Fox News.[7]  Instead, the government has resisted every effort to hold accountable the wrongdoer(s) responsible for the illegal leaks.  After the first Fox News report, Dr. Chen asked the U.S. District Court for the Eastern District of Virginia, which had authorized the search of Dr. Chen's home, to sanction the government for the leaks.  The DOJ fought any sanctions, and though that court acknowledged the "troubling series of events," it held that Dr. Chen must file a Privacy Act lawsuit to obtain relief.  *In re Search of 2122 21st Rd. N. Arlington*, No. 1:18-cr-00236, 2018 WL 534161, at *5 (E.D. Va. Jan. 23, 2018).

---

[7]As the DOJ Office of Inspector General concluded after examining contacts with the media by the FBI in advance of the 2016 election, the FBI had a "cultural attitude" that "was too permissive of unauthorized media contacts and disclosures of non-public information."  U.S. Dep't of Just. Office of the Inspector Gen., *Report of Investigation Regarding Alleged Unauthorized Contacts by Federal Bureau of Investigation Employees with the Media and Other Persons in Advance of the 2016 Election* 4 (Aug. 2021).  The FBI's policies prohibiting disclosures to the media were "widely ignored,"  with "numerous FBI employees, at all levels of the organization and with no official reason to be in contact with the media, who were nevertheless in frequent contact with reporters."  *Id.* at 6.

Next, Dr. Chen wrote to the Inspectors General of the DOJ, DOD, and Department of Homeland Security, asking them to investigate. [*E.g.*, Dkt. 123-3.] All refused to do so. The DOJ Inspector General suggested that Dr. Chen also make a referral to the FBI's Inspection Division. (Ex. K.) It too refused to investigate the misconduct. The FBI's Counterintelligence Division similarly declined to investigate. (Ex. L.) Dr. Chen filed Freedom of Information Act requests asking the FBI to provide documents that would shed light on the misconduct; five years later, none have been provided. No government agency—including those responsible for policing misconduct by law enforcement officials—would expend any energy to determine who violated the law by disclosing protected records to Fox News.

Left without other means of obtaining accountability, Dr. Chen filed this Privacy Act suit in December 2018. For the past five years, the FBI, its informant, and now Herridge have fought to withhold information that would reveal the truth. After losing its motion to dismiss, [Dkt. 13], the FBI has withheld vast quantities of information on the basis of the law enforcement privilege. [*See* Dkts. 34, 59 (motions to compel production of such information).] The FBI says it has lost relevant emails, text messages with Rhoads, and documentation of its search of Dr. Chen's home. When Dr. Chen turned to Rhoads for information, Herridge connected Rhoads with Judicial Watch lawyers who fought efforts to obtain his phone records and to depose him. (*See, e.g.*, Memorandum Opinion and Order, *Chen v. FBI*, 1:22-mc-00074 (D.D.C. Oct. 18, 2022) [Dkt. 18] (denying Rhoads' motion to quash deposition subpoena); Memorandum Opinion, *Chen v. FBI*, 1:20-mc-00107 (D.D.C. Dec. 24, 2020) [Dkt. 26] (denying Rhoads' motion to quash phone records subpoena).) Rhoads then claimed he lost the phone on which he exchanged messages with Agent Pappa and Herridge. (Decl. of Stephen Rhoads, 1:22-mc-00074 (D.D.C. July 15, 22) [Dkt. 2-1].)

Now Herridge—backed by Fox News' legal team—has refused to reveal the truth about

who broke the law.  On August 1, 2023, the Court denied Herridge's efforts to quash Dr. Chen's deposition subpoena and ordered Herridge to testify regarding the identity of that individual.  (*See generally* MTQ Order.)  But at her subsequent deposition, she refused to do so.  (*See* Pl.'s Application for an Order to Show Cause Why Non-Party Catherine Herridge Should Not Be Found in Civil Contempt for Defiance of the Court's August 1, 2023 Order at 9 ("Contempt Application") (Oct. 30, 2023) [Dkt. 159].)  On November 14, 2023, the Court issued an Order to Show Cause [Dkt. 162] requiring Herridge to show cause why she should not be held in contempt of the August 1, 2023 Order.  Herridge's Response, filed on December 14, 2023, largely engages in character attacks on Dr. Chen and reiterates arguments from Herridge's Motion to Quash that were already rejected by the Court: that the Court should engage in a wide-ranging balancing of the importance of source confidentiality versus Dr. Chen's interest in vindicating her rights; that the Court should decline to hold Herridge in contempt because Dr. Chen supposedly cannot prove entitlement to one category of damages she seeks; and that disclosure of Herridge's source would have a chilling effect on the press.  (*See generally* Resp..)  Herridge further argues that if she is held in contempt, any sanction for her disregard of a lawful court order should be "friendly" and "nominal," and stayed so that it has no actual effect.  (*Id*. at 29-31.)

## ARGUMENT

### I.  Herridge Offers No Sound Basis for Reconsidering or Modifying the Order on the Motion to Quash.

#### A.  Herridge Identifies No Authority Suggesting Any Error in the Court's Application of the Law.

Herridge first argues that the Court should "modify" its Order on the Motion to Quash, which, she says, the Court has the authority to do where the Order was "erroneously" issued. (Resp. at 17.)  Herridge then proceeds to argue, as she did in her Motion to Quash, that the Court should conduct a "broad-ranging balancing inquiry"—one that weighs Herridge's interest in

protecting her source against Dr. Chen's interest in pursuing her claim—and that the Court should also now "consider additional information bearing on the balance of interests." (*Id*. at 18-19.) This Court has already determined such a balancing test is precluded by D.C. Circuit precedent.

In its Order on the Motion to Quash, the Court carefully considered relevant D.C. Circuit precedent concerning the scope of the First Amendment privilege in the Privacy Act context.  In particular, the Court analyzed the decisions in *Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981) and *Lee v. Dep't of Justice*, 413 F.3d 53 (D.C. Cir. 2005), as well as subsequent district court applications of that precedent.  (MTQ Order at 5-13.)  The Court held that *Zerilli* "does not contemplate the kind of free-form, anything-goes analysis that Herridge and Fox seek," but instead identified the "specific factors" that a district court is to consider when weighing whether a Privacy Act plaintiff is entitled to obtain from a reporter the identity of a source that leaked protected information.  (*Id*. at 6.)  Those "precise guidelines," set forth in *Zerilli*, are whether the identity of the source is central to the plaintiff's case, whether the plaintiff has exhausted reasonable alternative sources of discovering the leaker's identity before seeking it from the reporter, and whether the reporter is a party.  (*Id*. at 7-8.)  The Court then held that the subsequent D.C. Circuit decision in *Lee* confirmed that "courts must tailor the balancing test to those central factors identified in *Zerilli*," and that, "[l]ike *Zerilli*, then, *Lee* did not apply a free-form balancing of interests but rather struck the balance between private and public interests by reference to the specific factors identified in *Zerilli*—the centrality of the requested discovery and the exhaustion of reasonable alternatives."  (*Id*. at 9-10.)  Applying this binding precedent, the Court held that the identity of the leaker was central to Dr. Chen's Privacy Act claim, she had exhausted reasonable alternative avenues of identifying that person or persons, and she therefore was entitled to discover that information from Herridge.  (*Id*. at 14-21.)

In requesting that the Court modify its Order on the Motion to Quash, Herridge offers no argument that the Court erred in determining that Dr. Chen demonstrated centrality and exhaustion. Instead, Herridge's argument is based upon the premise that the Court already rejected: that the Court should engage in a "broad-ranging balancing inquiry." (Resp. at 18.)  Although Herridge's arguments about the relative worth of Herridge's interest and Dr. Chen's fail on their own merits, as discussed further below, the crucial and dispositive omission from Herridge's brief is the absence of any legal argument demonstrating that the Court got it wrong in concluding that D.C. Circuit precedent does not permit district courts to engage in such a free-form, subjective balancing inquiry.  Herridge cites no new authority from the D.C. Circuit, or any district court in this Circuit, that casts any doubt on this Court's interpretation of *Zerilli* and *Lee*—which, as noted in the Order on the Motion to Quash, was entirely consistent with how other district courts have interpreted that precedent.  (*See* MTQ Order at 11-12 (discussing *Hatfill v. Gonzales*, 505 F. Supp. 2d 33 (D.D.C. 2007) and *Lee v. Dep't of Justice ("Lee II")*, 401 F. Supp. 2d 123, 139 (D.D.C. 2005).)  In short, Herridge does not offer anything to establish that the Court's Order on the Motion to Quash was erroneous, and therefore her arguments about a free-form balancing test are immaterial to whether Herridge should be held in contempt.

**B.    Herridge's Damages Argument is Irrelevant to the Issue of Whether Herridge Violated the Court's Order.**

As she did in her Motion to Quash, Herridge argues that she should not be forced to reveal the lawbreaking government official because DOD's decision to terminate UMT from the Tuition Assistance program was an "independent" decision that "breaks any alleged causal chain that could be traced to Ms. Herridge's articles." (Resp. at 1.)  Herridge insists that the Court should allow "summary judgment briefing" on the issue of damages in order to "evaluate whether (and to what extent) Plaintiff's Privacy Act claim may survive summary judgment *before* taking the

irretrievable step of compelling disclosure of confidential source(s)." (*Id*. at 1, 18-19.)  This argument, also a retread from the Motion to Quash briefing, fails again for two reasons.

First, D.C. Circuit precedent does not remotely suggest that a Court should delay a decision on compelling disclosure until after a Privacy Act case survives summary judgment.[8]  As this Court noted in rejecting this argument the first time Herridge made it, neither *Zerilli* nor *Lee* instruct district courts to engage in a "full-bore analysis of [a plaintiff's] likelihood of success on the merits of her Privacy Act claim," let alone "the full-blown preview of summary judgment briefing that Herridge … seek[s] here."  (MTQ Order at 11, 22.)  Indeed, the D.C. Circuit's inquiry into the merits of a plaintiff's Privacy Act case has gone no farther than the observation in *Zerilli* that the suit was "not frivolous." (*Id*. at 10 (quoting *Zerilli*, 656 F.2d at 714).)  As this Court further observed, the *Carey* case that the D.C. Circuit relied upon in *Zerilli* for the balancing test rejected the notion that there should be an "extensive interrogation of the merits at this stage of a case." (*Id*. at 10-11 (citing *Carey v. Hume*, 492 F.2d 631, 637-38 (D.C. Cir. 1974)).)  Herridge's suggestion is especially impractical in this litigation, where the Court bifurcated the liability and damages phases.  Herridge would have the parties undertake the process of damages discovery (with its attendant burdens on the defendants, their employees, and experts), brief summary judgment on it, and litigate any genuine issues of material fact before returning to this question.  Her approach also ignores that causation may turn on foreseeability to the liable party, which in this case could require knowing the identity of the wrongdoer.  *See Fleck v. Dep't of Veteran*

---

[8] Herridge's argument that the Court should engage in a summary-judgment like analysis of the merits of Dr. Chen's claims before requiring Herridge to reveal her source relies on out-of-circuit cases that involved state-law libel claims, not the issue of disclosure in the context of a Privacy Act suit.  (Resp. at 18-19 (citing *Bruno & Stillman Inc. v. Globe Newspaper Co*., 633 F.2d 583 (1st Cir. 1980); *Atlanta Journal-Constitution v. Jewell*, 555 S.E.2d 175 (Ga. App. 2001); *State ex rel. Classic III, Inc. v. Ely*, 954 S.W.2d 650 (Mo. App. 1997)).)

*Affairs*, 596 F. Supp. 3d 24, 58 (D.D.C. 2022) ("Although independent action by a third party can sometimes negate the proximate causality of a defendant's actions, that is true only when the third party's action is unforeseeable to the defendant.")

Given the above, it is unsurprising that no authority in this Circuit supports delaying compelling a journalist to disclose a source—or a finding of contempt for failure to comply—until after summary judgment. *Lee* reached the D.C. Circuit in the midst of fact discovery, and the D.C. Circuit's decision made no examination of the merits of the plaintiff's case. *See Lee*, 413 F.3d at 60-63. The *Lee II* case similarly was decided during discovery, and Judge Collyer's only reference to the merits of the Privacy Act claims was to conclude the question was irrelevant to determining whether the reporter should be compelled to disclose a source and held in contempt for failure to do so. *Lee II*, 401 F. Supp. 2d at 142 n.24 ("[The journalist] is a non-party and this case is in discovery. Not only does [the journalist] lack standing to raise arguments concerning the merits of Dr. Lee's lawsuit, but at this early stage in the litigation, the resolution of such issues is wholly premature.") Judge Walton in *Hatfill* likewise granted the Privacy Act plaintiff's motion to compel reporters to divulge their sources in the midst of discovery. *Hatfill*, 505 F. Supp. 2d at 35-36.

Second, even if the Court were to consider the merits of Dr. Chen's Privacy Act claim, Herridge's argument about the DOD Tuition Assistance decision would still be irrelevant. As the Court noted in rejecting a similar argument in its Order on the Motion to Quash, "those are not the only damages Chen alleges she suffered." (MTQ Order at 22.) Chen also seeks economic damages for costs to remediate the reputational harm caused by Herridge's reporting, as well as lost profits aside from DOD payments. (*Id*. at 22-23.) The Privacy Act itself also entitles Dr. Chen to statutory damages if she prevails on her claims. *See* 5 U.S.C. § 552a(g)(4)(A). Herridge's Response does not acknowledge any of the other damages claimed by Dr. Chen, let alone attempt to argue she is

13

precluded from recovering them.  Herridge's damages-causation argument thus remains a red herring.

### C.    Herridge's Suggestion that the Court Should Decide Who is Worthy of the Protection of the Law is Not Just Misguided, But Insidious.

Under the guise of arguing for the already-rejected broad balancing inquiry, Herridge devotes much of her Response to airing accusations that Dr. Chen was a PLA colonel in the 1980s, claims that she "lied" to conceal that past, and wild insinuations that Dr. Chen "may" have been a Chinese spy.  In reality, Dr. Chen was a researcher for the Chinese astronaut program before she came to this country more than thirty-five years ago and she renounced her Chinese citizenship to become a U.S. citizen more than two decades ago.  Despite a lengthy, scorched-earth FBI investigation, she has never been charged with—much less convicted of—any crime, let alone espionage.  Regardless, the myopic focus of Herridge's Response betrays the true nature of her argument: she asks the Court, under the guise of "balancing," to decide that Dr. Chen is an unworthy litigant who, unlike other Americans, does not deserve protection from government abuses.  This argument is not merely misguided but fundamentally dangerous and offensive.

Herridge made the same argument in her Motion to Quash—one the Court aptly paraphrased as suggesting that Dr. Chen "had it coming."  (MTQ Order at 24.)  The Court should reject this argument again for the same reason: Privacy Act cases do not turn on whether the Court believes the plaintiff was "wrongfully 'smeared' by [the] government leaks" or not.  (*Id.*)  Instead, "[t]he Privacy Act protects not just Chen but all private citizens, whether blameworthy or blameless, from the risk that government officials might be tempted to abuse their access to sensitive information by leaking materials intended to embarrass particular individuals."  (*Id.*)

The Court should also reject the transparent effort by Herridge and her Fox-backed legal team to distract from Herridge's willful violation of the Court's Order by injecting anti-China

politics and inflammatory rhetoric.  Rather than grappling with her own violation of the law, Herridge's Response instead invokes the PLA twenty-eight times and the CCP twenty-one times, along with gratuitous references to recent Chinese cyber incidents and espionage attempts, notwithstanding that Dr. Chen left that country thirty-six years ago.[9]  Herridge's resort to these offensive tactics is perhaps the clearest indication of the feebleness of her legal arguments, and only serves to underscore the wisdom of Judge Collyer's observation in *Lee II* that conducting the type of subjective balancing Herridge advocates would be "inherently unworkable" and a "daunting and well-nigh impossible task," because "[w]hether a reporter must reveal his sources should not rest on the value assigned by a jurist to [] the litigant's purpose."  401 F. Supp. 2d at 138-140.

### D.    Herridge's Newfound "National Security" Concern Rings Hollow.

Herridge's argument that disclosure of her source would raise "national security concerns" rings hollow and should be rejected.  (*See* Resp. at 21-26.)  This late-breaking excuse is grounded in unsubstantiated innuendo and attempts to substitute Herridge's judgment for that of the government and the Court, and ignores the ongoing national security threat posed by the failure to hold accountable the government official who illegally leaked raw FBI investigative materials.

As set forth above, this professed concern is based on wild speculation that impugns the character of a woman who became a U.S. citizen a quarter century ago.  But Herridge also ignores that discovery has been ongoing for years, and the identities of many of the government officials that were involved in the investigation a decade ago have already been revealed in discovery.  As

---

[9] Notably, Herridge's heavy innuendo that Dr. Chen is a spy never crosses the line into actually making that wild accusation.  Instead, Herridge and her declarants refer to the "risk" that Dr. Chen engaged in such conduct.  (Resp. at 2.)  The choice of language is a  deliberate dodge that is repeated throughout Herridge's Response.  (*See, e.g., id.* at 2-4, 21-24.)  Dr. Chen was never charged with or convicted of any such thing, and Herridge cannot even assert that such a claim amounts to anything more than conjecture.

the Court noted in its Order on the Motion to Quash, Dr. Chen's exhaustive efforts to uncover the identity of the leaker included eighteen depositions and twenty-two declarations of current and former government personnel with a connection to the FBI's investigation.  (MTQ Order at 3.) Indeed, Herridge's own Motion to Quash identifies at least nine of those individuals by name.  As this Court also observed in holding that Dr. Chen had demonstrated exhaustion, Dr. Chen has uncovered evidence suggesting that particular, identified individuals had the means and a motive to leak information about her to Herridge.  (*Id.* at 21.)  It is thus highly unlikely that the leaker is going to be a previously unidentified individual.  It is far more likely that a person who has already been identified is the one who broke the law, abused their authority, and lied about it.[10]

Additionally, the government and the Court have well-established practices for protecting any information that truly risks national security, and when the government has sought to conceal the identities of its employees (even public affairs officials that deal with the press every day), Dr. Chen has assented to the use of pseudonyms.  The government has not hestitated to protect law enforcement interests in this litigation, and it is not Herridge's place to vaguely intimate that the identity of her source could be sensitive when she refuses to identify that individual and allow the parties or the Court to pressure-test that assertion.

Third, Herridge's argument ignores that the individual or individuals who leaked information to Herridge are walking national security threats.  Far more concrete than Herridge's unsubstantiated and speculative concerns is the ***objective reality*** that Herridge's refusal to comply with the Court's Order is resulting in shielding the identity of her "confidential national security

---

[10] And of course, Herridge knows the identity of her source, and if it was someone not already revealed in the record of this case, one would think Herridge would have said so in her Response to buttress her argument that disclosure risks identifying some previously-unknown individual who was involved in the investigation.  Tellingly, she did not.

source" who was apparently cavalier enough with information about a "counterespionage investigation" to leak extensive details about it to a reporter.  (*See* Resp. at 25.)  The evidence produced in discovery suggests that a government official illegally gave Herridge an FBI-created PowerPoint that is well over one-hundred pages long and contains tremendous detail about the FBI's investigation of Dr. Chen, its investigative methods, and the materials the FBI gathered in the course of its investigation.  So sensitive is that leaked document that much of the version produced to Dr. Chen in discovery remains redacted under an assertion of "law enforcement privilege," which means that the Government Defendants contend that the PowerPoint contains information which, if disclosed, would be "contrary to the public interest in the effective functioning of law enforcement," and that could affect "the integrity of law enforcement techniques."  *See Kusuma Nio v. U.S. Dep't of Homeland Security*, 314 F. Supp. 3d 238, 243 (D.D.C. 2018) (citation omitted).  Nevertheless, Herridge's "confidential national security source" decided to leak these sensitive materials to a reporter who then broadcast to the world that she was in possession of them.  That a government official who was willing to take an action both unlawful ***and*** contrary to law enforcement interests remains unidentified and free to do so again is a concrete national security concern that Herridge's recalcitrance is allowing to go unaddressed.

### E.   Herridge's Scaremongering About the Effect of a Contempt Finding on the Functioning of the Press is Not Credible.

Finally, Herridge argues that an order holding her in contempt would have a "chilling effect" on the "functioning of the free press" because confidential sources will not provide information on government actions or sensitive policy matters without assurances of confidentiality.  While it is no surprise to see Herridge and her supporting media declarants make this slippery-slope argument, the reality is that there is no evidence to support it, and decades of lived experience refute it.

To begin with, the doomsaying about the dangers of a hypothetical legal regime where reporters can be required to divulge their sources makes no sense because that already is the reality. In 1974, the D.C. Circuit "rejected the [] contention" that "there [] is, or should be, an absolute First Amendment barrier to the compelled disclosure by a newsman of his confidential sources under any circumstances." *Carey*, 492 F.2d at 639. That there is no absolute barrier to court-ordered disclosure of a confidential government source in a Privacy Act case was confirmed in 1981 in *Zerilli*, 656 F.2d at 712-13, and again in 2005 in *Lee*. 413 F.3d at 60. In both *Lee* and *Hatfill*, journalists were held in contempt for refusing to comply with an order to divulge the sources that leaked Privacy Act protected records, *Lee II*, 401 F. Supp. 2d at 144; *Hatfill v. Mukasey* ("*Hatfill II*"), 539 F. Supp. 2d 96, 99 n.5 (D.D.C. 2008), and this was widely reported on by major media outlets contemporaneously.[11] Thus, ***at the time a government official leaked the records at issue in this case***, the law in this Circuit clearly held that a journalist can be compelled to disclose a confidential source in a Privacy Act case, and yet that apparently did not stop said government official from leaking protected records to Herridge. Nor is there any evidence that this long-existing legal regime has impacted the media's ability, writ large, to obtain information from confidential government sources.

Moreover, the fact that Herridge has been ordered to divulge her source in this case does not even appear to have had any impact on her own continued ability to rely on confidential sources. This Court entered its Order on the Motion to Quash on August 1, 2023, and the fact that

---

[11] *See, e.g.,* Neely Tucker, *Wen Ho Lee Reporters Held in Contempt*, The Washington Post (Aug. 19, 2004), https://www.washingtonpost.com/archive/politics/2004/08/19/wen-ho-lee-reporters-held-in-contempt/10950514-8e7f-4041-a15c-e4d8b4fc067a/; *Reporters in Wen Ho Lee case held in contempt of court, sanctioned*, Reporters Committee for Freedom of the Press (Aug. 18, 2004), https://www.rcfp.org/reporters-wen-ho-lee-case-held-contempt-court-sanctioned/; Eric Lichtblau, *Reporter Held in Contempt in Anthrax Case*, The New York Times (Feb. 20, 2008), https://www.nytimes.com/2008/02/20/us/20anthrax.html.

Herridge was ordered to divulge a confidential source was widely reported.[12]  Yet in the months

since, Herridge has published numerous news reports relying on confidential sources—including

government and national security sources.[13]

The reality is that, as this Court knows well, these types of cases are rare, with only a

handful of compelled disclosure orders in Privacy Act cases in this Circuit in the last four decades.

The vast majority of victims of an unlawful disclosure will not elect to sue, and even then, "it is

no easy task to exhaust all reasonable alternative sources of information."  (MTQ Order at 13.)

And in most cases, "it is likely that, when forced to exhaust all reasonable alternatives, plaintiffs

will often be able to identify the source of a journalist's reporting without resort to the journalist."

(*Id*.)  As this Court observed in discussing Judge Tatel's dissent in the 2005 *Lee* case, which raised

similar concerns about journalists' ability to gather information, Herridge "point[s] to no evidence

that the floodgates to journalists' notepads have opened in the eighteen years since."  (*Id*. at 14

n.4.)

Because the risk of a compelled disclosure is so attenuated, there is little reason to believe

that a government official who wants to leak to a reporter is going to hesitate to do so because of

---

[12] *See, e.g*., Oliver Darcy, *She reported a scientist was under FBI investigation. Now a judge is ordering her to reveal her source*, CNN (Aug. 2, 2023), https://www.cnn.com/2023/08/02/media/catherine-herridge-deposition-reliable-sources/index.html.

[13] *See, e.g*., https://x.com/CBS_Herridge/status/1732549428643254655?s=20 (Dec. 6, 2023) (Herridge tweet citing a confidential source with knowledge of discussions between former Chief of Staff Meadows and Special Counsel Jack Smith concerning a potential immunity agreement); https://x.com/CBS_Herridge/status/1730591036009750569?s=20 (Dec. 1, 2023) (Herridge tweet posting video of a December 1, 2023 CBS broadcast report in which Herridge cites an anonymous source "close to senior command" for information about a national security investigation); Catherine Herridge, *House Republicans move closer to impeachment inquiry*, CBS (Aug. 28, 2023) (citing an anonymous "senior GOP aide" for information about House Republicans considering impeachment proceedings), https://www.cbsnews.com/colorado/news/house-republicans-move-closer-to-impeachment-inquiry/?intcid=CNM-00-10abd1h.

the remote possibility a lawsuit may be filed and years later the reporter ordered to divulge her

source.  As commentators have observed, in addition to a lack of analytical or statistical evidence

supporting that the remote possibility of a forced disclosure order actually deters would-be sources

from speaking with reporters, the commonsense reality is that "of all the risks of exposure that a

source faces, the danger that a reporter will be subpoenaed and compelled to testify is probably

the most remote."  Randall D. Eliason, *The Problems with the Reporter's Privilege*, 57 Am. Univ.

L. Rev., 1341, 1359 (2008).  It thus makes little sense to believe that sources "would willingly

assume all of the greater and more immediate risks of exposure by leaking information, but will

be deterred from coming forward by the most remote risk of all—the risk of the reporter being

forced to testify."  *Id*.  Of course, if the upshot of a contempt finding here is that government

officials will think twice before abusing their power to smear private citizens, ***that would be a***

***good thing*** and help to advance the purpose of the Privacy Act.  But Herridge and her declarants

present no actual evidence to suggest that the remote risk of court-ordered exposure has any affect

on would-be leakers' decision-making.

## II.     A Contempt Sanction Must Have Teeth in Order to Fulfill its Purpose.

Because it cannot be disputed that the Order was clear on its face and that Herridge willfully

chose to defy it, the Court should find Herridge in civil contempt and impose a sanction designed

to secure compliance.  Civil contempt sanctions may "be employed for either or both of two

purposes; to coerce the defendant into compliance with the court's order, and to compensate the

complainant for losses sustained."  *United States v. United Mine Workers of Am.*, 330 U.S. 258,

303-04 (1947).  Here, the Court should impose sanctions for both purposes.

First, as to Dr. Chen's request for attorneys' fees arising from the deposition and

application for a contempt order, Herridge argues this amounts to "extraordinary chutzpah"

because Dr. Chen "insisted" on incurring these expenses rather than allow Herridge to appeal the

20

Order on the Motion to Quash without first refusing to comply with it.  (Resp. at 29-30.)  But this framing makes no sense, because Dr. Chen does not make the law or decide when an appeal is permissible.  Dr. Chen's position all along was simply that Circuit precedent ***requires*** a non-party like Herridge to defy a discovery order before she can appeal it, and thus, it was Herridge who was causing both her and Dr. Chen to incur needless expense by repeatedly requesting this Court's dispensation to appeal prematurely, and then lodging a meritless appeal anyway when permission was not forthcoming.  Both this Court and the D.C. Circuit agreed that Dr. Chen was correct.  (*See* Op. & Order at 1 (Sept. 6, 2023) [Dkt. 152] (holding that the "proper procedure" was for Herridge to "challenge the subpoena by refusing to comply and appealing an ensuring contempt order"); Order, *Chen. v. FBI, et al.*, No. 23-5198 (D.C. Cir. Sept. 25, 2023) (holding the D.C. Circuit lacked jurisdiction to entertain Herridge's appeal because she needed to first defy the order and then appeal a contempt citation).)[14]  If Herridge had complied with this Court's Order on the Motion to Quash, Dr. Chen would not have incurred significant attorneys' fees on a fruitless deposition that will need to be repeated, and Dr. Chen would not have incurred fees to file a contempt application. Dr. Chen should be made whole for the significant expenses incurred as a result of Herridge's recalcitrance.  *See, e.g.*, *Pierce v. Kadida*, No. 21-3326, 2022 WL 18529814, at *2 (D.D.C. Sept. 20, 2022) (finding a non-party in civil contempt for refusing to comply with a court order to produce documents and awarding plaintiff fees "occasioned by the need" to file motions to compel and for contempt).

---

[14] Equally incongruous is Herridge's assertion that her "deposition could have been brief," but that Dr. Chen's counsel "lengthened" it by "asking [Herridge] individually about the source for every photograph and document that appeared in the stories, requiring Ms. Herridge to assert privilege over and over again…"  (Resp. at 15.)  Dr. Chen of course needed to exhaust potential questions that could have elicited a response that, if substantive, might have identified the source.  Anything less, and Herridge surely would instead be arguing that Dr. Chen failed to make a record establishing clear defiance of the Order.

Second, Herridge's request that any non-compensatory sanction should be "nominal" and "friendly" would render the Court's Order meaningless and frustrate a primary purpose of such a sanction, which is compliance with the Court's order. *See, e.g.*, *United Mine Workers of Am.*, 330 U.S. at 303-04; *see also NLRB v. Blevins Popcorn Co.*, 659 F.2d 1173, 1184 (D.C. Cir.1981). Herridge's lip-service to her "respect" for the Court's Order on the Motion to Quash ignores that she did, in fact, flatly defy the order. Regardless, in this context, "the intent of the recalcitrant party is irrelevant." *United States v. Philip Morris USA Inc*., 287 F. Supp. 2d 5, 11 (D.C. Cir. 2003) (quoting *Blevins*, 659 F.2d at 1184). Nor does Herridge cite any authority in this Circuit to support her assertion that "the proper purpose of any contempt sanction is … to establish the procedural prerequisite of a final order that will allow Ms. Herridge to appeal." (Resp. at 31.) Again, in this Circuit, it is well-established that the primary purpose of a contempt sanction is not to facilitate an appeal but to coerce the recalcitrant litigant's compliance with a lawful court order. *In re Fannie Mae Securities Litig*., 552 F.3d 814, 823 (D.C. Cir. 2009). If Herridge's position were accepted, any litigant who defied a discovery order could avoid sanctions, and defer compliance, by stating an intent to appeal the underlying order. Moreover, the notion that this context—an order directing disclosure by a reporter in a Privacy Act case—is somehow deserving of special treatment is belied by the fact that in both the *Lee* and *Hatfill* cases, the district courts rejected similar arguments and imposed meaningful fines far in excess of the $1 per day Herridge seeks. *Hatfill II*, 539 F. Supp. 2d at 99 n.5 (imposing a fine of $500 per day, which would increase to $5,000 per day if the reporter maintained a refusal to comply); *Lee v. U.S. Dep't of Justice*, 327 F. Supp. 2d 26, 33 (D.D.C. 2004) (rejecting that the First Amendment context supports the imposition of only a nominal fine, rejecting a request for a $1 a day sanction as "insufficient to [] coerce compliance," and imposing a fine of $500 per day).

22

Regardless of Herridge's reasons for defying the Order on the Motion to Quash, or her hope that she might obtain a different result on appeal, the fact remains that "[f]ederal court orders are to be obeyed," and "[l]itigants may not defy court orders because their commands are not to the litigants' liking." *Philip Morris*, 287 F. Supp. 2d at 14. Instead, "[i]f the rule of law is to be upheld, it is essential that the judiciary takes firm action to vindicate its authority to compel compliance with lawfully issued directives, and to not reward delay and disobedience." *Id*. The Court should not reward Herridge's disobedience with a "friendly" sanction, but should instead issue a sanction sufficient to vindicate its authority and secure Herridge's compliance.

Finally, Herridge's request that any contempt sanction be stayed pending appeal should be denied. Herridge cannot establish that the relevant factors—that she is likely to prevail on the merits of an appeal of the Order on the Motion to Quash, that she will suffer irreparable harm absent a stay, the absence of harm to others, and that a stay is in the public interest—weigh in her favor. *See Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985). On this score, Judge Walton's opinion in *Hatfill II*, which addressed each of these elements in an identical context, is directly on point. *See* 539 F. Supp. 2d at 100-107. Most importantly, Judge Walton held that because the plaintiff in that case had established that the identity of the reporter's source was central to his claims and had exhausted other reasonable avenues of discovery, the D.C. Circuit's clear and binding opinion in *Lee* meant that the reporter could not satisfy her burden of showing a likelihood of success on appeal. *Id*. at 101.[15] This Court has similarly held that its Order on the Motion to Quash was was guided by the "binding case law of this Circuit," and that

---

[15] Judge Walton held the reporter in *Hatfill* could not satisfy this factor even if the court applied a lesser standard requiring only showing of a "substantial case on the merits" rather than likelihood of success. *Id*. at 101. Herridge similarly argues that she should only be required to show a "serious legal question" rather than a probability of success on appeal. (Resp. at 37.)

Dr. Chen had overcome Herridge's privilege assertion by demonstrating centrality and exhaustion. (MTQ Order at 1-2.)  As in *Hatfill II*, Herridge offers no relevant arguments distinguishing this case from the D.C. Circuit's holding in *Lee*, and thus this element weighs heavily in Dr. Chen's favor.  *See Hatfill*, 539 F. Supp. 2d at 103.

Next, Herridge argues that she will be harmed absent a stay because she will have to choose between paying a fine or disclosing her source.  (Resp. at 36-38.)  As to the first purported harm, Judge Walton astutely observed that the fine could not constitute cognizable harm because the entire objective of a civil contempt order is "to coerce compliance with a court's earlier ruling by depriving the contemnor of a plausible alternative."  *Hatfill II*, 539 F. Supp. 2d at 103.  Judge Walton did accept, for the sake of argument, that disclosure of a source could constitute irreparable harm since disclosure would essentially moot the issue on appeal.  *Id*. at 104.  However, he also concluded that this harm had to be balanced against the Privacy Act plaintiff's interest in advancing his claims, and that, "contrary to [the reporter's] position, further delay of a case that is already over four years old may very likely prejudice [plaintiff], with the potential result being the erosion of his ability to effectively establish his Privacy Act claims."  *Id*.  This concern is particularly acute here.  Not only has Dr. Chen now been attempting to press her claims for over five years, but Herridge admitted in her recent deposition that she knowingly destroyed highly relevant documents in her possession while discovery was ongoing.  (*See* Contempt Application at 9-10).  Thus, as in *Hatfill II*, the analysis of harm should result in at least a "draw" and does not favor Herridge.  *Hatfill II*, 539 F. Supp. 2d at 106.

Finally, Herridge cannot demonstrate that a stay is in the public interest.  While she predictably focuses on the supposed "chilling" of journalists' ability to report, as discussed above, she cannot explain how enforcement of the law as it has existed for decades will have such effect.

24

She also ignores the strong public interest in enforcement of the Privacy Act, the purpose of which is to protect private citizens from "the risk that government officials might be tempted to abuse their access to sensitive information by leaking materials intended to embarrass particular individuals." (MTQ Order at 24.) Judge Walton emphasized this in *Hatfill II*, noting that federal courts should not be "promoting lawlessness in order to facilitate the media's ability to inform the public," and "the greater public interest rests on the side of insuring that violators of the Privacy Act not be shielded from detection at the expense of those who, like [the plaintiff] (allegedly), are injured by the illegal disclosures and who the Act is therefore designed to protect." 539 F. Supp. 2d at 105. Herridge's defiance of this Court continues to shield a government official who broke the law and abused his power, at the expense of Dr. Chen's ability to vindicate her rights.

As in *Hatfill II*, the relevant factors weigh against a stay. At a minimum, Dr. Chen submits that the question can and should be posed to a D.C. Circuit panel that will hear Herridge's appeal, and does not oppose Herridge's request for an administrative stay that allows Herridge sufficient time to make a motion to the D.C. Circuit.

## **CONCLUSION**

For the foregoing reasons, Dr. Chen respectfully requests that the Court hold Ms. Herridge in contempt of its August 1, 2023 Order and issue coercive and compensatory sanctions.

Dated: January 31, 2024

Respectfully submitted,

  */s/ Andrew C. Phillips*
Andrew C. Phillips (DC Bar No. 998353)
MEIER WATKINS PHILLIPS PUSCH LLP
919 18th Street NW, Suite 650
Washington, DC 20006
Email: andy.phillips@mwpp.com

*Counsel for Plaintiff Yanping Chen*

25