## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| **YANPING CHEN**, |
| Plaintiff, |
| v. |
| **FEDERAL BUREAU OF INVESTIGATION**, *et al.*, |
| Defendants. |

Case No. 18-cv-3074 (CRC)

## MEMORANDUM OPINION AND ORDER

In August 2023, the Court partially denied journalist Catherine Herridge's motion to quash a subpoena in this Privacy Act lawsuit, thereby permitting Plaintiff Yanping Chen to depose Herridge regarding the sources for her investigative reports on Chen's affiliations with the Chinese military. At her deposition the following month, though, Ms. Herridge refused to answer any questions about the identity and intent of her sources. The question now is whether Herridge should be found in civil contempt for defying the Court's clear and unambiguous order. After careful consideration, the Court concludes that a finding of civil contempt is warranted.

The Court does not reach this result lightly. It recognizes the paramount importance of a free press in our society and the critical role that confidential sources play in the work of investigative journalists like Herridge. Yet the Court also has its own role to play in upholding the law and safeguarding judicial authority. Applying binding precedent in this Circuit, the Court resolved that Chen's need for the requested information to vindicate her rights under the Privacy Act overcame Herridge's qualified First Amendment reporter's privilege in this case. Herridge and many of her colleagues in the journalism community may disagree with that decision and prefer that a different balance be struck, but she is not permitted to flout a federal

court's order with impunity.  Civil contempt is the proper and time-tested remedy to ensure that the Court's order, and the law underpinning it, are not rendered meaningless.

At the same time, Herridge does have a right to appeal this contempt order in the hopes of persuading the D.C. Circuit to recalibrate the existing qualified reporter's privilege in her favor or forge a new federal common law newsgathering privilege that sweeps more broadly than the Constitution.  To provide ample room for her to exercise that right, the Court will stay the contempt sanction pending a timely appeal.

## I.     Background

Before delving into the present dispute, it is worth recounting the long journey to this point.  Dr. Yanping Chen is a naturalized U.S. citizen who, in 1998, founded the University of Management and Technology ("UMT"), an educational institution that attracted a substantial number of military servicemembers who attended with tuition assistance from the Department of Defense.  Compl. ¶¶ 13, 42.  Beginning in 2010, Chen became the focus of an FBI investigation concerning statements she made on immigration forms about her work in China in the 1980s.  Id. ¶ 15.  As a part of that investigation, the FBI executed search warrants for Chen's home and the main office of UMT, seizing materials during both searches.  Id. ¶¶ 18, 20.

Prosecutors eventually informed Chen that no charges would be filed against her, but about a year later, Fox News Network ("Fox") ran a series of television segments and news articles about her.  The thrust of the stories, principally authored by then-Fox reporter Catherine Herridge, was that Chen had concealed her former membership in the Chinese military on her U.S. immigration forms and might have used UMT to funnel valuable information about the American military to the Chinese government.  Id. ¶¶ 22, 25–31; see Catherine Herridge, Fox News Investigation: DoD-Funded School at Center of Federal Probes over Suspected Chinese

Military Ties, Fox News (Feb. 24, 2017, 1:58 PM), https://www.foxnews.com/politics/fox-news-investigation-dod-funded-school-at-center-of-federal-probes-over-suspected-chinese-military-ties.  The reporting also included family photographs of Chen, excerpts from Chen's immigration forms, and a snippet from what appears to be an internal FBI memorandum summarizing an interview of Chen's daughter conducted for the investigation.  Compl. ¶¶ 25–31.

Believing these materials could only have come from the FBI's search and that someone in the government leaked them to Herridge and Fox in violation of the Privacy Act—which generally prohibits federal agencies from disclosing internal records about a person without her consent—Chen filed suit in 2018 against the FBI, the Department of Defense, and two other agencies.  Id. ¶ 23; see 5 U.S.C. § 552a.  Over the next five years, Chen pounded the pavement to uncover the identity of the potential leaker.  She served scores of document requests, interrogatories, and requests for admission; took 18 depositions of current and former government employees; issued over a dozen third-party subpoenas; and obtained declarations from 22 government personnel who had a connection to the FBI's investigation.  Opp'n to Herridge Mot. to Quash at 2.  Through that discovery, Chen developed a theory for how Herridge and Fox obtained the allegedly leaked records: that they came from an internal FBI PowerPoint presentation created by the lead agent on her case.  Id. at 1.  She also homed in on a few individuals who, she thinks, may have leaked the PowerPoint—namely, the lead case agent who created the PowerPoint, self-identified FBI-informant Stephen Rhoads (who was an on-the-record source for Herridge's reporting), and a few other government agents who might have possessed the PowerPoint.  Id. at 10–11.  Despite her best efforts, Chen has been unable to obtain direct evidence that any of them, or any other person, was responsible for the suspected leak.

After years of failed efforts and false starts, Chen sought to pursue the one seemingly surefire method to discover how Herridge and Fox obtained the materials in question: to ask them herself.  Chen served Fox and Herridge with deposition subpoenas in May and June of 2022, respectively.  See Notice of Filing Dep. Subpoena (Herridge deposition subpoena); Fox Mot. to Quash, Ex. H. (Fox deposition subpoena).  She also served both with subpoenas for relevant documents and communications.  See Herridge Mot. to Quash, Ex. L (Herridge document subpoena); Fox Mot. to Quash, Ex. G (Fox document subpoena).  Herridge and Fox moved to quash the subpoenas, asserting the qualified First Amendment reporter's privilege and, alternatively, urging the Court to adopt a federal common law newsgathering privilege.

The Court partially denied Herridge's motion on August 1, 2023.  See Chen v. Fed. Bureau of Investigation, No. 18-cv-3074 (CRC), 2023 WL 5289432 (D.D.C. Aug. 17, 2023) (redacted public version).  Following binding case law, the Court explained that Chen's need for the requested evidence overcame Herridge's qualified First Amendment privilege and that it would be improper for the Court to circumvent that precedent by fashioning a wider common law privilege.  Id. at *11.

Starting with the First Amendment, the Court faithfully applied the test that the D.C. Circuit established over forty years ago in Zerilli v. Smith, 656 F.2d 705 (D.C. Cir. 1981). Zerilli began from the premise that the *qualified* reporter's privilege requires courts to weigh "the public interest in protecting the reporter's sources against the private interest in compelling disclosure."  Id. at 712.  Zerilli did not, however, end its analysis with that "general" guidance or contemplate that district courts would engage in a free-form, anything-goes balancing exercise. Id.  It instead identified a "number of more precise guidelines" that "can be applied to determine how the balance should be struck in a particular case."  Id.  Chief among those considerations are

(1) whether the information sought is "central" to the claim and (2) whether the plaintiff has "exhausted every reasonable alternative source of information." Id. at 713.  Twenty-four years later, the Circuit doubled down on this test in Lee v. Department of Justice, reiterating that, in deciding when to "compel a non-party journalist to testify about a confidential source," courts must focus on whether the information goes to "the heart of the matter" and whether the litigant has "exhausted 'every reasonable alternative source of information.'"  413 F.3d 53, 59 (D.C. Cir. 2005) (quoting Zerilli, 656 F.2d at 713).  Thus, while not forbidding consideration of other factors, the Circuit has made clear—not once, but twice—that district courts should anchor their analysis to Zerilli's two guideposts: centrality and exhaustion.

Both factors weigh heavily in Chen's favor, the Court concluded.  On centrality, directly tracking the Circuit's reasoning when confronted with the identical issue in Lee, "it is clear that the information [Chen] is seeking goes to the heart of [her] case." Id. at 60.  "[T]he relevant information is the identity of the individuals who may have leaked information in violation of the Privacy Act.  If [Chen] cannot show the identities of the leakers, [her] ability to show the other elements of the Privacy Act claim, such as willfulness and intent, will be compromised." Id.  As to exhaustion, Chen's five-year odyssey to uncover the leaker's identity assured the Court that her request to depose Herridge had come at "the end, and not the beginning, of the inquiry." Zerilli, 656 F.2d at 713 (quoting Carey v. Hume, 492 F.2d 631, 638 (D.C. Cir. 1974)).  The only reasonable option left was for Chen to ask Herridge herself.  With the two central factors lopsided in Chen's favor, the Court resolved that Herridge's qualified First Amendment privilege must give way.  See Chen, 2023 WL 5289432 at *3–11.

 The Court could have stopped there.  But for sake of completeness and in recognition of the important First Amendment rights at stake, it proceeded to explain why a full-bore analysis

of Chen's likelihood of success on the merits of her claim or a free-form balancing of the public and private interests was unlikely to tilt the scales back in Herridge's direction.  Though it was premature to preview summary judgment, the Court recognized that <u>Zerilli</u> permits courts to sneak a peek at the merits to ensure the case is "not frivolous" such that no purpose would be served in forcing disclosure.  656 F.2d at 714.  Peering around the corner, the Court found that Chen's Privacy Act claim easily surpassed that low bar.  The Court was also unmoved by Herridge's contention that Chen's "parochial" interest in her Privacy Act claim should yield to the public interest in a robust free press, especially when the reporting touches on national security and the subject is not an "innocent person."  <u>See</u> Herridge Mot. to Quash at 26, 34–39. Privacy Act claims vindicate more than the personal interests of the litigant, the Court explained; they serve a systemic function in deterring the "intentional or willful" dissemination of private records maintained by our government.  <u>Chen</u>, 2023 WL 5289432 at *11 (quoting 5 U.S.C. § 552a(g)(4)).  That is as true here as in any other case.  On the other side of the ledger, the Court questioned just how much the public interest was actually advanced by Herridge including the purportedly leaked materials in the reporting when, on her own account, these records added little of substance to her stories.  If they were just garnish, as Herridge claims, any conflict between the Privacy Act and the First Amendment could have been avoided without a serious loss to public understanding.  Therefore, even if it were to venture beyond the Circuit's "more precise guidelines" and consider the full panoply of possible interests, the Court found the outcome would likely remain the same.  <u>See</u> <u>id.</u> at *10–11.

Moving beyond the First Amendment's scope, the Court rejected Herridge and Fox's invitation to open a back door to a broader balancing test by recognizing a federal common law newsgathering privilege.  <u>Id.</u> at *11–12.  In doing so, the Court followed the lead of other courts

in this district that have uniformly declined similar requests to "circumvent" the D.C. Circuit's

First Amendment case law by forging a more protective common law privilege.  Lee v. Dep't of

Just. ("Lee II"), 401 F. Supp. 2d 123, 139 (D.D.C. 2005); accord Hatfill v. Gonzales, 505 F.

Supp. 2d 33, 43–48 (D.D.C. 2007).  As these courts recognized, a federal common law

newsgathering privilege of the sort Herridge and Fox advocated "would create a subjective and

elastic standard," saddle courts with the "daunting and well-nigh impossible task" of determining

"whether the harm caused by leaked information outweighs the 'value' of that information to the

citizenry," and undermine "the fundamental purpose of the Privacy Act" of "discourag[ing] the

kind of [alleged] leaks that are at issue in this action."  Lee II, 401 F. Supp. 2d at 139, 141–42.

Given that the Circuit recognizes a well-established First Amendment privilege that protects

journalists' interests and channels judicial discretion in balancing that interest against evidentiary

need, the Court found that Herridge and Fox had not carried their burden of "demonstrat[ing]

with a high degree of clarity and certainty that" their proposed privilege would "effectively

advance a public good" relative to these potential drawbacks.  Chen, 2023 WL 5289432 at *12

(quoting Lee II, 401 F. Supp. 2d at 137).

To minimize any intrusion into the press function, the Court concluded its opinion by

sequencing discovery.  Id. at *12–13.  It first provisionally granted Fox's motion to quash both

subpoenas directed against the network as duplicative of the Herridge subpoenas.  Id. at *12.  By

the same token, the Court granted Herridge's motion to quash the document subpoena for the

time being because this request would have proven unnecessary if Herridge provided the missing

link in her deposition.  Id. at *13.  It further cabined Herridge's deposition subpoena to ensure

she did not have to answer any questions concerning sources who did not provide her

information covered by the Privacy Act.  Id. at *7, 13.  Having whittled down the subpoenas to

their core, the Court concluded with a clear order: "Chen may depose Herridge regarding the identity and intent of the source or sources of the documents and images allegedly provided to her in violation of the Privacy Act, and any non-privileged other matters relevant to her Privacy Act claim." Id. at *13.

Herridge then requested that this Court certify the Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Exercising its discretion, the Court declined to certify because, in part, Herridge could refuse to comply with the Order and appeal from any subsequent finding of civil contempt. See Op. & Order, ECF No. 152 ("Certification Order"); Op. & Order, ECF No. 158 ("Motion for Reconsideration Order"). As the Court explained, that procedure is customary both in this jurisdiction and throughout the country. Herridge simultaneously sought an immediate appeal of this Court's Order to the D.C. Circuit under 28 U.S.C. § 1292(b)'s collateral-order doctrine. The Circuit dismissed the appeal for lack of jurisdiction, reasoning along similar lines that Herridge could adequately vindicate her assertion of privilege by "seek[ing] appellate review of the district court's order denying her motion to quash by defying that order and appealing from any contempt citation." Order, Chen v. Fed. Bureau of Investigation, No. 23-5198 (D.C. Cir. Sept. 25, 2023). As a result, the Court's Order remained in full effect.

Pursuant to that Order, Herridge sat for her deposition on September 26, 2023. See Contempt Mot., Ex. 3 ("Herridge Dep."). In it, Herridge acknowledged that the Court's Order required her to "identify the source or sources of any Privacy Act material related to Dr. Chen that [she] received in the course of [her] reporting on Dr. Chen and the University of Management & Technology." Id. at 19:20–24; see id. at 19:25 (answering "yes"). Herridge also repeatedly admitted that she knew who the source was. See id. at 84:20–85:12, 86:11–87:5, 91:5–14, 94:18–95:10. Nonetheless, she steadfastly refused to disclose her source's identity or

provide any information on when and in what form she received the allegedly leaked materials.

See, e.g., id. at 33:19–41:23, 44:20–49:11.  When pressed, Herridge declared:

> I have complete respect for the court and its authority and for the order.  I have no
> desire to defy a court order, but my understanding is that the courts have ruled that
> in order to seek further judicial review, I must now disobey the order, and for that
> reason, among others, I am invoking my First Amendment rights and declining to
> answer the question.

Id. at 20:7–13; see also id. at 208:2–10 (repeating that statement).

Chen responded by filing an application for an order to show cause why Ms. Herridge should not be found in civil contempt for defying the Court's Order.  Herridge opposes the application, urging the Court to modify its Order based on "additional information."  Alternatively, she requests that any civil-contempt sanction be nominal and stayed pending appeal.

## II.   Legal Standards

This Court has both an "inherent and a statutory power to enforce compliance with its orders through the remedy of civil contempt."  SEC v. Bilzerian, 112 F. Supp. 2d 12, 16 (D.D.C. 2000).  The "power to punish for contempts is inherent in all courts; its existence is essential to . . . the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice.'"  Broderick v. Donaldson, 437 F.3d 1226, 1234 (D.C. Cir. 2006) (quoting Ex parte Robinson, 86 U.S. (19 Wall.) 505, 510 (1874)).  Building on that innate power, Federal Rule of Civil Procedure 45(e) provides that an "issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena."

A person is in contempt of court if she "violates a definite and specific court order requiring [her] to perform or refrain from performing a particular act or acts with knowledge of that order."  SEC v. Bankers All. Corp., 881 F. Supp. 673, 678 (D.D.C. 1995) (citation omitted).

The party seeking a finding of contempt must demonstrate, by clear and convincing evidence, that (1) there was a court order in place; (2) the order clearly and unambiguously required certain conduct; and (3) the alleged contemnor failed to comply with that order.  Int'l Painters & Allied Trades Indus. Pension Fund v. ZAK Architectural Metal & Glass LLC, 736 F. Supp. 2d 35, 38 (D.D.C. 2010).  The alleged contemnor's intent in failing to comply is irrelevant, so a court need not find that an individual acted in bad faith to hold her in contempt.  Bilzerian, 112 F. Supp. 2d at 16.

The purpose of civil contempt is not to punish but "to obtain compliance with a court order or to compensate for damage sustained as a result of noncompliance."  NLRB v. Blevins Popcorn Co., 659 F.2d 1173, 1184 (D.C. Cir. 1981).  Accordingly, civil-contempt sanctions "must be calibrated to coerce compliance or compensate a complainant for losses sustained."  In re Fannie Mae Sec. Litig., 552 F.3d 814, 823 (D.C. Cir. 2009).

## III. Analysis

### A. Herridge Is in Contempt of Court

There is no genuine dispute that Herridge is in contempt of the Court's August 1, 2023 Order partially denying her motion to quash Chen's deposition subpoena.  The Order clearly and unambiguously required Herridge to answer questions about "the identity and intent of the source or sources of the documents and images allegedly provided to her in violation of the Privacy Act, and any non-privileged other matters relevant to [Chen's] Privacy Act claim."  Chen, 2023 WL 5289432, at *13.  Herridge understood that straightforward directive.  In her motion for certification, filed ten days later, she acknowledged the Court had directed her "to respond to the deposition subpoena to answer questions identifying confidential source(s) for the Fox reporting."  Mot. to Certify Appeal at 4.  At her deposition the following month, however,

Herridge willfully disobeyed the Order by refusing to answer questions about the identity of the sources who supplied the allegedly leaked materials. <u>See</u> Herridge Dep. at 20:11 ("I must now disobey the order."). That obvious violation of "a definite and specific court order" warrants a finding of civil contempt. <u>Bankers Alliance Corp.</u>, 881 F. Supp. at 678.

Herridge does not attempt to argue otherwise. She instead requests that, in lieu of finding her in contempt, the Court modify its Order based on "additional information that is relevant under <u>Zerilli</u> balancing"—including declarations from two esteemed journalists on the importance of confidential sources and from two former counterintelligence officials discussing the national-security interests purportedly at play here. <u>See</u> Opp'n at 17–28. But this "additional information" is just a new chapter in the same book of arguments Herridge raised, and the Court rejected, in her motion to quash the subpoenas. It does not undermine the Court's prior decision or support the requested modification.

For starters, none of the additional information speaks to the two "precise guidelines" established in <u>Zerilli</u> and echoed in <u>Lee</u>: (1) whether the requested discovery is central to the plaintiff's claim and (2) whether the plaintiff has exhausted other reasonable alternatives of accessing the information. <u>See Zerilli</u>, 656 F.2d at 712–13; <u>Lee</u>, 413 F.3d at 57–60. As the Court explained previously, in defining the contours of the reporter's privilege, <u>Zerilli</u> and <u>Lee</u> did not embrace an open-ended weighing of all possible interests but rather struck the balance between private and public interests by reference to these two central factors. <u>See Chen</u>, 2023 WL 5289432, at *3–6. Applying this framework here, the Court found that both considerations favored Chen. Identifying the alleged leaker was central to Chen's Privacy Act claim, and she had exhausted all reasonable alternative avenues of identifying Herridge's source. <u>See id.</u> at *7–

9.  With a one-sided score on the two most important factors, the Court concluded, the balance weighed in Chen's favor and supported her request to depose Herridge.

Herridge's current motion does not refute any of this analysis.  She does not contend that the Court erred in finding Chen had satisfied her burden on both factors.  Nor does she point to any new authority indicating that the Court misconstrued <u>Zerilli</u> and <u>Lee</u> when resolving that the balancing test should center on centrality and exhaustion—an understanding shared by numerous courts in this district.[1]  Herridge simply renews her prior claim that "<u>Zerilli</u> calls for a broad-ranging balancing inquiry" to decide whether to pierce the reporter's privilege.  <u>See</u> Opp'n at 18– 19.  The Court rejected this contention once before and, upon second look, it is equally unpersuaded.  It therefore reaffirms the core rationale behind its prior decision:  <u>Zerilli</u> and <u>Lee</u> call on courts to focus primarily (even if not exclusively) on centrality and exhaustion, and those two factors are dispositive here.

Moreover, as was true the last go-around, the Court continues to believe that a free-wheeling balancing of interests would not change the outcome in any event.  Herridge urges the Court to place three more considerations onto the scale: (1) the merits of Chen's Privacy Act claim, including her prospects for recovering damages; (2) the national-security interests at stake; and (3) the broad chilling effect that Herridge fears will result from forcing her to disclose her sources.  The Court mulled each of these considerations in its prior opinion, <u>see</u> Chen, 2023 WL 5289432, at *10–11, and nothing in the current motion alters the Court's thinking.

---

[1]  <u>See, e.g.</u>, <u>Hatfill</u>, 505 F. Supp. 2d at 37–47; <u>Lee II</u>, 401 F. Supp. 2d at 139; <u>In re Subpoena to Goldberg</u>, 693 F. Supp. 2d 81, 85 (D.D.C. 2010); <u>U.S. Commodity Futures Trading Comm'n v. McGraw-Hill Companies, Inc.</u>, 507 F. Supp. 2d 45, 50 (D.D.C. 2007); <u>Tripp v. Dep't of Def.</u>, 284 F. Supp. 2d 50, 55 (D.D.C. 2003); <u>Hutira v. Islamic Republic of Iran</u>, 211 F. Supp. 2d 115, 119, 121–22 & n.8 (D.D.C. 2002).

*First*, Herridge plows old ground in arguing that her First Amendment interests outweigh Chen's interest in pursuing her Privacy Act claim because, in her view, Chen will be unable to recover any damages.  Herridge asserts that any financial harm to UMT was caused by the Defense Department's independent decision in January 2018 to cut off tuition assistance, not her reporting, and that any reputational harm is impossible to trace to the alleged Privacy Act violation because the lion's share of her reporting came from lawful sources.  See Opp'n at 1, 18–19.  As the Court has explained, however, this effort to pick apart Chen's claim far exceeds Zerilli's cursory inspection to ensure the "suit is not frivolous."  See Chen, 2023 WL 5289432, at *10–11 (quoting Zerilli, 656 F.2d at 714).  And regardless, even if it proves true that only a snippet of Herridge's reporting—such as the compromising photographs of Chen and her husband—could support a Privacy Act claim, the Court still "does not doubt that the images of Chen holding or wearing a Chinese military uniform could have given the Fox reporting more traction than it otherwise would have had and caused Chen more damage than she otherwise would have suffered."  Id. at *10.

Downplaying the significance of the leaked materials is also a double-edged sword for Herridge.  If the leaked materials truly did not affect the substance of her reporting on Chen but were instead mere ornamentation, as Herridge says, the press function need not have come into conflict with Chen's statutory privacy rights at all.  Herridge could have published the same set of stories minus the records—the incriminating photographs, excerpts from immigration forms, and snippets of FBI interviews—without compromising the informational value of her pieces.  Had she done so, the Privacy Act would not be implicated, Chen would have no case, and the subpoenas would never have issued.  Herridge (or her producers) instead decided to gild the lily

by including these evocative (and click-inducing) details—opening the door for a Privacy Act

claim and discovery into the identity of the potential leaker.

*Second*, Herridge again urges the Court to consider the national-security implications of

requiring her "to reveal the identity of her confidential source(s) to Plaintiff—a former colonel in

the [People's Liberation Army] whom [the Department of Defense] expressly determined to be a

national security risk." Opp'n at 21.  She submits declarations from two counterintelligence

experts who contend that, from their vantage, there is a "serious risk" Chen used UMT "to

provide information on U.S. servicemembers" to Chinese officials and that Chen was not

absolved of wrongdoing just because she was never prosecuted.  Id. at 22–24.  But whether or

not these charges are true, any national-security concerns over requiring Herridge to reveal her

source ring hollow.  It is hard to fathom how disclosing Herridge's source would place America

in jeopardy.  In fact, it is much more plausible that ferreting out the government agent who may

have leaked the records would benefit, not harm, national security by exposing someone inclined

to mishandle highly sensitive law-enforcement records.  And on the off chance there were an

actual security risk, the government is a party to this action and could easily intervene to protect

these interests (as it has done on occasion in this case already).

Under the banner of "national security," Herridge also maintains that it is appropriate to

consider the "risk that Plaintiff was making U.S. servicemembers' information available to a

foreign power—and thus that her 'private interest' in this Privacy Act suit is, in effect, seeking

taxpayer money to recover funding for that conduct."  Id. at 25–26.  The Court strongly

disagrees.  The Court's job is to apply the law evenhandedly, not to adjudicate who is worthy of

the law's protection.  That the plaintiff "had it coming" is not a viable defense under the Privacy

Act.  The Act protects "all private citizens, whether blameworthy or blameless, from the risk that

government officials might be tempted to abuse their access to sensitive information by leaking materials intended to embarrass particular individuals." Chen, 2023 WL 5289432, at *11. Whatever her past, Chen is no exception.

*Third*, Herridge asserts that forcing her to disclose her source would have a chilling effect and undermine the ability of the press to inform the public on important matters. On this score, Herridge submits declarations from the Dean of the Columbia Journalism School, Jelani Cobb, and Pulitzer Prize winning investigative journalist Steve Coll. See Opp'n at 19–21. Dean Cobb explains that confidential sources are "vital to the functioning of a free and independent press" and contends that the "act of disclosing a confidential source, even as the result of a court order, erodes the ability of journalists everywhere to credibly promise confidentiality to sources who demand it, and would have a chilling effect on the flow of important information to journalists reporting on government matters." Id., Ex. B ¶¶ 5, 11. Mr. Coll adds that these concerns are only magnified in the areas of national security and international affairs, where it is often impossible to uncover what's going on without confidential sources who are willing to turn over protected information. Id., Ex. C ¶¶ 6–8. The Reporters Committee for Freedom of the Press echoes these worries in its amicus brief. After touting that confidential sources have enabled journalists to tell some of the most important public-interest stories of the past half century—from Watergate to the Iran-Contra affair to warrantless surveillance post-9/11—the Reporters Committee warns that compelled disclosure here could stifle similar stories going forward, especially those involving sensitive issues of national security. Reps. Comm. Br. at 2–3, 11–13.

The Court appreciates these concerns and does not question the vital role of a free press in "bar[ing] the secrets of government and inform[ing] the people." N.Y. Times Co. v. United States, 403 U.S. 713, 717 (1971) (Black, J., concurring). It also recognizes and respects that, in

many instances, confidential sources provide an essential ingredient for investigative reporting. That does not give the Court a free pass to ignore binding precedent, however.  The Circuit in Zerilli was also "mindful of the preferred position of the First Amendment and the importance of a vigorous press."  656 F.2d at 712.  Yet, recognizing that the reporter's privilege is not ironclad, the Circuit crafted a balancing test to determine when confidentiality must give way to competing interests—the central one being the interest of a litigant who needs the information to vindicate her rights and has exhausted every reasonable alternative source.  Id. at 712–13; see also Carey, 492 F.2d at 639 (rejecting the contention that there is "an absolute First Amendment barrier to the compelled disclosure by a newsman of his confidential sources under any circumstances").  The Court is not free to disregard the balance the Circuit has struck by placing a thumb on the scale in favor of confidentiality.

Even if the Court enjoyed such discretion, it is important not to overstate the impact of requiring disclosure here.  Judge Tatel expressed similar concerns about the detrimental effect compelling disclosure may have on journalists' ability to gather information in his dissent from the denial of rehearing en banc in Lee back in 2005.  See Lee v. Dep't of Just., 428 F.3d 299, 301–02 (D.C. Cir. 2005) (Tatel, J., dissenting from denial of reh'g en banc).  Time has told a somewhat different story.  Almost two decades have passed since Lee reaffirmed Zerilli and required the reporter there to divulge his source, yet there is limited evidence that the floodgates to journalists' notepads have opened or the wellspring of confidential sources has dried up during that period.  At most, there appears to have been an uptick in the number of subpoena requests for confidential sources in federal proceedings during the early 2000s.  See RonNell Andersen Jones, Avalanche or Undue Alarm?  An Empirical Study of Subpoenas Received by the News Media, 93 Minn. L. Rev. 585, 637–52 (2008); see also id. at 586 (acknowledging that the uptick

in subpoena requests did "not constitute an avalanche in scale"). But whether this was a blip or a sustained increase, a matter Herridge does not plumb, it has not resulted in widespread piercing of the privilege. Other courts in this district have long embraced and applied this Court's reading of Zerilli and Lee. See supra pg. 12 n.1. And still, cases requiring reporters to divulge confidential sources have remained few and far between, as the Reporters Committee acknowledges. See Reps. Comm. Br. at 2 ("Privacy Act cases involving efforts to compel the identities of confidential journalistic sources are rare[.]"). That's because, as Lee recognized, vigilant application of the centrality and exhaustion factors should ensure that compelled disclosure is the exception, not the rule. Lee, 413 F.3d at 60 (finding that an inquiry centered on these guidelines "does not leave journalists without protection"). Consistent with this expectation, courts applying the Circuit's framework often have found that plaintiffs' subpoena requests falter on one or both of these factors. See, e.g., In re Subpoena to Goldberg, 693 F. Supp. 2d at 88; Hatfill, 505 F. Supp. 2d at 49–50; Tripp, 284 F. Supp. 2d at 60–61; Hutira, 211 F. Supp. 2d at 121–22. That suggests Zerilli and Lee may have found the right balance after all.

To be sure, beyond actual case results, stakeholders in this area should remain attuned to the ripple effects that court decisions have on confidential sources' willingness to come forward in the first place. Identifying this impact can be tricky business, however. Much of the reporting on this score is anecdotal, and systematic studies lend only mild support for the notion that confidential sources may be slightly more hesitant to speak up nowadays. See Jones, supra, at 648–49 (finding 62.5% of newsroom leaders in 2007 reported that sources were as willing to speak on condition of confidentiality as five years before whereas 25.5% reported they were "somewhat less" willing to do so). But even then, it is uncertain whether sources are holding their tongues because, in their view, courts appear more solicitous of requests to compel

reporters to disclose sources.  See Randall D. Eliason, The Problems with the Reporter's Privilege, 57 Am. U. L. Rev. 1341, 1359 (2008) (contending that "of all of the risks of exposure that a source faces, the danger that a reporter will be subpoenaed and compelled to testify is probably the most remote").  At a minimum, any marginal chilling effect has certainly not frozen the information pipeline.  Instances of journalism built on confidential sources remain legion. See Reps. Comm. Br. at 12–13 (offering a "small sampling" of examples).  The current dispute is a case in point.  The Court's interpretation of Zerilli and Lee was the prevailing law in this district at the time of the alleged leak.  But Herridge's source was still apparently undeterred by the prospect that, at some point in the future, a court might order Herridge to name her source. Projecting forward, then, it is far from clear that the Court's decision will unnecessarily clog the free flow of information.

Finally, beyond these three considerations Herridge raised, the Reporters Committee also notes that the Department of Justice recently amended its internal policies to restrict its own use of compulsory processes to pierce the reporter's privilege.  See Reps. Comm. Br. at 8–10 (citing 28 C.F.R. § 50.10).  That amendment may well be a salutary development deserving of applause, but it does not alter how the Court should resolve the current dispute based on this Circuit's precedent.  In fact, the Department of Justice's forbearance showcases that federal court enforcement of the First Amendment is not the final word when it comes to protecting confidential sources.  There is a robust body of local, state, and federal laws promoting the freedom of speech and press in ways that extend beyond the First Amendment's safeguards.  See Genevieve Lakier, The Non-First Amendment Law of Freedom of Speech, 134 Harv. L. Rev. 2299 (2021).  One need look no further than the reporter's privilege.  Almost every State has enacted some form of "shield law" protecting reporters from having to disclose their sources.

See Chen, 2023 WL 5289432, at *12.  Congress could do the same with a few strokes of a pen, but it has not done so.  See Branzburg v. Hayes, 408 U.S. 665, 706 (1972) ("At the federal level, Congress has freedom to determine whether a statutory newsman's privilege is necessary and desirable and to fashion standards and rules as narrow or broad as deemed necessary to deal with the evil discerned and, equally important, to refashion those rules as experience from time to time may dictate.").  Absent congressional intervention or a shift in Circuit precedent, the Court's duty is to apply and enforce the law on the books.

*　　*　　*

In sum, after considering all the "additional information" Herridge has provided, the Court finds no compelling reason to modify its August 1, 2023 Order requiring her to answer questions concerning the identity and intent of the source or sources of the records allegedly given to her in violation of the Privacy Act, as well as any non-privileged other matters relevant to her Privacy Act claim.  Herridge plainly violated that Order when she refused to divulge the identity of the suspected leaker during her deposition last September.  That defiance warrants a finding of civil contempt, no matter how noble Herridge's justification for refusing to reveal her source.  See Bilzerian, 112 F. Supp. 2d at 16 (noting a contemnor's intent is irrelevant).  Herridge may disagree with the Court's decision, as is her right, and she may believe that the Circuit's reporter's privilege doctrine strikes the wrong balance by undervaluing the importance of confidentiality for a free press.  Still, the fact remains that "[l]itigants may not defy court orders because their commands are not to the litigants' liking.  If the rule of law is to be upheld, it is essential that the judiciary takes firm action to vindicate its authority and to compel compliance with lawfully issued directives."  Am. Rivers v. Army Corps of Eng'rs, 274 F. Supp.

19

2d 62, 70 (D.D.C. 2003).  A finding of civil contempt is therefore appropriate and necessary to uphold those principles here.

Yet contempt must be confined to the clear and unambiguous scope of the Court's order, see Int'l Painters, 736 F. Supp. 2d at 38, so it cannot extend as far as Chen advocates.  To repeat, the August 1, 2023 Order required Herridge to divulge her source and answer questions about any non-privileged other matters relevant to Chen's Privacy Act claim.  Chen complains that, in addition to not naming the leaker, Herridge also declined to answer questions on various other matters such as "the preparation of the Fox News stories, the timing of their publication, and why certain materials and information were included or omitted."  Contempt Mot. at 9.  But those matters at least arguably fall within the First Amendment reporter's privilege, which "shields both confidential and nonconfidential information from compelled disclosure," Hutira, 211 F. Supp. 2d at 120, and generally guards against compelled disclosure of information that would have "a chilling effect upon the newsgathering and editorial processes," Maughan v. NL Indus., 524 F. Supp. 93, 95 (D.D.C. 1981).  Disclosing these other items would intrude upon, and possibly chill, Herridge's newsgathering and editorial processes.  The Court's Order therefore did not clearly require Herridge to answer these questions, so she cannot be found in contempt for refusing to do so.

B.  Contempt Sanction

The remaining question is:  What is the appropriate sanction for Herridge's contempt?  Civil-contempt sanctions may "be employed for either or both of two purposes; to coerce the [contemnor] into compliance with the court's order, and to compensate the complainant for losses sustained."  United States v. United Mine Workers of Am., 330 U.S. 258, 303–04 (1947).  In considering these twin purposes, courts have "wide discretion" and "broad equitable powers to

craft remedial sanctions." <u>United States v. Two Gen. Elec. Aircraft Engines</u>, 317 F. Supp. 3d 516, 522 (D.D.C. 2018) (quotation marks omitted).  Exercising that discretion here, the Court will impose a fine of $800 per day until Herridge complies with the Court's Order but stay that fine for thirty days or until completion of proceedings on a timely appeal, whichever is later.

Herridge requests that the Court impose no more than a nominal sanction, such as $1 per day.  <u>See</u> Opp'n at 29.  But such a trivial sanction would not serve the fundamental purpose of civil contempt: ensuring compliance with a court order.  It would permit Herridge to pay pittance in perpetuity while continuously violating the Court's directive and effectively vitiating Chen's right to pursue her Privacy Act claim.  That cannot be correct.  Judicial orders are not tollbooths that can be bypassed with spare change.  Recognizing this reality, other courts in this district have imposed far stiffer penalties in similar contexts to ensure journalists comply with disclosure orders.  In <u>Hatfill II</u>, for example, the court imposed a graduated fine of $500 for the first seven days following entry of the contempt order, which increased to $1,000 per day the following week, escalating to $5,000 per day thereafter.  <u>Hatfill v. Mukasey ("Hatfill II")</u>, 539 F. Supp. 2d 96, 99 n.5 (D.D.C. 2008).  Similarly, in <u>Lee III</u>, the court rejected the reporter's request for a nominal sanction as "insufficient to [ ] coerce compliance" and imposed a fine of $500 per day.  <u>Lee v. U.S. Dep't of Just. ("Lee III")</u>, 327 F. Supp. 2d 26, 33 (D.D.C. 2004).  The Court will adopt the low-end of this range (roughly adjusted for inflation) and impose a fine of $800 per day until Herridge complies with the August 1, 2023 Order.

The Court will stay that contempt sanction, however, to afford Herridge an opportunity to appeal this decision.  Courts in this district and beyond have routinely stayed contempt sanctions to provide journalists ample room to litigate their assertions of privilege fully in the court of appeals before being coerced into compliance.  <u>See, e.g.</u>, <u>Lee III</u>, 327 F. Supp. 2d at 33; <u>United</u>

States v. Cutler, 6 F.3d 67, 70 (2d Cir. 1993); United States v. Cuthbertson, 630 F.2d 139, 143

(3d Cir. 1980).  Indeed, when the district court denied a stay of contempt sanctions in Hatfill III,

539 F. Supp. 2d at 106, the D.C. Circuit stepped in and granted the stay request, see Hatfill v.

Mukasey, No. 08-5049, Doc. No. 1104546 (D.C. Cir. March 11, 2008) (per curiam).  Following

suit, the Court will stay the contempt sanction against Herridge pending a timely appeal.

 Apart from being the standard practice in this context, a stay pending appeal is justified

here under the four-factor test for determining whether such a stay is warranted: "(1) the

likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the

likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that

others will be harmed if the court grants the stay; and (4) the public interest in granting the stay."

Cuomo v. U.S. Nuclear Regul. Comm'n, 772 F.2d 972, 974 (D.C. Cir. 1985) (per curiam).  First,

given that prior reporter's privilege cases have divided the Circuit and attracted en banc activity,

and that almost two decades have passed since the Circuit decided Lee, it is possible that the

Circuit may take the opportunity to refine the applicable First Amendment test in Herridge's

favor or recognize a new federal common law newsgathering privilege broader than the

constitutional analog.  See Citizens for Resp. & Ethics in Washington v. Off. of Admin., 565 F.

Supp. 2d 23, 28 (D.D.C. 2008) (noting a "court is not required to find that ultimate success by

the movant is a mathematical probability" (quotation marks omitted)).  Second, absent a stay,

Herridge would have to choose between disclosing her source's identity—a decision that "is, by

its very nature, irreparable," Robert Half Int'l Inc. v. Billingham, 315 F. Supp. 3d 419, 433–34

(D.D.C. 2018)—or face possible financial hardship by racking up potentially hundreds of

thousands of dollars in fines in the interim.  Third, though the Court appreciates that an appeal

will further delay resolution of Chen's Privacy Act claim, the time it will take to pursue an

appeal is somewhat marginal in comparison to the five years Chen has already spent to suss out the leaker's identity.  Fourth, the Court recognizes there are competing public interests at stake— namely, the First Amendment interest in protecting confidential sources versus a substantial interest in ensuring compliance with court orders and enforcement of the Privacy Act.  But given that the question now is only whether to defer contempt sanctions in the interim to ensure that Herridge can litigate her First Amendment claim to the hilt before revealing her source, the Court finds that the public interest also favors the stay request.  See Certification Order at 3 ("[I]t is better to be safe than sorry when it comes to First Amendment rights.").

The Court concludes that these two elements—a $800 per day fine combined with a stay pending appeal—will adequately ensure compliance with the Court's Order while preserving Herridge's right to appeal that decision.  See Lee III, 327 F. Supp. 2d at 33 ("[T]he journalists' argument that the fine should be nominal where constitutional issues will be presented on appeal can be addressed simply by staying the fine pending appeal.").  At the present juncture, the Court does not deem it necessary to award Chen any compensatory sanctions for costs and fees related to Herridge's deposition or the ensuing contempt proceeding.  Chen argued all along (and the Court and the Circuit agreed) that refusing to comply with the Court's Order and being found in contempt was the ordinary and proper route for obtaining appellate review here.  That Herridge ultimately chose to pursue this avenue to appellate review does not necessarily warrant compensation for Chen.  The Court also opts, for now, not to follow the approach adopted in Hatfill II and forbid Herridge from accepting funding from any other persons or entity to pay her contempt sanction.  See 539 F. Supp. 2d at 107.  The Court may reconsider these matters down the line depending on how things play out after any appellate proceedings.

**IV.   Conclusion**

For these reasons, it is hereby

**ORDERED** that Herridge is in civil contempt of the August 1, 2023 Order of this Court;

it is further

**ORDERED** that Herridge is fined in the sum of $800.00 per day, payable to the United

States, until she complies therewith; it is further

**ORDERED** that the aforementioned fine will be stayed for a period of thirty days, or

until completion of proceedings on a timely appeal, whichever is later; it is further

**ORDERED** that Chen's application for a compensatory award of sanctions is

denied without prejudice.

**SO ORDERED**.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date: <u>February 29, 2024</u>