**PUBLIC VERSION**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| YANPING CHEN,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL BUREAU OF INVESTIGATION, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendants. | Case No. 1:18-cv-03074-CRC |

**NON-PARTY CATHERINE V. HERRIDGE'S OPPOSITION TO PLAINTIFF'S MOTION TO ENFORCE AND MODIFY CONTEMPT ORDER AND MEMORANDUM IN SUPPORT OF CROSS-MOTION TO CLARIFY OR EXTEND STAY**

PUBLIC VERSION

## TABLE OF CONTENTS

Page

INTRODUCTION ..... 1

BACKGROUND ..... 5

A. Ms. Herridge's Work as an Investigative National Security Journalist ..... 5

B. Ms. Herridge's Reporting on Plaintiff and Evidence That Plaintiff Was a Former Colonel in the People's Liberation Army ..... 5

C. Information About Plaintiff on the Public Record in an FBI Search Warrant Affidavit ..... 8

D. DOD Determines that [redacted] and Publicly Announces that Funding to Her School Must Be Terminated "On National Security Grounds" ..... 9

E. Plaintiff Sues the Government and Ultimately Subpoenas Ms. Herridge to Uncover Ms. Herridge's Confidential National Security Sources ..... 10

F. Ms. Herridge Is Deposed and Declines to Reveal Her Confidential Source(s) ..... 10

G. The Court's Contempt Order and Subsequent History ..... 11

ARGUMENT ..... 13

I. The Court Should Clarify that Its Order Stayed Contempt Fines Through Timely Direct Appeals, Including Ms. Herridge's Forthcoming Petition for Certiorari or, in the Alternative, Should Modify the Stay. ..... 13

II. The Court Should Reject Plaintiff's Request to Increase the Contempt Fines and Prohibit Support from Third Parties. ..... 16

III. Assuming that the Stay Is No Longer in Effect, the Court Should Clarify that Fines Did Not Begin to Accrue Until July 20, 2026, when Ms. Herridge Submitted a Declaration Declining to Disclose Her Source(s) at this Time. ..... 23

IV. The Court Should Clarify Its Order to Allow Ms. Herridge to Pay any Fines in Batches of Three or Four Days at a Time. ..... 24

CONCLUSION ..... 25

PUBLIC VERSION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akiachak Native Cmty. v. Jewell*,
995 F. Supp. 2d 7 (D.D.C. 2014) .......... 15

*Alemu v. Dep't of For-Hire Vehicles*,
327 F. Supp. 3d 29 (D.D.C. 2018) .......... 19

*CBS Broad. Inc. v. FilmOn.com, Inc.*,
814 F.3d 91 (2d Cir. 2016) .......... 22

*Chen v. FBI*,
153 F.4th 1289 (D.C. Cir. 2025) .......... 11, 18

*Chen v. FBI*,
No. 24-5050 (D.C. Cir.) .......... 12, 13

*Chinaryan v. City of Los Angeles*,
122 F.4th 823 (9th Cir. 2024) .......... 15

*Citigroup Inc. v. Sayeg*,
No. 21-cv-10413, 2022 WL 1620298, at *3 (S.D.N.Y. May 23, 2022) .......... 22

*Douglas v. Agric. Stabilization & Conservation Serv.*,
33 F.3d 784 (7th Cir. 1994) .......... 20

*In re Fannie Mae Sec. Litig.*,
552 F.3d 814 (D.C. Cir. 2009) .......... 18

*Galen v. Cnty. of Los Angeles*,
477 F.3d 652 (9th Cir. 2007) .......... 19

*Guantanamera Cigar Co. v. Corporacion Habanos, S.A.*,
750 F. Supp. 2d 31 (D.D.C. 2010) .......... 21

*Hand v. Gary*,
838 F.2d 1420 (5th Cir. 1988) .......... 19

*Hatfill v. DOJ*,
No. 1:03-cv-1793 (D.D.C. June 27, 2008) .......... 23

*Hatfill v. Mukasey*,
539 F. Supp. 2d 96 (D.D.C. 2008) .......... 22

*Hatfill v. Mukasey*,
No. 08-5049 (D.C. Cir. March 11, 2008)....................23

*Herridge v. Chen*,
No. 25A1448 (U.S. July 2, 2026) ....................12, 13

*In re HMCA (Carolina), Inc.*,
301 B.R. 764 (Bankr. D.P.R. 2003)....................23

*Hotel Oakland Assocs. v. Doyle Real Est. Advisors, LLC*,
No. 21-cv-05389-SK, 2022 WL 1493267 (N.D. Cal. May 3, 2022) ....................19

*IBM v. United States*,
493 F.2d 112 (2d Cir. 1973)....................21

*Kleiman v. Dep't of Energy*,
956 F.2d 335 (D.C. Cir. 1992) ....................19

*Leib v. Veterans Admin.*,
546 F. Supp. 758 (D.D.C. 1982) ....................20

*Massachusetts Sch. of L. at Andover, Inc. v. Am. Bar Ass'n*,
914 F. Supp. 1172 (E.D. Pa. 1996) ....................23

*McCutcheon v. Fed. Election Comm'n*,
572 U.S. 185 (2014)....................22

*Mideast Sys. & China Civ. Constr. Saipan Joint Venture v. Hodel*,
792 F.2d 1172 (D.C. Cir. 1986) ....................19

*New York State Nat'l Org. for Women v. Terry*,
886 F.2d 1339 (2d Cir. 1989)....................17, 18

*Philipp v. Federal Republic of Germany*,
436 F. Supp. 3d 61 (D.D.C. 2020) ....................15

*United States v. United Mine Workers of Am.*,
330 U.S. 258 (1947)....................17, 21

**Other Authorities**

Fed. R. Evid. 501 ....................23

## INTRODUCTION

When this Court entered an order holding reporter Catherine Herridge in contempt for refusing to disclose her confidential source(s), it rightly recognized that "it is better to be safe than sorry when it comes to First Amendment rights" and that Ms. Herridge should be permitted "to litigate her First Amendment claim to the hilt" before the contempt sanctions would take effect. ECF No. 193 at 23 ("Contempt Order").

Now, however, less than two weeks after the D.C. Circuit issued its mandate on Ms. Herridge's appeal—and before Ms. Herridge has even exhausted her direct appeals with the filing of her timely, forthcoming petition for a writ of certiorari in the Supreme Court—Plaintiff has asked the Court to *increase* the contempt fines to the financially crippling level of $5,000 a day and to forbid Ms. Herridge from receiving funds from other sources to pay those fines. The obvious purpose of seeking such punitive sanctions is to crush Ms. Herridge with fines that would permanently destroy her family's finances and thereby force her to abandon her right to seek review in the Supreme Court. This Court should not reverse course now and impose fines that are plainly intended by Plaintiff to prevent Ms. Herridge from "litigat[ing] her First Amendment claim to the hilt." *Id.*

Not only should the Court reject Plaintiff's requests, it should also clarify or modify its existing stay order to ensure that contempt fines do not accumulate until Ms. Herridge's rights for direct appeal have been exhausted and the Supreme Court has ruled on her forthcoming petition for certiorari.

*First*, Ms. Herridge respectfully submits that, under the Court's order staying contempt fines "until completion of proceedings on a timely appeal," *id.* at 21, the intended duration of the stay is ambiguous. Out of an abundance of caution, Ms. Herridge has interpreted that order to mean that, once the mandate issued from the D.C. Circuit and the case returned to this Court,

contempt fines would begin if Ms. Herridge again refused to disclose her source(s). But submitting a petition for certiorari is part of Ms. Herridge's right to pursue a "timely appeal," and the proceedings on Ms. Herridge's direct appeals will not be concluded until the Supreme Court has ruled on her forthcoming petition for certiorari, which is due on August 20, 2026. Similarly, the principle guiding the Court's order—that Ms. Herridge should be permitted to "litigate her First Amendment claim to the hilt" before being fined—necessarily suggests that fines should not begin until *after* the petition for certiorari has been decided. Accordingly, Ms. Herridge respectfully requests that the Court clarify whether it intended the original stay order to extend through exhaustion of Ms. Herridge's timely direct appeals, including her petition for certiorari.

*Second*, if the Court intended its stay to last only through the first level of appellate review, Ms. Herridge respectfully requests that the Court extend the stay until the Supreme Court has ruled on the forthcoming petition for certiorari. The same rationale the Court announced in entering the stay applies equally now. No one would say that Ms. Herridge has been permitted to litigate her claims "to the hilt" before the Supreme Court has ruled on her forthcoming petition for certiorari. In addition, Ms. Herridge will still face irreparable harm if she is forced to disclose her source(s) before the Supreme Court has ruled on her petition, and the balance of equities has not changed. The Court's stay has been in effect for over two and a half years. Plaintiff cannot point to any material harm she would suffer if the stay were extended for another three months until the petition for certiorari has been decided.

*Third*, the Court should reject Plaintiff's requests to enter a new, appealable order *increasing* the daily contempt fines and prohibiting Ms. Herridge from receiving funding from other sources. It would be wholly inconsistent with the Court's view that Ms. Herridge should be permitted to "litigate her First Amendment claim to the hilt" to begin ratcheting up the fines *now*,

before Ms. Herridge has even filed her petition for certiorari—especially where the request for increased fines is obviously designed to financially cripple Ms. Herridge and thereby coerce her into abandoning her right to seek Supreme Court review at all. Fines at the level Plaintiff requests would require Ms. Herridge to pay the astronomical sum of more than $380,000 simply to preserve her ability to present her petition for certiorari to the Supreme Court. Prohibiting Ms. Herridge from receiving funding from third parties would also raise associational and free speech concerns that no court has ever addressed. Ms. Herridge can exercise her First Amendment rights to speak and publish about the case in a way that would generate financial support for the fines—she is, after all, an independent journalist operating on a subscription-based model. An order prohibiting Ms. Herridge from receiving any funding would enter uncharted First Amendment territory. Plaintiff cites only one example of such an order, and that order was stayed before it went into effect.

Moreover, civil contempt sanctions must be calibrated to reflect both the magnitude of the harm at issue in the case and the subject's ability to pay. As Ms. Herridge has explained, Plaintiff's damages are all—or almost all—foreclosed by Plaintiff's inability to secure damages for the Department of Defense's independent decision to cut off her funding and publicly brand her a national security threat. $5,000-a-day fines would irrationally require Ms. Herridge to pay fines that exceed the likely value of Plaintiff's entire case. In addition, fines of $5,000 a day—the equivalent of $1,825,000 a year—would greatly exceed Ms. Herridge's entire daily income. Increasing the fines to that amount would convert them into improper *punitive* sanctions that substantially exceed Ms. Herridge's ability to pay. The Court should reject Plaintiff's invitation to ratchet up fines to punitive levels that are out of all proportion to the needs of this case and the

value of the claims at issue, and it especially should not take such a step while Ms. Herridge still has not exhausted available avenues for direct appellate review of the Contempt Order.

*Fourth*, if the Court intends the contempt fines to accumulate pending Ms. Herridge's forthcoming petition for certiorari, Ms. Herridge respectfully requests that the Court clarify the exact date on which the fines began. Plaintiff's assertion that the fines automatically began the day after the D.C. Circuit issued its mandate would mean that Ms. Herridge would be fined even during the time it would take to arrange a deposition if she intended to disclose her source(s). That approach does not make much sense, and Ms. Herridge has proceeded on the understanding that the fines began when she notified Plaintiff (in a form acceptable to Plaintiff to avoid the need for a deposition) that she would not presently disclose her source(s). At bottom, Ms. Herridge simply seeks clarification from the Court so that she may properly comply with the Court-ordered fines.

*Fifth*, if the Court holds that contempt fines should accumulate pending Ms. Herridge's exhaustion of her direct appeals, Ms. Herridge also respectfully requests that the Court instruct the Clerk's office to allow Ms. Herridge to pay fines in batches covering three or four days at a time and, if feasible for the Clerk's office, to permit Ms. Herridge to use electronic funds transfers to pay the fines (*e.g.*, ACH transfers). The Clerk's office has indicated that, without instructions from the Court, it cannot approve any payment schedule. Out of an abundance of caution, therefore, Ms. Herridge has been writing a paper check and mailing the contempt fine payments to the Court daily. Ms. Herridge submits that the monetary fines themselves provide the coercive sanction. It is not necessary for the operation of the sanction to require Ms. Herridge to fill out and mail a new check every day.

## BACKGROUND

### A. Ms. Herridge's Work as an Investigative National Security Journalist

Catherine Herridge is an Emmy Award-winning investigative journalist with 32 years of experience at Fox News, ABC News, and CBS News reporting on national security and intelligence matters. Her work has repeatedly focused on stories raising issues of accountability in matters that will have a concrete, positive impact on the lives of members of the military and veterans. For example, after Herridge's CBS News investigation, the Army awarded Purple Hearts to 50 soldiers injured when Iran struck their airbase in Iraq with ballistic missiles in January 2020.[1] Herridge's investigative work at CBS is also credited with helping to spur passage of the Camp Lejeune Justice Act in August 2022, which benefited nearly a million veterans exposed to toxic water supplies.

Ms. Herridge was last formally employed in February 2024, as a Senior Investigative Correspondent at CBS News.

### B. Ms. Herridge's Reporting on Plaintiff and Evidence That Plaintiff Was a Former Colonel in the People's Liberation Army

In 2017, Ms. Herridge (then the Chief Intelligence Correspondent for Fox News Network) was the lead reporter on a series of articles[2] focusing on another matter that involved U.S.

---

[1] *See* Michael Kaplan & Catherine Herridge, *Army to award Purple Hearts to 50 soldiers injured in Iran missile attack following CBS News investigation*, CBS News (Dec. 20, 2021), https://perma.cc/G564-ZNYU.

[2] *See* Catherine Herridge, Pamela K. Browne & Cyd Upson, *Fox News investigation: DoD-funded school at center of federal probes over suspected Chinese military ties*, FOXNews.com, (Feb. 24, 2017), https://www.foxnews.com/politics/fox-news-investigation-dod-funded-school-at-center-of-federal-probes-over-suspected-chinese-military-ties, ("February Article"); Catherine Herridge, Pamela K. Browne & Cyd Upson, *Congress investigating taxpayer-backed school over alleged ties to Chinese military after Fox News report*, FOXNews.com, (updated May 1, 2017), https://www.foxnews.com/politics/congress-investigating-taxpayer-backed-school-over-alleged-ties-to-chinese-military-after-fox-news-report, ("April Article"); Catherine Herridge, Pamela K. Browne & Cyd Upson, *FBI 'reopening' probe of DoD-funded school with suspected Chinese*

servicemembers being placed at risk. Her reports described a counterespionage investigation into Plaintiff and a possible PLA intelligence operation targeting U.S. military personnel.

Plaintiff founded and runs the University of Management Technology ("UMT"), a university in Arlington, Virginia, that caters primarily to U.S. military personnel. In December 2012, the FBI had publicly executed search warrants at UMT's offices and at Plaintiff's home. ECF No. 96-3 at 1. In March 2016, the U.S. Attorney's Office for the Eastern District of Virginia informed Plaintiff that she would not be prosecuted. Compl. ¶22, ECF No. 1.

In 2017, Ms. Herridge reported on the investigation in a series of three articles published on February 24, April 28, and June 28. ECF Nos. 96-3, 96-5, 96-6. The stories presented evidence that Plaintiff had been a colonel in the PLA and that she sought to hide that fact by lying on immigration forms and telling others to lie under oath to a federal grand jury to conceal her past. *Id.* Among other things, the stories featured on-camera interviews with Stephen Rhoads, a whistleblower who had worked at UMT and had served as an undercover FBI informant. *Id.* Rhoads explained that Plaintiff had admitted to him that she had been a colonel in the PLA and made efforts to conceal that fact. Plaintiff told Rhoads she "was an Army officer," and when he asked where she trained, she "laughed and said, 'Oh, no, I was in the Chinese army, you know.'" ECF No. 96-3 at 2. When Rhoads told Plaintiff that the FBI wanted him to testify before a grand jury, Plaintiff told him to lie: "Oh, you don't tell them anything .… You don't—you don't know I was a colonel in the P.L.A. They'll never have proof to say that." *Id.* at 3.

---

*military ties, rep says*, FOXNews.com, (June 28, 2017), https://www.foxnews.com/politics/fbi-reopening-probe-of-dod-funded-school-with-suspected-chinese-military-ties-rep-says, ("June Article"). These articles are attached as Exhibits B, D, E to Ms. Herridge's Memorandum in Support of Motion to Quash, ECF Nos. 96-3, 96-5, 96-6.

Rhoads also explained that UMT was collecting information about U.S. servicemembers' military history that could then be remotely accessed: "It got uploaded into an O-drive, they called it … their personal military bio, you know, where they were trained, how they were trained, how long, that could be remotely accessed." *Id.* Plaintiff asked Rhoads specifically to recruit students at one of the Air Force's most technology-and-research-heavy locations—Wright-Patterson Air Force Base. *Id.* An expert on the Chinese military, Peter Mattis, explained that the personnel records would provide a "curated database" that would be of interest to the PLA for two reasons: "The first is, militaries everywhere want to know what a potential adversary might look like—what are their capabilities, how will they act? The second is this might also serve as a vehicle for recruiting individuals." ECF No. 96-5 at 2.

Rhoads explained that UMT was also receiving approximately $250,000 to $300,000 per month in taxpayer dollars from DOD through a tuition assistance program. *Id.* at 1. As Rhoads summed it up: "It's a bad deal for the soldiers … it's a bad deal for the taxpayer." *Id.*

The stories explained that the FBI and the U.S. Attorney's Office disagreed about prosecuting Plaintiff based in part on concerns about disclosing intelligence sources and methods.[3] ECF No. 96-3 at 3. In addition, the Naval Criminal Investigative Service ("NCIS") confirmed that there was "still an active multi-agency investigation" into UMT. ECF No. 96-6 at 1.

Finally, the stories included some information that Plaintiff later claimed had come from government files and was subject to the Privacy Act. Plaintiff points to pictures allegedly seized in the FBI raids (including pictures of her wearing the uniform of a colonel in the PLA), *see* Compl.

---

[3] Prosecuting an espionage case consistent with the defendant's constitutional rights may force the government to disclose classified information, including intelligence sources and methods. The government may decide that the prosecution is not worth further compromising national security. *See generally* Karen H. Greve, *Graymail: The Disclose or Dismiss Dilemma in Criminal Prosecutions*, 31 Case W. Reserve L. Rev. 84 (1980).

¶¶26, 31, ECF No. 1, portions of her immigration forms (including a form showing her false denial that she had ever been affiliated with the Communist Party), *id.* ¶¶25, 27; and images or information from FBI memoranda memorializing interviews with her, including, in particular, an interview in which she denied having held rank in the PLA, *id.* ¶¶26, 29.

### C. Information About Plaintiff on the Public Record in an FBI Search Warrant Affidavit

When Ms. Herridge's stories ran, almost all of the information that later became the basis for Plaintiff's Privacy Act claim was already a matter of public record in the Eastern District of Virginia in the affidavit the FBI had used to secure search warrants for its raids in 2012 (the "FBI Affidavit"), Ex. A. [4]

Short of providing the actual pictures of Plaintiff in her colonel's uniform that were allegedly seized in the FBI raid, the FBI Affidavit detailed every bit of information that Plaintiff has pointed to as the basis for her Privacy Act claim—and more. *See* ECF No. 96-11. It included transcribed cuts from tape recordings in which Plaintiff admitted that she had been a colonel in the PLA to an FBI informant wearing a wire. *See id.* ¶¶15–16. It described Plaintiff's false statement on an immigration form that she had never been affiliated with the Communist Party—the same form that appeared in Ms. Herridge's articles. *Id.* ¶¶20–21. It also listed multiple further false statements on immigration forms that were not mentioned in the articles. *Id.* ¶¶18–19, 24–29. It spelled out that a "UMT employee" had confirmed that personnel at UMT's Beijing offices had access to the database of information UMT had compiled on U.S. servicemembers. *Id.* ¶14. And

[4] Although the affidavit had been under seal, in litigation brought by Plaintiff seeking sanctions for an alleged leak, the district court held that, because the order sealing it had expired four years earlier, the information in the affidavit was "public information" and there could be no violation in disclosing it. *See id.*, ECF No. 20 (May 8, 2017 H'rg Tr. at 26:10–13; 29:21–30:3).

it detailed Plaintiff's denial that she had held rank in the PLA during her 2012 interview by the FBI. *Id.* ¶¶48–49.

### D. DOD Determines that [redacted] and Publicly Announces that Funding to Her School Must Be Terminated "On National Security Grounds"

DOD publicly announced in 2018 that it had concluded an inquiry into Plaintiff and UMT and had determined that UMT must be terminated from the tuition assistance program "on national security grounds."[5]

DOD formally determined that [redacted] DOD also determined that [redacted] DOD noted that [redacted] DOD also found that [redacted] DOD also noted that [redacted]

[5] Natalie Gross, *DoD bans popular TA school from accepting the benefit*, Military Times (Apr. 6, 2018), https://perma.cc/D9VA-MXWF.

[redacted] Plaintiff never challenged those factual determinations in court.

**E. Plaintiff Sues the Government and Ultimately Subpoenas Ms. Herridge to Uncover Ms. Herridge's Confidential National Security Sources**

Rather than challenging DOD's findings, Plaintiff sued several agencies under the Privacy Act seeking to have the federal government compensate her for the revenue she lost when DOD found UMT to be a national security threat and publicly announced that fact. She sought to blame her losses on an alleged leak of Privacy Act information to Ms. Herridge.

On June 16, 2022, Plaintiff served Ms. Herridge with subpoenas for documents and a deposition seeking to discover the confidential source(s) for Ms. Herridge's stories. Ms. Herridge moved to quash the subpoenas, invoking the First Amendment reporter's privilege and federal common law reporter's privilege. *See* ECF No. 94-1. On August 1, 2023, the Court denied Ms. Herridge's motion to quash and held that Ms. Herridge should be required to reveal her confidential national security source(s). ECF No. 140 ("Disclosure Order").

**F. Ms. Herridge Is Deposed and Declines to Reveal Her Confidential Source(s)**

On September 26, 2023, Plaintiff deposed Ms. Herridge. When Plaintiff's counsel asked Ms. Herridge to identify her confidential source(s), Ms. Herridge made clear that she fully respected the Court's order and had no wish to defy it, but that the Court's rulings left her with no other alternative to secure appellate review of her rights. As she stated:

> I have complete respect for the court and its authority and for the order. I have no desire to defy a court order, but my understanding is that the courts have ruled that in order to seek further judicial review, I must now disobey the order, and for that reason, among others, I am invoking my First Amendment rights and declining to answer the question.

Deposition of Catherine V. Herridge at 19:17-20:13, ECF No. 176-7.

In addition, Ms. Herridge explained particular concerns that reinforced her reasons for asserting privilege to secure appellate review. Ms. Herridge explained that, based on the information in her published stories and DOD's public decision to terminate Plaintiff's university from tuition assistance on national security grounds,[6] she believed that Plaintiff was a colonel in the PLA and that Plaintiff had been engaged in espionage. *Id.* at 220:6-12. Ms. Herridge does not want to provide any additional information about U.S. government personnel who may have been involved in a counterintelligence investigation to a person whom DOD publicly announced was a national security risk.

### G. The Court's Contempt Order and Subsequent History

Following the deposition, Plaintiff filed a motion seeking to have Ms. Herridge held in contempt. Just as she does now, Plaintiff asked the Court to impose escalating fines, ending at $5,000 per day. Contempt Mot. at 19, ECF No. 179. Plaintiff also asked the Court to forbid Ms. Herridge from accepting any third-party funds. The Court denied both requests and set a fine of $800 per day. Contempt Order at 21. In the same Order, the Court stayed the fine "until completion of proceedings on a timely appeal." *Id.* at 24. The Court explained that Ms. Herridge should be permitted to litigate her First Amendment claims "to the hilt" before sanctions started and that, with First Amendment rights, "it is better to be safe than sorry." *Id.* at 23.

Ms. Herridge appealed. On September 30, 2025, a panel of the D.C. Circuit affirmed, holding that the reporter's privilege must give way if (i) the source's identity is central to the plaintiff's claim and (ii) the plaintiff has exhausted other means of discovery. *Chen v. FBI*, 153 F.4th 1289, 1294–95 (D.C. Cir. 2025). On May 22, 2025, the court of appeals denied rehearing

---

[6] Ms. Herridge has not signed the Protective Order in this case and thus has not seen the details [redacted]

and rehearing en banc. *Chen v. FBI*, No. 24-5050 (D.C. Cir. May 22, 2026), Nos. 2174732, 2174732. Ms. Herridge then sought a stay of the mandate from both the D.C. Circuit and the U.S. Supreme Court, but the motions were denied. *Chen v. FBI*, No. 24-5050 (D.C. Cir. June 23, 2026), No. 2180022; Order, *Herridge v. Chen*, No. 25A1448 (U.S. July 2, 2026). Justice Kavanaugh noted he would have granted the stay.

The mandate issued from the court of appeals on July 7, 2026. The same day, counsel for Plaintiff contacted counsel for Ms. Herridge about scheduling a deposition, and counsel agreed to meet and confer. In a telephone conference on July 10, to avoid the expense of an unnecessary deposition, counsel for Ms. Herridge offered to provide Plaintiff with a declaration from Ms. Herridge stating that Ms. Herridge would continue to decline to identify her source(s) at least until the Supreme Court has had an opportunity to rule on her forthcoming petition for certiorari. Counsel for Plaintiff indicated that such an approach was likely acceptable, but that Plaintiff would want to have the declaration provided soon in order to "get the ticker started" on contempt fines. After providing a draft of a declaration to Plaintiff's counsel to ensure that the content of the declaration would be satisfactory to Plaintiff (and would obviate the need for a deposition), counsel for Ms. Herridge provided Plaintiff's counsel with the final declaration on July 20.

Ms. Herridge's declaration explains that Ms. Herridge would continue to decline to identify her source(s) at least until the Supreme Court has had an opportunity to rule on her forthcoming petition for certiorari. ECF 203-2. As Ms. Herridge explained, she is not willing to moot her request for review by disclosing her confidential source(s) while review in the Supreme Court remains available. *See id.* The same day, Ms. Herridge wrote and mailed her first check for the $800 daily fine imposed by the Court.

Also on the same day, less than two weeks after the mandate issued from the court of appeals and while Ms. Herridge's timely appeals have not yet been exhausted, Plaintiff filed a motion again asking the Court to impose the same terms the Court previously rejected—namely, increasing the fine up to $5,000 per day and barring Ms. Herridge from accepting any funds from third parties to support those payments.

## ARGUMENT

### I. The Court Should Clarify that Its Order Stayed Contempt Fines Through Timely Direct Appeals, Including Ms. Herridge's Forthcoming Petition for Certiorari or, in the Alternative, Should Modify the Stay.

Ms. Herridge respectfully requests that the Court clarify the duration of the stay the Court intended to establish when it stayed its order through "completion of proceedings on a timely appeal." Contempt Order at 24. Out of an abundance of caution, Ms. Herridge has interpreted that language to mean that contempt fines would begin to accrue if, after the D.C. Circuit issued its mandate and proceedings resumed in this Court, she continued to refuse to disclose her source(s). Accordingly, she sought stays of the mandate from both the D.C. Circuit and the Supreme Court based on that interpretation. *See generally* Mot. to Stay Mandate, *Chen v. FBI*, No. 24-5050 (D.C. Cir. May 28, 2026); *Herridge v. Chen*, No. 25A1448 (U.S. 2026).

Ms. Herridge believes, however, that the order is ambiguous as to whether the Court intended to stay fines only through the completion of the first level of appellate review in the court of appeals or through the completion of *all* timely direct appeals, including a ruling on Ms. Herridge's forthcoming petition for certiorari seeking review in the Supreme Court. That ambiguity is heightened by the Court's stated rationale for entering the stay—namely, that "it is better to be safe than sorry when it comes to First Amendment rights" and that Ms. Herridge should be able to "litigate her First Amendment claim to the hilt" before contempt sanctions begin.

Contempt Order at 23. Ms. Herridge has not yet litigated her First Amendment claims "to the hilt," because she has not yet submitted her petition for a writ of certiorari.

Ms. Herridge intends to file a petition for certiorari on or before the August 20, 2026 deadline. Accordingly, Ms. Herridge respectfully asks the Court to clarify whether the stay announced in the February 29 Order extends through the filing and disposition of Ms. Herridge's forthcoming petition for a writ of certiorari.

Alternatively, Ms. Herridge respectfully asks the Court to extend the stay until the Supreme Court has ruled on her forthcoming petition for certiorari. The Court was correct in holding that Ms. Herridge should be able "to litigate her First Amendment claim to the hilt" before sanctions are imposed, and that will not happen until the Supreme Court has ruled upon her petition.

For all the reasons the Court identified in its original order, Ms. Herridge would suffer irreparable harm if she is forced to disclose her source(s) before the Supreme Court has ruled on her petition. Contempt Order at 21–23. As the Court explained, "absent a stay [pending review], Herridge would have to choose between disclosing her source's identity—a decision that is, by its very nature, irreparable—or face possible financial hardship by racking up potentially hundreds of thousands of dollars of fines in the interim." *Id.* at 22 (quotation omitted). In addition, the balance of equities continues to favor a stay. The current stay has been in place for over two and half years. Continuing the stay at this point for three more months to allow the Supreme Court to address Ms. Herridge's petition for certiorari will not cause any material prejudice to Plaintiff, and Ms. Herridge should not be subject to crippling fines while her direct appeals are still under way. The same analysis on these points that the Court applied in staying the Order in the first place still applies now.

To the extent Plaintiff argues that Ms. Herridge cannot show that her petition for certiorari is likely to succeed in light of the Supreme Court's denial of her emergency application to stay the mandate, likely success is not necessary. Under the sliding scale approach, where, as here, irreparable harm is certain and great, a serious question on the merits is all that is required. *See, e.g.*, *Philipp v. Federal Republic of Germany*, 436 F. Supp. 3d 61, 66 (D.D.C. 2020); *Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 12 (D.D.C. 2014). Ms. Herridge's petition will certainly present a substantial constitutional question, and in light of the other factors overwhelmingly favoring a stay, that is sufficient to warrant continuing the Court's stay until the Supreme Court has ruled on Ms. Herridge's forthcoming petition.

Indeed, in *Philipp*, the district court entered a stay in an almost identical procedural posture. The district court had rejected the defendant's motion to dismiss on foreign sovereign immunity grounds, and the D.C. Circuit affirmed on appeal. 436 F. Supp. 3d at 64. The D.C. Circuit denied rehearing and also denied a motion to stay its mandate. *Id.* The Supreme Court also rejected a motion to stay.[7] *Id.* Recognizing, however, that the defendant's petition for certiorari presented a substantial legal question and that there would be no harm to the other parties from staying the case until the Supreme Court had resolved the petition, the district court entered a stay. *Id.* at 70. The same outcome is warranted here. Whether cast as a stay of the contempt order or simply a stay of all proceedings in this case, a pause that postpones the burden of contempt fines until Ms. Herridge's petition for certiorari has been addressed is plainly warranted. *Cf. Chinaryan v. City*

[7] The Supreme Court's order also noted that it was "without prejudice to petitioners filing a new application after seeking relief in the district court," *id.* at 64, but that was not critical to the outcome in *Philipp*. The Supreme Court's order declining to stay the mandate from the D.C. Circuit in this case implies no judgment on this Court's inherent authority to stay its own order—or stay proceedings entirely as a matter of managing the court's docket—until the Supreme Court has an opportunity to rule on Ms. Herridge's petition for certiorari.

*of Los Angeles*, 122 F.4th 823, 825 (9th Cir. 2024) (noting that the district court possesses "inherent authority to stay federal proceedings pursuant to its docket management powers," including a stay pending disposition of a petition for writ of certiorari).

## II. The Court Should Reject Plaintiff's Request to Increase the Contempt Fines and Prohibit Support from Third Parties.

The Court should reject Plaintiff's motion asking the Court to enter a new, appealable order to both (i) increase the daily fines imposed on Ms. Herridge and (ii) prohibit Ms. Herridge from receiving any funds from third parties to pay the fines. It would be wholly at odds with the Court's holding that Ms. Herridge should be permitted to "litigate her First Amendment claim to the hilt," Contempt Order at 23, to begin increasing fines *now*, before Ms. Herridge has exhausted her direct appeals by filing a petition for certiorari. Such an approach would also be particularly misplaced because, as Ms. Herridge makes clear in her declaration, at this point she has decided *only* that she cannot renege on her promise to keep her source(s) confidential—and cannot moot her own case—while she still has available an avenue for direct appellate review. ECF 203-2 ¶6. After the Supreme Court has ruled on her petition for certiorari, if certiorari is denied, Ms. Herridge will face another decision point. With all avenues for judicial review exhausted, she may reconsider her position. But as the Court recognized in its original order, she should at least be allowed pursue all avenues for direct review. Under Plaintiff's proposed fine increases, Ms. Herridge would have to pay over $380,000 in fines[8]—an amount greater than her expected income—simply to preserve her right to present a petition for certiorari to the Supreme Court. Decl. of Catherine V. Herridge

[8] Briefing on this motion will be complete on August 24. If the Court were to order the proposed fine increases the next day, Ms. Herridge would be required to pay $800 a day from July 8 through August 25; $1,500 a day from August 25–31; and $5,000 a day from September 1 through November 6, the day of the conference at which the Supreme Court would likely rule on a timely petition for certiorari.

¶¶5–6, Ex. B. At this point, the only purpose for increasing the fines to that draconian level would be to crush Ms. Herridge, threatening her family with financial ruin, in order to force Ms. Herridge into dropping her request for further appellate review. The Court should not accept Plaintiff's invitation to coerce Ms. Herridge into abandoning her rights in that fashion and instead should postpone any consideration of increasing fines until *after* Ms. Herridge has exhausted avenues for direct appellate review.

In addition, Plaintiff's requests are wholly incompatible with the settled standards governing civil contempt fines—standards that Plaintiff fails to address in her motion. When setting a coercive civil contempt sanction, courts must consider: (1) "the character and magnitude of the harm threatened by" noncompliance; (2) "the probable effectiveness of any suggested sanction"; and (3) "the amount of the defendant's financial resources and the consequent seriousness of the burden to that particular defendant." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947). "The ultimate consideration is whether the coercive sanction . . . is reasonable in relation to the facts." *New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1353 (2d Cir. 1989). All three elements weigh against Plaintiff's requests in this case.

First, neither the character nor the magnitude of the harm threatened by Ms. Herridge's refusal to identify her confidential source(s), at least until her petition for certiorari has been ruled upon, justifies a larger fine or a bar on third-party funding at this point in time. To begin with, it bears emphasis that, at this point, Ms. Herridge has decided *only* that she must preserve the confidentiality of her source(s) until her forthcoming petition for certiorari has been addressed. The only harm threatened by Ms. Herridge taking that position is a delay of about three months until the Supreme Court rules on the petition. Given that this case has been pending for more than seven years and has effectively been stayed for more than two and a half years, a delay for an

additional three months at this point will not cause Plaintiff any material harm and certainly does not justify an increase in fines at this point.

Even putting that consideration to one side, to assess the "magnitude of the harm" caused by Ms. Herridge's refusal to identify her source(s)—and whether it warrants increasing daily fines to the astronomical levels suggested by Plaintiff—the Court necessarily must make a realistic assessment of the magnitude of Plaintiff's claims at stake in the case. That is the only way to ensure that any contempt sanction "is reasonable in relation to the facts." *New York State Nat'l Org. for Women*, 886 F.2d at 1353. As Ms. Herridge has explained, however, Plaintiff does not realistically stand to recover anything—or at most very little—on her Privacy Act claims, which are largely based on a single photograph of Plaintiff in her PLA colonel's uniform. Herridge Mot. to Quash at 27–28, ECF No. 96-1; Herridge Reply ISO Mot. to Quash at 13–16 & n.7, ECF No. 129. In fact, the D.C. Circuit decided this case on the assumption that Plaintiff may not be entitled to any recovery beyond $1,000 in statutory damages. *Chen v. Fed. Bureau of Investigation*, 153 F.4th 1289, 1294 (D.C. Cir. 2025). Ms. Herridge has already paid eight times that amount in contempt fines—more than the probable value of the entire case. A further increase would necessarily be "disproportionate" and "unreasonable" in relation to the needs of the case and cannot be justified. *In re Fannie Mae Sec. Litig.*, 552 F.3d 814, 823–24 (D.C. Cir. 2009).

Ms. Herridge has explained the reasons that Plaintiff faces zero or, at best, minimal recovery. All or almost all of the damages that Plaintiff seeks arose from DOD's decision to terminate UMT from its tuition assistance program and to publicly announce that action was taken "on national security grounds." *See* ECF No. 1 ¶¶42, 55, 56. DOD based that decision on a series of independent factual findings that Plaintiff never challenged. DOD found that [redacted]

[redacted] Based on those findings, DOD terminated UMT based "on national security grounds." *Id.* at A1.

For a host of reasons, Plaintiff cannot recover damages in this Privacy Act suit for that independent decision by DOD. To start with, Plaintiff cannot prove causation. Here, the record discloses an independent, supervening cause that created Plaintiff's losses: the government's investigation and decision to terminate her funding because she was a national security threat. That was a supervening cause breaking the chain of causation between Ms. Herridge's reporting and Plaintiff's damages.[9] To overcome this hurdle, Plaintiff would need to present evidence that the government did not rely on its own fact finding and instead terminated Plaintiff's funding because of the leak to Ms. Herridge. *See, e.g.*, *Hand v. Gary*, 838 F.2d 1420, 1428 (5th Cir. 1988) ("An independent intermediary breaks the chain of causation unless it can be shown that the deliberations of that intermediary were in some way tainted ….").[10]

But even entertaining an argument along those lines would raise a further fatal problem: the agency decision is entitled to a presumption of regularity and cannot be collaterally attacked in this Privacy Act suit. *See, e.g.*, *Kleiman v. Dep't of Energy*, 956 F.2d 335, 337–38 (D.C. Cir.

[9] *See, e.g.*, *Mideast Sys. & China Civ. Constr. Saipan Joint Venture v. Hodel*, 792 F.2d 1172, 1177-78 (D.C. Cir. 1986); *Alemu v. Dep't of For-Hire Vehicles*, 327 F. Supp. 3d 29, 52 (D.D.C. 2018); *Hotel Oakland Assocs. v. Doyle Real Est. Advisors, LLC*, No. 21-cv-05389-SK, 2022 WL 1493267, at *10 (N.D. Cal. May 3, 2022).

[10] *See also, e.g.*, *Galen v. Cnty. of Los Angeles*, 477 F.3d 652, 663 (9th Cir. 2007) ("Pursuant to traditional tort law principles of causation, … a judicial officer's exercise of independent judgment in the course of his official duties is a superseding cause that breaks the chain of causation ….").

1992) (the Privacy Act "is not, however, a vehicle for amending the *judgments* of federal officials" (emphasis in original; quotation omitted)); *Douglas v. Agric. Stabilization & Conservation Serv.*, 33 F.3d 784, 785 (7th Cir. 1994) (explaining that the "Privacy Act does not authorize relitigation of the substance of agency decisions"); *Leib v. Veterans Admin.*, 546 F. Supp. 758, 762 (D.D.C. 1982) ("The Privacy Act was not intended to be and should not be allowed to become a backdoor mechanism to subvert the finality of agency determinations." (quotation omitted)).

The Court has previously pointed to Plaintiff's claim for amounts expended on consulting fees and "reputation management services" as distinct damages that Plaintiff may recover, Disclosure Order at 22–23, but those categories of damages do not change the calculus. Those damages also resulted from public information in the Articles and/or DOD's actions, not from any Privacy Act violation tied to a few photographs. Almost all of the information in the Articles—including that Plaintiff was a colonel in the PLA, that she lied about it on her immigration forms, that she lied about it to the FBI, that she instructed an employee to also lie to the FBI, that she operated a school catering to military personnel, that the school was collecting large amounts of servicemember data, and that the school was making that information available in China—was either public information or originated in on-camera interviews with a whistleblower from her school. Moreover, DOD subsequently publicly announced that it was cutting off taxpayer funding for Plaintiff and her school on "national security grounds." *That* was the action that squarely damaged Plaintiff's reputation and allegedly required her to get reputation remediation services. The only alleged Privacy Act information Plaintiff has been able to identify in the Articles consisted of background images of Plaintiff in her PLA uniform and images of her immigration forms and FBI interview papers. Plaintiff cannot establish any distinct damages or need for reputation remediation attributable to those images. Whatever costs Plaintiff incurred to address

reputational injuries were entirely caused by public information and DOD's announcement that Plaintiff was a national security threat—not by a handful of images included in the Articles.

Second, an increased fine would not have any "probable effectiveness" at this time. *United Mine Workers of Am.*, 330 U.S. at 304. As Ms. Herridge explained in her declaration, she is not willing to moot her forthcoming petition for certiorari by identifying her source(s) before the Supreme Court has a chance to rule on her petition. ECF 203-2 ¶6. Although Ms. Herridge fully respects the Court's authority in this matter, she also believes that she should be permitted to litigate her First Amendment claims "to the hilt," including by securing a ruling on her petition for a writ of certiorari. Her position on that principle will not change even if the daily fine were increased. An increased fine at this point would simply be punitive in nature—which is impermissible in this coercive civil contempt context. *Guantanamera Cigar Co. v. Corporacion Habanos, S.A.*, 750 F. Supp. 2d 31, 34 (D.D.C. 2010).

Third, the proposed fines would be grossly excessive in relation to Ms. Herridge's "financial resources and the consequent seriousness of the burden" imposed on Ms. Herridge. *United Mine Workers of Am.*, 330 U.S. at 304. Ms. Herridge is no longer employed by any media company and instead has been self-employed for more than two years. She could not afford to pay anything remotely approaching a $5,000-a-day fine if she were forced to pay without any support from third parties. Fines at that level equate to *more than $1.8 million per year*. Setting aside a one-time sale of assets to cover extraordinary expenses, Ms. Herridge's entire annual income last year was approximately $340,000. Ex. B ¶¶5–6. Thus, fines at that level would vastly exceed Ms. Herridge's entire daily income. *Cf. IBM v. United States*, 493 F.2d 112, 115–16 & n.2 (2d Cir. 1973) (coercive civil contempt fine not excessive where it amounted to less than 5% of corporation's daily earnings). As explained above, moreover, the fines suggested by Plaintiff

would require Ms. Herridge to pay more than $380,000 simply to preserve her ability to present a petition for certiorari to the Supreme Court. That is more than Ms. Herridge's expected annual income. Ex. B ¶¶5–6. A sanction at that level would "wreak ruinous financial consequences" on Ms. Herridge and thus is impermissible. *Citigroup Inc. v. Sayeg*, No. 21-10413, 2022 WL 1620298, at *3 (S.D.N.Y. May 23, 2022) (quotation omitted). Indeed, fines at that level, by exceeding Ms. Herridge's ability to pay, would improperly convert the court's sanction into a punitive measure. *Cf. CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 102 (2d Cir. 2016) ("The sheer size of the sanction is indicative of whether the sanction is intended to punish or to coerce a contemnor . . . .").

Finally, Plaintiff's request to bar Ms. Herridge from receiving funding from any third parties raises a host of issues that no court has ever fully addressed. Third parties who may wish to support Ms. Herridge financially as she pursues a petition for certiorari are at least arguably exercising their First Amendment rights. *Cf. McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 203 (2014) (explaining that political donations implicate both the right to free speech and to free association). Ms. Herridge, moreover, could exercise her First Amendment rights to speak or publish about this case in ways that directly generate financial support from third parties (income) intended to help defray the cost of the fines. The extent to which the Court could prohibit Ms. Herridge from generating financial support in that fashion is at least highly doubtful. The Court rightly avoided all these questions by declining to impose any bar on Ms. Herridge receiving support from third parties. And there is no warrant to reconsider that decision now, before Ms. Herridge has even exhausted her direct appeals.

To the best of undersigned counsel's knowledge, no federal court has ever successfully prohibited a journalist from receiving any source of funding to help defray the cost of a civil

contempt fine imposed for the journalist's refusal to identify a confidential source. Plaintiff points (Mot. at 7–8) to the order in *Hatfill v. Mukasey*, 539 F. Supp. 2d 96 (D.D.C. 2008), in which Judge Walton required a journalist to pay contempt fines personally without any third party support. But Plaintiff fails to tell the Court the most significant fact about that order—it was never put into effect. The D.C. Circuit stayed that order before the reporter had paid a dime, *Hatfill v. Mukasey*, No. 08-5049 (D.C. Cir. March 11, 2008) (per curiam), Doc. No. 1104546 (attached as Ex. C), and the case subsequently settled before the court of appeals ruled on the propriety of the order. Notice of Settlement, *Hatfill v. DOJ*, No. 1:03-cv-1793 (D.D.C. June 27, 2008), ECF No. 237; Mandate, *Hatfill v. DOJ*, No. 1:03-cv-1793 (D.D.C. Jan. 15, 2009), ECF No. 243; *see also Hatfill*, No. 08-5049 (D.C. Cir. Nov. 17, 2008), Doc. No. 1149629 (per curiam) (attached as Ex. D) (noting case raised "close questions under Fed. R. Evid. 501 and the First Amendment"). That order provides no persuasive precedent whatsoever. The other cases Plaintiff cites are irrelevant. They involved finite sanctions imposed on attorneys for litigation misconduct, turned in part on the court's "inherent power to discipline attorneys who appear before it," *Massachusetts Sch. of L. at Andover, Inc. v. Am. Bar Ass'n*, 914 F. Supp. 1172, 1179 (E.D. Pa. 1996), and required the attorneys to pay the fines rather than their clients or others. *See id; In re HMCA (Carolina), Inc.*, 301 B.R. 764, 773 (Bankr. D.P.R. 2003). Neither stands for the proposition that a court can broadly limit sources of financial support for a third-party witness journalist facing coercive civil contempt fines for refusing to disclose a confidential source.

## III. Assuming that the Stay Is No Longer in Effect, the Court Should Clarify that Fines Did Not Begin to Accrue Until July 20, 2026, when Ms. Herridge Submitted a Declaration Declining to Disclose Her Source(s) at this Time.

If the Court intends the contempt fines to accumulate pending Ms. Herridge's forthcoming petition for certiorari, Ms. Herridge respectfully requests that the Court clarify the exact date on which the fines began. Plaintiff's assertion that the fines automatically began the day after the

D.C. Circuit issued its mandate would mean that Ms. Herridge would be fined even during the time it would take to arrange a deposition if she intended to disclose her source(s). That approach does not make much sense, and Ms. Herridge has proceeded on the understanding that the fines began when she notified Plaintiff (in a form acceptable to Plaintiff to avoid the need for a deposition) that she would not disclose her source(s). As noted above, at the parties' meet and confer, it appeared that Plaintiff's counsel initially was operating under that understanding as well. At bottom, Ms. Herridge simply seeks clarification from the Court so that she may properly comply with the Court-ordered fines.

## IV. The Court Should Clarify Its Order to Allow Ms. Herridge to Pay any Fines in Batches of Three or Four Days at a Time.

If the Court holds that contempt fines should accumulate pending Ms. Herridge's exhaustion of her direct appeals, Ms. Herridge also respectfully requests that the Court instruct the Clerk's office to allow Ms. Herridge to pay any contempt sanctions (1) through electronic funds transfers, if feasible, and (2) in batches of three or four days at a time. The Clerk's office has indicated that, without instructions from the Court, it cannot approve any specific payment schedule. Out of an abundance of caution, Ms. Herridge has been submitting paper checks by mail on a daily basis to cover the cost of the sanction. Ms. Herridge submits that the monetary fines themselves provide the coercive sanction the Court intended and that it is not necessary for the functioning of the contempt sanction to require Ms. Herridge to fill out and physically mail a new check daily. Ms. Herridge respectfully requests that she not be faced with the threat of being accused of failing to comply with the Court's order if it is logistically difficult to physically get a check into a mailbox or the post office every single day. Permitting payments in batches of three or four days at a time will likely be more efficient for the Clerk's office processing the payments as well.

## CONCLUSION

The Court should (i) clarify that the Court's existing stay order extends through the Supreme Court's ruling on Ms. Herridge's forthcoming petition for certiorari or, alternatively, extend the stay through such a ruling; (ii) reject Plaintiff's request for increased fines and an order barring Ms. Herridge from receiving financial support from third parties to pay fines; (iii) if the Court's stay is not in effect, clarify the date on which the fines first began to accrue; and (iv) if the Court's stay is not in effect, permit Ms. Herridge to pay the fines in batches of three or four days at a time and, if feasible, through electronic funds transfers.

August 3, 2026

Respectfully submitted,

/s/ *Patrick F. Philbin*
Patrick F. Philbin
Kyle T. West
Chase T. Harrington
TORRIDON LAW PLLC
801 Seventeenth Street, N.W.
Suite 1100
Washington, DC 20006
(202) 249-6633
pphilbin@torridonlaw.com

*Counsel for Catherine V. Herridge*